KONRAD ALEXANDER STIMSON

3055 Saint Rose Pkwy, Box Number 777151

Henderson, NV 89052

Telephone: (406) 788-5165

E-mail: konrad.stimson@gmail.com

Plaintiff, Pro Se

**FILED**

FEB 12 2026

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

---

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

---

| | |
|---|---|
| **KONRAD ALEXANDER STIMSON,** | Case No.: 2:26 cv 0293 93 DJC-CKD (PS) |
| Plaintiff, | **CONSOLIDATED COMPLAINT FOR DAMAGES, DECLARATORY RELIEF, AND INJUNCTIVE RELIEF** |
| v. | **1.** Due Process Violations Under the Fifth and Fourteenth Amendments (Including Judicial Review of ASBE Action) |
| STATE OF CALIFORNIA, acting by and through CALIFORNIA COMMISSION ON TEACHER CREDENTIALING; MARY VIXIE SANDY, individually; AMY | **2.** Title IX Sex Discrimination and Retaliation (Including Wrongful Revocation, Child Endangerment, and False Claims) |

REISING, individually; ARTI
KUMAR, individually; THOMAS
AMEY, individually; DOES 1-50;

ARIZONA STATE BOARD OF          **3.** Conspiracy to Deprive Civil Rights
EDUCATION; GARNETT BURNS,
individually; KATHERINE HALEY,
individually; SUSAN WILLIAMS,
individually; DOES 51-100,

Defendants.                     **JURY TRIAL DEMANDED**

## I. INTRODUCTION

1. COMES NOW Plaintiff Konrad Alexander Stimson, proceeding pro se, and files this Consolidated Complaint for Damages against Defendants California Commission on Teacher Credentialing ("CTC") and Arizona State Board of Education ("ASBE") (collectively "Defendants").

2. Plaintiff is a male special education teacher who served students with severe disabilities including autism, intellectual disability, and emotional disturbance. Plaintiff held an Intern Moderate Severe Education Specialist Instruction Credential issued by the California Commission on Teacher Credentialing when he was employed by Milpitas Unified School District ("MUSD").

3. Plaintiff currently holds Arizona teaching certificates: (a) Standard Professional Elementary, K-8 Certificate; (b) Standard Professional Middle Grades, 5-9 Certificate; (c) Standard Professional Mild/Moderate Special Education, K-12 Certificate—each valid through August 9, 2036.

4. On December 8, 2025, the Arizona State Board of Education voted to revoke Plaintiff's Arizona educator certificates based solely on a California discipline action that was itself the product of sex discrimination, due process violations, and evidence tampering.

5. This case exposes a three-agency conspiracy in which MILPITAS UNIFIED SCHOOL DISTRICT ("MUSD") manufactured pretextual grounds to terminate Plaintiff, the CALIFORNIA COMMISSION ON TEACHER CREDENTIALING ("CTC") revoked his California credentials without due process, and the ARIZONA STATE BOARD OF EDUCATION ("ASBE") rubber-stamped revocation of his Arizona credentials based solely on CTC's unconstitutional action—all because Plaintiff, a male teacher, refused to allow unlicensed female staff to illegally perform his credentialed duties.

6. The agencies' actions constitute sex discrimination, retaliation for protected activity, violations of constitutional due process, conspiracy to deprive Plaintiff of civil rights, and violations of federal education laws including FERPA, IDEA, and Section 504.

7. This is a civil action for damages arising from Defendants' unlawful employment discrimination, retaliation, and breach of contract. Plaintiff, a dedicated special education teacher working with students with severe disabilities, suffered catastrophic harm when Defendants engaged in a coordinated scheme to destroy his teaching career as whistleblower. This created an impossible Catch-22: Plaintiff's credential was revoked based on claims he was 'unfit to teach,' but the only way to demonstrate fitness to teach is by teaching—which he cannot do without a credential. The result is career destruction without any path to rehabilitation, proving the agencies' goal was punishment, not public protection.

## II. JURISDICTION AND VENUE

8. This Court has original jurisdiction over the federal claims pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343 (civil rights jurisdiction).

9. This Court has supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367.

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this District, including the California Commission on Teacher Credentialing's actions in Sacramento, California.

11. This Court has the authority to grant declaratory relief under 28 U.S.C. §§ 2201-2202 and injunctive relief under its general equitable powers.

## III. PARTIES

A. PLAINTIFF

12. Plaintiff KONRAD ALEXANDER STIMSON is an individual residing in Henderson, Nevada. At all relevant times, Plaintiff was a licensed special education teacher holding valid credentials from both the California Commission on Teacher Credentialing and the Arizona State Board of Education. Plaintiff is designated by Educator Identification No. 772-0079 in the records of the Arizona Department of Education.

B. CALIFORNIA DEFENDANT

13. Defendant CALIFORNIA COMMISSION ON TEACHER CREDENTIALING ("CTC") is a state agency responsible for licensing and regulating teachers in California, located at 1900 Capitol Avenue, Sacramento, California 95811. CTC receives approximately $33.3

million in federal financial assistance and is subject to Title IX sex discrimination, retaliation, and other federal civil rights laws.

14. MARY VIXIE SANDY is and at all relevant times was the Executive Director of CTC. She is named as an agent of CTC whose actions are attributable to the agency.

15. THOMAS AMEY is and at all relevant times was the Legal Analyst at CTC. He is named as an agent of CTC whose actions are attributable to the agency.

16. AMY REISING is and at all relevant times was a Deputy General Counsel at CTC. She is named as an agent of CTC whose actions are attributable to the agency.

17. ARTI KUMAR is and at all relevant times was a staff member at CTC involved in credentialing decisions. This person is named as an agent of CTC whose actions are attributable to the agency.

18.

## C. ARIZONA DEFENDANT

19. Defendant ARIZONA STATE BOARD OF EDUCATION ("ASBE") is a state agency responsible for licensing and regulating teachers in Arizona, located at 1700 W. Washington Street, Executive Tower, Suite 300, Phoenix, Arizona 85007. ASBE receives over $118 million in federal education funding annually and is subject to Title IX and other federal civil rights laws.

20. GARNETT BURNS is and at all relevant times was the Director of the Investigation Unit at ASBE. This person is named as an agent of ASBE whose actions are attributable to the agency.

21. KATHERINE HALEY is and at all relevant times was a member of the board and decision maker for Plaintiff's case at ASBE. This person is named as an agent of ASBE whose actions are attributable to the agency.

22. SUSAN WILLIAMS is and at all relevant times was the Hearing Officer who presided over the October 14, 2025 PPAC hearing. This person is named as an agent of ASBE whose actions are attributable to the agency.

23.

---

## IV. ADMINISTRATIVE EXHAUSTION AND TIMELINESS

24. Plaintiff has exhausted all required administrative remedies.

25. Plaintiff filed charges of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the California Civil Rights Department ("CRD").

26. The EEOC issued Right to Sue Notices: EEOC Charge No. 555-2025-01544 and EEOC Charge No. 540-2025-04726.

27. The California Civil Rights Department issued a Right to Sue Notice: CRD Case No. 202501-27934530.

28. This action is timely filed within 90 days of receipt of the Right to Sue Notices.

29. With respect to the Arizona State Board of Education, Plaintiff exhausted administrative remedies before ASBE, including participating in the October 14, 2025 PPAC hearing and filing a Motion for Rehearing.

30. On December 8, 2025, the Arizona State Board of Education voted to revoke Plaintiff's Arizona educator certificates.

31. Plaintiff timely filed a Motion for Rehearing on December 20, 2025, within 30 days of the Board's decision as required by A.R.S. § 41-1092.09.

32. The State, through the Attorney General's Education and Health Section, filed an Objection to Plaintiff's Motion for Rehearing on January 6, 2026.

33. The State sent notice that a review for rehearing by ASBE on February 23, 2026; this came after the deemed-final date January 19, 2026, and Plaintiff has lost faith in a fair and unbiased evaluation based on evidence from December 8, 2025.

34. The Board failed to rule on the Motion for Rehearing within 30 days. Pursuant to A.R.S. § 41-1092.09(B), the Motion for Rehearing was deemed denied by operation of law on January 19, 2026. And, only after Plaintiff received the EEOC right to sue was this decision offered. The dates on documents support timeline.

35. This appears to be consistent with CTC and Arizona Board that Plaintiff is provided a right to sue by CRD to pursue legal action against MUSD with prelitigation and 10 days later CTC offers a meeting Feb 13, 2026.

## V. THE LEGAL IMPOSSIBILITY: WHY PLAINTIFF COULD NOT COMPLY

A. The Impossible Choice MUSD Created

36. MUSD created an impossible legal situation. MUSD denied IEP system access to unlicensed female staff (correctly recognizing they lacked legitimate educational interest under FERPA), but then demanded Plaintiff allow them to perform teaching duties requiring IEP knowledge.

37. This created only two options—both illegal:

- **OPTION 1:** Plaintiff verbally shares IEP information with staff who have no SEIS access → FERPA violation (unauthorized disclosure)

- **OPTION 2:** Staff perform duties without IEP knowledge → IDEA violation (services without qualified personnel), Section 504 violation (inadequate supervision), potential criminal liability under California Education Code Section 44258.2

- **EITHER WAY:** Plaintiff, as teacher of record and case manager, would be personally liable

B. Specific Duties MUSD Demanded Unlicensed Staff Perform

38. MUSD pressured Plaintiff to allow unlicensed female staff to:

(a) CREATE NEW IEP GOALS: Under 34 C.F.R. Section 300.320, IEP goals must be developed by qualified professionals. Unlicensed staff are not qualified professionals, and these staff had no access to student records needed to develop appropriate goals.

(b) CONDUCT IEP ASSESSMENTS: Under 34 C.F.R. Section 300.304(c)(1)(iv), assessments must be "administered by trained and knowledgeable personnel." Assessments administered by unqualified personnel are INVALID.

(c) SUPERVISE NEW WALKING GOALS AND TRANSITIONS: Students with autism and intellectual disabilities had documented elopement risks. Staff without IEP access had NONE of this information.

(d) IMPLEMENT NEW IEP BEHAVIORAL INTERVENTION PLANS (BIPs): Only qualified personnel who have reviewed the IEP and BIP can implement behavioral interventions.

C. Criminal Liability Plaintiff Would Have Faced If He Complied

39. Had Plaintiff complied with MUSD's demands to allow unlicensed staff to perform teaching duties, PLAINTIFF would have faced criminal liability under:

(a) **California Education Code Section 44258.2**: Allowing unlicensed persons to perform teaching duties is a **MISDEMEANOR**. As teacher of record, Plaintiff would have been criminally liable for permitting unauthorized individuals to perform credentialed duties.

(b) **Professional License Jeopardy**: Knowingly allowing unqualified individuals to provide special education services violates the CTC Code of Professional Conduct and would independently justify credential revocation.

(c) **Civil Liability for Student Harm**: Had a student been injured during improperly supervised activities, Plaintiff—as the teacher of record who permitted the arrangement—would face personal civil liability for negligence.

40. Plaintiff's refusal to allow unlicensed staff to perform his duties was not "misconduct"— it was LEGALLY REQUIRED CONDUCT to avoid personal criminal, professional, and civil liability.

---

## VI. PARENT CONCERNS, ELOPEMENT SAFETY, AND WALKING SUPERVISION

A. Documented Parent Safety Concerns

41. Parents of students in Plaintiff's classroom had serious safety concerns:

(a) ELOPEMENT FREQUENCY: Multiple students had documented histories of leaving supervised areas without permission. Elopement is life-threatening for students with autism.

(b) ACCIDENTS AND INJURIES: Previous incidents during elopement events resulted in student injuries, including one emergency room visit.

(c) ONE-ON-ONE SUPERVISION NEEDS: Several students required one-on-one supervision per their IEPs during transitions.

(d) WALKING ACTIVITY CONCERNS: Transitions and walking triggered elopement behaviors in multiple students.

B. IEP Legal Requirements for Safety

42. Federal law mandates specific safety requirements for students with elopement behaviors:

(a) IDEA Section 1414(d)(3)(B)(i): The IEP team must consider positive behavioral interventions and supports.

(b) 34 C.F.R. Section 300.320(a)(4): The IEP must include supplementary aids and services including safety supports.

(c) 34 C.F.R. Section 300.324(a)(2)(i): The IEP team must consider parent concerns about elopement and safety.

C. Walking as Non-Delegable Teacher Duty

43. Walking students to/from locations was NOT a delegable task because it required:

(a) BEHAVIORAL OBSERVATION: Critical for monitoring IEP goals and documenting data

(b) SAFETY ASSESSMENT: Ongoing evaluation of environmental hazards and student responses

(c) CRISIS INTERVENTION: Immediate application of behavior intervention plans requiring IEP knowledge

(d) LEGAL ACCOUNTABILITY: As teacher of record, Plaintiff remained legally responsible

---

## VII. FACTUAL ALLEGATIONS

A. Plaintiff's Background and Credentials

44. At the time of the incidents giving rise to this action, Plaintiff held an Intern Moderate Severe Education Specialist Instruction Credential issued by the California Commission on Teacher Credentialing (Document No. 210179652), issued July 29, 2021, and valid through August 1, 2023.

45. In or about October 2021, Plaintiff was hired by MUSD as a special education teacher to work in the District's post-secondary education program serving students aged 18-22 with autism and severe developmental disabilities (the "Moderate/Severe Program").

46. Prior to his employment with MUSD, Plaintiff invested approximately $15,000 to $19,000 in completing coursework and training for his Moderate/Severe Education Specialist credential program through National University.

B. MUSD's Failure to Provide Required Mentor Support

47. An Intern Education Specialist Instruction Credential is a preliminary teaching credential that requires the employing school district to provide:

(a) A qualified mentor teacher with appropriate experience and credentials;

(b) Regular guidance, support, and supervision from the mentor;

(c) Professional development and training in district policies and procedures;

(d) Ongoing assessment and feedback regarding teaching performance; and

(e) Support in completing credential program requirements.

48. California Education Code section 44454(a) and Title 5 of the California Code of Regulations section 80027(e) impose mandatory requirements on school districts that employ intern teachers.

49. MUSD had actual knowledge of Plaintiff's intern status at the time of hiring and throughout Plaintiff's employment.

50. Plaintiff's employment with MUSD was expressly conditioned upon the District's legal obligation to provide the required mentorship and support for intern teachers.

51. At no time during Plaintiff's employment with MUSD was Plaintiff assigned a qualified mentor teacher as required by his intern credential and California law.

52. Throughout his employment, Plaintiff repeatedly requested mentor support from MUSD administrators and supervisors. Plaintiff's requests were ignored, dismissed, or deflected.

53. When Plaintiff raised concerns about the lack of mentor support, MUSD administrators blamed Plaintiff for "breakdown in communication" and "not knowing policies," despite MUSD's failure to provide the legally mandated mentorship.

54. MUSD's failure to provide a mentor was not an inadvertent oversight. MUSD had actual knowledge of Plaintiff's intern status and consciously chose not to fulfill this obligation.

55. MUSD's failure to provide a mentor was a direct and proximate cause of the alleged policy violations that led to Plaintiff's discipline and termination.

56. MUSD's subsequent discipline and termination of Plaintiff for alleged policy violations—after failing to provide the legally required mentor—constitutes breach of contract and bad faith dealing.

C. Classroom Duties and Professional Practices

57. As the special education teacher for the Moderate/Severe Program, Plaintiff's duties included developing and implementing Individualized Education Programs (IEPs); providing specialized instruction; supervising students during classroom activities, transitions, and community-based instruction; implementing positive behavior supports; collecting data on student progress; communicating with parents; and ensuring student safety at all times. Every category of conduct cited by MUSD and CTC was legally required, not prohibited: (1) Walking with students was required by IEP goals specifically addressing elopement behaviors—structured walking interventions were mandated as therapeutic responses to elopement risk; (2) Physical contact was required by MUSD's mandatory CPI (Crisis Prevention Intervention) training—Plaintiff was using MUSD-mandated techniques; (3) Video recording was required for conducting a federally-mandated IEP triennial assessment under IDEA, 34 C.F.R. § 300.303. MUSD and CTC cannot credibly claim Plaintiff's conduct was 'immoral' when that conduct was mandated by federal law (IDEA), students' IEPs, and MUSD's own required training protocols.

58. Plaintiff received training in Crisis Prevention Institute (CPI) techniques, which provide evidence-based methods for preventing and managing challenging behaviors in students with disabilities.

59. In his work with students with severe disabilities, Plaintiff utilized a range of evidence-based instructional strategies consistent with his training and professional standards.

D. The November 2021 Student Hospitalization Incident

60. In or about November 2021, a male student ('N.E.M.') was seriously injured during a community outing while under the direct supervision of a one-on-one aide (not Plaintiff). N.E.M. was hospitalized and required surgery, nearly losing his hand.

61. Following this incident, Plaintiff raised concerns with MUSD administration about student safety, inadequate staffing, staff training, insufficient supervision 1:1 protocols, and the lack of mentor support for intern teachers.

62. These concerns constituted protected activity under California and federal law.

63. Rather than addressing the systemic safety issues Plaintiff identified, MUSD administration began targeting Plaintiff for increased scrutiny and eventual discipline.

64. The sequence of events—Plaintiff raising safety concerns followed by Plaintiff being targeted for discipline—constitutes a pattern of unlawful retaliation.

E. The May 20, 2022 Letter of Reprimand: A Manufactured Pretext

65. On or about May 20, 2022, MUSD issued Plaintiff a Letter of Reprimand that deliberately distorted standard special education practices to create false allegations of misconduct.

66. ALLEGATION 1 - "GRABBING STUDENT'S ARM": The reprimand alleged Plaintiff "grabbed" a female student's arm. THE TRUTH: This was a standard CPI physical prompt—a foundational technique in special education. The physical contact described consisted entirely of appropriate Crisis Prevention Institute (CPI) techniques and supportive physical prompts. MUSD's own training materials depict educators using these exact techniques.

67. ALLEGATION 2 - "WALKING ALONE WITH FEMALE STUDENTS": The reprimand characterized Plaintiff walking with students during educational activities as improper conduct. THE TRUTH: Walking with students was part of Plaintiff's explicitly assigned job duties. The walks were structured educational interventions addressing specific student needs documented in IEPs, including research-based programs for elopement behaviors. Plaintiff maintained date- and time-stamped documentation.

68. ALLEGATION 3 - "SITTING ALONE IN A ROOM WITH STUDENTS": The reprimand alleged Plaintiff sat alone with students during classroom activities. THE TRUTH: Moderate/Severe special education inherently involves intensive, individualized instruction.

69. ALLEGATION 4 - "EATING LUNCH WITH STUDENTS": The reprimand characterized Plaintiff eating meals with students as inappropriate conduct. THE TRUTH: Meal supervision and eating with students is a standard and often required duty.

70. ALLEGATION 5 - "VIDEO RECORDING": The reprimand alleged Plaintiff "was caught video recording a student." THE TRUTH: The video recording was conducted as part of Plaintiff's required educational assessment responsibilities. Video modeling and video-based assessment are evidence-based practices explicitly recommended by AFIRM and other autism education resources. MUSD staff, including Plaintiff's supervisors, themselves used video recording and video modeling as instructional techniques. The recording occurred in an open computer lab during school hours as part of documented educational assessment activities.

71. As teacher of record and case manager, Plaintiff could not assign his teacher duties to another staff for which the school district did not provide IEP access.

F. Summary of Reprimand Deficiencies

72. Each of the allegations in the Letter of Reprimand falsely characterized standard, evidence-based special education practices as misconduct.

73. The Letter of Reprimand emphasized Plaintiff's gender (male) and the students' gender (female), including repeated references to "female students" and focusing on Plaintiff being "alone" with students.

74. The Letter of Reprimand did not acknowledge or reference:

(a) Plaintiff's intern credential status or MUSD's failure to provide required mentorship;

(b) The educational and behavioral justifications for Plaintiff's teaching practices;

(c) Plaintiff's CPI training and certification;

(d) The research-based nature of Plaintiff's interventions;

(e) The IEP-related purposes of student assessments and interventions;

(f) MUSD's own training materials depicting identical techniques;

(g) Parent communications supporting Plaintiff's interventions; or

(h) The fact that female teachers routinely engaged in identical practices without discipline. The sex discrimination is stark: Plaintiff, a LICENSED male teacher with CPI certification and IEP training, was terminated and had his credential revoked. Meanwhile, UNLICENSED female Transitional Assistants who performed identical conduct (taking students on walks, physical contact for behavioral support) received NO DISCIPLINE whatsoever. MUSD's own documents admit these female staff 'could have done' the same conduct without any consequence. The only variable distinguishing Plaintiff's treatment was his sex.

Ruby Comparator Analysis: Ruby, a 1:1 female instructional aide to male student at MUSD, was involved in an incident on approximately November of 2021, where a student sustained actual physical injury requiring medical attention due to her negligence. Despite the student injury, Ruby faced no investigation, no discipline, and was subsequently promoted to classroom aide, a higher position. In contrast, Plaintiff—a licensed male teacher—was investigated by CTC and had his credential revoked for conduct that caused zero student injuries and was consistent with his CPI training. This direct comparator demonstrates sex-based disparate treatment: a female employee whose negligence caused actual student injury was promoted, while a male teacher following proper training protocols was terminated and had his credentials revoked in two states. The timing is also significant: the complaint against Plaintiff appeared after he reported Ruby's neglect suggesting retaliatory motive.

G. Comparative Evidence of Gender Discrimination

75. MUSD applied its workplace policies in a discriminatory, non-gender-neutral manner, disciplining Plaintiff (a male teacher) for conduct that was permitted and accepted when performed by female teachers.

76. Female teachers and instructional aides in MUSD's special education programs routinely engaged in the same practices for which Plaintiff was disciplined, including:

(a) Walking alone with students of the opposite sex for instructional purposes;

(b) Using physical prompts, including touching students' arms, backs, and shoulders;

(c) Sitting in close proximity to students during activities and meals;

(d) Providing one-on-one instruction and support; and

(e) Using video recording for assessment and instructional purposes.

77. MUSD's own training materials depict a female educator using physical intervention techniques with a male student.

78. Plaintiff is informed and believes that no female teacher at MUSD has ever been disciplined for using CPI physical prompts, walking with students, sitting in proximity to students, or video recording.

79. The language and framing of the Letter of Reprimand reveals that Plaintiff's gender was a motivating factor in the disciplinary action.

H. Termination and Non-Reelection

80. On or about May 20, 2022, concurrent with the Letter of Reprimand, MUSD issued Plaintiff a Notice of Non-Reelection, effectively terminating his employment.

81. The termination was motivated by: Plaintiff's refusal to allow unlicensed staff to perform teaching duties; Plaintiff's gender; retaliation for Plaintiff raising safety concerns; and MUSD's desire to avoid accountability for its own failures.

**I. MUSD's Report to CTC**

82. Following Plaintiff's termination, MUSD reported Plaintiff to the California Commission on Teacher Credentialing, transmitting the false and misleading allegations.

83. MUSD's report to CTC did not include any acknowledgment of MUSD's failure to provide mentor support, context regarding the evidence-based nature of Plaintiff's teaching practices, or explanation of the IEP-related justifications for Plaintiff's conduct.

J. CTC's Failures and Due Process Violations

84. Upon receiving MUSD's report, CTC failed to conduct any independent investigation into the accuracy of the allegations.

85. CTC failed to provide Plaintiff with notice and an opportunity to be heard before initiating adverse action against his credential.

86. On or about July 5, 2024, CTC revoked Plaintiff's California teaching credential without a hearing, without independent fact-finding, and without consideration of Plaintiff's evidence or defenses.

87. CTC's revocation was based solely on MUSD's false and misleading report, without any verification or independent analysis.

88. CTC's revocation order contained material errors, including incorrect dates and credential titles. More critically, CTC deliberately or negligently sent critical credential revocation notices to an incorrect address—Richmond, Texas 77407—when Plaintiff resided in Henderson, Nevada 89011. CTC sent letters dated July 11, 2025 and August 20, 2025 to the wrong Texas address. Yet CTC's November 24, 2025 letter was correctly addressed to Plaintiff's Henderson, Nevada address—proving CTC possessed the correct address and chose when to use it. This pattern constitutes a fundamental Due Process violation: if CTC had the wrong address, how did they eventually find the correct one? Either CTC deliberately sent notices to an incorrect address to create default conditions and prevent Plaintiff from responding, or CTC was grossly negligent in failing to verify Plaintiff's address before sending notices that would deprive him of his property interest in his teaching credential. Either explanation establishes a Due Process violation under Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306 (1950), which requires notice "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action." CTC cannot claim notices to Texas were adequate when they possessed Plaintiff's Nevada address and later used it.

89. CTC materially altered witness statements from the original MUSD investigation to manufacture grounds for credential revocation. Specifically, the original MUSD Letter of Reprimand dated May 2, 2022 stated that Plaintiff's "arm [was] resting ON THE BENCH DIRECTLY behind her" during the Great Mall field trip. However, CTC's Accusation altered this description to state Plaintiff's "arm [was] resting behind AN"—deliberately deleting the exculpatory words "on the bench." This alteration transforms an innocent description of seating posture (arm on bench behind a student) into a false implication of inappropriate physical contact (arm behind a student's body). Additionally, the original MUSD document stated that "no other District employees were sitting next to or across from students, and NONE HAD THEIR ARMS POSITIONED CLOSELY OR AROUND STUDENTS"—language proving Plaintiff's conduct was not unique. CTC deleted this exculpatory language entirely. This pattern of deletions—all removing language favorable to Plaintiff—demonstrates intentional falsification of evidence, not clerical error. This falsification was material to CTC's finding of "immoral conduct" and formed the primary basis for credential revocation.

Pattern of CTC Misconduct: CTC's conduct toward Plaintiff is not isolated. In Carroll v. Commission on Teacher Credentialing, CTC faced allegations of similar misconduct including evidence manipulation, procedural violations, ex parte communications, and predetermined outcomes. The parallels between Carroll and the instant case—both involving male educators facing manufactured evidence and procedural irregularities—establish that CTC's treatment of Plaintiff reflects institutional practice and pattern rather than isolated aberration. This pattern supports findings of deliberate indifference, bad faith, and entitlement to punitive damages.

The alteration of witness statements may constitute multiple California felonies: Penal Code § 132 (offering false evidence), Penal Code § 134 (preparing false documentary evidence), and Penal Code § 115 (filing false document with a public office). These potential criminal violations establish bad faith and malice, support an award of punitive damages, and undermine any claim by Defendants that their conduct was reasonable or in good faith.

K. ASBE's Reciprocal Action

90. Following CTC's revocation of Plaintiff's California credential, the Arizona State Board of Education initiated reciprocal discipline proceedings based solely on the California action.

91. ASBE failed to conduct any independent investigation into the underlying facts, instead relying entirely on CTC's tainted proceedings and falsified evidence. Critically, ASBE never independently verified CTC's altered witness statements—the "smoking gun" evidence of fraud. ASBE accepted at face value CTC's version claiming Plaintiff's "arm [was] resting behind AN" without comparing it to the original MUSD document stating Plaintiff's "arm [was] resting ON THE BENCH DIRECTLY behind her." This blind reliance on falsified evidence, combined with the interstate reciprocity agreement between California and Arizona, created a conspiracy to revoke Plaintiff's credentials in both states based on manufactured evidence. The predetermined outcome via reciprocity agreement meant Plaintiff had no genuine opportunity to defend himself in Arizona— ASBE simply rubber-stamped CTC's fraudulent findings. This reciprocal revocation without independent investigation is the heart of the conspiracy: CTC falsified evidence, sent notices to the wrong address to prevent Plaintiff from responding, revoked Plaintiff's California credential, and then ASBE used the interstate agreement to revoke Plaintiff's

Arizona credential—all without anyone verifying the accuracy of the underlying allegations.

92. Burns, Director of the Investigation Unit, initiated the Arizona proceedings without independent fact-finding.

93. Haley pursued the case against Plaintiff despite knowing that the California proceedings were contested.

---

## VIII. THE OCTOBER 14, 2025 ADMINISTRATIVE PROCEEDING

94. On October 14, 2025, a hearing was held before the Professional Practices Advisory Committee ("PPAC") under Hearing Officer Susan Williams. Plaintiff provided approximately three (3) hours of sworn testimony, evidence, and argument.

95. At the hearing, Plaintiff submitted eleven (11) exhibits into evidence; delivered an opening statement; provided extensive sworn testimony; and argued that the actions were based on discrimination.

96. Despite Plaintiff's evidence and testimony, the Committee voted unanimously to recommend revocation of Plaintiff's Arizona educator certificates with no other witness.

97. The proceeding was fundamentally flawed:

(a) NO OPPOSING WITNESSES APPEARED: The State Attorney identified five witnesses, but not a single witness came forward to testify against Plaintiff.

(b) THE BURDEN OF PROOF WAS IMPROPERLY SHIFTED: The Hearing Officer placed the burden of proof on Plaintiff rather than the State, in violation of A.R.S. § 41-1092.07(F)(1).

(c) PLAINTIFF'S TESTIMONY WAS EXCLUDED: All testimony provided under oath regarding job duties, sex discrimination, and illegal sanctioning by CTC using altered written witness statements currently under investigation by California State Bar was refused and excluded from the final recommended decision and prevented from proceeding being fully explained in expanded detail.

(d) SEX DISCRIMINATION CLAIMS WERE SUPPRESSED: On pages 25 and 85 of the transcript, the Hearing Officer stopped Plaintiff's explanation of civil rights violations. At times during the 3 hour proceeding Plaintiff made attempts to expand on the matters herein presented while predetermined efforts to prevent disclosure instead of full disclosure are presented in the October 14 transcript.

(e) THE OUTCOME WAS PREDETERMINED: By page 95 of the transcript, it became clear that the Investigation Unit had already decided to revoke Plaintiff's license before the hearing occurred.

(f) THE RECOMMENDED DECISION WAS ONE-SIDED: The Hearing Officer produced findings that removed Plaintiff's sworn statements and evidence while retaining allegations from witnesses who failed to appear.

98. Plaintiff was the only individual present with firsthand knowledge of his employment at Milpitas. For the Hearing Officer to disregard all arguments and exhibits from the only witness present suggests a predetermined outcome.

A. The Recommended Decision Was Predetermined

99. Despite being the only witness with firsthand knowledge who actually appeared and testified, every element of Plaintiff's sworn testimony and documentary evidence was excluded from the Findings of Fact.

100.     The Recommended Decision represents a predetermined outcome that:

(a) Disregarded all arguments and exhibits from the only witness present;

(b) Issued findings identical to the prior Milpitas reprimand allegations;

(c) Excluded all sworn statements and evidence submitted by Plaintiff;

(d) Retained allegations from witnesses who failed to appear;

(e) Failed to acknowledge allegations of witness statement alteration; and

(f) Completely ignored evidence and testimony regarding sex discrimination.

101.     The documents presented by the Board contained significant factual and evidentiary discrepancies, including incorrect incident dates and altered witness statements.

## IX. THE DECEMBER 8, 2025 ENFORCEMENT ACTION

102.     On December 8, 2025, the Board adopted the Committee's recommendation and issued an Enforcement Action and Board Order prohibiting Plaintiff from seeking professional educator certifications in Arizona for seven (7) years.

103.     The Enforcement Action was adopted despite: Plaintiff being the only witness who testified; the State's failure to present any witnesses; and Plaintiff's presentation of eleven exhibits.

104.     The December 8, 2025 Enforcement Action contains fundamental legal and factual errors and was the product of proceedings that violated Plaintiff's constitutional rights.

## X. FIRST CAUSE OF ACTION

Due Process Violations Under the Fifth and Fourteenth Amendments

(Including Judicial Review of ASBE Agency Action)

(42 U.S.C. § 1983 - Against CTC and ASBE)

105.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

106.    The Fifth Amendment provides that no person shall be deprived of life, liberty, or property without due process of law. The Fourteenth Amendment extends this protection against state action.

107.    **42 U.S.C. § 1983 provides a cause of action against any person who, under color of state law, deprives another of rights, privileges, or immunities secured by the Constitution and laws of the United States.**

108.    At all relevant times, CTC and ASBE acted under color of state law in their capacities as state agencies.

109.    Plaintiff had a protected property interest in his California and Arizona teaching credentials. Teaching credentials are property interests protected by due process. See *Board of Regents v. Roth*, 408 U.S. 564 (1972).

110.    Plaintiff had a protected liberty interest in his professional reputation and ability to pursue his chosen profession.

111.    Due process requires, at minimum: Adequate notice of the charges; An opportunity to be heard at a meaningful time; The right to present evidence and confront adverse witnesses; An impartial decision-maker; A decision based on substantial evidence; and A written statement of the reasons.

112.     CTC violated Plaintiff's procedural due process rights by:

(a) Failing to conduct an independent investigation;

(b) Revoking Plaintiff's credential without a hearing;

(c) Failing to provide notice and opportunity to be heard;

(d) Altering witness statements to strengthen the case against Plaintiff;

(e) Issuing a revocation order with material errors;

(f) Reversing the presumption of innocence by treating MUSD's accusations as true without investigation.

113.     ASBE violated Plaintiff's procedural due process rights by:

(a) Failing to conduct an independent investigation;

(b) Improperly shifting the burden of proof;

(c) Excluding Plaintiff's sworn testimony;

(d) Relying on witnesses who failed to appear;

(e) Having a predetermined outcome;

(f) Failing to consider discrimination evidence;

(g) Reversing the presumption of innocence by treating MUSD's accusations as true without investigation.

114.     Case law support: *Mathews v. Eldridge*, 424 U.S. 319 (1976): The Supreme Court established a three-part balancing test for determining what process is due. *Slochower v. Board of Higher Education*, 350 U.S. 551 (1956): Automatic termination based on accusations without proper inquiry violates due process.

115.     Both CTC and ASBE reversed the fundamental presumption of innocence—a core component of due process—by:

(a) Treating MUSD's accusations as true without investigation;

(b) Placing burden on Plaintiff to prove innocence rather than requiring agencies to prove misconduct;

(c) Failing to consider exculpatory evidence;

(d) Making adverse credibility determinations without ever hearing from Plaintiff; and

(e) Ignoring MUSD's documented FERPA, IDEA, and Title VII and Title IX violations.

116.    As the Supreme Court stated in *Coffin v. United States*, 156 U.S. 432, 453 (1895): 'The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary.' See also *Addington v. Texas*, 441 U.S. 418 (1979); *Santosky v. Kramer*, 455 U.S. 745 (1982); *In re Winship*, 397 U.S. 358 (1970).

Judicial Review of ASBE Agency Action

117.    This Court has jurisdiction to review ASBE's December 8, 2025 Enforcement Action under federal question jurisdiction where the agency action violates federal constitutional rights.

118.    Plaintiff exhausted administrative remedies, including participation in the October 14, 2025 PPAC hearing and filing a timely Motion for Rehearing that was deemed denied by operation of law on January 19, 2026.

119.    Under standards consistent with A.R.S. § 12-910(F), the agency action must be set aside if it is: (1) Contrary to law; (2) Not supported by substantial evidence; (3) Arbitrary and capricious; or (4) An abuse of discretion.

120.    The Board's decision should be reversed because:

(a) The decision was arbitrary, capricious, and characterized by an abuse of discretion;

(b) The decision was not supported by substantial evidence where the only witness who appeared testified for Plaintiff;

(c) The Board's procedures violated constitutional due process requirements;

(d) The Board improperly shifted the burden of proof to Plaintiff;

(e) The Board excluded relevant evidence and testimony;

(f) The Board failed to make adequate findings regarding Plaintiff's evidence of discrimination; and

(g) The decision was based upon unlawful procedure and affected by errors of law.

121.     Issues Presented for Review:

(1) Whether the Board's decision to impose reciprocal discipline was contrary to law where the underlying California decision is subject to pending proceedings and challenge.

(2) Whether the Board's decision was not supported by substantial evidence where the California documents contained material errors and altered statements.

(3) Whether the Committee's refusal to consider Plaintiff's evidence of discrimination was arbitrary and capricious.

(4) Whether the penalty of complete revocation was an abuse of discretion where no criminal charges have been filed and Plaintiff has no criminal record.

(5) Whether the Board committed errors of law by applying an improper standard of review and improperly shifting the burden of proof.

122.     ASBE violated state law, reinforcing federal due process claims:

(a) A.R.S. Section 15-534 (requires investigation);

(b) A.R.S. Section 15-550 (due process rights);

(c) AAC R7-2-1308 (hearing procedures);

(d) Arizona Constitution Article II, Section 4.

---

## XI. SECOND CAUSE OF ACTION

Title IX Sex Discrimination and Retaliation

(Including Wrongful Revocation, Child Endangerment, and False Claims)

### (20 U.S.C. § 1681 - Against CTC and ASBE)

123.　Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

A. Title IX Applicability and Sovereign Immunity Waiver

124.　Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), provides that no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

125.　CTC receives approximately $33.3 million in federal financial assistance and is subject to Title IX requirements.

126.　ASBE receives over $118 million in federal education funding annually and is subject to Title IX requirements.

127.　**Sovereign Immunity Waiver**: By accepting federal financial assistance, both CTC and ASBE have waived sovereign immunity for Title IX claims. The Supreme Court held in *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998), and *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60 (1992), that Title IX creates an implied private right of action for money damages against recipients of federal education funds. Acceptance of federal funds constitutes a waiver of Eleventh

Amendment immunity as to claims arising under the funding statute. See *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1 (1981); *Atascadero State Hospital v. Scanlon*, 473 U.S. 234 (1985).

128.    Both CTC and ASBE, by voluntarily accepting substantial federal education funding while certifying Title IX compliance, have unambiguously waived sovereign immunity for Title IX discrimination and retaliation claims. Compensatory damages are therefore available against these agencies.

129.    Plaintiff is a person within the meaning of Title IX who was denied the benefits of, and subjected to discrimination under, education programs and activities operated by CTC and ASBE.

B. Sex Discrimination

130.    CTC discriminated against Plaintiff on the basis of sex by:

(a) Adopting and ratifying MUSD's gender-discriminatory discipline without independent analysis;

(b) Revoking Plaintiff's credential based on allegations that targeted his conduct as a male teacher with female students;

(c) Failing to investigate evidence of sex-based disparate treatment;

(d) Altering witness statements to strengthen the gender-biased case against Plaintiff.

131.    ASBE discriminated against Plaintiff on the basis of sex by:

(a) Adopting and ratifying MUSD's gender-discriminatory discipline without independent analysis;

(b) Ignoring Plaintiff's documentary evidence establishing that female educators performed identical job duties without facing discipline;

(c) Revoking Plaintiff's teaching credentials based on proceedings infected by sex-based bias;

(d) Refusing to consider Plaintiff's evidence that male special education teachers are subjected to heightened scrutiny; and

(e) Perpetuating the sex-based disparate treatment initiated by MUSD.

132.    But for Plaintiff's sex, MUSD would not have ended Plaintiff's teaching position based on Letter of Reprimand. Thereby CTC and ASBE made decisions to revoke Plaintiff's license based on Title IX sex discrimination.

C. Retaliation (Including Wrongful Revocation)

133.    Title IX prohibits retaliation against any individual for opposing discrimination or participating in any investigation, proceeding, or hearing. *Jackson v. Birmingham Board of Education*, 544 U.S. 167 (2005).

134.    Plaintiff engaged in protected activity under Title IX by:

(a) Raising complaints of sex discrimination regarding disparate treatment;

(b) Filing EEOC Charges alleging sex discrimination;

(c) Informing the Arizona Investigation Unit of his intent to file complaints with OCR and FBI;

(d) Presenting evidence of sex discrimination at the October 14, 2025 PPAC hearing; and

(e) Filing this civil action alleging Title IX violations.

135.    CTC and ASBE knew of Plaintiff's protected activity and retaliated by:

(a) Pursuing credential revocation proceedings after Plaintiff raised sex discrimination claims;

(b) Excluding Plaintiff's testimony and evidence regarding sex discrimination;

(c) Issuing the December 8, 2025 Enforcement Action after Plaintiff raised civil rights violations; and

(d) Rubber-stamping the discriminatory California proceedings.

136.     **Wrongful Revocation as Retaliation**: CTC and ASBE revoked Plaintiff's credentials for refusing to violate federal law—specifically FERPA, IDEA, and Section 504. MUSD terminated Plaintiff for refusing to allow unlicensed staff to perform special education teaching duties—conduct that would have violated:

(a) IDEA (20 U.S.C. Section 1400 et seq.) - denial of FAPE by allowing unqualified personnel;

(b) Section 504 (29 U.S.C. Section 794) - discrimination by allowing unknowledgeable staff;

(c) FERPA (20 U.S.C. Section 1232g) - sharing IEP information with staff lacking legitimate interest.

137.     Plaintiff's refusal was legally required conduct, not insubordination. The wrongful revocation of Plaintiff's credentials for protecting students and complying with federal law constitutes unlawful retaliation under Title IX.

138.     Case law support: *Tameny v. Atlantic Richfield Co.*, 27 Cal. 3d 167 (1980): Employees terminated for refusing to commit illegal acts have a tort claim. *Gantt v. Sentry Insurance*, 1 Cal. 4th 1083 (1992): The public policy must be fundamental, substantial, and well-established. *Green v. Ralee Engineering Co.*, 19 Cal. 4th 66 (1998): Employees who refuse to participate in illegal conduct are protected.

D. Child Endangerment Supporting Title IX Claims

139.     MUSD's demands that Plaintiff allow unlicensed staff to perform credentialed special education duties would have negligently endangered students with moderate to severe disabilities.

140.     Plaintiff's caseload included students with documented safety concerns including:

(a) Elopement behaviors requiring constant supervision;

(b) History of accidents and injuries related to elopement attempts;

(c) Need for one-on-one supervision during transitions;

(d) Behavioral challenges requiring credentialed intervention; and

(e) Parent concerns about frequency of safety incidents.

141.     Walking supervision for students with elopement behaviors is a non-delegable duty because:

(a) It requires knowledge of individual student behavior patterns documented in IEPs;

(b) It requires implementation of behavior intervention plans;

(c) Unlicensed staff lack access to IEP information due to FERPA;

(d) Students with elopement behaviors require specially designed instruction; and

(e) Delegation would violate the teacher's duty of care.

142.     The child endangerment that would have resulted demonstrates that CTC and ASBE punished Plaintiff for protecting students with disabilities—conduct that:

(a) Supports Plaintiff's Title IX claims by showing that male teachers who advocate for student safety are targeted while female teachers are not subjected to similar scrutiny;

(b) Demonstrates the pretextual nature of the disciplinary action;

(c) Shows deliberate indifference to student safety in favor of gender-based discipline.

143.     Case law: *Tarasoff v. Regents of University of California*, 17 Cal.3d 425 (1976): Professionals owe a duty of care. *Hoyem v. Manhattan Beach City School District*, 22 Cal.3d 508 (1978): Schools have a duty to exercise reasonable care in supervising students. *Dailey v. Los Angeles Unified School District*, 2 Cal.3d 741 (1970): School personnel must exercise ordinary care.

E. False Claims Supporting Title IX Claims

144.     CTC ($33.3M) and ASBE ($118M) receive federal funds conditioned on Title IX compliance and must certify such compliance to continue receiving federal financial assistance.

145.     Defendants' discriminatory conduct—while continuing to certify Title IX compliance to receive federal funds—constitutes evidence of the intentional and knowing nature of the Title IX violations, supporting enhanced damages and demonstrating deliberate indifference.

146.     FERPA Violations as Evidence Supporting Title IX Claims: The interplay between FERPA violations and Title IX sex discrimination demonstrates the systematic nature of discriminatory conduct:

(a) MUSD denied IEP system access to unlicensed female staff but then demanded Plaintiff—a male teacher—allow them to perform teaching duties requiring IEP knowledge;

(b) When Plaintiff properly refused to facilitate FERPA violations, he was disciplined and reported to CTC;

(c) Female teachers who delegated duties to unlicensed staff or violated FERPA protocols were not subjected to similar scrutiny;

(d) CTC and ASBE ratified MUSD's discriminatory treatment by revoking Plaintiff's credentials for refusing to facilitate federal law violations.

F. Case Law Support

147.    *Cannon v. University of Chicago*, 441 U.S. 677 (1979): Title IX creates an implied private right of action. *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60 (1992): Monetary damages are available for intentional violations. *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999): Institutions may be liable for failing to respond to known discrimination. *Jackson v. Birmingham Board of Education*, 544 U.S. 167 (2005): Title IX encompasses retaliation. *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006): Actionable retaliation includes any action that 'might have dissuaded a reasonable worker.'

---

## XII. THIRD CAUSE OF ACTION

Conspiracy to Deprive Civil Rights

(42 U.S.C. § 1985 - Against CTC and ASBE)

148.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

149.    **Section 1985(3) provides a cause of action against two or more persons who conspire to deprive any person of equal protection of the laws.**

150.    The conspiracy was motivated by gender-based discriminatory animus, as evidenced by:

(a) The underlying California discipline that explicitly targeted Plaintiff's conduct as a male teacher with female students;

(b) CTC's adoption of the gender-biased MUSD proceedings without independent analysis;

(c) ASBE's adoption of CTC's gender-biased proceedings without independent analysis;

(d) Both agencies' refusal to consider Plaintiff's evidence of disparate treatment based on sex; and

(e) The systematic exclusion of Plaintiff's gender discrimination evidence from the administrative record.

151.    This conspiracy involved coordinated actions to:

(a) MUSD creating illegal staffing situation and reporting Plaintiff for refusing to comply;

(b) CTC revoking credential without investigation or hearing;

(c) ASBE rubber-stamping CTC's tainted decision;

(d) Retaliate against Plaintiff for whistleblowing and civil rights complaints;

(e) Accept and rely upon manipulated administrative records and altered witness statements;

(f) Conduct proceedings designed to ratify predetermined outcomes; and

(g) Deprive Plaintiff of his constitutional rights to due process and equal protection.

152.    Case law: *Griffin v. Breckenridge*, 403 U.S. 88 (1971): Section 1985(3) requires: (1) a conspiracy; (2) for the purpose of depriving a person of equal protection; (3) an act in furtherance; and (4) injury.

153.    State Law Whistleblower Violations as Evidence of Conspiracy: California Labor Code section 1102.5(b) provides that an employer may not retaliate against an employee for disclosing information where the employee has reasonable cause to believe the information discloses a violation of law.

154.    Plaintiff disclosed information regarding violations of state and federal statutes, including: violations of special education laws, inadequate supervision and safety

protocols, violations of California Education Code provisions requiring qualified mentors, and inadequate staff training.

155.    Plaintiff also requested a due process hearing and informed the Investigation Unit of his intent to file complaints with OCR and the FBI.

156.    Following Plaintiff's protected disclosures, retaliation occurred by:

(a) Increasing scrutiny of Plaintiff's teaching practices;

(b) Issuing a Letter of Reprimand characterizing appropriate practices as misconduct;

(c) Placing Plaintiff on administrative leave;

(d) Terminating Plaintiff's employment; and

(e) Reporting Plaintiff to CTC, leading to credential revocation.

157.    The CTC credential revocation on July 5, 2024, constituted a continuation of retaliatory conduct. Under *Aryeh v. Canon Business Solutions, Inc.*, 55 Cal. 4th 1185 (2013), each manifestation restarts the limitations period.

## XIII. DAMAGES

158.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer substantial damages, including but not limited to:

(a) LOSS OF EARNINGS AND EMPLOYMENT BENEFITS: Plaintiff has lost substantial income. Specialized Moderate/Severe special education teachers earn approximately $3,000-$3,500 per week ($156,000-$182,000 annually). Plaintiff's economic losses exceed $600,000 to date.

(b) LOSS OF FUTURE EARNING CAPACITY: Plaintiff is 53 years old and had a reasonable expectation of working until age 65-70, representing lost career earnings

exceeding $3,000,000 in base salary alone. Total lost future earning capacity exceeds $5,000,000.

(c) LOSS OF EDUCATIONAL INVESTMENT: Plaintiff's investment of $15,000-$19,000 in his specialized credential program has been rendered worthless.

(d) EMOTIONAL DISTRESS: Plaintiff has suffered severe emotional distress, including depression, anxiety, humiliation, loss of self-esteem, loss of professional identity, and mental anguish.

(e) REPUTATIONAL HARM: Plaintiff's professional reputation has been permanently damaged.

(f) LOSS OF PROFESSIONAL DEVELOPMENT OPPORTUNITIES: Plaintiff has been deprived of the opportunity to complete his credential program and advance in the teaching profession.

(g) COMPLETE DESTRUCTION OF TEACHING CAREER: Plaintiff cannot work as a teacher in California, Arizona, or any other state due to credential revocations.

(h) LOSS OF RETIREMENT AND PENSION BENEFITS.

(i) EXPENSES INCURRED IN ATTEMPTING TO DEFEND CREDENTIALS.

(j) OTHER DAMAGES TO BE PROVEN AT TRIAL.

159.    **Title IX Damages Against CTC and ASBE**: Pursuant to the sovereign immunity waiver effectuated by CTC's and ASBE's voluntary acceptance of federal financial assistance, Plaintiff is entitled to compensatory damages against these agencies for intentional Title IX violations. See *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60 (1992).

160.    Plaintiff is entitled to compensatory damages in an amount to be proven at trial.

161.    Plaintiff is entitled to punitive damages against individual defendants in an amount sufficient to punish Defendants for their malicious, oppressive, and fraudulent conduct and to deter similar conduct in the future.

162.    Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988, Title IX, and other applicable law.

163.    Plaintiff is entitled to pre-judgment and post-judgment interest.

---

Qualified Immunity Does Not Apply: Individual state officials who falsify evidence, deny hearings, and shift burdens of proof cannot claim qualified immunity. No reasonable official would believe that altering witness statements to manufacture grounds for credential revocation was lawful. The clearly established law prohibiting evidence fabrication and due process violations defeats any qualified immunity defense. See Devereaux v. Abbey, 263 F.3d 1070 (9th Cir. 2001) (no qualified immunity for deliberate fabrication of evidence).

## XIV. PRAYER FOR RELIEF

WHEREFORE, Plaintiff KONRAD ALEXANDER STIMSON respectfully prays for judgment against Defendants, jointly and severally, as follows:

A. DECLARATORY RELIEF:

1. A declaration that Defendants violated Title IX (20 U.S.C. Section 1681);

2. A declaration that CTC and ASBE violated Plaintiff's due process rights under the 5th and 14th Amendments;

3. A declaration that Defendants conspired to violate Plaintiff's civil rights under 42 U.S.C. Section 1985;

4. A declaration that CTC breached its regulatory duty to enforce mentor requirements;

5. A declaration that MUSD wrongfully terminated Plaintiff in violation of public policy;

6. A declaration that Plaintiff's refusal to allow unlicensed staff to perform teaching duties was legally required conduct, not insubordination;

7. A declaration that CTC and ASBE reversed the presumption of innocence in violation of due process;

8. A declaration that Defendants negligently endangered students with disabilities by punishing Plaintiff for protecting them;

9. A declaration that Defendants retaliated against Plaintiff for FERPA compliance;

10. A declaration that CTC's revocation of Plaintiff's California credential violated due process and Title IX;

11. A declaration that ASBE's revocation of Plaintiff's Arizona credential violated due process and Title IX; and

12. A declaration that Defendants' actions constituted illegal retaliation for protected activity.

B. INJUNCTIVE RELIEF:

1. An order requiring CTC to immediately reinstate Plaintiff's California teaching credential;

2. An order requiring ASBE to immediately reinstate Plaintiff's Arizona teaching certificates;

3. An order expunging all negative reports from the National Association of State Directors of Teacher Education and Certification (NASDTEC) Clearinghouse;

4. An order removing all references to "misconduct" or "insubordination" from Plaintiff's personnel and credentialing files;

5. An order requiring CTC to investigate MUSD's use of unlicensed personnel;

6. An order requiring both CTC and ASBE to implement due process protections before credential revocation;

7. An order setting aside and vacating the December 8, 2025 Enforcement Action and Board Order issued by ASBE;

8. An order directing ASBE to conduct a new hearing before an impartial tribunal, with proper procedural safeguards, or in the alternative, to dismiss all actions against Plaintiff; and

9. An order prohibiting reciprocal revocation without independent review.

C. COMPENSATORY DAMAGES:

1. Compensatory damages against CTC and ASBE pursuant to Title IX's sovereign immunity waiver;

2. Lost wages and benefits from termination to present and future;

3. Lost earning capacity due to credential revocation;

4. Emotional distress damages;

5. Damage to professional reputation;

6. Costs of attempting to restore credentials; and

7. All other compensatory damages according to proof.

D. PUNITIVE DAMAGES:

1. Punitive damages against Defendants in an amount sufficient to punish and deter such conduct, where permitted by law.

E. ATTORNEYS' FEES AND COSTS:

1. Reasonable attorneys' fees under 42 U.S.C. Section 1988;

2. Reasonable attorneys' fees under Title IX; and

3. Costs of suit.

F. ADDITIONAL RELIEF:

1. Pre-judgment and post-judgment interest;

2. Referral to the United States Department of Education Office for Civil Rights for investigation; and

3. Such other and further relief as this Court deems just and proper.

## XV. DEMAND FOR JURY TRIAL

Plaintiff KONRAD ALEXANDER STIMSON hereby demands a trial by jury on all issues so triable in this action, pursuant to the Seventh Amendment to the United States Constitution, Federal Rule of Civil Procedure 38, Article I, Section 16 of the California Constitution, California Code of Civil Procedure Section 592, and Article II, Section 23 of the Arizona Constitution.

A. Constitutional and Statutory Authority

The Seventh Amendment to the United States Constitution provides: "In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved."

Federal Rule of Civil Procedure 38(a) states: "The right of trial by jury as declared by the Seventh Amendment to the Constitution—or as provided by a federal statute—is preserved to the parties inviolate."

Federal Rule of Civil Procedure 38(b) provides that a party may demand a jury trial on any issue triable of right by a jury by serving upon the other parties a written demand.

Article I, Section 16 of the California Constitution guarantees the right to a jury trial in civil actions.

Article II, Section 23 of the Arizona Constitution provides: "The right of trial by jury shall remain inviolate."

B. Specific Claims Demanding Jury Trial

Plaintiff specifically demands a jury trial on all issues of fact relating to the following claims:

1. **Due Process Violations under 42 U.S.C. § 1983 (First Cause of Action)**

2. **Title IX Sex Discrimination and Retaliation (Second Cause of Action)**

3. **Conspiracy to Deprive Civil Rights under 42 U.S.C. § 1985 (Third Cause of Action)**

4. All claims for compensatory damages

5. All claims for punitive damages

6. All issues related to Defendants' liability

7. All issues related to the amount of damages

C. Issues to Be Tried by Jury

Plaintiff demands a jury determination on the following specific factual issues:

1. Whether Defendants discriminated against Plaintiff on the basis of sex

2. Whether Defendants retaliated against Plaintiff for protected activity

3. Whether Defendants violated Plaintiff's due process rights

4. Whether Defendants conspired to deprive Plaintiff of his civil rights

5. Whether CTC failed regulatory duties to provide required mentor support to Plaintiff

6. Whether Plaintiff's teaching practices were appropriate and evidence-based

7. Whether female teachers engaged in identical practices without discipline

8. Whether Defendants' stated reasons for discipline were pretextual

9. CTC materially altered witness statements from the original MUSD investigation to manufacture grounds for credential revocation. Specifically, the original MUSD Letter of Reprimand dated May 2, 2022 stated that Plaintiff's "arm [was] resting ON THE BENCH DIRECTLY behind her" during the Great Mall field trip. However, CTC's Accusation altered this description to state Plaintiff's "arm [was] resting behind AN"—deliberately deleting the exculpatory words "on the bench." This alteration transforms an innocent description of seating posture (arm on bench behind a student) into a false implication of inappropriate physical contact (arm behind a student's body). Additionally, the original MUSD document stated that "no other District employees were sitting next to or across from students, and NONE HAD THEIR ARMS POSITIONED CLOSELY OR AROUND STUDENTS"—language proving Plaintiff's conduct was not unique. CTC deleted this exculpatory language entirely. This pattern of deletions—all removing language favorable to Plaintiff—demonstrates intentional falsification of evidence, not clerical error.

10. Whether ASBE conducted a fair and impartial hearing

11. Whether Defendants' conduct was willful, malicious, and oppressive

12. The amount of compensatory damages

13. The amount of punitive damages

14. Whether Defendants acted with deliberate indifference to Plaintiff's rights

D. Preservation of Right

This demand for jury trial is made pursuant to and in compliance with all applicable rules and statutes. Plaintiff has not waived and does not waive the right to a trial by jury on any claim or issue in this action.

This demand is timely made as part of this Consolidated Complaint filed within the time permitted by applicable rules.

Plaintiff will pay all required jury fees at the time and in the manner prescribed by law.

PLAINTIFF HEREBY UNCONDITIONALLY AND IRREVOCABLY DEMANDS A JURY TRIAL ON ALL CLAIMS AND ISSUES SO TRIABLE.

## XVI. VERIFICATION

I, KONRAD ALEXANDER STIMSON, am the Plaintiff in this action. I have read the foregoing Consolidated Complaint and Demand for Jury Trial and know the contents thereof. The same is true of my own knowledge, except as to those matters which are therein stated upon information and belief, and as to those matters, I believe it to be true.

I declare under penalty of perjury under the laws of the United States of America, the State of California, and the State of Arizona that the foregoing is true and correct.

Date: _February 9, 2026_

Respectfully submitted,

_Konrad A. H[signature]_

KONRAD ALEXANDER STIMSON
Plaintiff, Pro Se

3055 Saint Rose Pkwy, Box Number 777151
Henderson, NV 89052
Telephone: (406) 788-1830
Email: konrad.stimson@gmail.com

Konrad Alexander Stimson
3055 Saint Rose Pkwy, Box Number 777151
Henderson, NV 89052
Telephone: (406) 788-5165
E-mail: konrad.stimson@gmail.com
Plaintiff, Pro Se

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**
**SACRAMENTO DIVISION**

KONRAD ALEXANDER STIMSON,
  Plaintiff,

v.

STATE OF CALIFORNIA, ACTING BY AND
THROUGH THE CALIFORNIA COMMISSION
ON TEACHER CREDENTIALING;
MARY VIXIE SANDY; THOMAS AMEY;
AMY REISING; ARTI KUMAR; DOES 1-50;

ARIZONA STATE BOARD OF EDUCATION;
GARNETT BURNS; KATHERINE HALEY;
SUSAN WILLIAMS; DOES 51-100,
  Defendants.

Case No.: _____

**PLAINTIFF'S EXHIBITS**

**LIST OF EXHIBITS**

| Exhibit | Description | Pages |
|---------|-------------|-------|
| A | EEOC Right to Sue Letters (January 21, 2026)<br>Charge No. 540-2025-04726 (Arizona)<br>Charge No. 555-2025-01544 (California) | 3-97 |
| B | ASBE Rehearing Materials<br>January 28, 2026 Notice of February 23, 2026 Rehearing<br>Motion for Rehearing (Case No. C-2025-000232) | 99-217 |

1

# EXHIBIT A

EEOC Right to Sue Letters

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Phoenix District Office**
3300 North Central Avenue, Suite 690
Phoenix, AZ 85012
(602) 661-0002
Website: www.eeoc.gov

## DISMISSAL

(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 01/21/2026

**To:** KONRAD STIMSON
3055 Saint Rose Pkwy
HENDERSON, NV 89052
Charge No: 540-2025-04726

EEOC Representative and email:    ALYSSA CRUZ
EQUAL OPPORTUNITY INVESTIGATOR
ALYSSA.CRUZ@EEOC.GOV

## DISMISSAL

The EEOC is closing this charge because you were not in an employment relationship with the Respondent.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice that the EEOC has dismissed your charge and has issued you notice of your right to sue the respondent(s) on this charge. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of EEOC's official notice of dismissal.** You should keep a record of the date you received the EEOC's official notice of dismissal. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 540-2025-04726.

On behalf of the Commission,

Melinda Caraballo
District Director

Cc:
Garnett Burns
Executive Tower 1700 W Washington St. #300,
PHOENIX, AZ 85007

Arizona Department of Education
Arizona Teacher
PHOENIX, AZ 85007

Please retain this Notice for your records.

 **U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

Oakland Local Office
1301 Clay Street, Suite 680-N
Oakland, CA 94612
(510) 956-0004
Website  www.eeoc.gov

## DISMISSAL

(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 01/21/2026

**To:** KONRAD STIMSON
3055 Saint Rose Pkwy Box No. 777151
HENDERSON, NV 89052
Charge No: 555-2025-01544

EEOC Representative and email:   PATRICK GHEORGHE
EQUAL OPPORTUNITY INVESTIGATOR
PATRICK.GHEORGHE@EEOC.GOV

### DISMISSAL

The EEOC is closing this charge because your charge was not filed within the time limits under the law; in other words, you waited too long after the date of the alleged discrimination to file your charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice that the EEOC has dismissed your charge and has issued you notice of your right to sue the respondent(s) on this charge. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of EEOC's official notice of dismissal.** You should keep a record of the date you received the EEOC's official notice of dismissal. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 555-2025-01544.

On behalf of the Commission,

Digitally signed by
CARLOS ROCHA
Date: 2026.01.21
08:59:17 -08'00'

Carlos Rocha
Local Office Director

Cc:
CTC Teacher Commission
651 Bannon St Suite 600
SACRAMENTO, CA 95811

Thomas Amey
651 Bannon St Suite 600
SACRAMENTO, CA 95811

Please retain this Notice for your records.

# CHARGE OF DISCRIMINATION

Form 5 (06/24)

This form is affected by the Privacy Act of 1974.
See attached Privacy Act Statement and other information before completing this form.

| CHARGE PRESENTED TO: | AGENCY CHARGE NO. |
|---|---|
| EEOC | 540-2025-04726 |

Arizona Attorney General's Office, Civil Rights Division

Name *(indicate Mr., Ms., Mrs., Miss, Dr., Hon., Rev.)*: Mr. KONRAD STIMSON

Phone No.:        (406) 788-5165
Year of Birth:        08/09/1973
Mailing Address: 3055 Saint Rose Pkwy
HENDERSON, NV 89052

Named below is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency that I believe discriminated against me or others.

Name: Arizona Department of Education
No. Employees, Members:
Phone No.:
Mailing Address: Arizona Teacher
PHOENIX, AZ 85007, UNITED STATES OF AMERICA
Name:
No. Employees, Members:
Phone No.:
Mailing Address:

DISCRIMINATION BASED ON:

Retaliation, Sex

DATE(S) DISCRIMINATION TOOK PLACE

Earliest: 01/09/2025
Latest: 01/06/2026
Continuing Action

THE PARTICULARS ARE:

In writing, by the Arizona State Board of Education, I am a certified educator designated by Educator Identification No. 772-0079 in the records of the Arizona Department of Education, valid through August 9, 2036. Arizona documents identify that my right to work, to obtain or be hired, to use my certification, to seek employment, to volunteer in Arizona public or charter k-12 settings in any capacity is decided by the Arizona State Board of Education.

My Arizona documented evidence for civil rights violations, including sex discrimination and retaliation are presented to EEOC in written and available by video from the October 14, 2025 Reporter's Transcript of Proceedings. Other Arizona Board documents and dates of evidence supporting sex discrimination and retaliation are Findings of Fact, Conclusion of Law, and Recommended Decision dated October 14, 2025, Findings of Fact, Conclusion of Law, And Order dated December

8, 2025, Board Order and Notice dated December 8, 2025, and State's Response to Applicant's Motion for Review or Rehearing dated January 6, 2026.

The most current date of January 6, 2026 with full knowledge that California Civil Rights Department ("CRD") issued a Right to Sue, Arizona State Board of Education ("Board") made a state response to deny my request for review or rehearing stating my rights were not materially affected. That is false. Arizona covered up the civil rights violation against me. This is a severe criminal act both by state and federal law. I filed a complaint with the State Bar of California for acts of moral turpitude, dishonesty, and corruption by altering written witness allegations as well as "under color of law" depriving my rights.

The majority of evidence comes from October 14, 2025 Reporter's Transcript of Proceedings this 113 page document and Findings of Fact, Conclusion of Law, and Recommended Decision dated October 14, 2025, together prepared the same date for the same proceeding is the building blocks for my EEOC Arizona Charge of Discrimination. Page 25, line 21-25, I describe sex discrimination of job duty. Page 85, line 13-15 the hearing officer stops my explaining of civil rights violations, and by Page 95 it was clear that a predetermined Arizona Investigation Unit decision to revoke my license by covering up civil rights violations would not allow me a fair hearing and my due process rights meant nothing at the proceeding. This is most supported by Findings of Fact, Conclusion of Law, and Recommended Decision. In the Reporter's Transcript of Proceedings, Page 29, line 6-25, the state provided no witness to defend a single statement. I did make statements on the record. The transcript reflects I was the only person from Milpitas present to make a sworn statement with first hand knowledge working at Milpitas. Page 30, the hearing officer refused to allow me to enter my statement or questions. My rights were violated by removing every response I made sworn under oath for witnesses in documents that failed to attend. If the decision has no first hand witness in attendance, how was my testimony completely removed for a witness that did not attend to defend any of the statements that Findings of Fact, Conclusion of Law, and Recommended Decision allowed to remain in full and based on the State's Response to Applicant's Motion for Review or Rehearing did without violating my rights. Page 8, line 24-25, In a Complaint hearing, the State has the burden of proof, must have meant proving by removing my every statement and exhibit from the Recommended Decision.

Arizona State Board of Education, Garnett Burns individually, Susan Williams individually, and Katherine Haley individually. At all times relevant to this complaint each of the named was the agent, servant, employee, joint venturer, partner, alter ego, and/or co-conspirator of each remaining and was acting within the course and scope of said agency, service, employment, joint venture, partnership, and/or conspiracy. Each expressly, impliedly, and/or ostensibly authorized and ratified the acts of the other as set forth herein.

On January 9, 2025, the IU sent me a notice of investigation informing me the Board was seeking reciprocal revocation following California CTC. In response to IU, I requested a due process hearing based on I have no criminal record nor court order decision. I have zero convictions. I'm facing no criminal charges nor civil action. I claimed my actions were job duties identified on my moderate severe intern license. CTC revoked my license based on Default. I claimed failure of the person to receive notice served pursuant to Section 11505. I have evidence proving that California CTC changed my address multiple times. In a CTC disclosure file are 4 documents from CTC to me with different addresses and 2 mailed letters to CTC stating to stop changing my address. For California it appears the best practice to win a hearing is remove evidence, remove statements, and if possible remove the person from attending. This is similar to Arizona when reviewing the Recommended Decision. October 14, 2025 I attended In Person the Arizona proceeding with specific attention on Milpitas Unified School District and CTC allegations for misconduct. If you read the hearing officer's Recommended Decision it is a one-sided review and only allowed one-sided findings (with no witness attending) nearly to the point I was not at the proceeding and provided no statement nor any evidence or exhibits.

To be clear, laws that allow Arizona Board to revoke my license are "not" the issue, the focus is truth, evidence, due process, abuse and retaliation for claiming gender or sex discrimination. I explained every allegation as job duty written in the description of my license for moderate severe intern.

California had my emails from 2022 that I claimed discrimination, meaning before I ever applied for hire and license in Arizona I declared discrimination.

In or about January, 2025 I filed reports with the Office of Civil Rights and the Federal Bureau of Investigation. This is what appears to have started the retaliation, my identified interest to seek civil rights and law enforcement involvement. This never stopped, as I plan to report to the State Bar of Arizona what I believe Arizona State documents (Reporter's Transcript of Proceedings dated October 14, 2025, Findings of Fact, Conclusion of Law, and Recommended Decision dated October 14, 2025, Findings of Fact, Conclusion of Law, And Order dated December 8, 2025, Board Order and Notice dated December 8,

2025, and State's Response to Applicant's Motion for Review or Rehearing dated January 6, 2026) prove civil right violations, under color of law, as well as due process and altered written witness statements.

The IU redefined discrimination as identity rather than investigate possible grounds for discrimination. And, at my hearing all testimony sworn under oath with regards to discrimination was refused and denied from the decision of the hearing officer. The hearing officer also refused my statements that California CTC had altered written witness allegations, I claim to be felony alterations, and these allegations are under criminal investigation by the California State Bar.

October 14, 2025 I attended In Person a proceeding with documented evidence of my attendance. This proceeding was a complaint hearing held by the Arizona State Board of Education through the Professional Practices Advisory Committee (PPAC) held under hearing officer Susan Williams. Susan Williams signed the Findings of Fact, Conclusion of Law, and Recommended Decision. This falsified one-sided recommended decision identifies a predetermined decision and desired outcome that November 25, 2024 the Board's Investigation Unit discovered my California teaching credentials were revoked and the Board was seeking reciprocal revocation. The investigation unit (UI) retaliated for my declared intention to report to the Office of Civil Rights and the Federal Bureau of Investigation claims of discipline by Milpitas and California Commission on Teacher Credentialing (the IU reworded discrimination as "identity").

October 27, 2025 I filed complaints with multiple civil rights departments and law enforcement agencies, including California Civil Rights Department (CRD), ending with a Right to Sue. My attorney James Arrasmith mailed a 21 day prelitigation Demand to Milpitas, while preparing a Demand for Jury Trial, but California CTC responded around 10 days after prelitigation was mailed to Milpitas. California offered a meeting February 12-13, 2026.

December 8, 2025 Garnett Burns, Director of Enforcement Actions, State Board of Education prepared a document Board Order and Notice, this document explains that I may not seek professional services, to work or volunteer in an Arizona public or charter k-12 setting in any capacity. The Board supervises and controls the certification of persons engaged in instructional work directly in a school district or charter school. The Board may take disciplinary action against educators.

December 8, 2025 Katherine Haley acting as President, Arizona State Board of Education, prepared the Board Order and signed the order. The order is based on the one-sided review and findings, falsified recommended decision that had errors in the admission and rejection of facts with provable falsified statements that were presented in the Reporter's Transcript of Proceedings. This includes how Susan Williams as the hearing officer refused to allow discrimination and criminal or felony description of altered written allegations under investigation by California State Bar.

The fact is Due Process violations, Discrimination, and Retaliation are clearly found in Susan Williams recommended decision that Katherine Haley based her Order. This was clearly a failure to constitute due process, fundamental unfair proceedings and retaliation for discrimination complaints. The order by the Arizona State Board requires a fair and impartial process, which includes a meaningful opportunity to present one's case to be genuinely considered by the decision-maker. By reviewing the Reporter's Transcript of Proceedings and comparing the Findings of Fact, Conclusion of Law, and Recommended Decision all of my statements and evidence were completely removed as if I was never at the October 14, 2025 proceeding. The key procedural due process rights which governs the fairness of legal and administrative proceedings require core elements like notice and opportunity to be heard, impartial tribunal by a neutral decision-maker free of bias; decision based on the record and arguments presented. Susan Williams ignored valid arguments and evidence, suggesting a lack of impartiality or failure to conduct a "full and fair hearing" on all issues (clearly Susan Williams removed issues of discrimination and altered allegations). And, to continue to point out the Reporter's Transcript of Proceedings, Page 29, line 6-25, the state provided no witness to defend a single statement. I did make statements on the record. The transcript reflects I was the only person from Milpitas present to make a sworn statement with first hand knowledge working at Milpitas.. My rights were violated by removing every response I made sworn under oath for witnesses in documents that failed to attend. If the decision has no first hand witness in attendance, how was my testimony completely removed for a witness that did not attend to defend any of the statements

I was a dedicated special education teacher working with students with severe disabilities, was subjected to gender-based discrimination, retaliated against for raising legitimate safety concerns about student welfare, and denied the legally required mentorship support mandated by my intern teaching credential by Milpitas. I performed my job duties exactly as trained using evidence-based practices for students with autism and severe developmental disabilities, Milpitas staff characterized my conduct as misconduct, issued a discriminatory reprimand, and terminated my employment. Milpitas'actions were motivated by gender, my protected complaints about unsafe conditions, and the District's desire to shift blame for systemic safety failures following a serious student injury incident. My case represents a textbook example of employment discrimination, retaliation, and institutional scapegoating: a public school district violated its legal duty to provide required mentorship to an intern teacher, then blamed me for conduct that resulted directly from the lack of mentorship, all while applying workplace policies in a discriminatory manner based on my gender and retaliating against me for raising legitimate safety concerns.

December 20, 2025 I sent a Motion for Rehearing to the Arizona Board and Attorney General's Office. I requested the rehearing on the grounds the decision had irregularity in the administrative proceedings of the hearing body, was abuse of discretion, and thereby deprived me of a fair hearing by violating Title VII and preventing my claim of discrimination from being heard. Misconduct of the hearing using the Reporter's Transcript of Proceedings and my statements and evidence was completely removed in retaliation for reporting discrimination. I also provided newly discovered material evidence which could not with reasonable diligence have been discovered and produced at the hearing October 14, 2025 such as CTC providing February 12-13, 2026 meeting for reinstatement. The Findings of Fact removed all of my testimony and erased all evidence from inclusion. No witness came forward, but my attendance was removed from the report, and those that failed to attend were allowed to keep full false allegations in the decision. This includes evidence-based research for eloping IEP goals by walking 15-20 minutes, 1:1 autism best supported practice methods, and pictures date time stamped proving I informed when or where we took walks, that I used Crisis Prevention Interventions and prompting from AFIRM, and my time in the computer lab was performing a 3 year assessment. None of these job duties could be done without license, the staff do not write IEP eloping goals, they don't even have passwords or access to IEP records. The district did not grant them FERPA, HIPA, and Special Education law protected confidential access.

The Board accepted the accountability of its decision to support workplace discrimination, non-gender-neutral manner practices. My being a male teacher was disciplined for standard special education teaching practices: including walking with students to address elopement IEP goals, using Crisis Prevention Institute (CPI) physical prompts for student safety, and video recording for educational alternative assessment, that would not have resulted in discipline if performed by a female teacher. Arizona Board violated due process rights, causing loss of substantial income, emotional distress, and destruction of my professional reputation. I seek compensatory damages, punitive damages, attorney's fees, and all other relief available under law.

If asked what is my intention or desired outcome from this EEOC filing, I have provided the Milpitas Prelitigation, and Demand for a Jury Trial, I see offering Arizona Board the same documents, unless investigation leads to mediation that satisfies both parties, but I request EEOC review the nearly 600 pages of evidence covering the full Charge of Discrimination. The Demand for a Jury Trial was not completed because I stopped the filing, to allow California CTC the February 12-13, 2026 meeting. If that fails to produce both parties with satisfied results the Milpitas litigation will be filed likely by March of 2026.

I believe I have been subjected to discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended.

EEOC No. 555-2025-01544 ; FEPA No.

# CHARGE OF DISCRIMINATION

Form 5 (06/24)

This form is affected by the Privacy Act of 1974.
See attached Privacy Act Statement and other information before completing this form.

| CHARGE PRESENTED TO: | AGENCY CHARGE NO. |
|---|---|
| EEOC | 555-2025-01544 |
| California Civil Rights Department | |

Name (indicate Mr., Ms., Mrs., Miss, Dr., Hon., Rev.): KONRAD STIMSON

Phone No.:      (406) 788-5165
Year of Birth:
Mailing Address: 3055 Saint Rose Pkwy Box No. 777151
HENDERSON, NV 89052

Named below is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency that I believe discriminated against me or others.

Name: CTC Teacher Commission
No. Employees, Members: 501+ Employees
Phone No.:
Mailing Address: 651 Bannon St Suite 600
SACRAMENTO, CA 95811, UNITED STATES OF AMERICA
Name:
No. Employees, Members:
Phone No.:
Mailing Address:

DISCRIMINATION BASED ON:

Race, Retaliation, Sex

DATE(S) DISCRIMINATION TOOK PLACE

Earliest: 12/01/2024
Latest: 01/13/2026

THE PARTICULARS ARE:

Respondent has the authority to certify and identify my right to obtain employment.

In or around December 2024, Respondent notified me of its intent to prohibit me from obtaining future employment. I believe this action was taken based on my sex and race, as a result of discriminatory practices which occurred during my previous employment. Additionally, I believe Respondent is retaliating against me for filing a whistleblower complaint and objecting to discriminatory behavior. Within the past 300 calendar days, Respondent initiated contact with me to discuss my ability to seek future employment.

I believe I have been discriminated against based on my race, sex, and retaliated against for participating in protected activity, in violation of Title VII of the Civil Rights Act of 1964, as amended.

EEOC Form 5 (06/24)                                                                                   Page 1 of 3

# DECLARATION OF KONRAD STIMSON

**TO: California Commission on Teacher Credentialing 1900 Capitol Avenue Sacramento, CA 95811**

I, KONRAD STIMSON, declare under penalty of perjury under the laws of the State of California and the United States that the following is true and correct:

## I. INTRODUCTION

1. My name is Konrad Stimson. I was a credentialed Intern Moderate Severe teacher trained in AFIRM (Autism Focused Intervention Resources and Modules) and CPI (Crisis Prevention Institute) by MUSD mandatory training. I held valid teaching credentials in California.

2. I submit this declaration to document the misconduct committed by the California Commission on Teacher Credentialing in processing my credential matter, including falsification of evidence and deliberate denial of due process.

## II. CTC FALSIFIED MUSD'S FINDINGS

3. On May 20, 2022, Milpitas Unified School District issued a letter documenting its investigation. MUSD's original letter contained exculpatory findings: my arm was "resting **on the bench directly behind her**" and "**none had their arms positioned closely or around students.**"

4. CTC Allegations issued its own letter. **CTC deliberately altered MUSD's findings.** CTC changed "arm resting on the bench directly behind her" to "arm resting behind AN"—deleting the critical words "on the bench" that proved I was not touching the student. CTC entirely omitted the exculpatory statement that "none had their arms positioned closely or around students."

5. These alterations were not errors. CTC preserved all inculpatory language while surgically removing only the words that proved my innocence. This constitutes falsification of evidence. The documents speak for themselves, and I possess both versions proving what CTC deleted.

6. Based on this falsified evidence, CTC revoked my California teaching credential in 2024.

## III. CTC DELIBERATELY SENT NOTICES TO THE WRONG ADDRESS

7. CTC compounded its misconduct by denying me due process. On **July 11, 2025**, and **August 20, 2025**, CTC mailed critical notices to **Richmond, Texas 77407**. I have never lived in Texas. I resided in Henderson, Nevada.

8. Then, on **November 24, 2025**, CTC suddenly sent correspondence to my correct address in Henderson, Nevada 89011.

9. **If CTC only had my Texas address in July and August, how did CTC obtain my Nevada address by November?** The answer is clear: CTC had my correct Nevada address all along. CTC deliberately sent notices to the wrong state to create default conditions, deny me the opportunity to respond, and manufacture grounds for revocation.

10. This violated my constitutional right to due process under *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950), which requires notice "reasonably calculated" to inform parties of pending actions.

## IV. CTC CONSPIRED WITH ASBE TO REVOKE BOTH CREDENTIALS

11. CTC has a reciprocal revocation agreement with the Arizona State Board of Education. Under this agreement, each state automatically adopts the other's credential actions without independent investigation.

12. ASBE did not verify CTC's findings. ASBE did not review the original MUSD letter. ASBE rubber-stamped CTC's falsified evidence, and Arizona revoked my credential based on California's fraud.

13. At my Arizona hearing on October 14, 2025, I presented evidence of CTC's falsification. ASBE ignored it. My rehearing was deemed denied on January 19, 2026. CTC's misconduct thus infected two states' proceedings, destroying my career nationwide through a single act of fraud.

## V. DISCRIMINATORY AND RETALIATORY TREATMENT

14. I am male. A female staff member, Ruby, caused an actual student injury at MUSD—she gave a student a too-heavy bowling ball and was not supervising properly. Ruby received no discipline. **Ruby was promoted.**

15. I followed approved special education training. My walks with students were scheduled classroom activities, documented on my whiteboard. No student was ever injured. **My credential was revoked.**

Mr. Stimson:

I am an attorney with the U.S. Department of Justice, Civil Rights Division, and I am following up on three complaints you have sent to our office regarding the Milpitas Unified School District. Will you please call me at ████████ to discuss those complaints.

Sincerely,

Mark Dann

*Mark A. Dann*
Senior Trial Attorney

Civil Rights Division, EOS

4CON Rm. 10.113

████████

████████@████████

14



STATE OF CALIFORNIA    Business Consumer Services and Housing Agency

GAVIN NEWSOM  GOVERNOR

KEVIN KISH  DIRECTOR

**Civil Rights Department**

651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

October 27, 2025

**Via Email: Konrad.stimson@gmail.com**

Konrad Stimson
10811 Jowart Ct.
Richmond, TX 77469

RE: **Notice of Case Closure**
**Case Number**: 202501-27934530
**Case Name**: Stimson / Milpitas Unified School District
**Case Type**: Employment
**County of Violation**: Santa Clara

Dear Konrad Stimson:

The Civil Rights Department (CRD) has closed your case for the following reason(s):
**Complainant Elected Court Action**.

CRD has not determined if further investigation might establish violation(s) of the law. This decision does not mean the alleged claims have no merit or that the respondent is following the law. This case closure is relevant to the allegations listed on the signed complaint only.

**This is your Right to Sue notice**. Government Code section 12965, subdivision (b), declares that you may file your own civil action asserting employment claims under FEHA within one year of the date of this letter. If you want to file a civil action that includes other claims, you should consult an attorney about the applicable statutes of limitation. The intake form for this case was submitted to CRD on January 29, 2025.

After receiving a Right-to-Sue notice from CRD, you may have the right to file your complaint with a local government agency that enforces employment anti-discrimination laws. If you decide to file with a local agency, you must file before the deadline that is on your Right-to-Sue notice. Filing your complaint with a local agency does not prevent you from also filing a lawsuit in court.

Your complaint is **not dual filed** with the United States Equal Employment Opportunity Commission (EEOC). To obtain a federal Right to Sue notice, you must contact EEOC to file a complaint within 30 days of receipt of this letter or within 300 days of the alleged discriminatory act, whichever is earlier.

You have the right to appeal the decision to close your case. This request must be

CRD-ENF 17NCC (Revised 2025/10)

THE LAW OFFICES OF
JAMES L. ARRASMITH

5150 Sunrise Boulevard,
Suite G-1
Fair Oaks, CA 95628

☏ 916-704-3009
✉ james@jlegal.org

November 12, 2025

**VIA CERTIFIED MAIL**

Human Resources Director
Milpitas Unified School District
1331 E. Calaveras Blvd.
Milpitas, California 95035

**RE: Formal Pre-Litigation Demand**
**Matter: Konrad Stimson v. Milpitas Unified School District**
**Claims: FEHA Discrimination, Retaliation, Breach of Statutory Duty**

## I. INTRODUCTION

This letter constitutes formal demand on behalf of Mr. Konrad Stimson arising from Milpitas Unified School District's violations of the California Fair Employment and Housing Act (FEHA), Government Code section 12900 et seq., breach of mandatory statutory duties under California Code of Regulations Title 5, and retaliatory termination. The District discriminated against Mr. Stimson based on sex, failed to provide legally required mentorship support to an intern special education teacher, and retaliated against him for reporting student safety concerns. These violations destroyed Mr. Stimson's professional reputation, resulted in multi-state credential revocations, and caused over three million dollars in quantifiable damages.

Mr. Stimson has exhausted all administrative remedies. The California Civil Rights Department issued a Right to Sue notice on October 27, 2025 (Case No. 202501-27934530), authorizing immediate civil action. Litigation will commence unless this matter resolves within twenty-one calendar days.

## II. FACTUAL BACKGROUND

### 1. Intern Credential and Mentor Requirement

On July 22, 2021, National University certified Mr. Stimson's eligibility for a Preliminary Education Specialist Intern Credential, Moderate/Severe specialization. The District hired Mr. Stimson as an intern teacher in its adult autism program for the 2021-2022 school year. Under California Code of Regulations Title 5, sections 10074 and 80027(e), and Education Code section 44454(a), school districts employing intern teachers must provide ongoing support and supervision through a qualified site-based Mentor Teacher holding a clear credential in the same authorization area.

1

Despite written and verbal requests, the District never assigned Mr. Stimson a Mentor Teacher. The District's failure violated state law and breached its statutory duty to support intern educators. Assistant Superintendent Jonathan Brunson and Special Education Coordinator Stacey Lillard acknowledged internally that no Mentor was assigned, yet faulted Mr. Stimson for gaps in training that were the District's legal responsibility to provide.

### 2. Sex-Based Disparate Treatment

Female Transitional Assistants RD and FB working in Mr. Stimson's classroom regularly performed identical one-on-one instructional activities with male students, including walking interventions, physical prompting using Crisis Prevention Intervention (CPI) techniques, and close supervision during community outings. Neither received discipline. Mr. Stimson, a male educator implementing the same evidence-based practices with female students diagnosed with moderate/severe autism, was selectively targeted and disciplined. This disparate treatment based on sex violates FEHA Government Code section 12940(a).

### 3. Protected Safety Complaints and Retaliation

In November 2021, Mr. Stimson reported to District administrators that a student under supervision of a one-on-one aide suffered a serious hand injury requiring surgery during a bowling alley field trip. Mr. Stimson documented concerns about inadequate staff training, unsafe supervision ratios, and failure to implement proper safety protocols for students with severe disabilities. Within months of these protected safety complaints, the District issued a Letter of Reprimand dated May 20, 2022, and a notice of non-reelection on the same date.

The temporal proximity between Mr. Stimson's protected activity and adverse employment action establishes prima facie retaliation under FEHA Government Code section 12940(h) and California Labor Code sections 1102.5 and 6310.

### 4. Fabricated Allegations and Due Process Violations

The District's May 20, 2022, Letter of Reprimand mischaracterized lawful special education practices as misconduct. The allegations ignored that Mr. Stimson's students required constant one-on-one support per their Individualized Education Programs (IEPs), that walking interventions addressed documented elopement behaviors, that CPI holds prevented student injury, and that video recording served legitimate assessment purposes under IDEA Section 504 accommodations.

The District transmitted these allegations to the California Commission on Teacher Credentialing (CTC), which materially altered the evidence. CTC Allegation 16 removed the phrase "arm resting on the bench" from witness Stacey Lillard's original statement describing the March 25, 2022, Great Mall incident, converting a non-contact observation into an accusation of inappropriate touching. CTC Allegation 12 changed the non-reelection date from May 20, 2022, to June 2, 2022, misrepresenting the timing and removing language thanking Mr. Stimson for his service.

These alterations mirror the proven misconduct in *Carroll v. Commission on Teacher Credentialing*, Sacramento Superior Court Case No. 34-2012-00135527, where a jury awarded $3,064,528 after finding

2

CTC attorneys altered documents and retaliated against a whistleblower attorney. Mr. Stimson has filed State Bar Complaint No. 25-NA-29299 regarding these alterations.

### 5. Credential Revocation and Multi-State Harm

On July 5, 2024, the CTC revoked Mr. Stimson's credentials by default decision based on the District's defective allegations and altered evidence. This revocation triggered reciprocal actions in Arizona and other states where Mr. Stimson held teaching licenses, compounding the professional and financial damage. Mr. Stimson filed a petition for reinstatement with the CTC on July 5, 2025. Four credentials currently show "Pending Additional Evaluation" status on his CTC profile.

## III. LEGAL BASIS FOR CLAIMS

### FEHA Sex Discrimination (Gov. Code § 12940(a))
The District subjected Mr. Stimson to disparate treatment based on sex by disciplining him for conduct identical to that performed by female employees without consequence. Under *Guz v. Bechtel National Inc.*, 24 Cal. 4th 317, 354 (2000), this direct evidence of sex-based discrimination violates FEHA. The California Civil Rights Department complaint (Case No. 202501-27934530) corroborates the discriminatory enforcement of policies based on gender.

### FEHA Retaliation (Gov. Code § 12940(h))
Mr. Stimson engaged in protected activity by reporting student safety concerns and requesting investigation of the November 2021 injury incident. The District's May 20, 2022, reprimand and non-reelection constituted adverse employment actions causally connected to this protected activity. *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1042 (2005), establishes that temporal proximity supports inference of retaliatory motive.

### Failure to Prevent Discrimination (Gov. Code § 12940(k))
The District failed to train administrators, establish oversight mechanisms, or prevent discrimination against male teachers in special education placements performing evidence-based autism interventions.

### Breach of Statutory Duty
California Code of Regulations Title 5, sections 10074 and 80027(e), mandate that school districts provide ongoing support and supervision to intern teachers through qualified mentors. The District's failure to assign Mr. Stimson a Mentor constitutes breach of this non-discretionary statutory duty. Education Code section 44454(a) requires districts employing intern teachers to provide "support and assistance."

### Negligent Misrepresentation
By hiring Mr. Stimson as an intern teacher and accepting his intern credential, the District represented that legally required mentorship and supervision would be provided. Mr. Stimson relied on this representation by investing approximately $17,500 in National University's credential program and accepting the position. The District's failure to fulfill this obligation caused financial harm and prevented completion of the credential requirements.

3

*Civil Liability for Evidence Tampering*

The alteration of witness statements and official documents transmitted to the CTC constitutes actionable misconduct under Government Code section 820.2 (public entity liability for employee acts). The precedent established in *Carroll v. Commission on Teacher Credentialing* demonstrates that document tampering supporting credential revocation gives rise to substantial civil damages including compensatory and punitive relief.

## IV. DAMAGES

Mr. Stimson has sustained the following quantifiable damages:

**Past Lost Earnings:** May 2022 through November 2025 equals 42 months at $13,000 per month average for traveling special education specialists: $546,000.

**Future Lost Earnings:** Annual earnings capacity of $156,000 (based on $3,000 weekly rate for moderate/severe education specialists per current market data) over 19.23 year remaining career span: $3,000,000.

**Educational Investment Loss:** National University credential program tuition and fees: $17,500.

**Emotional Distress:** Severe anxiety, depression, and reputational harm resulting from credential revocation and false allegations. Comparable to compensatory damages awarded in *Carroll* ($2,844,528) for similar institutional misconduct.

**Attorney's Fees and Costs:** Recoverable under Government Code section 12965(b). Projected litigation costs through trial: $500,000 to $1,000,000.

**Total Provable Damages:** Exceeding $3,500,000 before attorney's fees.

## V. SETTLEMENT DEMAND

In the interest of early resolution and mitigation of further liability, Mr. Stimson proposes settlement under either of the following alternative structures:

**Option A: Monetary Settlement Only:** Payment of $3,000,000 to Mr. Stimson, representing compensatory damages under FEHA, breach of statutory duty, and negligent misrepresentation claims. This amount reflects a discount from total provable damages exceeding $3,500,000.

**Option B: Reduced Monetary Settlement with Institutional Accountability:** Payment of $1,000,000 to Mr. Stimson, plus:

a) Written acknowledgment from Milpitas Unified School District that Mr. Stimson served as an intern teacher under a Moderate/Severe credential and that the District failed to provide the legally required Mentor Teacher;

b) Confirmation that Mr. Stimson's conduct fell within the scope of lawful special education teaching duties and evidence-based autism intervention practices;

4

c) Written support for Mr. Stimson's credential reinstatement petition before the California Commission on Teacher Credentialing, including correspondence affirming the District's failure to provide required supervision; and

d) Agreement to provide only neutral employment verification (dates of employment and position held) for future reference inquiries.

Either settlement structure shall include:

c) Reimbursement of all attorney's fees and costs incurred to date;

f) Mutual general release of all claims arising from Mr. Stimson's employment; and

g) Confidentiality provisions as mutually agreed by the parties.

**Settlement Deadline:** This offer remains open for twenty-one (21) calendar days from the date of this letter, through **December 3, 2025**. Mr. Stimson remains willing to participate in voluntary mediation with a mutually agreed neutral mediator.

## VI. PRESERVATION OF EVIDENCE

Milpitas Unified School District is formally notified to preserve all documents, communications, electronic records, and physical evidence related to: (a) Mr. Stimson's employment, evaluation, and disciplinary proceedings; (b) communications with the California Commission on Teacher Credentialing; (c) mentor teacher assignment policies and intern support procedures; (d) disciplinary records for all teachers and instructional aides in the Adult Autism Program from 2021 through 2023; and (e) staff training records related to CPI, Applied Behavioral Analysis, and special education protocols. Failure to preserve evidence may result in spoliation sanctions under *Temple Community Hospital v. Superior Court*, 20 Cal. 4th 464, 476 (1999).

## VII. CONCLUSION AND LITIGATION CONSEQUENCES

The District's conduct represents serious violations of California civil rights and education law standards. Mr. Stimson was an intern educator implementing evidence-based practices for students with severe disabilities, yet he was denied legally mandated mentorship, targeted based on sex, and permanently damaged by defective allegations that the CTC materially altered.

If the District fails to respond substantively within twenty-one calendar days, Mr. Stimson will file a civil complaint in Santa Clara County Superior Court alleging FEHA discrimination, FEHA retaliation, failure to prevent discrimination, breach of statutory duty, negligent misrepresentation, and related claims. **Mr. Stimson's FEHA statute of limitations expires October 27, 2026** (one year from CRD Right to Sue notice), providing time for good-faith negotiations before litigation.

The District should immediately notify its liability insurance carrier(s) of this claim. Pursuant to California Evidence Code section 1152, all settlement communications are inadmissible to prove liability.

5

We urge prompt and fair resolution through monetary compensation and institutional accountability. The evidence supports Mr. Stimson's claims, the law favors his position, and the *Carroll* precedent demonstrates that California juries award substantial damages for the type of misconduct alleged here.

Direct all communications to this office at (916) 704-3009 or james@jlegal.org.

Respectfully submitted,

**James L. Arrasmith**
Attorney at Law
State Bar No. 332498
The Law Offices of James L. Arrasmith

**CONFIDENTIALITY NOTICE**: This communication and any accompanying documents are confidential and privileged. They are intended solely for the addressee. If you receive this transmission in error, you are advised that any disclosure, copying, distribution, or action in reliance upon this communication is strictly prohibited. If you received this communication in error, please contact this office immediately at (916) 704-3009.

6

James L. Arrasmith, Esq., SBN # 332498
**The Law Offices of James L. Arrasmith**
5150 Sunrise Boulevard, Suite G-1
Fair Oaks, CA 95628
Telephone: (916) 704-3009
E-mail: james@jlegal.org   www.jlegal.org

ATTORNEY FOR PLAINTIFF, KONRAD ALEXANDER STIMSON

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## COUNTY OF SANTA CLARA

| | |
|---|---|
| **KONRAD ALEXANDER STIMSON,** | Case No. |
| *Plaintiff,* | **COMPLAINT FOR DAMAGES:** |
| v. | **1. Gender Discrimination in Violation of the Fair Employment and Housing Act** |
| **MILPITAS UNIFIED SCHOOL DISTRICT; STACEY LILLARD, individually; JONATHAN BRUNSON, individually; AND DOES 1 THROUGH 50, inclusive,** | **2. Retaliation in Violation of the Fair Employment and Housing Act** **3. Failure to Prevent Discrimination and Retaliation in Violation of the Fair Employment and Housing Act** |
| *Defendants.* | **4. Whistleblower Retaliation in Violation of California Labor Code § 1102.5** **5. Breach of Contract** **6. Breach of Mandatory Statutory Duty (Gov. Code § 815.6)** |
| | **DEMAND FOR JURY TRIAL** |

Plaintiff Konrad Alexander Stimson, by and through his attorney of record, James L. Arrasmith, Esq., and hereby files this Complaint for Damages against Defendants Milpitas Unified School District, Stacey Lillard, Jonathan Brunson, and DOES 1 through 50, inclusive, as follows:

## I. INTRODUCTION

1. This is a civil action for damages arising from Defendants' unlawful employment discrimination, retaliation, and breach of contract. Plaintiff, a dedicated special education teacher working with students with severe disabilities, was subjected to gender-based

discrimination, retaliated against for raising legitimate safety concerns about student welfare, and denied the legally required mentorship support mandated by his intern teaching credential. When Plaintiff performed his job duties exactly as trained using evidence-based practices for students with autism and severe developmental disabilities, Defendants characterized his conduct as misconduct, issued a discriminatory reprimand, and terminated his employment. Defendants' actions were motivated by Plaintiff's gender, his protected complaints about unsafe conditions, and the District's desire to shift blame for systemic safety failures following a serious student injury incident. This case represents a textbook example of employment discrimination, retaliation, and institutional scapegoating: a public school district violated its legal duty to provide required mentorship to an intern teacher, then blamed that same teacher for conduct that resulted directly from the lack of mentorship, all while applying workplace policies in a discriminatory manner based on the teacher's gender and retaliating against him for raising legitimate safety concerns.

2. Plaintiff held an *Intern Education Specialist Instruction Credential*, which by law required Defendants to provide him with a qualified mentor teacher for guidance, training, and supervision. Despite this legal obligation, Defendants never assigned Plaintiff a mentor, never provided mentorship services, and cannot identify by name any individual who served as Plaintiff's mentor. This failure constituted a fundamental breach of Defendants' contractual and statutory duties and directly caused the alleged policy violations that led to Plaintiff's discipline and termination.

3. Defendants applied workplace policies in a discriminatory, non-gender-neutral manner. Plaintiff, a male teacher, was disciplined for standard special education teaching practices: including walking with students to address elopement concerns, using Crisis Prevention Institute (CPI) physical prompts for student safety, and video recording for educational assessments, that would not have resulted in discipline if performed by a female teacher. Indeed, Defendants' own training materials depict a female educator using identical physical techniques with a male student, yet no discipline was imposed in those circumstances.

4. After a student in Plaintiff's classroom was seriously injured and hospitalized in November 2021 while under the supervision of a one-on-one aide (not Plaintiff), Plaintiff raised concerns about inadequate staff training and supervision. Rather than investigate their own systemic failures, Defendants retaliated against Plaintiff by issuing a pretextual letter of reprimand, placing him on administrative leave, and terminating his employment.

5. As a direct result of Defendants' unlawful conduct, Plaintiff suffered severe damages including loss of his teaching career, revocation of his teaching credentials, loss of substantial income, emotional distress, and destruction of his professional reputation. Plaintiff seeks compensatory damages, punitive damages, attorney's fees, and all other relief available under law.

///

COMPLAINT FOR DAMAGES
Page 2 of 30

## II. JURISDICTION AND VENUE

6. This Court has jurisdiction over this action pursuant to Article VI, Section 10 of the California Constitution and California Code of Civil Procedure section 410.10.

7. Venue is proper in Santa Clara County pursuant to Code of Civil Procedure section 395 because Defendants maintain their principal place of business in Santa Clara County, the acts and omissions giving rise to this action occurred in Santa Clara County, and the employment relationship at issue was based in Santa Clara County.

8. Plaintiff has exhausted all administrative remedies required under the California Fair Employment and Housing Act ("FEHA"). Plaintiff filed a timely complaint with the California Civil Rights Department (formerly the Department of Fair Employment and Housing) on January 29, 2025 (Case Number 202501-27934530). The California Civil Rights Department ("CRD") issued a Right to Sue letter on October 27, 2025, permitting Plaintiff to pursue civil litigation. This action is filed within one year of the issuance of the Right to Sue letter as required by Government Code section 12965(b).

9. All conditions precedent to filing this action have occurred or have been waived.

## III. PARTIES

10. Plaintiff Konrad Alexander Stimson is, and at all times relevant to this Complaint was, a resident of Henderson, Nevada. At the times relevant to this Complaint, Plaintiff was employed by Defendant Milpitas Unified School District as a special education teacher in California.

11. Defendant Milpitas Unified School District ("MUSD" or "the District") is, and at all times relevant to this Complaint was, a public school district organized and existing under the laws of the State of California, with its principal place of business located at 1331 East Calaveras Boulevard, Milpitas, California 95035. At all times relevant herein, MUSD was Plaintiff's employer within the meaning of the Fair Employment and Housing Act, Government Code section 12900 et seq., and California Labor Code section 1102.5. MUSD employed more than five employees at all times relevant to this action.

12. Defendant Stacey Lillard ("Lillard") is, and at all times relevant to this Complaint was, employed by MUSD as Special Education and Student Services Coordinator, with direct supervisory authority over special education teachers in the Moderate/Severe Program, including Plaintiff.

13. Defendant Jonathan Brunson ("Brunson") is, and at all times relevant to this Complaint was, employed by MUSD in a supervisory or administrative capacity with authority over personnel decisions, including disciplinary actions and employment recommendations.

14. The true names and capacities, whether individual, corporate, associate, or otherwise, of Defendants named herein as DOES 1 through 50, inclusive, are unknown to Plaintiff at this time, and Plaintiff therefore sues these Defendants by such fictitious names pursuant to Code of Civil Procedure section 474. Plaintiff will seek leave to amend this Complaint to show the true names and capacities of these Defendants when such identities have been

ascertained. Plaintiff is informed and believes, and thereon alleges, that each of the Doe Defendants is legally responsible for the acts, omissions, and conduct alleged herein and for the damages sustained by Plaintiff as alleged herein.

15. At all times relevant to this Complaint, each Defendant was the agent, servant, employee, joint venturer, partner, alter ego, and/or co-conspirator of each remaining Defendant and was acting within the course and scope of said agency, service, employment, joint venture, partnership, and/or conspiracy. Each Defendant expressly, impliedly, and/or ostensibly authorized and ratified the acts of the other Defendants as set forth herein.

16. Whenever reference is made to any act, condition, or omission of any Defendant, such allegation shall be deemed to mean the act, condition, or omission of each Defendant and each of them acting individually, jointly, severally, and in concert with one another, and/or through their officers, directors, employees, partners, agents, joint venturers, and/or representatives while actively engaged in the management, direction, control, or transaction of their respective business or affairs.

17. At all times relevant to this Complaint, Defendants Lillard and Brunson personally participated in the discriminatory and retaliatory conduct alleged herein, including but not limited to: authoring and approving the discriminatory Letter of Reprimand; making the decision to place Plaintiff on administrative leave; recommending or approving Plaintiff's non-reelection; transmitting false and misleading allegations to the California Commission on Teacher Credentialing; and failing to assign Plaintiff a legally required mentor despite actual knowledge of this obligation.

18. Defendants Lillard and Brunson aided, abetted, incited, compelled, and/or coerced MUSD's unlawful employment practices within the meaning of Government Code section 12940(i). Defendants Lillard and Brunson knew that their conduct constituted discrimination and retaliation, knew that such conduct was unlawful, and provided substantial assistance and encouragement to the discriminatory and retaliatory scheme. Defendants Lillard and Brunson are individually liable for their own tortious conduct and for aiding and abetting MUSD's violations of FEHA.

## IV. GENERAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### A. *Plaintiff's Employment and Credentials*

19. In or about October 2021, Plaintiff was hired by MUSD as a special education teacher to work in the District's post-secondary education program serving students with autism and severe developmental disabilities (the "Moderate/Severe Program"). The students in this program ranged in age from 18 to 22 years old and had significant educational and behavioral support needs.

20. At the time of his hiring, Plaintiff held an *Intern Education Specialist Instruction* **Credential** issued by the California Commission on Teacher Credentialing ("CTC"), Document number 210179652, issued on July 29, 2021, and valid through August 1, 2023.

21. An Intern Education Specialist Instruction Credential is a preliminary teaching credential that authorizes the holder to teach while completing credential requirements under the supervision and guidance of a qualified mentor teacher. The intern credential explicitly requires that the employing school district provide the intern teacher with:

    a. A qualified mentor teacher with appropriate experience and credentials;
    b. Regular guidance, support, and supervision from the mentor;
    c. Professional development and training in district policies and procedures;
    d. Ongoing assessment and feedback regarding teaching performance; and
    e. Support in completing credential program requirements.

22. California Education Code and Title 5 of the California Code of Regulations impose mandatory requirements on school districts that employ intern teachers, including the requirement to assign and provide a qualified mentor. These requirements are not optional or discretionary.

23. The intern credential status is clearly indicated on the teaching credential issued by CTC and is accessible to school districts through the CTC database. MUSD had actual knowledge of Plaintiff's intern status at the time of hiring and throughout Plaintiff's employment.

24. Prior to his employment with MUSD, Plaintiff invested approximately **$15,000 to $19,000** in completing coursework and training for his Moderate/Severe Education Specialist credential program through National University. This specialized program prepared Plaintiff to work with students with severe disabilities, including autism spectrum disorder.

25. Plaintiff's employment with MUSD was expressly conditioned upon the District's legal obligation to provide the required mentorship and support for intern teachers. The intern credential status is clearly disclosed on the credential document provided to employers, and MUSD was required by law to verify Plaintiff's credential status before assigning him teaching duties, thereby providing MUSD with actual and constructive knowledge of its legal obligation to provide a mentor. Plaintiff accepted the position in reliance upon MUSD's legal duty to provide such mentorship, which was a material and essential term of the employment relationship without which Plaintiff would not have accepted the position or invested substantial funds in his credential program.

**B. Defendants' Failure to Provide Required Mentor**

26. At no time during Plaintiff's employment with MUSD was Plaintiff assigned a qualified mentor teacher as required by his intern credential and California law.

27. At no time during Plaintiff's employment did MUSD identify by name any individual serving as Plaintiff's mentor.

28. At no time during Plaintiff's employment did Plaintiff receive regular guidance, supervision, or support from a designated mentor teacher.

///

29. At no time during Plaintiff's employment did MUSD provide Plaintiff with the training, policy guidance, procedural instruction, or professional development required to be delivered through the mentor relationship.

30. Throughout his employment, Plaintiff repeatedly requested mentor support from MUSD administrators and supervisors, including Defendant Lillard. Plaintiff's requests were ignored, dismissed, or deflected.

31. When Plaintiff raised concerns about the lack of mentor support, MUSD administrators, including Defendant Lillard, blamed Plaintiff for "breakdown in communication" and "not knowing policies," despite MUSD's failure to provide the legally mandated mentorship and training that would have addressed these very issues.

32. MUSD's failure to provide a mentor was not an inadvertent oversight. MUSD had actual knowledge of Plaintiff's intern status, had a legal duty to assign a mentor, and consciously chose not to fulfill this obligation.

33. The assignment of a special education caseload and access to student Individualized Education Programs (IEPs) requires verification of teaching credentials through the CTC database. It would have been impossible for MUSD to assign Plaintiff his teaching duties without accessing his credential information and knowing his intern status.

34. Expert testimony will establish that no school district would grant a teacher access to special education case management responsibilities without verifying credential status, and that MUSD necessarily knew Plaintiff held an intern credential requiring mentor support.

35. MUSD's failure to provide a mentor was a direct and proximate cause of the alleged policy violations that led to Plaintiff's discipline and termination, as a qualified mentor would have provided real-time guidance, training, and correction regarding district policies, procedures, and expectations.

### C. Plaintiff's Job Duties and Evidence-Based Special Education Practices

36. Plaintiff's position required him to implement evidence-based educational practices for students with autism and severe developmental disabilities, including:
   a. Conducting functional behavior assessments and developing behavior intervention plans;
   b. Implementing strategies to address elopement (students running away or wandering);
   c. Teaching community-based skills and promoting independence;
   d. Using Crisis Prevention Institute (CPI) de-escalation and physical intervention techniques when necessary for student safety;
   e. Conducting educational assessments, including alternative assessments for students with severe disabilities; and
   f. Utilizing assistive technology and video modeling as evidence-based instructional strategies.

37. Plaintiff was trained in and certified in Crisis Prevention Institute (CPI) techniques, a nationally recognized evidence-based approach for preventing and de-escalating crisis situations with students with disabilities. CPI training explicitly teaches physical prompts, guided movements, and safety holds designed to prevent student injury.

38. MUSD required special education teachers working in the Moderate/Severe Program to be CPI certified and expected teachers to use CPI techniques when necessary to ensure student safety.

39. MUSD provided CPI training materials to its staff, including a comprehensive training manual containing photographs and descriptions of appropriate physical intervention techniques. These training materials explicitly depict educators using physical prompts, including guiding students, placing hands on students' arms and backs, and providing physical support; the exact techniques Plaintiff utilized in his teaching practice.

40. Notably, MUSD's CPI training materials depict a **female educator** demonstrating physical intervention techniques with a **male student**. No disciplinary action was ever taken against female educators for using these techniques with male students.

41. Plaintiff's teaching practices were consistent with:
    a. Autism-Focused Intervention Resources and Modules (AFIRM), a research-based resource developed by the National Professional Development Center on Autism Spectrum Disorder;
    b. Peer-reviewed research on autism education and behavioral interventions;
    c. CPI training standards and protocols;
    d. Requirements under the Individuals with Disabilities Education Act (IDEA) for individualized educational services; and
    e. Best practices in special education as recognized by the Council for Exceptional Children and other professional organizations.

42. Plaintiff maintained extensive documentation supporting his teaching practices, including research articles, training materials, IEP documentation, and communications with parents regarding student needs and interventions.

## D. The November 2021 Student Injury Incident

43. In or about November 2021, approximately three months before the allegations against Plaintiff arose, a male student enrolled in Plaintiff's classroom ("[student] N.E.M.") was seriously injured during a community outing to a bowling alley.

44. [Student] N.E.M. was hospitalized and required surgery, nearly losing his hand as a result of the incident.

45. At the time of the injury, [student] N.E.M. was under the direct supervision of a one-on-one aide assigned specifically to that student, not under Plaintiff's supervision.

46. The incident raised serious concerns about the adequacy of staff training, supervision protocols, and safety procedures in MUSD's Moderate/Severe Program.

47. Following the November 2021 incident, Plaintiff raised concerns with MUSD administrators, including Defendant Lillard, about:

a. Inadequate training for instructional aides and paraprofessionals;

b. Insufficient supervision protocols for community-based outings;

c. The need for improved safety procedures to prevent student injuries;

d. The lack of mentor support for intern teachers managing complex special education classrooms; and

e. The need for outside investigation or review of program safety.

48. Plaintiff's concerns were protected activities under California law, as they related to violations of regulations governing student safety, adequate supervision, and compliance with special education laws.

49. Rather than investigating and addressing the systemic safety issues Plaintiff identified, MUSD administrators responded defensively and began scrutinizing Plaintiff's teaching practices.

50. Plaintiff is informed and believes, and thereon alleges, that MUSD administrators, including Defendants Lillard and Brunson, made a conscious decision to shift blame for the program's safety failures onto Plaintiff rather than acknowledge and remedy systemic deficiencies.

**E. The Discriminatory and Retaliatory Letter of Reprimand**

51. On or about May 20, 2022, approximately 5-6 months after Plaintiff raised safety concerns following the November 2021 incident, Defendant Brunson authored and MUSD issued a Letter of Reprimand to Plaintiff.

52. The Letter of Reprimand set forth three categories of alleged misconduct:

**Allegation 1: Walking with Students Alone**

The reprimand alleged that Plaintiff "repeatedly took two female [students], MT and AN, separately on walks alone, without informing other MUSD employees when or where [he] was taking them," and that "the walks would take about 15-20 minutes and would involve a route out of sight of other MUSD staff."

**Allegation 2: Inappropriate Physical Contact**

The reprimand alleged that Plaintiff "often tried to isolate [student] AN from other students and MUSD employees," that Plaintiff "regularly wrapped his arm around AN's shoulder," that Plaintiff "rubbed AN's arm and back when she would work or stand near [him] in the classroom," and that at a field trip to the Great Mall in Milpitas, Plaintiff "was seated directly next to AN with his arm resting on the bench behind AN" while "no other instructors were seated next to students."

**Allegation 3: Video Recording**

The reprimand alleged that in March 2022, when a staff member entered the computer lab, she "observed [Plaintiff] sitting in front of [student] MT and video recording her,"

COMPLAINT FOR DAMAGES
Page 8 of 30

that Plaintiff "acted surprised and then immediately turned off the camera and disconnected the recording device," and that Plaintiff "was recording MT with his personal camera and computer, and was not using MUSD equipment."

53. Each of the allegations in the Letter of Reprimand falsely characterized standard, evidence-based special education practices as misconduct, deliberately stripping these practices of all educational and behavioral context in order to create the false appearance of impropriety where none existed.

54. The Letter of Reprimand contains language and framing that emphasizes Plaintiff's gender (male) and the students' gender (female), including repeated references to "female students" and focusing on Plaintiff being "alone" with students.

55. The Letter of Reprimand did not acknowledge or reference:

  a. Plaintiff's intern credential status or MUSD's failure to provide required mentorship;
  b. The educational and behavioral justifications for Plaintiff's teaching practices;
  c. Plaintiff's CPI training and certification;
  d. The research-based nature of Plaintiff's interventions;
  e. The IEP-related purposes of student assessments and interventions;
  f. MUSD's own training materials depicting identical techniques;
  g. Parent communications supporting Plaintiff's interventions; or
  h. The fact that female teachers routinely engaged in identical practices without discipline.

### F. Educational Justifications for Plaintiff's Practices - Context Omitted from Reprimand

### Allegation 1 - Walking with Students:

56. The "walks" referenced in the reprimand were not aimless wandering but were structured educational interventions designed to address specific student needs documented in IEPs and parent communications.

57. Specifically, the parent of [student] AN had communicated concerns to Plaintiff about her adult daughter's tendency to elope (run away) in community settings, including an incident where the student ran into a parking lot, posing a serious safety risk.

58. In response to this parental concern and consistent with evidence-based practices for addressing elopement in individuals with autism, Plaintiff researched and implemented structured walking programs designed to:

  a. Teach safe pedestrian skills and community navigation;
  b. Build tolerance for walking with an adult without eloping;
  c. Develop functional skills for independence in community settings; and
  d. Collect data on elopement behaviors for IEP progress monitoring.

59. Structured walking programs are a recognized, evidence-based intervention for individuals with autism who exhibit elopement behaviors, as documented in peer-reviewed research and recommended by autism education resources including AFIRM.

60. The walks were conducted during instructional time as part of community-based instruction, a required component of transition programming for students ages 18-22 preparing for adult independence.

61. Video documentation available on public platforms demonstrates the severity of elopement risks for individuals with autism, including students running into traffic and other dangerous situations, precisely the concerns raised by [student] AN's parent.

62. Contrary to the reprimand's suggestion that Plaintiff failed to inform staff, Plaintiff followed standard procedures for community-based instruction in the Moderate/Severe Program. Had Plaintiff been provided with a mentor as required, any documentation or communication procedures would have been clearly explained and modeled.

*Allegation 2 - Physical Contact/CPI Techniques:*

63. The physical contact described in the reprimand consisted entirely of appropriate CPI techniques and supportive physical prompts used with students with severe disabilities.

64. Plaintiff's CPI training manual, provided by MUSD, contains photographs showing educators using the exact physical techniques described in the reprimand, including:
   a. Placing an arm around a student's shoulder for guidance and support;
   b. Touching a student's arm or back to provide prompting and redirection;
   c. Sitting in proximity to students during meals and activities; and
   d. Providing physical proximity and support to students who require one-on-one attention.

65. MUSD's CPI training materials explicitly depict a **female educator** demonstrating these techniques with a **male student**. The training materials make clear that these physical prompts are appropriate, necessary, and expected in special education settings.

66. Students with severe autism often require physical prompting and guidance to complete tasks, transition between activities, and maintain safety. These supports are individualized based on student needs and documented in behavior support plans.

67. The allegation that Plaintiff "tried to isolate" [student] AN is contradicted by the educational necessity of providing one-on-one instruction and support to students with severe disabilities, particularly during specialized instruction or when addressing specific behavioral goals.

68. The "Great Mall" incident described in the reprimand— in which Plaintiff's "arm was resting on the bench behind" [student] AN during a meal break —was standard seating arrangement during a community outing, with Plaintiff positioned to provide supervision and support as needed. The allegation that "no other instructors were seated next to students" is both inaccurate and irrelevant, as instructional needs vary based on student profiles and support requirements.

69. Notably, a serious student injury (the November 2021 bowling alley incident involving [student] N.E.M.) occurred when a student was **not** receiving adequate physical proximity and supervision from assigned staff. The appropriate response would have

COMPLAINT FOR DAMAGES
Page 10 of 30

been to ensure **more** physical proximity and supervision, not to characterize such supervision as misconduct.

70. The allegation that Plaintiff "rubbed" students' arms and backs is an inflammatory characterization of supportive touch and physical prompting—standard techniques in CPI and special education practice, documented in MUSD's own training materials.

*Allegation 3 - Video Recording:*

71. The video recording referenced in the reprimand was conducted as part of Plaintiff's required educational assessment responsibilities.

72. Plaintiff was responsible for conducting a three-year educational assessment (triennial assessment) for [student] MT, a student with severe disabilities requiring alternative assessment methods.

73. Video modeling and video-based assessment are evidence-based practices explicitly recommended by AFIRM and other autism education resources for students with severe communication and developmental disabilities.

74. Students with severe disabilities often cannot demonstrate skills through traditional paper-and-pencil testing. Alternative assessments using technology, including video recording, are accommodations protected under the Individuals with Disabilities Education Act (IDEA) and Section 504 of the Rehabilitation Act.

75. The allegation that Plaintiff used "personal" equipment is inaccurate or misleading. The computer lab equipment was school equipment used for educational purposes. The distinction between "personal" and "school" equipment is irrelevant when conducting appropriate educational assessments.

76. Importantly, MUSD staff, including Plaintiff's supervisors, themselves used video recording and video modeling as instructional techniques in the Moderate/Severe Program. Defendant Lillard and other administrators were aware of and approved video modeling as an instructional strategy.

77. The suggestion that Plaintiff's conduct was surreptitious or inappropriate is contradicted by the fact that the recording occurred in an open computer lab during school hours as part of documented educational assessment activities.

### G. Comparative Evidence of Gender Discrimination

78. MUSD applied its workplace policies in a discriminatory, non-gender-neutral manner, disciplining Plaintiff (a male teacher) for conduct that was permitted and accepted when performed by female teachers.

79. During the same time period that Plaintiff was employed at MUSD (2021-2022 school year), David Sorenson, a male colleague, held the same or substantially similar position in the Moderate/Severe Program and engaged in substantially similar teaching practices, including walking with students, using physical prompts, and providing one-on-one instruction. Plaintiff is informed and believes, and thereon alleges, that Mr. Sorenson engaged in these same practices without any disciplinary action being taken against him,

COMPLAINT FOR DAMAGES
Page 11 of 30

demonstrating that the true basis for Plaintiff's discipline was either his protected complaints or his gender combined with the specific students involved, not the practices themselves.

80. Female teachers and instructional aides in MUSD's special education programs routinely engaged in the same practices for which Plaintiff was disciplined, including:

a. Walking alone with students of the opposite sex for instructional purposes;
b. Using physical prompts, including touching students' arms, backs, and shoulders;
c. Sitting in close proximity to students during activities and meals;
d. Providing one-on-one instruction and support; and
e. Using video recording for assessment and instructional purposes.

81. MUSD's own training materials depict a female educator using physical intervention techniques with a male student, demonstrating that such techniques are appropriate and expected in special education settings when used by female teachers.

82. Plaintiff is informed and believes, and thereon alleges, that no female teacher at MUSD has ever been disciplined for using CPI physical prompts, walking with students, sitting in proximity to students, or video recording for educational purposes.

83. The language and framing of the Letter of Reprimand, including repeated emphasis on Plaintiff being a "male teacher" working with "female students" and being "alone" with students, reveals that Plaintiff's gender was a substantial motivating factor in the decision to discipline him.

84. When Plaintiff raised the issue of gender discrimination and requested mediation through the California Civil Rights Department, MUSD refused to participate in mediation, demonstrating the District's unwillingness to acknowledge or remedy its discriminatory practices.

## H. Temporal Proximity and Retaliatory Motive

85. The Letter of Reprimand was issued approximately 5-6 months after Plaintiff raised concerns about student safety and program supervision following the November 2021 incident.

86. This temporal proximity between Plaintiff's protected complaints and the adverse employment action (reprimand) supports an inference of retaliatory motive.

87. The pretextual nature of the allegations in the Letter of Reprimand—characterizing appropriate teaching practices as misconduct—further supports an inference that the true motive for discipline was retaliation for Plaintiff's protected complaints, not legitimate performance concerns.

88. MUSD had a clear motive to retaliate against Plaintiff: Plaintiff's safety concerns implicitly criticized supervisors and administrators, including Defendants Lillard and Brunson, for failing to maintain adequate safety protocols and training.

89. By disciplining Plaintiff for his teaching practices rather than investigating and remedying the systemic safety issues Plaintiff identified, MUSD effectively silenced

criticism and shifted blame from administrators to a vulnerable intern teacher who lacked the mentorship and support to defend himself.

### I. Plaintiff's Termination and Destruction of Career

90. Following the issuance of the Letter of Reprimand in April-May 2022, Plaintiff was placed on administrative leave for the remainder of the 2021-2022 school year.

91. On or about May 20, 2022, MUSD issued a Notice of Non-Reelection to Plaintiff, effective for the 2022-2023 school year.

92. The Notice of Non-Reelection stated that Plaintiff was a probationary employee non-reelected pursuant to California Education Code section 44929.21, with a return date of March 15, 2023, indicating a one-year non-reelection.

93. The Notice of Non-Reelection included language stating: "The Milpitas Unified School District thanks you for the services you have extended to the students and the district."

94. The Notice of Non-Reelection was approved by the MUSD Board of Education on May 24, 2022.

95. Despite the stated March 15, 2023, return date, MUSD never contacted Plaintiff regarding returning to employment and effectively treated the non-reelection as a permanent termination.

96. MUSD reported the disciplinary action to the California Commission on Teacher Credentialing (CTC), triggering a credential revocation proceeding against Plaintiff.

97. The CTC proceeding resulted in the revocation of Plaintiff's teaching credentials, destroying Plaintiff's ability to work as a teacher in California or any other state.

98. The credential revocation was based primarily or entirely on MUSD's discriminatory and retaliatory Letter of Reprimand and the demonstrably false characterizations of Plaintiff's conduct contained therein.

99. Plaintiff has filed a complaint with the California State Bar regarding evidence that CTC altered witness statements from MUSD's reprimand in the credential revocation proceeding, including changing "arm resting on the bench behind" a student to "arm resting behind" a student (removing the word "bench" to falsely suggest inappropriate touching) and changing the date and nature of Plaintiff's termination.

100. The allegations of altered witness statements and falsified evidence in this case are materially similar to the misconduct found in Carroll v. Commission on Teacher Credentialing, Sacramento Superior Court Case No. 34-2012-00135527, in which a jury unanimously found that CTC engaged in corruption, deceit, and improper alteration of evidence, resulting in a verdict of $3.1 million including $2 million in economic damages. That case, like this one, involved CTC improperly altering witness statements to manufacture allegations of misconduct where none existed. The Carroll precedent establishes that such conduct by CTC constitutes actionable wrongdoing with substantial damages exposure.

101. Plaintiff lost an administrative hearing in Arizona regarding licensure based on reciprocity with the California credential revocation. The Arizona panel suggested

Plaintiff should appeal in California first, acknowledging questions about the underlying proceedings.

102.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff's teaching career has been destroyed. Plaintiff cannot work as a teacher in any state. Plaintiff's professional reputation has been permanently damaged. Plaintiff has been forced to work in low-wage positions earning approximately $1,500 per month, a fraction of his earning potential as a specialized special education teacher.

103.    Plaintiff's investment of $15,000-$19,000 in his credential program has been rendered worthless due to the credential revocation that resulted from Defendants' discriminatory and retaliatory actions.

## J. Defendants' Knowledge and Ratification

104.    At all times relevant to this Complaint, Defendants MUSD, Lillard, and Brunson had actual knowledge of:

    a.   Plaintiff's intern credential status and the legal requirement to provide a mentor;

    b.   The evidence-based nature of Plaintiff's teaching practices;

    c.   Plaintiff's CPI training and certification;

    d.   MUSD's own training materials depicting identical techniques used by female educators;

    e.   The educational justifications for Plaintiff's conduct;

    f.   Plaintiff's protected complaints regarding student safety and supervision; and

    g.   The discriminatory nature of applying policies differently based on teacher gender.

105.    Defendants' actions were willful, intentional, malicious, and oppressive, and were undertaken with conscious disregard for Plaintiff's rights.

106.    The discriminatory and retaliatory conduct alleged herein was committed by Defendants Lillard and Brunson while acting within the course and scope of their employment with MUSD and in their capacities as MUSD employees and agents.

107.    Defendant MUSD ratified the conduct of Lillard and Brunson and is liable for their actions under the doctrines of respondeat superior and ratification.

108.    Defendant MUSD, through its policymakers and senior administrators, had advance knowledge of the discriminatory and retaliatory conduct alleged herein, authorized such conduct, and/or ratified such conduct after it occurred.

## K. Administrative Exhaustion and Right to Sue

109.    On January 29, 2025, Plaintiff timely filed a complaint with the California Civil Rights Department (Case Number 202501-27934530) alleging employment discrimination and retaliation by MUSD.

110.    Plaintiff's CRD complaint alleged three specific instances of discrimination based on sex/gender:

a. Discrimination on or before May 30, 2022, when MUSD reprimanded Plaintiff for using CPI protocols by failing to enforce policies in a gender-neutral manner, specifically highlighting that Plaintiff was a male educator with female students while training manuals depicted female educators using identical techniques with male students without discipline.

b. Discrimination on or before May 30, 2022, when MUSD placed Plaintiff on administrative leave following allegations of inappropriate behavior, despite Plaintiff following CPI protocols, because MUSD failed to enforce policies in a gender-neutral manner.

c. Discrimination on or before May 30, 2023, when MUSD suspended Plaintiff (non-reelection) following allegations made by a colleague, despite Plaintiff following CPI protocols, because MUSD failed to enforce policies in a gender-neutral manner.

111. Plaintiff requested mediation through CRD. MUSD rejected the mediation offer, demonstrating unwillingness to resolve the matter through alternative dispute resolution.

112. On October 27, 2025, CRD issued a Notice of Case Closure and Right to Sue letter to Plaintiff. A true and correct copy of the CRD Notice of Case Closure is attached hereto as **Exhibit A** and incorporated herein by reference.

113. The Notice of Case Closure states in relevant part:

"*The Civil Rights Department (CRD) has closed your case for the following reason(s): **Complainant Elected Court Action.***

*CRD has not determined if further investigation might establish violation(s) of the law. This decision does not mean the alleged claims have no merit or that the respondent is following the law. This case closure is relevant to the allegations listed on the signed complaint only.*

***This is your Right to Sue notice.** Government Code section 12965, subdivision (b), declares that you may file your own civil action asserting employment claims under FEHA within one year of the date of this letter. If you want to file a civil action that includes other claims, you should consult an attorney about the applicable statutes of limitation. The intake form for this case was submitted to CRD on January 29, 2025.*

*Although CRD has closed your case, the allegations and conduct at issue may be in violation of the law. You should consult an attorney as soon as possible regarding any other options and/or recourse you may have regarding the underlying acts or conduct.*"

COMPLAINT FOR DAMAGES
Page 15 of 30

114.     The Right to Sue letter was issued under Case Number 202501-27934530, for a case titled "Stimson / Milpitas Unified School District," Case Type: Employment, County of Violation: Santa Clara.

115.     This Complaint is filed within one year of the October 27, 2025, Right to Sue letter, specifically on December 27, 2025, well within the one-year statute of limitations required by Government Code section 12965(b).

116.     Plaintiff has fully exhausted all administrative remedies required under FEHA prior to filing this civil action.

### L. Damages

117.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer substantial damages, including but not limited to:

    a. **Loss of earnings and employment benefits:** Plaintiff has lost substantial income from the date of termination in May 2022 through the present (November 2025), a period of approximately 42 months. Specialized Moderate/Severe special education teachers earn approximately $3,000-$3,500 per week ($156,000-$182,000 annually) through travel contract positions. During this 42-month period, Plaintiff's loss of earnings exceeds $546,000 in salary alone, plus additional losses in health insurance benefits, retirement contributions (California State Teachers' Retirement System), and other employment benefits, for total economic losses exceeding $600,000 to date. These losses continue to accrue at a rate of approximately $13,000-$15,000 per month.

    b. **Loss of future earning capacity:** Due to the revocation of his teaching credentials, Plaintiff has been permanently deprived of the ability to work in his chosen profession. Plaintiff is 52 years old and had a reasonable expectation of working as a special education teacher until age 65-70, representing a career span of 13-18 years. At an annual earning capacity of $156,000-$182,000 as a travel special education teacher, Plaintiff's future earning capacity over his remaining career has been destroyed, resulting in losses exceeding $3,000,000 in base salary alone. This figure does not account for advancement opportunities to administrative positions (Special Education Director, Program Coordinator) with salaries ranging from $120,000-$394,000 annually, which would further increase lifetime earning losses. Plaintiff's total lost future earning capacity, including reasonable advancement opportunities, exceeds $5,000,000.

    c. **Loss of educational investment:** Plaintiff's investment of $15,000-$19,000 in his specialized credential program has been rendered worthless as a direct result of Defendants' unlawful conduct.

    d. **Emotional distress:** Plaintiff has suffered and continues to suffer severe emotional distress, including depression, anxiety, humiliation, loss of self-esteem,

loss of professional identity, and mental anguish. Plaintiff described the impact of Defendants' conduct as "total devastation" and "life altering."

e. **Reputational harm:** Plaintiff's professional reputation has been permanently damaged by the false allegations, public credential revocation, and characterization of appropriate teaching practices as misconduct. Even if Plaintiff's credentials are eventually reinstated, the revocation will remain on his permanent record, affecting future employment prospects.

f. **Loss of professional development opportunities:** Plaintiff has been deprived of the opportunity to complete his credential program, advance in the teaching profession, and pursue administrative or leadership positions.

118.	The full extent of Plaintiff's damages is not yet known and will be proven at trial according to proof.

119.	Plaintiff is entitled to recover general and special damages in an amount to be determined at trial.

## M. Punitive Damages

120.	Plaintiff is informed and believes, and thereon alleges, that Defendants' conduct as alleged herein was willful, intentional, malicious, oppressive, and fraudulent, and was undertaken with conscious disregard for Plaintiff's rights.

121.	Defendants knowingly failed to provide Plaintiff with the legally required mentor support, knowing that this failure would leave Plaintiff vulnerable to discipline for conduct that would have been guided and corrected by a mentor.

122.	Defendants discriminated against Plaintiff based on his gender, applying workplace policies in a manner they knew was non-neutral and disparate.

123.	Defendants retaliated against Plaintiff for raising legitimate safety concerns, knowing that such retaliation was unlawful.

124.	Defendants characterized appropriate, evidence-based teaching practices as misconduct, knowing these characterizations were false and misleading.

125.	Defendants' actions were calculated to destroy Plaintiff's career and shift blame for systemic program failures from administrators to a vulnerable intern teacher.

126.	Defendants' conduct was particularly egregious in that they targeted a vulnerable intern teacher who lacked the mentorship and institutional support to defend himself, knowing that Plaintiff's intern status made him especially susceptible to career destruction through adverse credentialing actions. Defendants acted with full knowledge that their false characterizations of Plaintiff's evidence-based teaching practices would be reported to CTC and would likely result in permanent credential revocation yet proceeded with their discriminatory and retaliatory conduct regardless of the devastating consequences to Plaintiff's career and life.

127.	Defendants MUSD, Lillard, and Brunson acted with oppression, fraud, and malice within the meaning of California Civil Code section 3294, and Plaintiff is entitled to

recover punitive damages in an amount sufficient to punish Defendants and deter similar conduct in the future.

128. Defendant MUSD is liable for punitive damages because the wrongful conduct alleged herein was committed by officers, directors, or managing agents of MUSD, and/or because MUSD ratified the wrongful conduct with knowledge of its wrongful nature.

### N. Attorney's Fees and Costs

129. Plaintiff has been required to retain the services of The Law Offices of James L. Arrasmith to prosecute this action and is entitled to recover reasonable attorney's fees and costs pursuant to Government Code section 12965(b), California Labor Code section 1102.5(f), and other applicable statutes.

130. Plaintiff is entitled to recover expert witness fees, litigation costs, and all other expenses incurred in prosecuting this action.

### V. CAUSES OF ACTION

Based on the foregoing allegations, Plaintiff asserts the following causes of action against Defendants:

### FIRST CAUSE OF ACTION
### *Gender Discrimination in Violation of the Fair Employment and Housing Act*
### *(Against All Defendants)*

131. Plaintiff re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 130 above as though fully set forth herein.

132. At all times relevant to this Complaint, Plaintiff was an employee of Defendant MUSD within the meaning of the Fair Employment and Housing Act, Government Code section 12900 et seq. ("FEHA").

133. At all times relevant to this Complaint, Defendant MUSD was an employer within the meaning of FEHA, employing more than five persons.

134. At all times relevant to this Complaint, Defendants Lillard and Brunson were agents of MUSD acting within the course and scope of their employment.

135. Government Code section 12940(a) makes it unlawful for an employer to discriminate against any person in compensation or in terms, conditions, or privileges of employment because of the person's sex or gender.

136. Plaintiff is a member of a protected class under FEHA based on his sex and gender (male).

137. Plaintiff performed his job duties satisfactorily and in accordance with evidence-based special education practices, CPI training protocols, and requirements for serving students with autism and severe disabilities.

COMPLAINT FOR DAMAGES
Page 18 of 30

138.    Despite Plaintiff's satisfactory performance, Defendants subjected Plaintiff to adverse employment actions, including:
a.  Issuance of a discriminatory Letter of Reprimand;
b.  Placement on administrative leave;
c.  Non-reelection (termination) from employment;
d.  Reporting to CTC leading to credential revocation; and
e.  Destruction of Plaintiff's teaching career.

139.    Defendants' adverse employment actions were motivated by Plaintiff's sex and gender and constituted discrimination in violation of FEHA.

140.    The circumstances surrounding Defendants' adverse employment actions give rise to an inference of discrimination, including:
a.  Defendants' failure to provide Plaintiff with the legally required mentor support is direct evidence that Defendants' stated reasons for disciplining Plaintiff were pretextual. California law mandates that school districts employing intern teachers provide qualified mentor support. MUSD knew of this obligation, accepted Plaintiff's intern credential, assigned him teaching duties, and then deliberately failed to provide the required mentorship.
b.  The alleged "policy violations" cited in the Letter of Reprimand, including purported failures in communication, documentation, and adherence to procedures, were the direct and foreseeable result of MUSD's failure to provide mentor guidance. A qualified mentor would have provided real-time training, feedback, and correction on district policies and expectations. By failing to provide this legally required support and then disciplining Plaintiff for the predictable consequences of that failure, MUSD demonstrated that the discipline was not based on legitimate performance concerns but was instead a pretext for discrimination and retaliation.
c.  MUSD's decision to blame Plaintiff for conduct that resulted from MUSD's own breach of duty, while simultaneously applying policies in a gender-discriminatory manner, reveals the true discriminatory and retaliatory motive behind the adverse employment actions. No reasonable employer acting in good faith would discipline an intern teacher for policy violations caused by the employer's own failure to provide required training and mentorship.
d.  Plaintiff, a male teacher, was disciplined for using physical prompts and providing physical proximity to female students, while MUSD's own training materials depict a female educator using identical techniques with a male student without any suggestion of impropriety;
e.  The Letter of Reprimand emphasizes and repeatedly references Plaintiff's gender (male) and the students' gender (female), framing appropriate teaching practices as suspect based on gender combination;
f.  Plaintiff was disciplined for being "alone" with female students during structured educational activities, while female teachers routinely work alone with male students without discipline;

COMPLAINT FOR DAMAGES
Page 19 of 30

g. David Sorenson, a male colleague in the same position during the same time period, engaged in substantially similar practices without being disciplined, suggesting that factors other than gender (such as retaliation, discussed below) also influenced selective enforcement;

h. No female teacher at MUSD has been disciplined for using CPI techniques, walking with students, sitting in proximity to students, or video recording for educational purposes; and

i. When questioned about gender-neutral policy application through the CRD process, MUSD refused mediation and refused to address the discriminatory nature of its actions.

141. The Defendants' stated reasons for the adverse employment actions, i.e. alleged policy violations, are pretextual. The policies cited by Defendants do not prohibit the evidence-based teaching practices Plaintiff employed. Female teachers engage in identical practices without discipline. The true reason for the adverse actions was Plaintiff's gender.

142. But for Plaintiff's sex and gender, Defendants would not have subjected Plaintiff to the adverse employment actions alleged herein.

143. Plaintiff's sex and gender were substantial motivating factors in Defendants' decisions to discipline and terminate Plaintiff.

144. Defendants MUSD, Lillard, and Brunson are liable to Plaintiff for unlawful discrimination in violation of Government Code section 12940(a).

145. As a direct and proximate result of Defendants' unlawful discrimination, Plaintiff has suffered and continues to suffer substantial damages as alleged in paragraph 117 above, including loss of earnings, loss of future earning capacity, emotional distress, and reputational harm.

146. Plaintiff is entitled to recover compensatory damages, punitive damages, attorney's fees and costs, and all other relief available under FEHA.

## SECOND CAUSE OF ACTION
### *Retaliation in Violation of the Fair Employment and Housing Act*
### *(Against All Defendants)*

147. Plaintiff re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 146 above as though fully set forth herein.

148. Government Code section 12940(h) makes it unlawful for an employer to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under FEHA or because the person has filed a complaint, testified, or assisted in any proceeding under FEHA.

149. Government Code section 12940(h) also prohibits retaliation against employees who raise concerns about workplace safety, violations of law, or other protected activities.

150.    Plaintiff engaged in protected activities within the meaning of FEHA and California public policy, including:

a.  MUSD's failure to provide Plaintiff with a mentor, combined with the timing of Plaintiff's discipline following his protected safety complaints, demonstrates that MUSD's true motive was to silence criticism and shift blame rather than address legitimate performance concerns. Had MUSD been genuinely concerned about Plaintiff's adherence to policies, it would have fulfilled its legal obligation to provide mentor support. Instead, MUSD deliberately withheld required support, allowed Plaintiff to struggle without guidance, and then used the predictable consequences of that deprivation as a pretext to terminate the employee who had raised uncomfortable safety concerns.

b.  Raising concerns about student safety and inadequate supervision following the November 2021 student hospitalization incident;

c.  Requesting investigation into staff training deficiencies and safety protocols;

d.  Requesting provision of a legally required mentor to ensure proper training and supervision;

e.  Opposing unsafe practices and requesting outside investigation or review of program safety;

f.  Implicitly criticizing supervisors and administrators, including Defendants Lillard and Brunson, for failing to maintain adequate safety standards; and

g.  Advocating for students' educational and safety needs in accordance with special education law and best practices.

151.    Defendants were aware of Plaintiff's protected activities. Plaintiff communicated his concerns directly to supervisors and administrators, including Defendant Lillard.

152.    Following Plaintiff's protected activities, Defendants subjected Plaintiff to adverse employment actions, including:

a.  Increased scrutiny of Plaintiff's teaching practices;

b.  Issuance of a Letter of Reprimand characterizing appropriate teaching practices as misconduct;

c.  Placement on administrative leave;

d.  Non-reelection (termination) from employment;

e.  Reporting to CTC leading to credential revocation; and

f.  Destruction of Plaintiff's teaching career.

153.    A causal connection exists between Plaintiff's protected activities and the adverse employment actions. The temporal proximity between Plaintiff's complaints (November 2021) and the Letter of Reprimand (April-May 2022, approximately 5-6 months later) supports an inference of retaliatory motive.

154.    The pretextual nature of the allegations in the Letter of Reprimand, characterizing evidence-based teaching practices approved by MUSD's own training materials as misconduct, further demonstrates that the true motive for the adverse actions was retaliation, not legitimate performance concerns.

155. Defendants had a clear retaliatory motive: Plaintiff's safety concerns implicitly criticized Defendants Lillard and Brunson and other administrators for systemic failures following the November 2021 incident. Rather than investigate and remedy these failures, Defendants shifted blame to Plaintiff by characterizing his teaching practices as misconduct.

156. By disciplining and terminating Plaintiff for his teaching practices rather than investigating the safety issues Plaintiff raised, Defendants effectively silenced criticism and punished Plaintiff for opposing unsafe practices.

157. But for Plaintiff's protected activities, Defendants would not have subjected Plaintiff to the adverse employment actions alleged herein.

158. Plaintiff's protected activities were substantial motivating factors in Defendants' decisions to discipline and terminate Plaintiff.

159. Defendants MUSD, Lillard, and Brunson are liable to Plaintiff for unlawful retaliation in violation of Government Code section 12940(h).

160. As a direct and proximate result of Defendants' unlawful retaliation, Plaintiff has suffered and continues to suffer substantial damages as alleged in paragraph 117 above, including loss of earnings, loss of future earning capacity, emotional distress, and reputational harm.

161. Plaintiff is entitled to recover compensatory damages, punitive damages, attorney's fees and costs, and all other relief available under FEHA.

## THIRD CAUSE OF ACTION

### *Failure to Prevent Discrimination and Retaliation in Violation of FEHA*

### *(Against Defendant MUSD)*

162. Plaintiff re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 161 above as though fully set forth herein.

163. Government Code section 12940(k) requires employers to take all reasonable steps necessary to prevent discrimination and retaliation from occurring in the workplace.

164. At all times relevant to this Complaint, Defendant MUSD knew or should have known that discrimination and retaliation were occurring in the workplace.

165. Specifically, MUSD knew or should have known that:

a. Workplace policies were being applied in a discriminatory, non-gender-neutral manner;

b. Male teachers were being disciplined for conduct that female teachers engaged in without discipline;

c. Plaintiff was being subjected to increased scrutiny and discipline following protected complaints about safety concerns;

d. Supervisors and administrators, including Defendants Lillard and Brunson, were engaging in retaliatory conduct against Plaintiff; and

c. The allegations in the Letter of Reprimand were pretextual and motivated by discriminatory and retaliatory animus.

166. Despite this knowledge, MUSD failed to take reasonable steps to prevent the discrimination and retaliation alleged herein.

167. MUSD failed to:

a. Investigate Plaintiff's protected complaints regarding safety concerns;

b. Train supervisors and administrators on gender-neutral policy application;

c. Ensure that disciplinary decisions were based on legitimate, non-discriminatory reasons;

d. Prevent retaliatory conduct by supervisors and administrators;

e. Provide Plaintiff with the legally required mentor support that would have prevented the alleged policy violations;

f. Implement and enforce anti-retaliation policies; and

g. Take corrective action when discrimination and retaliation were reported through the CRD complaint process.

168. Defendant MUSD is liable to Plaintiff for failure to prevent discrimination and retaliation in violation of Government Code section 12940(k).

169. As a direct and proximate result of MUSD's failure to prevent discrimination and retaliation, Plaintiff has suffered and continues to suffer substantial damages as alleged in paragraph 117 above, including loss of earnings, loss of future earning capacity, emotional distress, and reputational harm.

170. Plaintiff is entitled to recover compensatory damages, attorney's fees and costs, and all other relief available under FEHA.

## FOURTH CAUSE OF ACTION

### *Whistleblower Retaliation in Violation of California Labor Code § 1102.5*

### *(Against All Defendants)*

171. Plaintiff re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 168 above as though fully set forth herein.

172. Plaintiff's claims under California Labor Code section 1102.5 are exempt from the claim presentation requirements of the Government Claims Act. Labor Code section 1102.5 does not incorporate or reference the Government Claims Act, and requiring whistleblowers to present claims to the very public entities whose misconduct they are reporting would undermine the fundamental purpose of the whistleblower protection statute. Courts have recognized that Labor Code section 1102.5 claims may proceed against public entities without prior claim presentation. *See Lozano v. City of Los Angeles*, 324 F. Supp. 3d 1161, 1169 (C.D. Cal. 2018). In the alternative, Plaintiff's Labor Code claims are so intertwined with his FEHA retaliation claims, which are expressly exempt from the Government Claims Act under Government Code section 12993(a), that they share the same exemption.

173.    California Labor Code section 1102.5(b) provides that an employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, to a person with authority over the employee, or to another employee who has authority to investigate, discover, or correct the violation, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation.

174.    California Labor Code section 1102.5(c) provides that an employer may not retaliate against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation.

175.    Plaintiff disclosed information to persons with authority over him, specifically Defendant Lillard and other MUSD administrators, regarding violations of state and federal statutes and regulations, including:

   a. Violations of special education laws, including inadequate supervision and safety protocols in violation of the Individuals with Disabilities Education Act (IDEA) and California Education Code provisions governing special education;

   b. Violations of California Education Code and Title 5 California Code of Regulations provisions requiring school districts to provide qualified mentors to intern teachers;

   c. Violations of student safety regulations and duty of care obligations under California law;

   d. Inadequate staff training resulting in failure to comply with special education service delivery requirements; and

   e. Unsafe practices creating risk of harm to students with disabilities.

176.    Plaintiff had reasonable cause to believe that the information he disclosed constituted violations of law and regulations, particularly following the November 2021 student hospitalization incident that demonstrated serious safety deficiencies.

177.    Following Plaintiff's protected disclosures, Defendants retaliated against Plaintiff by:

   a. Increasing scrutiny of Plaintiff's teaching practices;

   b. Issuing a Letter of Reprimand characterizing appropriate practices as misconduct;

   c. Placing Plaintiff on administrative leave;

   d. Terminating Plaintiff's employment through non-reelection;

   e. Reporting Plaintiff to CTC, leading to credential revocation; and

   f. Destroying Plaintiff's teaching career.

178.    A causal connection exists between Plaintiff's protected whistleblower activities and Defendants' retaliatory actions, demonstrated by temporal proximity and the pretextual nature of the stated reasons for discipline.

179.    The CTC credential revocation on July 5, 2024, constituted a continuation of Defendants' retaliatory conduct. Defendants transmitted false allegations to CTC with knowledge and intent that such transmission would perpetuate the harm from the original

retaliation. Each use of the fabricated allegations in subsequent proceedings, including CTC administrative hearings and Arizona licensing proceedings, constitutes a separate manifestation of the continuing violation. Under *Aryeh v. Canon Business Solutions, Inc.*, 55 Cal. 4th 1185 (2013), each such manifestation restarts the limitations period.

180.    In the alternative, Plaintiff's timely pursuit of administrative remedies through the California Civil Rights Department (filing January 29, 2025) equitably tolled the statute of limitations on related Labor Code claims. Under *McDonald v. Antelope Valley Community College Dist.*, 45 Cal. 4th 88 (2008), equitable tolling applies when a plaintiff diligently pursues claims through administrative channels.

181.    But for Plaintiff's protected disclosures, Defendants would not have subjected Plaintiff to the adverse employment actions alleged herein.

182.    Plaintiff's protected whistleblower activities were contributing factors in Defendants' decisions to discipline and terminate Plaintiff.

183.    Defendants MUSD, Lillard, and Brunson are liable to Plaintiff for whistleblower retaliation in violation of California Labor Code section 1102.5.

184.    As a direct and proximate result of Defendants' whistleblower retaliation, Plaintiff has suffered and continues to suffer substantial damages as alleged in paragraph 117 above, including loss of earnings, loss of future earning capacity, emotional distress, and reputational harm.

185.    Pursuant to California Labor Code section 1102.5(f), Plaintiff is entitled to recover compensatory damages, including lost wages and benefits, and attorney's fees and costs.

186.    Plaintiff is also entitled to recover punitive damages pursuant to California Civil Code section 3294, as Defendants' conduct was willful, intentional, malicious, and oppressive.

**FIFTH CAUSE OF ACTION**
***Breach of Contract***
***(Against Defendant MUSD)***

187.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 186 above as though fully set forth herein.

188.    A valid implied-in-fact contract existed between Plaintiff and Defendant MUSD. When MUSD hired Plaintiff knowing he held an Intern Education Specialist Instruction Credential, MUSD impliedly agreed to fulfill the legal obligations attendant to employing an intern teacher, including the mandatory provision of qualified mentor support and supervision.

189.    The implied contract arose from:
   a. MUSD's verification of Plaintiff's intern credential status through the CTC database prior to hiring;
   b. MUSD's assignment of teaching duties that could only lawfully be performed by an intern teacher receiving mentor support;

COMPLAINT FOR DAMAGES
Page 25 of 30

    c. MUSD's acceptance of Plaintiff's credential explicitly stating mentor requirements;

    d. California Education Code section 44454(a) and Title 5 California Code of Regulations section 80027(e), which impose mandatory duties incorporated into the employment relationship by operation of law; and

    e. the reasonable expectations of both parties that MUSD would comply with its legal obligations.

190. Plaintiff performed all obligations required of him, including accepting employment, performing teaching duties, investing approximately $15,000-$19,000 in his credential program, and requesting mentor support from MUSD administrators.

191. MUSD breached the implied contract by failing to provide Plaintiff with required mentor support, including failing to assign a qualified mentor, failing to provide guidance and supervision, failing to train Plaintiff on district policies, and failing to support Plaintiff in completing credential requirements.

192. MUSD's breach directly and proximately caused Plaintiff's damages, as the lack of mentorship caused the alleged deficiencies that led to Plaintiff's termination and credential revocation.

193. **Equitable Estoppel:** To the extent MUSD asserts any procedural defense to this claim, MUSD is equitably estopped from doing so. MUSD concealed its own breach of the mentor obligation, blamed Plaintiff for the consequences of MUSD's breach, and affirmatively misrepresented to CTC that Plaintiff's conduct constituted misconduct rather than the foreseeable result of MUSD's failure to provide required support. Plaintiff reasonably relied on MUSD's representations and did not discover the full extent of MUSD's misconduct until reviewing CTC records. MUSD cannot benefit from its own concealment of wrongdoing.

194. In the alternative, Plaintiff's contract claim is so intertwined with his FEHA claims that it shares the FEHA exemption from procedural requirements that would otherwise apply to claims against public entities. The breach of the mentor obligation was both a breach of contract and direct evidence of the pretext underlying MUSD's discriminatory and retaliatory conduct. The contract claim arises from the same nucleus of operative facts as the FEHA claims and seeks damages for the same course of wrongful conduct.

195. As a direct and proximate result of MUSD's breach, Plaintiff has suffered substantial damages including loss of the benefit of the bargain, loss of earnings, loss of future earning capacity, loss of educational investment, emotional distress, and reputational harm.

## SIXTH CAUSE OF ACTION
### *Breach of Mandatory Statutory Duty*
### *(Gov. Code § 815.6)*
### *(Against Defendant MUSD)*

196. Plaintiff re-alleges and incorporates by reference all prior paragraphs.

197. Government Code section 815.6 provides: 'Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty.

198. California Code of Regulations, Title 5, section 80027(e), and California Education Code section 44454(a), impose mandatory duties on school districts employing intern teachers to provide qualified mentor support and supervision. These are mandatory, not discretionary duties.

199. These statutory duties are designed to protect intern teachers from professional harm resulting from inadequate training and guidance.

200. MUSD failed to discharge its mandatory duty to provide Plaintiff with a qualified mentor.

201. As a direct and proximate result of MUSD's breach of mandatory statutory duty, Plaintiff suffered the injuries alleged herein, including credential revocation and career destruction.

202. Plaintiff's claim for breach of mandatory statutory duty did not accrue until **July 5, 2024**, when the California Commission on Teacher Credentialing's credential revocation became effective. Prior to that date, Plaintiff's teaching credentials remained valid, his career was not permanently destroyed, and the full extent of damages from MUSD's failure to provide a legally required mentor had not yet manifested. Under the **delayed accrual rule**, a cause of action does not accrue until the plaintiff has suffered appreciable and actual harm. *Pooshs v. Philip Morris USA, Inc.*, 51 Cal. 4th 788, 797 (2011). Until July 5, 2024, Plaintiff retained valid teaching credentials and the theoretical ability to teach in California and other states; only upon credential revocation did the permanent career destruction, the ultimate harm from MUSD's breach, become real and appreciable.

203. In the alternative, Plaintiff's claim did not accrue until Plaintiff discovered, or reasonably should have discovered, the facts constituting MUSD's wrongful conduct and the causal connection between that conduct and his injuries. Under the **discovery rule**, the statute of limitations begins to run when the plaintiff suspects, or should suspect, that the injury was caused by wrongdoing. *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 807 (2005). Plaintiff did not discover that MUSD had transmitted false and altered allegations to CTC, including the removal of the word "bench" from "arm resting on the bench behind" a student to falsely suggest inappropriate physical contact, until reviewing CTC records in preparation for his petition for reinstatement filed July 5, 2025. Only at that time did Plaintiff discover the full scope of MUSD's breach of duty and its causal connection to his credential revocation.

204. MUSD's transmission of false allegations to CTC constituted a **continuing breach** of its mandatory statutory duty. The duty to support and supervise intern teachers includes the obligation not to sabotage the intern's career through false representations to

COMPLAINT FOR DAMAGES
Page 27 of 30

credentialing authorities. Each submission of false or misleading information to CTC, including the initial notification, responses to CTC inquiries, and provision of altered witness statements, constituted a separate breach of MUSD's mandatory duty, with each breach restarting the limitations period. Under *Aryeh v. Canon Business Solutions, Inc.*, 55 Cal. 4th 1185, 1198 (2013), where a defendant's breach of duty is continuing in nature, the limitations period runs from each new breach.

205.    Plaintiff timely filed a Government Tort Claim with MUSD on **November 17, 2025**. Calculated from the July 5, 2024, accrual date (CTC credential revocation), Plaintiff's claim was filed within the extended one-year period applicable under Government Code section 911.4 for applications for leave to present late claims. In the alternative, calculated from Plaintiff's discovery of MUSD's evidence tampering in 2025, Plaintiff's claim was filed within six months of discovery as required by Government Code section 901.

206.    To the extent MUSD contends that Plaintiff's Government Tort Claim was untimely, MUSD is **equitably estopped** from asserting timeliness defenses. MUSD actively concealed its own breach of the mandatory mentor duty, affirmatively blamed Plaintiff for the foreseeable consequences of MUSD's breach and transmitted false and altered allegations to CTC to perpetuate the concealment. A defendant may not benefit from procedural defenses where the defendant's own misconduct prevented the plaintiff from timely discovering the claim. *Lantzy v. Centex Homes*, 31 Cal. 4th 363, 383 (2003). MUSD's concealment of its wrongdoing, combined with its active misrepresentation of Plaintiff's conduct to CTC, estops MUSD from now claiming that Plaintiff should have discovered the claims earlier.

207.    In the further alternative, Government Code section 815.6 creates direct statutory liability for public entities that breach mandatory duties, and claims under this section are not subject to the shortened claim presentation periods applicable to common law tort claims. The mentor requirement imposed by Education Code section 44454(a) and Title 5 California Code of Regulations section 80027(e) creates a mandatory duty specifically designed to protect intern teachers from professional harm. This statutory scheme provides an independent basis for liability that does not require compliance with the Government Claims Act's shortened time periods applicable to personal injury claims.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Konrad Alexander Stimson prays for judgment against Defendants Milpitas Unified School District, Stacey Lillard, Jonathan Brunson, and DOES 1 through 50, inclusive, as follows:

1. For compensatory damages according to proof, including but not limited to:
   a. Back pay and lost earnings
   b. Front pay and loss of future earning capacity
   c. Loss of educational investment

d. Loss of employment benefits
e. Emotional distress damages
f. Reputational harm damages

2. For punitive damages in an amount sufficient to punish Defendants and deter future misconduct;

3. For pre-judgment and post-judgment interest at the legal rate;

4. For reasonable attorney's fees and costs pursuant to Government Code section 12965(b), California Labor Code section 1102.5(f), and other applicable statutes;

5. For expert witness fees and litigation costs;

6. For injunctive relief, including:

i. An order directing MUSD to implement policies and training to prevent future discrimination and retaliation

ii. An order directing MUSD to comply with legal requirements for employing intern teachers

iii. An order directing MUSD to provide a letter acknowledging violations of law and Plaintiff's proper conduct (in the alternative)

7. For an order directing Defendants to:

a. Withdraw, retract, or correct any and all adverse reports, allegations, or information provided to the California Commission on Teacher Credentialing or any other licensing or credentialing authority regarding Plaintiff;

b. Provide written documentation to the California Commission on Teacher Credentialing and any other relevant credentialing authorities acknowledging that the disciplinary action against Plaintiff was improper and based on discriminatory and retaliatory motives;

c. Provide written verification and documentation supporting Plaintiff's eligibility for credential reinstatement;

d. Cooperate fully in any administrative proceedings or appeals related to the restoration of Plaintiff's teaching credentials; and

e. Expunge all disciplinary records related to the Letter of Reprimand and termination from Plaintiff's personnel file;

8. For a declaration that Defendants' conduct violated FEHA, California Labor Code section 1102.5, and other applicable laws;

9. For damages pursuant to Government Code section 815.6 for breach of mandatory statutory duty;

10. For such other and further relief as the Court deems just and proper.

COMPLAINT FOR DAMAGES
Page 29 of 30

## VII. DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

**DATED: December 29, 2025**

**THE LAW OFFICES OF JAMES L. ARRASMITH**

By: _____

**JAMES L. ARRASMITH, ESQ.**
State Bar No. 332498
Attorney for Plaintiff Konrad Alexander Stimson

## VERIFICATION

I, Konrad Alexander Stimson, am the Plaintiff in the above-entitled action. I have read the foregoing Complaint and know the contents thereof. The same is true of my own knowledge, except as to those matters which are therein alleged on information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on December 29, 2025, at Henderson, Nevada.

**KONRAD ALEXANDER STIMSON**
Plaintiff

**RIGHT TO SUE LETTER (EXHIBIT A) TO BE ATTACHED HERE**

COMPLAINT FOR DAMAGES
Page 30 of 30



Back    Email Document

View the educator's public records (current documents, all documents held and Adverse and Commission Ac
st Name.

ucator Information:

**Last Name:** STIMSON

**First Name:** KONRAD

**Middle Name:** ALEXANDER

Current Information:

**Document Number:** 210179652

**Document Title:** Education Specialist Instruction Credential

**Term:** Intern

**Status:** Revoked

**Issue Date:** 7/29/2021

**Expiration Date:** 8/1/2023

**Original Issue Date:** 7/29/2021

**Grade:**

**Special Grade:**

**SB1969 (Title 5 §80487):**

## Renewal Requirements

Please disregard any # signs you may see below and refer to the "Additional Description" column to the right for specifi

**Renewal Description**

This intern credential may not be renewed. To continue to serve in a position authorized by this credential, the holder must obtain the recommendation from a Commission-approved Preliminary Education Specialist Credential program sponsor.

## Authorization / Subjects

**Subject Code**      **Authorization Description**                      **Authorization Code**

This individual has completed the intern preservice
preparation which included specific instruction on the
education specialist subjects and is participating in a
specialized intern preparation program. This
individual is being supported through the coordinated

Renewal Code Ad

**Renewal Description**

...complete... To continue to serve in a position authorized by this credential, the holder ...the teacher... same Commission-approved Preliminary Education Specialist Credential program | R17N | TC

## Authorization / Subjects

| Subject Code | Authorization Description | Authorization Code | Subject Description |
|---|---|---|---|
| ...AT | This individual has completed the initial preservice preparation, which included special instructions on the teaching of English learners, and is participating in a Commission approved intern preparation program. This individual must be supported by both the Commission approved program and the employer in the area(s) listed and in his/her work with English learners, and must make satisfactory progress toward program completion for the duration of the intern credential. | INTR | This is a non-authorized Credentials. |
| ...MS | This authorizes the holder to conduct Educational Assessments related to student's access to the academic core curriculum and progress towards meeting instructional academic goals, provide Instruction, and Special Education Support to individuals with a primary disability of autism, moderate/severe intellectual disabilities, deaf-blind, emotional disturbance, and multiple disabilities, to students in kindergarten, grades 1 - 12 through age 22, and classes organized primarily for adults in services across the continuum of program options available. | R3MS | Moderate/Severe Disabiliti |
| ...MNE | The following instructional services may be provided to English learners within the specialty area(s) and grade/age level authorization of this document: (1) English language development defined as instruction designed specifically for limited-English-proficient students to develop their listening, speaking, reading, and writing skills in English; and (2) specially designed content instruction delivered in English defined as instruction in a subject area, delivered in English, that is specially designed to meet the needs of limited-English-proficient students. This English learner authorization also covers classes taught on the basis of other valid non- | ELAE | |

## Employment Restrictions



July 22, 2021

To Whom It May Concern:

Konrad Stimson ID# 041222496 is currently enrolled in the Preliminary Education Specialist Moderate/Severe Credential Program through National University. He has met the following requirements that are mandatory to be eligible for an internship credential.
**(X indicates completed).**

**X** Bachelor's Degree

**X** Subject Matter Competency

**X** CBEST

**X** U.S. Constitution

 X  Prerequisite coursework

If this student were to be offered employment at your district, he would be eligible to enroll in National University's intern program once the above missing requirements are complete.  He would be qualified to be an intern in the following program:

   Preliminary Multiple Subject *Intern Credential*

__Preliminary Single Subject  *Intern Credential*

 **X** Preliminary Education Specialist *Intern Credential*
     _Mild/Moderate    OR      **X**__ Moderate/Severe

Please call me if you have any questions at (916) 414-0109 or e-mail me at vguerra@nu.edu.

Sincerely,

Valerie Guerra

Valerie Guerra Supervisor of Credentials and Field Services
National University



## Academic Advising Report
For **Konrad Stimson** (041222496) prepared on **06/02/2021**
Requested by **Valerie Guerra**

| Program | Requirement Term | Requirement Status |
|---|---|---|
| **Graduate Career** | 2020-09 September | **Not Satisfied** |
| **Education CRED Program** | 2020-09 September | **Not Satisfied** |
| **Prelim Ed Spec: MS CR Credential** | 2020-09 September | **Not Satisfied** |

### Cumulative GPA Requirement (RG-2526)
**Satisfied**: Complete all GPA requirements

### GPA Requirement - (RQ-2683)
**Satisfied**: Complete all GPA requirements

Cumulative GPA
**Satisfied**: Maintain a minimum overall cumulative GPA 3 0.

GPA: 3 000 required  3.830 completed

### Excluded Coursework (RG-3110)
Courses excluded toward current plan requirements

7 Year Limit
**Satisfied**: Excluded from current plan requirements as courses exceed 7 year limit

### Prelim Education Specialist Cred Moderate/Severe (RG-3677)
**Overall Requirement Not Satisfied**: Complete all requirements

### Prelim Ed Spec Cred M/S Preparatory (RQ-3390)
**Satisfied**: Complete all preparatory requirements

Preparatory courses
**Satisfied**: Complete the following course

· **Courses**: 1.00 required, 1.00 used

#### Courses Used

| Term | Subject | Catalog Nbr | Course Title | Grade | Units | Type |
|---|---|---|---|---|---|---|
| 2021-Feb | HEDX | 2301X | Intro Health Ed: K-12 | S | 0 00 | TE |

### Prelim Ed Spec Cred M/S Core (RQ-3391)
**Satisfied**: Complete all core requirements.

Core Courses 1
**Satisfied**: Complete eleven of the following courses.

· **Courses**: 11.00 required, 11.00 used

#### Courses Used

| Term | Subject | Catalog Nbr | Course Title | Grade | Units | Type |
|---|---|---|---|---|---|---|
| 2021-Feb | ITL | 510 | Language-Literacy: Foundations | S | 0.00 | TE |



| Term | Subject | Catalog Nbr | Course Title | Grade | Units | Type |
|------|---------|-------------|--------------|-------|-------|------|
| 2021-Feb | ITL | 512 | Language-Literacy Strategies | S | 0.00 | TE |
| 2021-Feb | ITL | 516 | Mathematics Integrative Design | S | 0.00 | TE |
| 2021-Feb | ITL | 530 | Optimized Learning Community | S | 0.00 | TE |
| 2021-Feb | ITL | 604 | Learners and Learning I | S | 0.00 | TE |
| 2021-Feb | ITL | 606 | Learners and Learning II | S | 0.00 | TE |
| 2021-Feb | ITL | 608 | Design and Process of Teaching | S | 0.00 | TE |
| 2021-Feb | SPD | 514 | Lang/Lit - Case Study | S | 0.00 | TE |
| 2021-Feb | SPD | 600S | Foundation Preparation, SPED | S | 0.00 | TE |
| 2021-Feb | SPD | 621 | Adv. Behavioral Supports & SEL | S | 0.00 | TE |
| 2021-Feb | SPD | 631 | Special Ed Law | S | 0.00 | TE |

Advanced Core
**Satisfied:** Complete two fo the following courses

· **Courses**: 2.00 required, 2.00 used

#### Courses Used

| Term | Subject | Catalog Nbr | Course Title | Grade | Units | Type |
|------|---------|-------------|--------------|-------|-------|------|
| 2020-Sep | SPD | 645 | Collab & Case Mgmnt M/S | A | 4.50 | EN |
| 2020-Oct | SPD | 643 | Assmnt Differentiation M/S | A | 4.50 | EN |

### Prelim Ed Spec Cred M/S Std Teach (RQ-3392)
**Not Satisfied:** Complete all student teaching requirements

Student Teaching Courses - Moderate/Severe
**Not Satisfied:** Complete 2 of the following courses

· **Courses**: 2.00 required, 0.00 used, 2.00 needed

#### Courses Available

SPD 550A, SPD 550B

### Prelim Ed Spec Cred M/S Verification (RQ-3393)
**Satisfied:** Complete all verification requirements

Core GPA
**Satisfied:** Maintain a minimum 3.0 GPA in all core courses.

· **GPA:** 3.000 required, 4.000 completed

## Course History

| Term | Subject | Catalog Nbr | Title | Grade | Units | Type |
|------|---------|-------------|-------|-------|-------|------|
| 2019-Feb | EXC | 621 | Intro Students w/Autism Spect | A | 4.50 | EN |
| 2019-Mar | EXC | 622 | Assess & Behavioral App in Aut | A- | 4.50 | EN |
| 2019-Apr | EXC | 623 | Intervention/Instr w/Aut | B+ | 4.50 | EN |
| 2019-May | EXC | 624 | Autism Collab w/Parents & Fam | A | 4.50 | EN |
| 2019-Aug | MTH | 301 | Fundamentals of Mathematics II | B+ | 4.50 | EN |
| 2019-Sep | SPD | 672 | Intro to ECSE | A | 4.50 | EN |
| 2019-Oct | SPD | 674 | Collaborative Partners | A | 4.50 | EN |
| 2019-Nov | SPD | 676 | ECSE Assessment & Intervention | A | 4.50 | EN |
| 2019-Dec | SPD | 678 | ECSE Field Experience | B+ | 4.50 | EN |
| 2020-Jan | MTH | 209A | Fundamentals of Mathematics I | A- | 4.50 | EN |
| 2020-Feb | MTH | 204 | Mathematics for Science | A | 4.50 | EN |
| 2020-Mar | CHE | 101 | Introductory Chemistry | A | 4.50 | EN |

56



| 2020-May | MTH | 215 | College Algebra & Trigonometry | B+ | 4.50 | EN |
|---|---|---|---|---|---|---|
| 2020-Sep | SPD | 645 | Collab & Case Mgmnt M/S | A | 4.50 | EN |
| 2020-Oct | SPD | 643 | Assmnt Differentiation M/S | A | 4.50 | EN |
| 2020-Nov | CHE | 150 | Introductory Organic Chemistry | C+ | 4.50 | EN |
| 2021-Feb | HEDX | 2301X | Intro Health Ed. K-12 | S | 0.00 | TE |
| 2021-Feb | ITL | 510 | Language-Literacy Foundations | S | 0.00 | TE |
| 2021-Feb | ITL | 512 | Language-Literacy. Strategies | S | 0.00 | TE |
| 2021-Feb | ITL | 516 | Mathematics Integrative Design | S | 0.00 | TE |
| 2021-Feb | ITL | 530 | Optimized Learning Community | S | 0.00 | TE |
| 2021-Feb | ITL | 604 | Learners and Learning I | S | 0.00 | TE |
| 2021-Feb | ITL | 606 | Learners and Learning I' | S | 0.00 | TE |
| 2021-Feb | ITL | 608 | Design and Process of Teaching | S | 0.00 | TE |
| 2021-Feb | SPD | 514 | Lang/Lit - Case Study | S | 0.00 | TE |
| 2021-Feb | SPD | 600S | Foundation Preparation SPED | S | 0.00 | TE |
| 2021-Feb | SPD | 621 | Adv Behavioral Supports & SEL | S | 0.00 | TE |
| 2021-Feb | SPD | 631 | Special Ed Law | S | 0.00 | TE |

57



Page 1 of 1



## Academic Advising Report
For **Konrad Stimson** (041222496) prepared on **06/02/2021**
Requested by **Valerie Guerra**

| Program | Requirement Term | Requirement Status |
|---|---|---|
| **Undergraduate Career** | 2019-07 July | **Satisfied** |
| **Letters & Science UGNO Program** | 2019-07 July | **Satisfied** |
| **Non-Degree UGRD Preparation** | 2019-07 July | **Satisfied** |

## Course History

| Term | Subject | Catalog Nbr | Title | Grade | Units | Type |
|---|---|---|---|---|---|---|
| 2019-Feb | EXC | 621 | Intro Students w/Autism Spect | A | 4.50 | EN |
| 2019-Mar | EXC | 622 | Assess & Behavioral App in Aut | A- | 4.50 | EN |
| 2019-Apr | EXC | 623 | Intervention/Instr. w/Aut. | B+ | 4.50 | EN |
| 2019-May | EXC | 624 | Autism Collab w/Parents & Fam | A | 4.50 | EN |
| 2019-Aug | MTH | 301 | Fundamentals of Mathematics II | B+ | 4.50 | EN |
| 2019-Sep | SPD | 672 | Intro to ECSE | A | 4.50 | EN |
| 2019-Oct | SPD | 674 | Collaborative Partners | A | 4.50 | EN |
| 2019-Nov | SPD | 676 | ECSE Assessment & Intervention | A | 4.50 | EN |
| 2019-Dec | SPD | 678 | ECSE Field Experience | B+ | 4.50 | EN |
| 2020-Jan | MTH | 209A | Fundamentals of Mathematics I | A- | 4.50 | EN |
| 2020-Feb | MTH | 204 | Mathematics for Science | A | 4.50 | EN |
| 2020-Mar | CHE | 101 | Introductory Chemistry | A | 4.50 | EN |
| 2020-May | MTH | 215 | College Algebra & Trigonometry | B+ | 4.50 | EN |
| 2020-Sep | SPD | 645 | Collab & Case Mgmnt M/S | A | 4.50 | EN |
| 2020-Oct | SPD | 643 | Assmnt Differentiation M/S | A | 4.50 | EN |
| 2020-Nov | CHE | 150 | Introductory Organic Chemistry | C+ | 4.50 | EN |
| 2021-Feb | HEDX | 2301X | Intro Health Ed: K-12 | S | 0.00 | TE |
| 2021-Feb | ITL | 510 | Language-Literacy: Foundations | S | 0.00 | TE |
| 2021-Feb | ITL | 512 | Language-Literacy: Strategies | S | 0.00 | TE |
| 2021-Feb | ITL | 516 | Mathematics Integrative Design | S | 0.00 | TE |
| 2021-Feb | ITL | 530 | Optimized Learning Community | S | 0.00 | TE |
| 2021-Feb | ITL | 604 | Learners and Learning I | S | 0.00 | TE |
| 2021-Feb | ITL | 606 | Learners and Learning II | S | 0.00 | TE |
| 2021-Feb | ITL | 608 | Design and Process of Teaching | S | 0.00 | TE |
| 2021-Feb | SPD | 514 | Lang/Lit - Case Study | S | 0.00 | TE |
| 2021-Feb | SPD | 600S | Foundation Preparation: SPED | S | 0.00 | TE |
| 2021-Feb | SPD | 621 | Adv. Behavioral Supports & SEL | S | 0.00 | TE |
| 2021-Feb | SPD | 631 | Special Ed Law | S | 0.00 | TE |

58





Stimson 0013 Respondent Exhibits

2X MATCH: Become a Supporter in 2025!

## Can exercise improve behavior?

Help encouraging a child who has autism

By Daniel Coury, MD

*This answer is from by Daniel Coury, MD, medical director of Autism Speaks Autism Treatment Network and a developmental-behavioral pediatrician with Nationwide Children's Hospital, in Columbus, Ohio. Nationwide Children's Hospital is one of 17 AS-ATN centers across the United States and Canada.*



99
**Can exercise improve our son's autism-related problem behaviors? What can we do to increase his activity?**

Parents know of the health benefits of exercise. It promotes healthy weight and strong bones, reduces stress and improves cardiovascular function. Less familiar are exercise's mental health and behavioral benefits.

Consider what the body is doing when exercising: The heart beats faster, circulating more blood through the body, including the brain. You breathe faster and deeper, increasing oxygen to your brain as well as your muscles. Finally, exercise increases the release of several brain chemicals called neurotransmitters. These include endorphins and dopamine, which affect our brain's functioning. Clearly, exercise can help the entire body, including the brain, function at its best.

Does this have any measurable benefit for individuals with autism and other neurodevelopmental disorders? Definitely. Several studies have looked at the effects of exercise in children and adults with attention deficit hyperactivity disorder (ADHD).

## They show clear evidence that exercise improves attention, concentration and organizational skills.

All are problems for individuals with ADHD.

*ZO minutes Walking*

### Encouraging research

One study found clear improvements in these areas after just 30 minutes of aerobic exercise. Another study showed improved behavior, thinking skills and school performance after 20 minutes of exercise in children with or without ADHD. In the second study, the children with ADHD also showed improved self-control and decreased impulsive behavior.

Certainly, improvements in attention, concentration and self-control would help individuals with autism spectrum disorder (ASD). And we have good evidence that exercise can provide similar benefits for children and adults on the spectrum.

In particular, studies have shown that exercise reduces problem behaviors such as repetitive behaviors, off-task behavior, mouthing, self-injury, disruptiveness and aggression in those with autism. We see these benefits last for several hours during and after exercise. These benefits can even produce a kind of positive feedback, making it easier for parents and therapists to encourage exercise.

## Encouraging exercise in those with autism

So how can parents encourage their children – or any loved one with autism – to exercise daily?

First, it's important to consider your child's preferences. Does he prefer jogging, riding a bike, swimming? Tapping into enjoyment and preferences is an important first step to motivation.

While many people exercise for the sake of a goal such as losing weight, many individuals with autism need more immediate reinforcement. Your child may simply enjoy running or swimming. However, you may need to offer some additional motivation. If so, I suggest a little "pay to play," as in holding off time at the computer or television until after the day's exercise.

Finally, it will probably help if you join your child in the exercise activity. This way you provide a role model while he learns a new activity. The simple truth is that you're almost certain to benefit from the daily exercise as well. So I encourage family's daily schedule and set aside 30 minutes a day for shared exercise. You have nothing to lose (but maybe extra weight) and a lot to gain.

46

To "walk a lap" means to complete **one full circuit or circuit around a defined course or object**, like a running track, field, or even a room, ending where you started, and it's about the route, not the speed (could be walking, jogging, or running). In different contexts, it can also mean to "work the room" at a party or event by moving around to talk to people.

Common Meanings:

- **Exercise/Sports:** One trip around a track, field, or pool.
- **Social Settings (e.g., parties, bars):** To walk around and mingle, check out the scene, or talk to different people.
- **Figurative:** "Taking a lap" can also mean taking a short walk for a break or cooling down.

Examples:

- "I need to walk three laps around the park to get my steps in".
- "Let's take a lap around the conference hall to see who's here".

Walk 1 lap - meant

Walk 1 time around
   a defined path

swim | lap
cars | lap

page 1

The two top, foundational methods for teaching individuals with autism are Applied Behavior Analysis (ABA), which offers structured, step-by-step learning, and Visual Support Techniques, which use pictures and visual aids to enhance understanding and routine. While ABA includes methods like Discrete Trial Training (DTT) for structured learning and Natural Environment Teaching (NET) for more natural skill-building, visual supports are a universally effective strategy to provide clarity and structure.

Applied Behavior Analysis (ABA) using a one-on-one (1:1) format is considered an evidence-based and effective method for teaching individuals with autism spectrum disorder (ASD), particularly for early and intensive intervention. However, calling it *the* preferred or "gold standard" method is a subject of intense debate.

Discrete Trial Training (DTT) is a structured ABA therapy technique where a teacher works one-on-one with a child with autism to teach new skills by breaking them into small, manageable steps, and using repetitive practice with positive reinforcement to ensure mastery. This method involves presenting a clear instruction (discriminative stimulus), the child's response, and a consequence (positive reinforcement for correct responses or gentle correction for incorrect ones), followed by a brief pause before the next trial begins. The goal of DTT is to improve communication, adaptive behavior, and social skills by promoting independent learning in a predictable environment.

How DTT Works

1. **A structured, predictable environment**: where instruction is given in a clear, distraction-free setting;
2. **Breaking down skills**: into small, isolated targets, often starting with very basic concepts like identifying colors.
3. **Repetitive practice**, where each small step is taught systematically through repeated trials;

49

Page 1

Walking with an autistic individual can improve cardiovascular fitness, build muscle strength, help regulate energy, reduce repetitive behaviors, and enhance attention and academic focus. It also provides a structured, routine activity, and a natural opportunity for social engagement and communication with a caregiver or peer. For individuals with sensory challenges, walking, especially in nature, can offer calming sensory input and serve as a meditative activity, reducing stress and promoting relaxation.

Benefits for the Autistic Individual

**Physical Health:**

Improves cardiovascular health, enhances endurance, and strengthens muscles.

**Behavioral & Emotional Well-being:**

- **Reduces Stereotyped Behaviors:** Regular movement and structured exercise can decrease repetitive behaviors.
- **Manages Energy:** Helps regulate energy levels, contributing to overall well-being.
- **Promotes Relaxation:** The rhythmic nature of walking, particularly in a natural setting, can be meditative and provide stress relief.

**Cognitive & Academic Function:**

Exercise interventions have been shown to improve executive functions and enhance attention, which can positively impact academic focus.

**Sensory Regulation:**

Provides structured sensory input through movement, which can help regulate sensory needs and improve sensory interaction.

Benefits of the 1:1 Aspect

**Structure and Routine:**

Walking can be integrated into a predictable daily routine, reinforced with visual supports to help manage transitions and promote consistency.

**Targeted Socialization:**

A 1:1 walk provides a low-pressure, natural environment for conversation and social engagement with the walking partner, which can be beneficial for individuals who find direct social interactions challenging.

47

Page 2

**Individualized Support:**

The walking partner can provide support and guidance tailored to the individual's sensory needs, preferences. and abilities, ensuring a positive and effective experience.

**Enhanced Observation:**

The walking partner can observe and identify early signs of motor delays, sensory processing differences, and other developmental needs, allowing for timely intervention.

How to Make it Work

**Incorporate Routine:**

Build a regular and predictable schedule for walks, using visual aids to help the individual anticipate and understand the activity.

**Consider the Environment:**

Choose routes and settings that provide appropriate sensory input, such as walking in nature for a calming effect or a more structured path for a focus on physical performance.

**Provide Visual Supports:**

Use tools like task cards, physical demonstrations, or video modeling to explain and reinforce the walking routine.

**Be Patient:**

Walking is an ongoing process that builds on consistent effort. Long-term, structured programs have shown positive results in motor skills and behavior.

48



# HHS Public Access

Author manuscript
*J Autism Dev Disord.* Author manuscript; available in PMC 2020 July 01.

Published in final edited form as:
*J Autism Dev Disord.* 2019 July ; 49(7): 2864–2872. doi:10.1007/s10803-019-04004-1.

## Do Student Characteristics Affect Teachers' Decisions to Use 1:1 Instruction?

Heather J. Nuske[1], Melanie Pellecchia[1], Viktor Lushin[1], Keiran Rump[1], Max Seidman[1], Rachel R. Ouellette[2], Diana Cooney[1], Brenna B. Maddox[1], Gwendolyn M. Lawson[1], Amber Song[1], Erica M. Reisinger[1], and David S. Mandell[1]

[1]Penn Center for Mental Health, Psychiatry Department, Perelman School of Medicine, University of Pennsylvania, PA, USA

[2]Department of Psychology, Florida International University, FL, USA

## Abstract

One-to-one instruction is a critical component of evidence-based instruction for students with autism spectrum disorder, but is not used as often as recommended. Student characteristics may affect teachers' decisions to select a treatment and/or implement it. This study examined the associations between students' clinical and demographic characteristics and teachers' reported use of discrete trial training (DTT) and pivotal response training (PRT). Children's higher sensory symptoms, lower social approach, lower verbal skills and higher self-regulation difficulties were associated with more frequent 1:1 DTT and PRT. Results suggest that teachers give more frequent 1:1 instruction to children with more observable impairments, do not match children to type of 1:1 intervention, and may inadvertently neglect other students for whom individualized intervention may still be beneficial.

## Keywords

1:1 instruction; child characteristics; personalized medicine; teacher decisions

Evidence-based treatments for children with autism spectrum disorder (ASD) include behavioral interventions that teach communication, cognitive, social and adaptive skills. There has been a steady rise in the number of children receiving ASD intervention services through schools (U.S. Department of Education, 2017), but the type and intensity of treatment vary greatly (White, Scahill, Klin, Koenig, & Volkmar, 2007). There is little research on factors that predict the type and intensity of school-based treatment children with ASD receive. Such factors may include different school resources, such as staffing, or

**Corresponding author:** Heather J. Nuske, hjnuske@upenn.edu, Telephone: (215) 746-6041.

Disclosure of Potential Conflicts of Interest
All authors declare that they have no conflict of interest

Ethical Approval
All procedures performed in studies involving human participants were in accordance with the ethical standards of the institutional and/or national research committee and with the 1964 Helsinki declaration and its later amendments or comparable ethical standards.

Informed Consent
Informed consent was obtained from all individual participants included in the study



*[Handwritten notes at top:]* still chage large   1. Different Textbook   2. Different Assignment   3. Different grading sight   what is learned   to Pass do Pass Circle   re word Lesson Que   reading the studen

## ACCOMMODATIONS & MODIFICATIONS

Name _____   *[handwritten: Dealing with disability]*

IEP Date _____

### PHYSICAL ARRANGEMENT OF ROOM
- seating student near the teacher
- seating student near a positive role model
- standing near the student when giving directions or presenting lessons
- avoiding distracting stimuli (air conditioner, high traffic area, etc.)
- increasing distance between desks

### LESSON PRESENTATION:
- pairing students to check work
- writing key points on board
- providing peer tutoring
- providing visual aids, large print, films
- providing peer notetaker
- making sure directions are understood
- including a variety of activities during each lesson
- repeating directions to the student after they have been given to the class; then have him/her repeat and explain direction to teacher
- providing written outline   *[handwritten: speak to the text]*
- allowing student to tape record lessons
- having child review key points orally
- teaching through multi-sensory modes, visual, auditory, kinesthetics, olfactory
- using computer-assisted instruction
- accompany oral directions with written directions for child to refer to blackboard or paper
- provide a model to help students, post the model and refer to it often
- provide cross age peer tutoring
- to assist the student in finding the main idea underlying, highlighting, cue cards, etc.
- breaking longer presentations into shorter segments

### ORGANIZATION:
- providing peer assistance with organizational skills
- assigning volunteer homework buddy
- allowing student to have an extra set of books at home
- sending daily/weekly progress reports home
- developing a reward system for in-schoolwork and homework
- completion providing student with a homework assignment notebook
- weekly progress report
- tutoring

### TEST TAKING:
*[handwritten: Masking]*
- test in resource room
- reduce number of concepts tested
- allowing open book exams
- giving exam orally
- giving take home tests
- using more objective items (fewer essay responses)
- allowing student to give test answers on tape recorder
- giving frequent short quizzes, not long exams
- allowing extra time for exam
- reading test item to student
- avoid placing student under pressure of time or competition
- modified test
- allow typed answers
- allow extra points for oral answers

### ASSIGNMENTS/WORKSHEETS:
- giving extra time to complete tasks
- work in resource room
- simplifying complex directions
- handing worksheets out one at a time
- reducing the reading level of the assignments
- requiring fewer correct responses to achieve grade (quality vs quantity)
- allowing student to tape record assignments/homework
- providing a structured routine in written form
- providing study skills training/learning strategies
- giving frequent short quizzes and avoiding long tests
- shortening assignments; breaking work into smaller segments
- allowing typewritten or computer printed assignments prepared by the student or dictated by the student and recorded by someone else if needed
- using self-monitoring devices
- reducing homework assignments
- not grading handwriting
- student should not be allowed to use cursive or manuscript writing
- reversals and transpositions of letters and numbers should not be marked wrong, reversals or transpositions should be pointed out for correction
- do not require lengthy outside reading assignments
- teacher monitor students self-paced assignments (daily, weekly, bi-weekly)
- give examples
- arrangements for homework assignments to reach home with clear, concise directions
- give points for participation in class
- allow extra points for oral answers (essays)
- modified curriculum
- modified grading

### BEHAVIORS:
- recognize and give credit for student's oral participation in class
- use of timers to facilitate task completion
- implementing time-out procedures
- increasing the immediacy of rewards
- contracting with the student
- allowing legitimate movement
- ignoring inappropriate behaviors not drastically outside classroom limits
- allowing student time out of seat to run errands, etc.
- implementing a classroom behavior management system
- marking student's correct answers, not his mistakes
- cueing student to stay on task (nonverbal signal)
- allowing for short breaks between assignments
- making "prudent use" of negative consequences
- keeping classroom rules simple and clear
- giving extra privileges and rewards
- using self-monitoring strategies
- praising specific behaviors
- structure transitional and unstructured times (recess, hallways, lunchroom, locker room, library, assembly, field trips, etc.)

CODE OF ETHICS OF THE EDUCATION PROFESSION

Preamble

The educator, believing in the worth and dignity of each human being, recognizes the supreme importance of the pursuit of truth, devotion to excellence, and the nurturing of democratic principles. Essential to these goals is the protection of freedom to learn and to teach and the guarantee of equal educational opportunity for all. The educator accepts the responsibility to adhere to the highest ethical standards.

The educator recognizes the magnitude of the responsibility inherent in the teaching process. The desire for the respect and confidence of one's colleagues, of students, of parents, and of the members of the community provides the incentive to attain and maintain the highest possible degree of ethical conduct. The Code of Ethics of the Education Profession indicates the aspiration of all educators and provides standards by which to judge conduct.

Principle I. Commitment to the Student

The educator strives to help each student realize his/her potential as a worthy and effective member of society. The educator therefore works to stimulate the spirit of inquiry, the acquisition of knowledge and understanding, and the thoughtful formulation of worthy goals.

In fulfillment of the obligation to the student, the educator:

1. Shall not unreasonably restrain the student from independent action in the pursuit of learning

2. Shall not unreasonably deny the student access to varying points of view

3. Shall not deliberately suppress or distort subject matter relevant to the student's progress

4. Shall make reasonable effort to protect the student from conditions harmful to learning or to health and safety

5. Shall not intentionally expose the student to embarrassment or disparagement

6. Shall not on the basis of race, color, creed, gender, national origin, marital status, political or religious beliefs, family, social, or cultural background, or sexual orientation, unfairly:

a. Exclude any student from participation in any program

b. Deny benefits to any student

c. Grant any advantage to any student

7. Shall not use professional relationships with students for private advantage

8. Shall not disclose information in the course of professional service unless disclosure serves a compelling professional purpose or is required by law

Principle II. Commitment to the Profession

DPP REC'D 08/23/2022

The education profession is vested by the public with a trust and responsibility requiring the highest ideals of professional service.

In the belief that the quality of the services of the education profession directly influences the nation and its citizens, the educator shall exert every effort to raise professional standards, to promote a climate that encourages the exercise of professional judgment, to achieve conditions that attract persons worthy of the trust to careers in education, and to assist in preventing the practice of the profession by unqualified persons.

In fulfillment of the obligation of the profession, the educator:

1. Shall not in any application for a professional position deliberately make a false statement or fail to disclose a material fact related to competency and qualifications

2. Shall not misrepresent his/her professional qualifications

3. Shall not assist any entry into the profession of a person known to be unqualified in respect to character, education, or other relevant attribute

4. Shall not knowingly make a false statement concerning the qualifications of a candidate for a professional position

5. Shall not assist a noneducator in the unauthorized practice of teaching

6. Shall not disclose information about colleagues obtained in the course of professional service unless disclosure serves a compelling professional purpose or is required by law

7. Shall not knowingly make false or malicious statements about a colleague

8. Shall not accept any gratuity, gift, or favor that might impair or appear to influence professional decisions or action

Source: National Education Association, 1975

Unauthorized Private Gain or Advantage

A certificated person shall not:

1. Use for his/her own private gain or advantage the time, facilities, equipment, or supplies which are the property of his/her employer without the express or clearly implied permission of his/her employer

2. Accept any compensation or benefit or thing of value other than his/her regular compensation for the performance of any service which he/she is required to render in the course and scope of his/her certificated employment. This rule shall not restrict performance of any overtime or supplemental service at the request of the school employer, nor shall it apply to or restrict the acceptance of gifts or tokens of minimal value offered and accepted openly from students, parents, or other persons in recognition or application of service.

Performance with Impaired Faculties

A certificated person shall not:

DPP REC'D 06/23/2022

1  Perform or attempt to perform any duties or services authorized by his/her credential during any period in which he/she knows or is in possession of facts showing that his/her mental or intellectual faculties are substantially impaired for any reason, including but not limited to use of alcohol or any controlled substance.

2. Assign or require or permit a subordinate certificated person to perform any duties authorized by his/her credential during any period in which the superior certificated person knows of his/her own knowledge or is in possession of facts showing that the subordinate certificated person's mental or intellectual faculties are substantially impaired for any reason, including but not limited to use of alcohol or any controlled substance.

a. For the purpose of this rule, substantial impairment means a visible inability to perform the usual and customary duties of the position in a manner that does not represent a danger to students, employees, or school property. It does not include or means inability attributable to lack of, or inadequate, professional preparation or education.

Harassment and Retaliation Prohibited

No certificated person shall directly or indirectly use or threaten to use any official authority or influence in any manner whatsoever which tends to discourage restrain, interfere with, coerce, or discriminate against any subordinate or any certificated person who in good faith reports, disclosed, divulges, or otherwise brings to the attention of the Governing Board of a school district, the Commission on Teacher Credentialing or any other public agency authorized to take remedial action, any facts or information relative to actual or suspected violation of any law regulating the duties of persons serving in the public school system, including but not limited to these rules of professional conduct.

70

DPP REC'D 06/23/2022



Big Al's        NEM injury

5 witness, staff

David Sorenson        Teacher

Carol Fu        Parent





**Crisis Prevention Institute**
t • 800.558.8976
f • 414.979.7098
tty • 888.758.6048 *(Deaf, hard of hearing, or speech impaired)*

**crisisprevention.com**

© 2020 CPI. All rights reserved  CPI® and *Nonviolent Crisis Intervention*® are registered trademarks

FLEX0001
20-NCIBLN-HND-0821   09/20

73



Page 1

# High-Level Holding in a Standing Position
## Children's Control Position℠





Lower-Level Holding        Medium-Level Holding        Higher-Level Holding

The Children's Control Position™ is designed to be used with children. Consider using this position only with individuals considerably smaller than yourself.

### Children's Standing Holding



Low-Level Restraint        Medium-Level Restraint        High-Level Restraint

### Children's Seated Holding



Close Low-Level Restraint        Close Medium-Level Restraint        Open High-Level Restraint

75

# 2024 Pequannock- CPI Approved Holds

## Seated Holding



Low-Level Restriction



Medium-Level Restriction



High-Level Restriction

## Standing Holding ⓘ Can I move or transport while holding?



Low-Level Restriction



Medium-Level Restriction



High-Level Restriction

## Children's Standing Holding



Low-Level Restriction



Medium-Level Restriction



High-Level Restriction

## Children's Seated Holding



Chair: Low-Level Restriction



Chair: Medium-Level Restriction



Chair: High-Level Restriction

52

## PROMPT LEVEL DEFINITION

I.    Independent Response – The consumer performs the response with no assistance from a trainer.

V.    Verbal Prompt – The consumer performs the response when the trainer orally or with sign language describes the target behavior.

G.    Gestural Prompt – The consumer performs the response when the trainer makes a movement, without touching the consumer, that indicates what the target response would be. (e.g., head motion, pointing, eye movement.)

D.    Demonstration Prompt – The consumer performs the response by imitating a behavior the trainer has demonstrated.

P.    Physical Prompt – The consumer performs the response while the trainer is touching him, but the consumer is supplying some of the movement himself.

M.    Manipulated Response – The consumer performs the response with the trainer supplying all the movement in a hand-over-hand fashion.

O.    No Response – The consumer actively resists responding at any level.

FormsFY03/jt/cf
FM04 Person Centered Planning Assessment

7

Define: Prompt

To assist or provide help.

56

# Module 1: The CPI *Crisis Development Model*[SM]



Integrated Experience

| Crisis Development/Behavior Levels | Staff Attitudes/Approaches |
|---|---|
| 1. **Anxiety:** a change in behavior (e.g., pacing, withdrawal) | 1. **Supportive:** an empathic, nonjudgmental approach (e.g., listen, allow time) |
| 2. **Defensive:** beginning to lose rationality (e.g., refusal, shouting) | 2. **Directive:** decelerating an escalating behavior (e.g., give simple directives, set limits) |
| 3. **Risk Behavior:** behaviors that may present a risk to self or others (e.g., hitting, self-injury) | 3. **Physical Intervention:** disengagement and/or holding skills to manage risk behavior (e.g., low-, medium-, high-level disengagement and/or holding skills) |
| 4. **Tension Reduction:** decrease in physical and emotional energy (e.g., crying, apology) | 4. **Therapeutic Rapport:** re-establish communication (e.g., listen carefully, debrief) |

*Care, Welfare, Safety, and Security*[SM]

4

78

**79**

# Module 4: Verbal Intervention



## The *Verbal Escalation Continuum*<sup>SM</sup>

### Intimidation

The individual is verbally and/or nonverbally threatening staff.

**Interventions/Examples:**
- Take all threats seriously.
- Seek assistance.
- Avoid physical intervention unless there is no safer alternative.

### Release

Verbal and emotional outburst.

**Intervention/Examples:**
- Allow venting, and if possible, remove the audience.

*like walks*

### Refusal

Noncompliance; slight loss of rationality.

**Intervention/Examples:**
- Set limits. Redirect the person's focus and attention to the desired outcomes.

### Tension Reduction

Decrease in physical and emotional energy.

**Intervention/Examples:**
- Establish Therapeutic Rapport. Re-establish communication with the individual.

### Questioning

**Interventions/Examples:**
1. Information-seeking: A rational question seeking a rational respons
   - Give a rational response.
2. Challenging: Questioning authority; attempting to draw staff into power struggle.
   - Downplay the challenge. Stick to the topic. Set limits.

79

**77.**

Konrad Stimson Instruction Book

**AFIRM** Autism Focused Intervention Resources & Modules _job duty_

**These evidence-based practices (EBPs) have been effective with learners with autism spectrum disorder (ASD) for social outcomes. Social outcomes are related to skills needed to interact with others, such as taking turns in conversation or recognizing facial expressions.**

80

ABI - Antecedent-based Intervention

CBI - Cognitive Behavioral Intervention

DR - Differential Reinforcement

DTT - Discrete Trial Training

FCT - Functional Communication Training

MD - Modeling

NI - Naturalistic Interventions

PII - Parent-implemented Interventions

PMII - Peer-mediated Instruction & Intervention

Picture Exchange Communication System

PRT - Pivotal Response Training

PP - Prompting

R+ - Reinforcement

RIR - Response Interruption & Redirection

SC - Scripting

SM - Self-management

SN - Social Narratives

SST - Social Skills Training

SPG - Structured Play Groups

TA - Task Analysis

TAII - Technology-aided Instruction & Intervention

TD - Time Delay

VM - Video Modeling

VS - Visual Supports

**VISIT AFIRM.FPG.UNC.EDU TO ACCESS THE AUTISM FOCUSED INTERVENTION RESOURCES AND MODULES.**



AFIRM

# Autism Focused Intervention Resources & Modules

AFIRM Modules    Timely Toolkits    Earn CE Cred

## Video Modeling

### Video Modeling (VM)

By using video modeling (VM), the learner with ASD might be able to process in and more quickly.

### What Will I Learn?

The AFIRM model guides the learner through four lessons to facilitate:

- Learning basic knowledge about video modeling supports (VM).

- Applying VM







5/14/25, 4:20 PM





**Kumar, Arti**

| | |
|---|---|
| **From:** | Brunson, Jonathon <jbrunson@musd.org> |
| **Sent:** | Tuesday, May 16, 2023 1:03 PM |
| **To:** | Kumar, Arti |
| **Cc:** | Brooke Bolton Tiutan; Steve Ngo; Damon James |
| **Subject:** | Re: Response to CCTC from Milpitas USD re K. Stimson |

Here are the Transition Assistants (TA) address, email and phone numbers.

I reached out them to give them a heads up that you may be contacting them

**Anupriya Mathur  was a TA at the time**
1012 Lancer Dr. San Jose CA 95129
Phone 408 718-9575
email amathur@musd.org

**Francesca Beradi was a TA at the time *and is no longer with the district***
1756 Arana Ct. Milpitas CA 95035
408 893-3975
email berarsdifrancesca00@gmail.com

**Ruby De Leon was a TA at the time**
4447 Pitch Pine Crt. San Jose CA 95136
408 888-1778
email rdeleon@musd.org

Take care,

Jonathon Brunson
Assistant Superintendent of Human Relations
Milpitas Unified School District
ACSA State Legislative Policy Co-Chair 2021-2023
jbrunson@musd.org
(408) 635-2600 ext. 6070

I've learned that people will forget what you said, people will forget what you did, but people will never forget how you made them feel.  Maya Angelou

CONFIDENTIALITY NOTICE: This communication and its attachments may contain non-public, confidential, or legally privileged information including HIPAA-protected PHI. The interception, use or disclosure of such information is prohibited. If you are not the intended recipient, or have received this information in error, please notify the sender immediately by reply email and delete all copies of this message and attachments without reading, saving, or further distributing them.

On Tue, May 16, 2023 at 11:23 AM Kumar, Arti <AKumar@ctc.ca.gov> wrote:

1

From:    Konrad Stinson
To:      Kumar, Arti
Subject: Re. 2-407288960
Date:    Monday, May 22, 2023 11:50:41 AM

Good morning,

I do have witness from my time at Milpitas. The person that would be called to a hearing is David Sorenson.

David Sorenson
dsorense@.musd.org

David Sorenson is another teacher working with Adult Autism.

1. David can substantiate the November 2021 student and information regarding the accident at the bowling alley. It was a real and real medical records from the parent could be another witness.

2. David could also tell more about the classroom hostile work environment caused by the November event.

Specific - I would ask David for one of his students to be hired as a staff. David knew I didn't trust my staff after the bowling alley. David also knows about the female students behaviors and need for 1:1 staffing. And we didn't have the staff. I had to assume double duty responsibilities responsibilities. David can tell about how the female student would elope and grab people. He can also support information on the other female student.

3. David last can explain about a day in February of 2022 where he had to use physical prompts to get a female student across the street- someone called the police and several officers came to investigate- they understood the student with autism was being assisted to cross the street. But, someone did report the situation. This is the risk of accusations we deal with working with off campus adult autism.

4. The taking walks on campus was in part due to the situation with David. I felt working with difficult students and teaching cooperation would reduce problems. David would be able to explain work sites and leaving campus.

Again, when accusations suggest I took students to on campus walks, David can support our jobs involved taming students off campus that would not be visible to on campus staff. Target, Walmart. library.

5. David and I had one hour each week, he took students to the computer room on Wednesdays and I had one hour on Thursdays. We both used computers. This accusation about video - doesn't even include what was be done. A very large open comment. He videoed - period. More detail? They can't give more detail because they never did a thorough investigation.

But it's what and who we're left out of the investigation that I will show evidence.

96

OPEN &
ASSIGN

| | | | |
|---|---|---|---|
| Certification ID | 516927331 | Jurisdiction | CALIFORNIA |
| | | License Type 1 | |
| First Name | Konrad | License Type 2 | |
| Last Name | Stimson | License Type 3 | |
| Middle Name/Initial | | License Type 4 | |
| Maiden Name | | Action Type | Revocation/Invalidation |
| Date of Birth | ▉▉▉▉ | Action Details: | |
| Action Date | 07/05/2024 | Criminal case status: Not Applicable | |
| Effective Date | 07/05/2024 | | |
| Transaction Date | 11/25/2024 | | |
| Record Format | Version 2 | | |

| | |
|---|---|
| Was action due to sexual misconduct? Sexual misconduct includes sexual abuse, sexual assault, inappropriate sexual relationship, conduct designed to lead to inappropriate romantic or sexual relationship and sexual harassment ? | NO |
| Was action due to violent actions? | NO |
| Was the action due to possession, sale, distribution, or use of an unlawful substance? | NO |
| Was the action due to theft or fraud? | NO |
| Was the action due to inappropriate actions and/or communication with a student? | NO |
| Was the action due to substance abuse? | NO |
| Was the action due to any manner of test or other academic fraud? | NO |
| Was the action due to the misuse of school equipment? | NO |
| Was the action due to financial misconduct such as defaulting on a student loan or failure to pay child support? | NO |
| Was the action due to violation of an employment contract with a school or school district? | NO |
| Was the action due to actions taken by another state or federal agency? | NO |
| Was the action due to circumstances not described above? | NO |

**Danette C. Rugg**

| | |
|---|---|
| From: | Konrad Stimson <konrad.stimson@gmail.com> |
| Sent: | Sunday, May 15, 2022 11:55 AM |
| To: | Jonathon Brunson, Steve Ngo |
| Subject: | Parent Witness Carol Fu |

**CAUTION: External E-Mail:**

Good afternoon,

I didn't want to confuse you  I wi  have w tness at our hearing.

Consider this- Carol Fu, carolfu@gmail.com :

Who is she? ██████ mother.

How long was ██████ in surgery? Is it required that ██████ have a 1:1 support staff? Who was the 1 1 the day that ██████ was injured? Were you aware that Ruby was promoted by Stacey Lillard after the incident? Are you aware that Ruby felt she deserved a pay raise and went to HR to discuss her pay raise? Do you feel the reason you were not informed Ruby was no where near ██████ playing with her phone and visiting staff- because Stacey felt you may file a lawsuit aga nst the district? Are you aware no investigation, no questions, no training review, nothing took p ace fol owing your son's accident? Do you know that Mr. Stimson had several disagreements with Dave, Ruby, and Stacey (emails) because Mr Stimson believes ██████ accident could have been prevented had Ruby followed his orders? Mr. Stimson asked Ruby to bowl for ██████ (before he was injured) and she said "I don't want too, I don't know how,' BUT what Stacey and Ruby can't explain is why Ruby didn't stay near ██████ during the bowling accident, Ruby had stated the bowling ball was too heavy, 8 pounds, but had she been doing her job she could have given him a lighte- ball, but she was unwilling to bowl for him and unwilling to stay with him  Mr  Stimson was gone from March 25, because he refused to drop the issue and a complaint against him mysteriously came up. And, as a result the investigation into ██████ accident continued to be ignored despite constantly being reported to Mr. Brunson and Mr. Ngo. Are you intestinal in a class action lawsuit together against the Milpitas school district?

Witness will be asked questions Mr. Ngo and Mr. Brunson- and either a class action lawsuit with parent and teacher or two separate but supported lawsuits will be involved and you will need to think about EVEN if staff lie to support Ruby, it will not explain promoted and higher pay.  Your Witness will not be able to explain my asking Ruby to bowl for him before the injury, nor the lack of investigation by Stacey -or yourselves.

Equity of Investigation 🔎 and discrimination, you will have a lot to lie about when you are exposed.  I'm thinking like Louden County sound the alarm!

Respectfully
Konrad Stimson

DPP REC'D 06/23/2022

**Danette C. Rugg**

From:        Steve Ngo
Sent:        Tuesday, May 17, 2022 5:51 PM
To:          Danette C. Rugg
Subject:     FW: What are you taking out? Recording

---

**From:** Konrad Stimson <konrad.stimson@gmail.com>
**Sent:** Tuesday, May 17, 2022 5:51:02 PM (UTC-08:00) Pacific Time (US & Canada)
**To:** Steve Ngo <srgo@lozanosmith.com>; Jonathon Brunson <jbrunson@musd.org>
**Subject:** What are you taking out? Recording

**CAUTION: External E-Mail:**

Good afternoon,

   **At this point, I'm wondering how much and what you are altering and removing?**

   I fear what your removing will seem more like **evidence tampering-** like during the last part of our interview, you state how I should not go after staff, if you were my attorney... which to me, suggests you knew they messed up.

   It's at that point, you should have said we will review the facts and meet one or two weeks later to discuss the outcome, but you appear to have a ignore and pray 🙏 ☁ plan? Like go away, don't email? I'm an employee with rights.

   To be clear I've told you how I will respond, this to me is a clear case of discrimination.
   The Milpitas Culture of We website only needs to be displayed, it's full of anti-white comments.
   Followed by covering ▬▬▬ lack of justice with an appropriate investigation 🔍 Also, Dave with the police 🚓 No investigation.
   But, more to reveal, unfair practices with investigations and what you have against me and the timing ⌛ ⊙

   This court action will not be why you investigated me - thats not the focus. The clear facts will be discrimination and involve everything from ▬▬▬ to everything up to the end. I will ask Carol Fu to be a witness. You have staff witness and I will have a parent witness.

   Your recording will simply identify more clearly why you investigated me, what you based your reason for my administrative leave but took zero corrective action on anyone else with much more - real and dangerous action or lack of action with no investigation - even with my constant emails telling everyone- how do you explain promotion and pay raise after surgery incident? You can't. The parent needs to know about that.

   I don't know what you plan to add to my interview allegations, suddenly you have more to share like I robbed Walmart or some crazy witness narrative. But, I requested parents helping parents be involved - hiding something? Not me, how about you?

Respectfully
Konrad Stimson

1

DPP REC'D 06/23/2022



**MILPITAS**
UNIFIED SCHOOL DISTRICT

1331 E. Calaveras Blvd. | Milpitas, CA 95035 | 408-635-2600 | www.musd.org

May 20, 2022

**By Personal Delivery and Email (konrad.stimson@gmail.com)**

Konrad Stimson


Re:  Letter of Reprimand

Dear Mr. Stimson:

This letter serves as a written reprimand for your unprofessional conduct as a Milpitas Unified School District ("District") probationary certificated employee. Based on credible witness statements and your responses to the evidence, the District determined that you engaged in inappropriate interactions with your students and exercised poor judgment in the performance of your duties

You are a teacher in the District's post-secondary education program, assigned to adult special education students. Two colleagues, Ruby DeLeon and Francesca Berardi, both Transitional Assistants assigned to your classroom, observed you repeatedly taking a female student, hereinafter referred to as Student M, on walks alone with you without informing other District employees when you were going on these walks or where you were going on these walks. DeLeon and Berardi also reported that you would take another female student, hereinafter referred to as Student A, on walks alone with you without informing other District employees when you were going on these walks or where you were going on these walks. They further reported that these walks alone with these students took about 15-20 minutes and that sometimes you ventured into areas that were not always visible to other District employees. Instead of providing instruction to other students in your care, you took regular walks alone with two female students, which these Assistants could have done.  Further, they reported that you often made efforts to isolate Student A from other students and District employees.  Both DeLeon and Berardi reported that during the walks with Student A, you regularly had your arms wrapped around Student A's waist and lower back, and you would touch or rub Student A's back and shoulder in a manner that made staff feel uncomfortable.  They also reported that you would rub Student A's arm and back area when she would work or stand near you. Berardi reported that you would refuse to allow female classroom assistants to assist you in the handling of Student A.

Berardi reported that in March 2022, you asked other District employees to return to the classroom while you worked with students in the computer lab.  When Berardi entered the computer lab, she observed you sitting in front of Student M and video recording her. Berardi



### MILPITAS
UNIFIED SCHOOL DISTRICT

1331 E. Calaveras Blvd. | Milpitas, CA 95035 | 408-635-2600 | www.musd.org

reported that once you noticed that she entered the computer lab, you began to turn off the camera and disconnect the equipment.

A third witness, Stacy Lillard, Special Education and Student Services Coordinator, reported that on March 25, 2022, your class went to the Great Mall in Milpitas. Lillard observed students sitting in the food court eating their lunches and you were seated directly next to Student A with your arm resting on the bench directly behind her. Lillard also reported that none of the other District employees were sitting next to or across from students and none had their arms positioned closely or around students.

Your responses to these allegations were defensive, contradictory, and lacked credibility. On May 10, 2022, the District interviewed you about these allegations. **(A copy of the audio recording of this interview will be provided under separate cover)**. Regarding taking Student M on walks alone, you admitted to the conduct, and explained that the purpose of such conduct was to alleviate Student M's undesirable behaviors. However, you admitted that you did not document this strategy, discuss it with anyone else, or otherwise memorialize any improvement of Student M's behavior resulted from the walks. Additionally, when asked why you went on these walks alone with Student M, you explained that it was because you did not trust the paraprofessionals to take Student M on walks. However, you left the same paraprofessionals, whom you did not trust, to watch the other students while you went on walks alone with Student M and you permitted the paraprofessionals to take Student M to the bathroom alone. Regarding taking Student A on walks alone, you explained that the purpose of such conduct was because of Student A's aggressive behavior, distractedness, and physical limitations. However, you admitted that you did not document this strategy, discuss it with anyone else, or memorialize any improvement of Student A's behavior resulted from the walks. Additionally, you stated that Student A was a larger student and lunged at and/or grabbed at other people daily. However, despite these tendencies, you refused to invoke the assistance of paraprofessionals in handling Student A; admitted to taking her on walks alone; and chose rather to keep your arms around her waist, rub her back and/or shoulder, or put your arm around her when sitting next to her, explaining that such conduct was your effort to prevent her from lunging and/or grabbing people. Such preventative measures, however, were unnecessary since you stated that Student A's undesirable behavior could be prevented by having District staff walk along each side of her. However, you chose to rely on physical touching of Student A despite knowing that such touching would not be necessary if you invoked the assistance of the paraprofessionals. Your explanations for the foregoing conduct were patently inadequate.

The District's Director of Special Education reviewed your conduct and determined that your self-described handling of Student A was not required for special education or general education students. As discussed above, the Transitional Assistants, who are trained to support teachers working with special education students, also noted that your conduct was unnecessary.



**MILPITAS**
UNIFIED SCHOOL DISTRICT

1331 E. Calaveras Blvd. | Milpitas, CA 95035 | 408-635-2600 | www.musd.org

The above-described conduct is inappropriate and unacceptable. Board Policy ("BP") 4119.21 ("Professional Standards") provides that employees are expected to maintain the highest ethical standards, to behave professionally, and exercise good judgment when interacting with students and members of the school community, to enhance the integrity of the District, calling on educators, for example, to "make reasonable effort to protect the student from conditions harmful to learning or the health and safety." Your conduct flouted this policy—taking female students alone on walks without providing legitimate reasons for doing so, excessive and unnecessary touching of a female student, and video recording of a female student, are bereft of any good judgment and far below any ethical standards to enhance the integrity of the District.

A copy of this letter will be placed in your personnel file. If you wish to respond to this letter in writing you may do so within ten (10) days. Any response will be attached to this letter and placed in your personnel file.

Please contact me if you have any questions regarding the concerns contained in this letter.

Sincerely,

Jonathon Brunson
Assistant Superintendent of Human Relations
Milpitas Unified School District

Enclosure:     BP 4119.21

cc:     Personnel File



## MILPITAS
### UNIFIED SCHOOL DISTRICT

Human Relations Department
1331 E. Calaveras Blvd. | Milpitas, CA 95035 | 408-635-2600 | www.musd.org

TO:        Konrad Stimson
           Post Secondary

FROM:      Jonathon Brunson
           Assistant Superintendent of Human
           Relations

DATE:      May 20, 2022

SUBJECT:   Non-Reelection for 2022-2023 School Year

This notification is to inform you that you will be recommended to the Milpitas Unified School District Board of Education for non-reelect of employment for the 2022-2023 school year pursuant to Education Code Section 44929.21. My reference to Education Code Section 44929.21 in the previous sentence does not change your status as a probationary employee. Enclosed are copies of the above referenced Education Code Sections.

The Milpitas Unified School District thanks you for the services you have extended to the students and the district.

You may have health benefits that will continue until June 30, 2022. You will be able to continue your health benefits under the COBRA Plan. For further information, please contact our payroll/benefits office at (408) 635-2600 ext. 6026.

If you have any questions regarding the foregoing, please do not hesitate to contact me at (408) 635-2600 ext. 6070.

ACKNOWLEDGMENT OF RECEIPT

Signature _____        Date ___May 20, 2022___

Cc:

Personnel
Payroll
Principal

EDUCATION CODE - EDC
**TITLE 2. ELEMENTARY AND SECONDARY EDUCATION [33000 - 64100]** *( Title 2 enacted by Stats. 1976, Ch. 1010. )*
**DIVISION 3. LOCAL ADMINISTRATION [35000 - 45460]** *( Division 3 enacted by Stats. 1976, Ch. 1010. )*
**PART 25. EMPLOYEES [44000 - 45460]** *( Part 25 enacted by Stats. 1976, Ch. 1010. )*
**CHAPTER 4. Employment—Certificated Employees [44800 - 45061.5]** *( Chapter 4 enacted by Stats. 1976, Ch. 1010. )***ARTICLE 2.7. Permanent Status [44929.20 - 44929.29]** *( Article 2.7 added by Stats. 1987, Ch. 1452, Sec. 380. )*

**44929.21.**
(a) Every employee of a school district of any type or class having an average daily attendance of 250 or more who, after having been employed by the district for three complete consecutive school years in a position or positions requiring certification qualifications, is reelected for the next succeeding school year to a position requiring certification qualifications shall, at the commencement of the succeeding school year be classified as and become a permanent employee of the district.

This subdivision shall apply only to probationary employees whose probationary period commenced prior to the 1983–84 fiscal year.

(b) Every employee of a school district of any type or class having an average daily attendance of 250 or more who, after having been employed by the district for two complete consecutive school years in a position or positions requiring certification qualifications, is reelected for the next succeeding school year to a position requiring certification qualifications shall, at the commencement of the succeeding school year be classified as and become a permanent employee of the district.

The governing board shall notify the employee, on or before March 15 of the employee's second complete consecutive school year of employment by the district in a position or positions requiring certification qualifications, of the decision to reelect or not reelect the employee for the next succeeding school year to the position. In the event that the governing board does not give notice pursuant to this section on or before March 15, the employee shall be deemed reelected for the next succeeding school year.

This subdivision shall apply only to probationary employees whose probationary period commenced during the 1983–84 fiscal year or any fiscal year thereafter.

*(Added by Stats. 1987, Ch. 1452, Sec. 380.)*



**MILPITAS**
UNIFIED SCHOOL DISTRICT

1331 E. Calaveras Blvd. | Milpitas, CA 95035 | 408-635-2600 | www.musd.org

## GOVERNING BOARD
## OF THE
## MILPITAS UNIFIED SCHOOL DISTRICT

### Resolution No. 2022.47

### RESOLUTION OF NON-REELECTION OF PROBATIONARY CERTIFICATED EMPLOYEE

**WHEREAS,** Education Code section 44929.21(b) authorizes the Governing Board to give notice to a probationary certificated employee of the Board's decision to non-reelect the employee for the next succeeding school year to such a position at any time prior to March 15th of the employee's **second** complete consecutive school year of employment by the District; and

**WHEREAS, KONRAD STIMSON** is a probationary certificated employee who has been employed by the District during the 2021-2022 school year, **which marks no more than his first complete school year as a probationary certificated employee**; and

**WHEREAS,** the Governing Board received a recommendation from the District Superintendent or designee not to reelect this employee; and

**WHEREAS,** the Governing Board has decided not to reelect this employee for the 2022-2023 school year.

**NOW, THEREFORE, BE IT RESOLVED,** that the Governing Board of MILPITAS UNIFIED SCHOOL DISTRICT hereby authorizes the District Superintendent or the Superintendent's designee to notify the employee of the Board's decision not to reelect them for the 2022-2023 school year in accordance with the requirements of Education Code section 44929.21(b). The District Superintendent or the Superintendent's designee is further authorized to take any other actions necessary to carry out the intent of this Resolution.

The foregoing Resolution was PASSED and ADOPTED at a regular meeting of the Governing Board of the Milpitas Unified School District on the 24th day of May 2022 by the following vote:

AYES: 5
NOES: 0
ABSTAIN:
ABSENT:

Dated: May 24, 2022

# EXHIBIT B

ASBE Rehearing Materials



**Arizona State Board of Education**
1700 W. Washington Street
Executive Tower, Suite 300
Phoenix, Arizona 85007
Phone: (602) 542-5057
Website: azsbe.az.gov



January 28, 2026

**Sent via U.S.P.S. Certified Mail**
9489 0090 0027 6708 9891 93

Konrad A Stimson
3055 Saint Rose Pkwy Box #777151
Henderson, NV 89052

RE: REQUEST FOR REVIEW OR REHEARING

       Case No.    C-2025-000232
       Educator No.  7720079

Enclosed is a copy of the materials that will be provided to the members of the State Board of Education for its consideration of your request for review or rehearing of the Board's December 8, 2025 decision. If you have not received the packet of materials, please refer to the certified mailing number above and contact your local United States Postal Service for delivery or enforcementactions@azsbe.az.gov for electronic delivery.

       DATE:     February 23, 2026

       TIME:     9:00 AM

       PLACE:    **1700 W. Washington St., Executive Tower,**
                   **3rd Floor Boardroom,**
                   **Phoenix, AZ 85007**

**Please note: If you wish to submit a written or verbal comment for the meeting, please visit our website at https://azsbe.az.gov/about/services/call-public.**

If you have questions or do not have internet access to register for a virtual or in person public comment, please contact the Board's office at (602) 542-5057 and a staff member will assist you.

Sincerely,

*Garnett Burns*

Garnett Burns
Director of Enforcement Actions
State Board of Education

KONRAD ALEXANDER STIMSON
3055 Saint Rose Pkwy 777151
Henderson, NV 89052

### BEFORE THE ARIZONA STATE BOARD OF EDUCATION

| | |
|---|---|
| IN THE MATTER OF:<br><br>KONRAD A. STIMSON<br><br>EDUCATOR IDENTIFICATION NO. 772-0079<br><br>(CERTIFICATED). | **Case No. C-2025-000232**<br><br>**Motion for Rehearing** |

COMES NOW Konrad Alexander Stimson, hereby files this Motion for Rehearing, pursuant to A.A.C. R7-2-709(A) copies sent to Arizona State Board of Education and Attorney General's Office by USPS Certified Mail on December 20, 2025.

### I. Particular Grounds

A. Irregularity in the administrative proceedings of the hearing body, or abuse of discretion, whereby the moving party was deprived of a fair hearing.

1. Newly discovered material evidence which could not with reasonable diligence have been discovered and produced at the October 14, 2025 hearing.

1 My attorney James L. Arrasmith began prelitigation November 14, 2025. I provided the 32 page Demand for Jury Trial, but before completion and filing CTC responded.

2. California Commission on Teacher Credentialing responded November 24, 2025. I provided the document providing a February 12-13, 2026 meeting.

3. I put (Yes) on the document, because I have 4 pages attached, I lost my case by Default, however I can prove using 4 CTC documents that (CTC) kept changing my address. They had the correct address, changed it three times, and now it is correct (again). If I am responsible for my address, no one else should be changing it. I plan to attend the Feb 12 meeting, In Person.

4. I reported to Arizona that I was in the Moderate Severe program. I referenced that I was a student teacher, or Intern. I was denied the right to a Mentor. I had paid nearly $20k for my program, I needed a Mentor to sign off on my training. I was never given that support or training.

5. If you read the description of the Moderate Severe credential, it describes what I was doing (allegations explained) I was walking for eloping goals, computer room was the Educational Assessment, and if you look at the program courses - they required me to learn about programs, like CPI. P for Prevention, like the bowling alley incident.

6. Besides the Intern credential, California has 4 license showing Pending Additional Evaluation, after the Feb 12 meeting, they should show Reinstated.

7. This is being called a meeting on the California document, and I have not been offered anything about Allegations.

8. I did not notice that 3/5/22 was a Saturday. The only Incident Date is a day no one was at school.

9. California does not have a "generic" Special Education Teacher credential - I was an Intern Moderate Severe.

10. CTC is aware that 3 dates, my address, and allegation(s) were altered. The Investigation Report #2, does not match the license date.

11. There was No Formal Report.

12. I tried to explain about FERPA at our hearing, I had more to state for the record, CTC lost a $3 million lawsuit and part of that was not following FERPA.

13. On my Intern license, it states Assessment - most people in education know about Confidentiality and FERPA. If paras or TA could have access, I will ask Feb 12, why they do not have passwords to access IEP records.

14. At the October 14 hearing, I stated comments about, Felony and altering written documented witness allegations, the only thing that I want to add is I filed a formal complaint with California State Bar, this is under

investigation. You can see the changes, they are not just reworded in a way I do not like, they are under investigation. I plan to file another State Bar complaint in January. It was illegal. It was a crime. It was not just word change.

2. Excessive penalties. I was in an Intern Moderate Severe program, denied support and training. And, California 10 days after I filed my prelitigation with Milpitas, offers a meeting, and they know all of this and more, that includes why, NEM was real, his mother was real, parent helping parent was real, and it's all coming out in public jury hearing or Feb 12. I ask for the Arizona Board to provide a rehearing, I ask for it to be after Feb 12-13, 2026.

3. Error in the admission or rejection of evidence or other errors of law occurring at the administrative hearing.

1 Exhibit 2, California understands this was not a criminal case, it was not about sexual or even inappropriate actions, Feb 12 will be a closed session meeting, and not because I wanted it that way.

2. I have 2 date time stamped schedule, California knows, pictures of my classroom whiteboard, I plan to use this to have people disbarred and file criminal charges for falsified legal documents, State Bar. I did not simply identify when but the board says walk 1 lap, lap means defined path, like a track. The time of 15 to 20 minutes is research based. I told staff in documented and permanently record, even if they did not hear me at the morning update at 8:15 to 8:30, they could read or even look at PECS picture icons, its documented, its tracking the record. And, I looked at some emails by staff - they even use places like the Sports Center.

3. I may have been an Intern, but I used what I knew, without a Mentor, and AFIRM tells about prompting, modeling, PECS, video modeling, and technology aided instruction and intervention. It also shows Discrete Trial Training, which is 1:1 a leading instruction method for autism.

4. My attorney will file a jury trial, including gender discrimination. I presented evidence of this October 14, 2025.

4. That the decision is not justified by the evidence or is contrary to the law.

I ask that you read and review the supporting documents and provide a rehearing. A 32 page Demand for Jury Trial explains my case, and February 12, 2026 California will provide In Person new decisions.

Dated this 20th day of December, 2025.

102

Konrad Stimson

Copies to:
Arizona State Board of Education
1700 W. Washington Street, Suite 300
Phoenix, Arizona 85007

Arizona Attorney General's Office
State Government Division
Education and Health Section
2005 N. Central Avenue
Phoenix, Arizona 85004

103



**Arizona State Board of Education**
1700 W. Washington Street
Executive Tower, Suite 300
Phoenix, Arizona 85007
Phone: (602) 542-5057
Website: azsbe.az.gov



September 17, 2025

**Sent via U.S.P.S. Certified Mail**
9489 0090 0027 6606 0289 18

Konrad Stimson
10811 Jowart Court
Richmond, TX 77469

RE:   HEARING
        Case No.    2025-000232
        Educator No.  7720079

You are hereby notified that a hearing on the attached materials has been set before the Professional Practices Advisory Committee ("PPAC") at the following date, time, and place:

      DATE:      October 14-15, 2025

      TIME:      9:00 A.M.

      PLACE:    1700 W. Washington Street
                 Executive Tower — 3rd floor Boardroom
                 Phoenix, AZ 85007

If you have not received the full packet of materials, please refer to the certified mailing number at the top of the page and contact your local United States Postal Service ("USPS") for more information on how to get those delivered. If you are unable to claim the materials at the USPS, are unable to attend the hearing or need assistance to attend this meeting, please contact Enforcementactions@azsbe.az.gov.

**The PPAC conducts application review hearings and complaint hearings seeking disciplinary action against an educators teaching certificates or right to work in an Arizona District or Charter School. Some hearings involve both an application and a complaint. Please refer to the packet of materials for the information specific to your case.**

**The PPAC hearings are set for two days per month. Depending on the number and length of hearings on the agenda, your hearing may be set on either day. Please contact the Attorney**

**BEFORE THE ARIZONA STATE BOARD OF EDUCATION**

In the Matter of:

**KONRAD A. STIMSON,**

Holder of Arizona Education Certificate(s),
Educator Identification No(s). 772-0079

Respondent.

Case No. C-2025-000232

**FINDINGS OF FACT,
CONCLUSIONS OF LAW, AND
ORDER**

On December 8, 2025, the Arizona State Board of Education (the "Board") met to consider the recommended decision of the Professional Practices Advisory Committee ("PPAC") in the above-captioned matter. The recommended decision is attached hereto and incorporated herein by reference.

The Board, having reviewed the administrative record and the attached PPAC's recommended Findings of Fact, Conclusions of Law, and Recommendation in this matter, and having considered the arguments of the parties present and fully deliberating the same, takes the following actions on the recommended decision and issues its order as set forth below:

## FINDINGS OF FACT

1. Adopt Findings of Fact Nos. 1 through 18 in their entirety.

## CONCLUSIONS OF LAW

1. Adopt Conclusions of Law Nos. 19 through 27 in their entirety.

## ORDER

Adopt the recommended order of the PPAC that the Board uphold the California revocation and that all states and territories be so notified.

1

## NOTICE

The parties are hereby notified that, pursuant to A.R.S. §§ 15-203(A)(14) and 41-1062(B), this Order shall be final unless a party submits a written motion for review of the decision with the Board under A.A.C. R7-2-709(H) within twenty (20) days after the Board decision in this matter; or a written motion for rehearing of the decision with the Board under A.A.C. R7-2-709(A) within thirty (30) days after the Board decision in this matter. The motion for review or rehearing must specify the particular grounds upon which it is based as stated in Board rule. A copy must be served upon all other parties to the hearing. In the alternative, the parties may seek judicial review of the Board decision pursuant to A.R.S. § 12-904 within thirty five (35) days after service of this Order. A party is not required to file a motion for review or rehearing of the Board decision in order to exhaust the party's administrative remedies.

DATED this 8th day of December, 2025.

Katherine Haley, President
Arizona State Board of Education

2

Case 2:26-cv-00393-DJ-CKD    Document 1    Filed 02/12/26    Page 151 of 262

**SEAN ROSS**
EXECUTIVE DIRECTOR
ARIZONA STATE BOARD OF EDUCATION
1700 W. Washington St., Suite 300
Phoenix, Arizona 85007
*Complainant*

**KRISTIN K. MAYES**
ATTORNEY GENERAL
FIRM BAR NO. 14000
Brenden Castellanos, Bar No. 040662
Assistant Attorney General
2005 N. Central Ave.
Phoenix, Arizona 85004
(602) 542-8331
Education@azag.gov
*Attorney for the Arizona State Board of Education*

### BEFORE THE ARIZONA STATE BOARD OF EDUCATION

| | |
|---|---|
| In the Matter of: | Case No. C-2025-000232 |
| **KONRAD A. STIMSON,** | **STATE'S RESPONSE TO APPLICANT'S MOTION FOR REVIEW OR REHEARING** |
| Educator Identification No. 772-0079 (Certificated.) | |

The attorney for the Arizona State Board of Education ("Board") hereby responds to Konrad A. Stimson ("Respondent")'s Motion for Rehearing ("Motion") pursuant to A.R.S. § 41-1062 and A.A.C. R7-2-709. The Motion should be denied because Respondent fails to establish any basis for rehearing in accordance with A.A.C. R7-2-709, much less one that materially affected his rights.

### I.     BACKGROUND

Respondent is a certificated educator designated by Educator Identification No. 772-0079 in the records of the Arizona Department of Education. (State's Exhibit 1.)

Respondent holds a Standard Professional Elementary, K-8 certificate (valid through

August 9, 2036), Standard Professional Middle Grades, 5-9 certificate (valid through August 9, 2036), and Standard Professional Mild/Mod Spec Ed, K-8 certificate (valid through August 9, 2036), issued by the Board. (*Id.*)

### A. Conduct at Milpitas Unified School District

In 2022, Respondent was employed by the Milpitas Unified School District ("District") located in Milpitas, California, as an adult post-secondary special education teacher. (State's Exhibit 4.)

During March of 2022, two (2) of Respondent's colleagues observed Respondent taking a female student ("Student M") outside to walk for fifteen (15) to twenty (20) minutes. Respondent was alone with Student M on these walks. Respondent did not inform any other employee when or where he took Student M on walks. (*Id.*)

During that same time period, Respondent's colleagues observed Respondent taking a second female student ("Student A") on fifteen (15) to twenty (20) minute walks in areas not visible to other employees. When Respondent and Student A were in visible areas, Respondent's colleagues observed Respondent wrapping his arms around Student A's waist and rubbing Student A's back. (*Id.*)

During that same time period, a colleague reported that Respondent had sat in front of Student A in a school computer lab and recorded her with his personal camera equipment. When one of Respondent's colleagues entered the computer lab and observed Respondent recording Student A, Respondent turned off the camera equipment. (State's Exhibit 4; State's Exhibit 5.)

On March 25, 2022, Respondent's class took a field trip to a mall. During lunchtime, Respondent was observed sitting next to Student A with his arm on the bench behind her. (State's Exhibit 4.)

Respondent's colleagues reported that Respondent regularly rubbed Student A's back when she would stand near him. They also reported that Respondent attempted to isolate Student A from her peers and other teachers. Specifically, Respondent would prevent female

2

classroom assistants from assisting him with Student A. (*Id.*)

When District staff interviewed Respondent about his conduct with Student M, Respondent claimed he took Student M on walks to alleviate her behavioral issues and because he did not trust the other paraprofessionals to walk with Student M. However, Respondent still left the paraprofessionals to supervise the remaining special education students and permitted the paraprofessionals to take Student M to the bathroom alone, despite his lack of trust. Further, Respondent failed to document or discuss his walks with Student M as a strategy for behavior management. (*Id.*)

When District staff interviewed Respondent about his conduct with Student A, Respondent claimed he took Student A on walks to manage her behavioral issues. Regardless, Respondent did not document or discuss his walks with Student A as a strategy for behavior management. Respondent alleged Student A was a large student who lunged at and grabbed people, which was why Respondent rubbed her back and put his arm around her. Respondent admitted that Student A's behavioral issues could have been prevented by having District staff walk along each side of Student A. However, Respondent chose to continue touching Student A instead of asking for the other paraprofessionals' assistance. (*Id.*)

On May 24, 2022, the District's Governing Board did not reelect Respondent as an employee for the 2022-2023 school year. (*Id.*)

**B.     California Commission on Teacher Credentialing Proceedings**

On April 9, 2024, the California Commission on Teacher Credentialing ("California Commission") filed an Accusation against Respondent alleging that Respondent demonstrated evident unfitness for service and engaged in unprofessional conduct, immoral conduct, and moral turpitude based on his aforementioned conduct at the District. (State's Exhibit 5.)

On June 28, 2024, the California Commission determined the conduct stated in the Accusation was supported by the evidence and revoked Respondent's California teaching credentials, effective July 5, 2024. (State's Exhibit 6.)

//

### C.     Arizona Board of Education Disciplinary Proceedings

On or about November 25, 2024, the Board's Investigative Unit ("IU") discovered that Respondent's California teaching credentials were revoked. (State's Exhibit 2.) Pursuant to A.R.S. § 15-534.04(A), the final adjudication or judgment in another jurisdiction—like California—that a certificated person has engaged in immoral or unprofessional conduct "shall be treated as immoral or unprofessional conduct  for the purposes of any disciplinary proceeding conducted against that person in this state." Further, A.R.S. § 15-534.04(C) provides the Board "may revoke or suspend all certificates issued in this state to that person in a manner that is consistent with the terms of revocation or suspension in the other jurisdiction, unless that person requests a hearing[.]"

On January 9, 2025, the Board's IU sent Respondent a Notice of Investigation/Surrender informing Respondent that the Board was seeking reciprocal revocation of Respondent's educator certificates in Arizona. (State's Exhibit 3.)

On February 4, 2025, Respondent requested a hearing via e-mail pursuant to A.R.S. § 15-534.04(C) so that the Board could make the determination of whether to uphold or decline the revocation of Respondent's Arizona educator certificates. (State's Exhibit 7.)

On October 14, 2025 a hearing was held before the Professional Practices Advisory Committee ("Committee"), governed by A.R.S. §§ 15-534.04(C) and 41-1061 through 41-1067. (See Reporter's Transcript  10/14/2025 ("Tr.").) During the hearing, the Committee heard approximately three (3) hours of testimony, evidence and argument. At the conclusion of the hearing, the Committee determined by a unanimous vote to revoke Respondent's Arizona educator certificates, so to be consistent with the California Commission's revocation of Respondent's California educator credentials. (Tr. 112-113.) In forming its recommendation, the Committee identified "multiple offenses," "refusal to acknowledge wrongful nature of conduct," and "vulnerability of the victims" as aggravating factors. (Tr. 109-110.)

On December 8, 2025, the Board adopted the Committee's recommendation and revoked Respondent's Arizona educator certificates. On December 20, 2025, Respondent submitted the

4

present Motion.

## II.    STANDARD OF REVIEW

A party aggrieved by a decision of the Board may move for a rehearing or review of the decision pursuant to A.A.C. R7-2-709. To obtain relief, the moving party must show that one of the following "materially affected" their rights during the disciplinary proceedings:

> 1. Irregularity in the administrative proceedings or the hearing body, or abuse of discretion, whereby the moving party was deprived of a fair hearing.
>
> 2. Misconduct of the hearing body or the prevailing party.
>
> 3. Accident or surprise which could not have been prevented by ordinary prudence.
>
> 4. Newly discovered material evidence which could not with reasonable diligence have been discovered and produced at the hearing.
>
> 5. Excessive or insufficient penalties.
>
> 6. Error in the admission or rejection of evidence or other errors of law occurring at the administrative hearing.
>
> 7. That the decision is not justified by the evidence or is contrary to law.

A.A.C. R7-2-709(B)(1)-(7); *see also* A.R.S. § 41-1062(B).

When a request for a rehearing is based on alleged misconduct of the hearing body or the prevailing party under A.A.C. R7-2-709(B)(2), a rehearing is only required if the alleged misconduct actually affected the decision. *Cf. Varco, Inc. v. UNS Electric, Inc.*, 242 Ariz. 166, 170-71 ¶ 13 (App. 2017) ("When ruling on a motion for new trial based on attorney misconduct, the trial court must decide whether the misconduct materially affected the rights of the aggrieved party, and reversal is only required when it appears probable that the misconduct actually influenced the verdict." (internal quotation marks and citations omitted)); *see generally* Ariz. R. Civ. P. 59(a)(1)(B); A.R.S. § 41-1062(B) (providing that an agency's rules regarding

rehearing or review be "drawn as closely as practicable" to Ariz. R. Civ. P. 59 pertaining to new trials in superior court").

## III.    ARGUMENT

Respondent claims that (1) irregularity in the proceedings of the Committee, or abuse of discretion affected its recommendation, (2) newly discovered evidence would have impacted the Committee's recommendation, (3) the Committee's recommended discipline was excessive, (4) error in the admission or rejection of evidence or other errors of law occurred at the Committee's hearing, and (5) the Committee's recommendation was not justified by evidence and was contrary to law. As outlined below, these claims are without merit. Respondent fails to assert any substantiated grounds for rehearing, much less any articulable facts to support a finding that he did not receive a fair hearing. As such, any claimed error would not have "materially affected" Respondent's rights or the proceedings.

**A.    The Committee proceeding was conducted in line with Board regulations and the Committee did not abuse its discretion.**

Respondent claims that irregularity in the Committee's proceedings, or abuse of discretion, deprived him of a fair hearing. (Motion.) In particular, Respondent argues that the California Commission's hearing documents contain factual errors including incorrect dates, educator certificate titles, and service addresses. (*Id.*) Respondent also claims that the California Commission falsified legal documents. (*Id.*) But, Respondent does not raise any specific allegations of irregularity or abuse of discretion by the Committee that materially affected his right to a fair hearing. (*Id.*) Despite Respondent's claims otherwise, the record demonstrates the Committee considered all evidence presented and acted appropriately. Further, Respondent does not present sufficient evidence to substantiate his claims or justify overturning the Board's decision to revoke.

Pursuant to A.R.S. § 15-534.04, the Board may revoke or suspend a person's educator certificates in a manner consistent with the terms of revocation or suspension in another jurisdiction upon notification that a person's educator certificate has been revoked or suspended

in that jurisdiction. A certificated person in Arizona, like Respondent, whose educator credentials were suspended or revoked in another jurisdiction, may request a hearing pursuant to A.R.S. §§ 41-1061 through 1067 to contest reciprocal disciplinary action by the Board. The Board established A.A.C. R7-2-705, R7-2-713, R7-2-715 and R7-2-717 to govern the Committee and hearings. The Committee's duty is to provide advisory recommendations on teacher certification and discipline to the Board. A.A.C. R7-2-205(A).

Here, the Committee acted appropriately and within its discretion by recommending that the Board uphold the California Commission's revocation of Respondent's California educator credentials and revoke Respondent's Arizona educator certificates. Committee members engaged in a three (3) hour hearing where Respondent had the opportunity to argue against the reciprocal revocation of his Arizona educator certificates. (Tr. 6, 114.) Respondent submitted eleven (11) exhibits into evidence, delivered an opening statement, and provided extensive testimony to the Committee. (Tr. 14-18, 21-28, 31-65.)

During Respondent's hearing, he repeatedly argued that the District's disciplinary action and the California Commission's revocation of his educator credentials were based on discrimination, corruption, and erroneous information. (Tr. 25, 41-49, 83-87, 103-107.) In response, Hearing Officer Lee clarified that the Committee's purpose is not to determine whether Respondent experienced discrimination, which is a task reserved for the California Civil Rights Department. (Tr. 105.) Instead, the Committee's job was to determine whether to uphold or decline reciprocal action based on the California Commission's revocation. (Tr. 11-12.) In making her vote to recommend revocation, Member Helton noted that Respondent's claims of procedural misconduct and discrimination by the District and the California Commission must be resolved through appeal in California. (Tr. 113.)

Respondent provided testimony on the allegations set forth in the California Commission's and Board's complaints against him. When questioned about the California Commission's and Board's allegations of unprofessional conduct, Respondent provided several off-topic responses or outright denied the allegations without explanation. (Tr. 53-58, 64-69.)

Based on the evidence presented at hearing, the Committee unanimously voted to add the following as aggravating factors: multiple offenses, refusal to acknowledge wrongful nature of conduct, and vulnerability of the victims. (Tr. 109-110.)

In his motion, Respondent has failed to establish that any alleged acts of misconduct by Committee members materially affected his right to a fair hearing. Respondent had the opportunity to explain why the Board should decline to uphold the California Commission's revocation. The Committee acted within its discretion by denying his request. Therefore, the Committee did not abuse its discretion in upholding the California Commission's revocation and recommending the reciprocal revocation of Respondent's educator certificates.

**B.** **Respondent's pending litigation against the District would not impact the Committee's recommendation**

Respondent claims the lawsuit against the District warrants the reversal of the Committee and Board's actions. The existence of this lawsuit does not constitute material evidence that would change the outcome of the Committee's hearing. On November 24, 2025, after the Committee hearing, Respondent, filed a Complaint for Damages ("Complaint") against the District and various District staff in Santa Clara County, California Superior Court. (Motion.) In the Complaint, Respondent alleges that the District (1) discriminated against Respondent on the basis of gender, (2) retaliated against Respondent for raising concerns over District practices, (3) failed to prevent discrimination and retaliation against Respondent, (4) violated anti-whistleblower laws in California, and (5) violated the terms of Respondent's employment contract. Respondent made similar claims at the Committee hearing. (Tr. 64-65, 69-70, 102-03; State's Exhibit 7; Respondent's Exhibit 9, 10.)

Under A.R.S. § 41-1062(B), an agency's rules regarding rehearing or review should be "drawn as closely as practicable" to Ariz. R. Civ. P. 59 pertaining to new trials in superior court." Ariz. R. Civ. P. 59(a)(1)(D) gives courts discretion to grant a new trial on grounds of "newly discovered material evidence that could not have been discovered and produced at the trial with reasonable diligence." But, the moving party must prove that such evidence "would

probably change the result" if a new trial were granted. *See Sabin v. Rauch*, 75 Ariz. 275, 281 (1953).

Filing a complaint against the District for alleged discrimination and misconduct does not factually establish that the District engaged in discrimination and misconduct when it disciplined Respondent and reported Respondent to the California Commission. Nor does it establish the California Commission's revocation was erroneous, or that the Board erred in also revoking Respondent's Arizona educator certificates. At best, Respondent's claims are speculative and must be treated as such.

Further, Respondent's Complaint against the District fails to present new information that was not previously addressed at hearing. Respondent spoke about his perceived discrimination by the District at his hearing. (Tr. 25, 102-105.) Respondent also provided exhibits outlining his discrimination and misconduct claims against the District. (Respondent's Exhibits 5, 6, 8, 10.) Respondent even told the Committee about his plans to file the Complaint during his hearing – further evidenced by the State's exhibits. (Motion Tr. 25, 35, 102-03; Motion; State's Exhibit 7.) Regardless, the Committee still unanimously voted to uphold California's discipline and revoke Respondent's certificates after careful consideration of all the evidence presented. (Tr. 112-113.) Member Helton specifically stated that Arizona should uphold the California Commission's decision until Respondent resolves his claims through appeal in California. (Tr. 113.) Evidence of a pending lawsuit would not have changed the Committee's unanimous decision to uphold the California Commission's revocation of Respondent's certificates. As follows, Respondent's hearing would not have been impacted by the fact that Respondent had filed a Complaint against the District. Respondent's right to a fair hearing was not materially impacted, and therefore Respondent's Complaint against the District is not sufficient grounds for a new hearing.

**C.    Respondent's pending Petition for Reinstatement with the California Commission would not impact the Committee's recommendation.**

As part of his Motion for Review or Rehearing, Respondent submitted a Notice from the

9

California Commission, which shares his Petition for Reinstatement will be considered by the California Commission in February of 2026. The mere existence of a petition for reinstatement does not constitute new, material information that would change the outcome of the Committee's hearing. Petitioning for reinstatement does not establish that the California Commission will grant Respondent's petition and reinstate his California Credentials. As such, evidence that Respondent filed a Petition for Reinstatement would not have impacted the Committee's recommendation or the Board's action. Accordingly, Respondent's right to a fair hearing was not materially impacted. A new hearing is therefore not necessary to address Respondent's Petition for Reinstatement.

**D.    The Committee's reciprocal revocation of Respondent's teaching certificates was reasonable based on the conduct at issue and not excessive.**

Respondent claims that the Committee's recommendation to uphold the California Commission's revocation of his California teaching credentials constituted an excessive penalty. (Motion.) Respondent provides no factual basis to support the argument that the Committee's recommendation to uphold the California Commission's revocation of his certificates was excessive. (*Id.*) Instead, Respondent argues that the California Commission's decision to revoke his certificates was excessive because he did not receive proper support from the District during his intern program and because his upcoming jury trial may establish facts supporting his claims of misconduct against the District.

An administrative penalty is excessive if it is so "disproportionate to the offense as to shock one's sense of fairness." *Culpepper v. State*, 187 Ariz. 431, 438 (App. 1996) (citing *Schillerstrom v. State*, 180 Ariz. 468, 471 (App. 1994)). As previously stated, A.R.S. § 15-534.04, empowers the Board to revoke or suspend a person's educator certificates in a manner consistent with the terms of revocation or suspension in another jurisdiction. A.A.C. R7-2-205(A) empowers the Committee to provide advisory recommendations on teacher certification and discipline to the Board through a hearing process governed by A.R.S. §§ 41-1061 through 1067.

The Board acted reasonably and within its discretion by upholding the California Commission's revocation of Respondent's certificates. Respondent presented evidence of the District and California Commission's conduct through testimony and exhibits and opined on his alleged mistreatment during his hearing. Ultimately, the Committee was not persuaded by Respondent's evidence when compared to the evidence of misconduct. (Tr. 113.) The Committee based its unanimous vote on the aggravating circumstances surrounding Respondent's conduct and the allegations established by the California Commission's discipline against Respondent. (Tr. 109-110, 112-113.) The Committee noted the nature of Respondent's misconduct with students, Respondent's refusal to acknowledge or address the wrongful nature of his conduct, and the vulnerability of the students involved as aggravating factors in forming its recommendation. (Tr. 109-110.) In light of these circumstances, the Committee's recommendation to reciprocally revoke Respondent's certificates was not disproportionate to Respondent's conduct.

To reiterate, Member Helton specifically stated that Respondent should resolve his issues with the District and California Commission through appeal in California. (Tr. 113.) Respondent should also heed her advice regarding the matter of review and rehearing. Until Respondent provides conclusive evidence of misconduct by the District or California Commission, any claim that the Committee's recommendation for reciprocal revocation of Respondent's certificates constitutes an excessive penalty is baseless. The facts as established at Respondent's hearing warrant the reciprocal revocation of Respondent's certificates.

E.    **The Committee did not err in admitting or rejecting evidence nor did it commit other errors of law during Respondent's hearing.**

Respondent asserts "error in the admission or rejection of evidence or other errors of law occurring at the administrative hearing" as grounds for rehearing. (Motion.) But, Respondent does not allege any instances in which the Committee erred in admitting or rejecting evidence or committed other errors of law during his hearing. (*Id.*)

Respondent did not object to the admission of any of the State's exhibits. (Tr. 11-12.)

11

Likewise, all eleven (11) of Respondent's exhibits were admitted (Tr. 14-18.) Respondent's hearing was held in accordance with standard Board rules. (Tr. 7.) The record does not show any error of law or error in admitting or rejecting evidence during Respondent's hearing by the State, Committee, or Hearing Officer. Respondent failed to make an argument or submit evidence to support his claim and therefore his claim that there was error in the admission or rejection of evidence or other errors of law at his hearing is baseless.

F.    **The Committee's recommendation was supported by substantial evidence and is in accordance with the law.**

In his motion, Respondent claims that the Committee's recommendation was not justified by the evidence or is contrary to law. (Motion.) Again, Respondent does not provide a cogent factual or legal basis to support his claim. (*Id.*) The Committee's recommendation was justified by the evidence presented at Respondent's hearing and in accordance with the law.

The evidentiary standard at Committee hearings is a preponderance of the evidence. *See Geer v. Ordway*, 156 Ariz. 588, 589 (App. 1987) (holding that the evidentiary standard at administrative hearings is a preponderance of the evidence). The party with the burden of proof – here, the State – must establish that the facts are more likely to have occurred than not. *See Kent K. v. Bobby M.*, 210 Ariz. 279, 284-86 (Ariz. 2005). The Board established the Committee to act in an advisory capacity to the Board regarding matters related to certification, immoral or unprofessional conduct, and "unfitness to teach." A.A.C. R7-2-205(A). The Committee advises the Board after participating in hearings conducted pursuant to A.A.C. R7-2-705. At these hearings, the Committee considers the evidentiary record, the credibility of witnesses, and the Board's rules defining unprofessional and immoral conduct. A.A.C. R7-2-205(A), (F)(6). Under A.R.S. § 15-534.04(A), a final adjudication in another jurisdiction that a certificated person has engaged in immoral or unprofessional conduct is treated as immoral or unprofessional conduct for the purposes of any disciplinary proceeding against that person.

Here, the California Commission's revocation of Respondent's California credentials constitutes unprofessional conduct for purposes of any Board disciplinary proceeding against

Respondent, including a hearing held before the Committee. A.R.S. § 15-534.04(A). At hearing, Respondent had the opportunity to argue against the reciprocal revocation of his Arizona teaching certificates based on the California Commission's disciplinary action. Respondent presented eleven (11) exhibits, many of which concerned issues beyond the scope of the Committee's hearing, such as alleged claims of discrimination, retaliation, and misconduct by the District and the California Commission. (Respondent's Exhibits 5, 6, 8, 9, 10.) The State presented ten (10) exhibits, including documents received from the California Commission, the District, and Respondent himself. The State's exhibits detailed the District's allegations against Respondent, the California Commission's allegations and subsequent action against Respondent, and the Board's correspondence with Respondent, including documents the Respondent sent directly to the Board. (State's Exhibits 4, 5, 6, 7, 8, 9, 10.) The Committee then weighed the evidence and testimony presented, adopted aggravating factors, and unanimously voted to uphold the California Commission's revocation of Respondent's Arizona certificates. (Tr. 109-110, 112-113.)

Given the substantial evidence that Respondent engaged in unprofessional conduct while working for the District, the California Commission's revocation of his teaching credentials, and the lack of mitigating information presented by Respondent, the Committee's and the Board's decision were justified by the evidence and in accordance with the law.

## IV. CONCLUSION

Respondent has failed to establish that any of the factors listed in A.A.C. R7-2-709 were present in his case, much less that any "materially affected" his rights. Therefore, the Board should deny Respondent's Motion, accordingly.

DATED this 6th day of January, 2026.

Brenden Castellanos
Assistant Attorney General
*Attorney for the Arizona State Board of Education*

13

**ORIGINAL** of the foregoing filed via email this 6th day of January, 2026, with:

Arizona State Board of Education
enforcementactions@azsbe.az.gov
inbox@azsbe.az.gov
1700 W. Washington St., Suite 300
Phoenix, Arizona 85007

**COPY** of the foregoing emailed this 6th day of January, 2026, to:

Konrad A. Stimson
3055 Saint Rose Pkwy. P.O. Box #777151
Henderson, Nevada 89052
konrad.stimson@gmail.com
*Respondent*

**SEAN ROSS**
EXECUTIVE DIRECTOR
ARIZONA STATE BOARD OF EDUCATION
1700 W. Washington St., Suite 300
Phoenix, Arizona 85007
*Complainant*

**KRISTIN K. MAYES**
ATTORNEY GENERAL
FIRM BAR NO. 14000
Sierra Porritt, Bar No. 039509
Assistant Attorney General
2005 N. Central Ave.
Phoenix, Arizona 85004
(602) 542-8890
Education@azag.gov
*Attorney for the Arizona State Board of*
*Education/Enforcement Actions Unit*

**BEFORE THE ARIZONA STATE BOARD OF EDUCATION**

| | |
|---|---|
| In the Matter of: | Case No. C-2025-000232 |
| **KONRAD A. STIMSON**, | **FINDINGS OF FACT, CONCLUSIONS OF LAW, AND RECOMMENDED DECISION** |
| Educator Identification No. 772-0079 (Certificated). | |

The Professional Practices Advisory Committee ("PPAC") hereby submits the following Findings of Fact, Conclusions of Law, and Recommended Decision for the Complaint against KONRAD A. STIMSON ("Respondent") to the Arizona State Board of Education for consideration and final disposition pursuant to Arizona Administrative Code ("A.A.C.") R7-2-717.

**I. FINDINGS OF FACT**

1.    Respondent is a certificated educator designated by Educator Identification No. 772-0079 in the records of the Arizona Department of Education. [Exhibit 1]

2.    Respondent holds the following certificate(s) issued by the Board: Standard

Professional Elementary, K-8 (valid through August 9, 2036); Standard Professional Middle Grades, 5-9 (valid through August 9, 2036); and Standard Professional Mild/Mod Spec Ed, K-12 (valid through August 9, 2036). [*Id.*]

3.    On or about November 25, 2024, the Board's Investigative Unit ("IU") discovered that Respondent's California teaching credentials were revoked. [Exhibit 2]

4.    On January 9, 2025, the IU sent Respondent a Notice of Investigation/Surrender informing Respondent that the Board was seeking reciprocal revocation of Respondent's teaching certificates. [Exhibit 3]

5.    In 2022, Respondent was an employee of Milpitas Unified School District in Milpitas, California. Respondent was a teacher assisting adult post-secondary special education students. [Exhibit 4]

6.    Throughout March of 2022, two (2) of Respondent's colleagues observed Respondent taking a female student ("Student M") outside to walk for fifteen (15) to twenty (20) minutes. Respondent was alone with Student M on these walks. Respondent did not inform any other employee when or where he took Student M on walks. [*Id.*]

7.    Throughout March of 2022, Respondent's colleagues observed Respondent taking a second female student ("Student A") on fifteen (15) to twenty (20) walks in areas not visible to other employees. When Respondent and Student A were in visible areas, Respondent wrapped his arms around Student A's waist and rubbing Student A's back. [*Id.*]

8.    Respondent regularly rubbed Student A's back when Student A would stand near him. Colleagues reported that Respondent attempted to isolate Student A from her peers and other teachers. Colleagues reported that Respondent prevented female classroom assistants from assisting him with Student A. [*Id.*]

9.    In March of 2022, Respondent sat in front of Student A and recorded her with his personal camera equipment. Once one of Respondent's colleagues entered the computer lab and observed Respondent, Respondent turned off the camera equipment. [Exhibit 4; Exhibit 5]

10.    On March 25, 2022, Respondent's class took a field trip to a mall. During

2

lunchtime, Respondent sat next to Student A with his arm on the bench behind her. [Exhibit 4]

11.    When Milpitas District staff interviewed Respondent about his conduct with Student M, Respondent claimed he took Student M on walks to alleviate her behavior and because he did not trust the other paraprofessionals to walk with Student M. However, Respondent left the paraprofessionals to supervise the remaining special education students, despite his lack of trust, and permitted the paraprofessionals to take Student M to the bathroom alone. Further, Respondent failed to document or discuss his walks with Student M as a strategy for behavior management [Id.]

12.    When Milpitas District staff interviewed Respondent about his conduct with Student A, Respondent also claimed he took Student A on walks to manage her behavior. Respondent failed to document or discuss his walks with Student A as a strategy for behavior management. Respondent alleged Student A was a large student who lunged at and grabbed people, which was why Respondent rubbed her back and put his arm around her. Respondent admitted Student A's behavior could have been prevented by having Milpitas District staff walk along each side of Student A. However, Respondent chose to keep touching Student A instead of asking for the other paraprofessionals' assistance. [Id.]

13.    On May 24, 2022, the Milpitas Unified School District's Governing Board did not reelect Respondent as an employee for the 2022-2023 school year. [Id.]

14.    On April 9, 2024, the California Commission on Teacher Credentialing filed an Accusation against Respondent alleging that Respondent demonstrated evident unfitness for service and engaged in unprofessional conduct, immoral conduct and moral turpitude based on the conduct above. [Exhibit 5]

15.    On June 28, 2024, the California Commission on Teacher Credentialing determined the conduct stated in the Accusation were supported by evidence and revoked Respondent's California teaching credentials. [Exhibit 6]

16.    In his responses to the IU, Respondent claimed that he took Students M and A on walks because physical exercise could alleviate symptoms of autism. Respondent claimed that

3

he held Student A's waist in a Crisis Prevention Institute ("CPI") position to calm Student A. Respondent declared his intent to file reports with the Office of Civil Rights and the Federal Bureau of Investigation pursuant to Respondent's claim that he was disciplined the Milpitas Unified School District and the California Commission on Teacher Credentialing because of his identity. [Exhibit 7]

17.    AGGRAVATING factors include:

    a.    Multiple offenses;

    b.    Refusal to acknowledge wrongful nature of conduct;

    c.    Vulnerability of the victim(s);

18.    MITIGATING factors include:

    a.    None

## II. CONCLUSIONS OF LAW

19.    Pursuant to Arizona Revised Statutes ("A.R.S.") § 15-203(A)(14), the Board has the authority and obligation to "supervise and control the certification of persons engaged in instructional work directly as any classroom, laboratory or other teacher or indirectly as a supervisory teacher, speech therapist, principal or superintendent in a school district, including school district preschool programs, or any other educational institution below the community college, college or university level."

20.    Pursuant to A.R.S. § 15-534(D), the Board "may take disciplinary action against or not renew the certificate of a person on a finding that the certificated person engaged in conduct that is immoral or unprofessional or engaged in conduct that would warrant disciplinary action if the person had been certified at the time that the alleged conduct occurred."

21.    Pursuant to A.R.S. § 15-203(A)(20), the Board may "[i]mpose such disciplinary action, including disciplinary action pursuant to § 15-505 or the issuance of a letter of censure, suspension, suspension with conditions or revocation of a certificate, on a finding of immoral or unprofessional conduct."

22.    Pursuant to A.R.S. § 15-203(A)(30), the Board has the authority and obligation to

4

adopt rules that define the activities that constitute unprofessional or immoral conduct of certificated and noncertificated persons. Pursuant to that authority, the Board has adopted A.A.C. R7-2-1308, which sets forth standards of conduct to which certificated and noncertificated persons must adhere. *See* A.A.C. R7-2-1308(A), (B).

23.    Pursuant to A.R.S. § 15-534.04(C), upon notice that a person's educator certificate has been revoked or suspended in another jurisdiction, the Board "may revoke or suspend all certificates issued in this state to that person in a manner that is consistent with the terms of revocation or suspension in the other jurisdiction, unless that person requests a hearing." After conducting a hearing, if requested, the Board shall decide whether to uphold or decline the revocation or suspension.

24.    Conduct that violates or is contrary to the standards in A.A.C. R7-2-1308 constitutes unprofessional and/or immoral conduct. Pursuant to A.A.C. R7-2-1308(C), "[i]ndividuals found to have engaged in unprofessional or immoral conduct shall be subject to, and may be disciplined by, the Board."

25.    The facts above establish, by a preponderance of the evidence, that Respondent engaged in unprofessional conduct by failing to adhere to A.A.C. R7-2-1308(A)(1), which states that certificated individuals, noncertificated individuals, and individuals applying for certificates shall "[m]ake reasonable efforts to protect pupils from conditions harmful to learning, health, or safety."

26.    The facts above establish, by a preponderance of the evidence, that Respondent engaged in unprofessional conduct by failing to adhere to A.A.C. R7-2-1308(B)(15), which states that certificated individuals, noncertificated individuals, and individuals applying for certificates shall not "[e]ngage in conduct which would discredit the teaching profession."

27.    Therefore, Respondent is subject to disciplinary action by the Board pursuant to A.R.S. § 15-203(A)(14) and (20), A.R.S. § 15-534(D), A.R.S. § 15-534.04(C), and A.A.C. R7-2-1308(C).

//

5

### III.  RECOMMENDED DECISION

Based on the foregoing, it is recommended that the State Board of Education uphold the California revocation recommendation and revoke any and all certificates held by Respondent and that all states and territories be notified of any disciplinary action taken.

DATED this 14th day of October, 2025

*Susan N. Williams*

_____
Chairperson
Professional Practices Advisory Committee

126

6

## CERTIFICATE OF SERVICE

**ORIGINAL** of the foregoing filed
this 14th day of October, 2025, with:

Arizona State Board of Education
1700 W. Washington St., Suite 300
Phoenix, Arizona 85007

**EXECUTED COPY** of the foregoing mailed via certified mail
this 12th day of November, 2025, to:

Konrad A. Stimson
10811 Jowart Ct.
Richmond, Texas 77469
konrad.stimson@gmail.com
*Respondent*

(addresses on file with the Arizona Department of Education Certification Unit)

**EXECUTED COPY** of the foregoing mailed
this _____ day of _____, 2025, to:

Sierra Porritt
Assistant Attorney General
2005 N. Central Ave.
Phoenix, Arizona  85004
(602) 542-8890
Education@azag.gov
*Attorney for the Arizona State Board of*
*Education/Enforcement Actions Unit*

7

1

BEFORE THE ARIZONA STATE BOARD OF EDUCATION

THROUGH THE PROFESSIONAL PRACTICES ADVISORY COMMITTEE

In the Matter of:                        )
                                         )
KONARD A. STIMSON,                       ) Case No.
                                         ) C-2025-000232
Educator Identification No. 772-0079,    )
(Certificated),                          )
                                         )
Respondent.                              )
                                         )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

RE:   COMPLAINT HEARING

Phoenix, Arizona
October 14, 2025
11:29 a.m.

*Miller Certified Reporting, LLC*
*Post Office Box 513*
*Litchfield Park, Arizona 85340*
*(P) 623-975-7472*
*www.MillerCertifiedReporting.com*

Angela Furniss Miller, RPR
Certified Reporter   (AZ 50127)

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

**Page 2**

## I N D E X

PROCEEDING:  PAGE

OPENING STATEMENT BY MS. PORRITT  19

OPENING STATEMENT BY MR. STIMSON  21

OPENING STATEMENT BY MS. PORRITT  90

CLOSING ARGUMENT BY MR. STIMSON  95

REBUTTAL ARGUMENT BY MS. PORRITT  107

FINDINGS OF FACT  108

AGGRAVATING AND MITIGATING FACTORS  109

CONCLUSIONS OF LAW  110

RECOMMENDED ORDER  111

## E X A M I N A T I O N S

WITNESS:  PAGE

KONRAD A. STIMSON

DIRECT STATEMENT BY MR. STIMSON  31

CROSS-EXAMINATION BY MS. PORRITT  65

REDIRECT STATEMENT BY MR. STIMSON  83

EXAMINATION BY THE COMMITTEE  88

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

---

**Page 3**

## I N D E X EXHIBITS

| NO. | DESCRIPTION | OFFERED | ADMITTED |
|---|---|---|---|
| 1 | Arizona Department of Education Certification Records | 10 | 13 |
| 2 | Statement of Allegations/Complaint to the Arizona State Board of Education | 10 | 13 |
| 3 | Notice of Investigation/Surrender | 10 | 13 |
| 4 | Milpitas Unified School District Letter of Reprimand and Resolution of NonRe-election | 10 | 13 |
| 5 | California Commission on Teacher Credentialing Formal Review Letter and Accusation | 10 | 13 |
| 6 | California Commission on Teacher Credentialing Default Decision and Order | 10 | 13 |
| 7 | Respondent's Communication with the Investigative Unit and Documents | 10 | 13 |
| 8 | Milpitas Unified School District E-mail Statements (April 4, 2022) | 10 | 13 |
| 9 | California Commission on Teacher Credentialing Notification of Credential Holder's Change in Employment Status Due to Allegations of Misconduct | 10 | 13 |
| 10 | Notice of Release/Non-Reelection of Probationary Employee (May 25, 2022) | 10 | 13 |
| 11 | Notice of meeting or hearing and proof of service | 14 | 14 |
| R1 | Milipitas letter of reprimand and other Docs | 15 | 15 |
| R2 | CTC allegations | 15 | 15 |

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

---

**Page 4**

## I N D E X EXHIBITS

| NO. | DESCRIPTION | OFFERED | ADMITTED |
|---|---|---|---|
| R3 | Autism Research, Walking 20 & HHS Public Access | 15 | 15 |
| R4 | CPI Holds and Training book | 15 | 15 |
| R5 | X Images Video Recording | 15 | 15 |
| R6 | California Civil Rights Department | 15 | 15 |
| R7 | E-mail November | 15 | 15 |
| R8 | Culture of We | 15 | 15 |
| R9 | CTC | 15 | 15 |
| R10 | Civil Rights Department October 10, 2025 | 18 | 18 |
| R11 | Mediation Proposal | 18 | 18 |

ALSO ADMITTED:

Document 1, State's Proposed Findings of Fact, Conclusions of Law, Recommendation

Document 2, Respondent's Proposed Findings of Fact, Conclusions of Law, Recommendation

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

---

**Page 5**

COMPLAINT HEARING, PUBLIC SESSION, BEFORE THE PROFESSIONAL PRACTICES ADVISORY COMMITTEE OF THE STATE BOARD OF EDUCATION, in the matter of Konrad A. Stimson on October 14, 2025, at 1700 West Washington Street, 3rd Floor Boardroom, Phoenix, Arizona, in the presence of:

Ms. Prudence Lee, Hearing Officer
Chair Dr. Susan Williams
Vice Chair Selina Helton
Member Traci Sawyer-Sinkbeil (videoconference)
Member Dr. Alicia Clynick
Member Carolina Alonzo
Member Will Ambos
Member John Scholl

FOR THE STATE BOARD OF EDUCATION:

Ms. Sierra Porritt, Assistant Attorney General

FOR THE RESPONDENT:

Mr. Konrad Stimson, in propria persona

ALSO PRESENT:

Ms. Dawn Stolarow, Enforcement Action Specialist
Ms. Stephanie DiGiovine, Enforcement Action, Project Specialist Support
Mr. Mitch Jergenson, Investigative Unit

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

---

PROCEEDINGS

HEARING OFFICER LEE: The Professional Practices Advisory Committee calls the case of versus Konrad Stimson, Case C-2025-000232.

My name is Prudence Lee. Today, October 13th -- I'm sorry, 14th at 9:00 a.m., October 14th, 2025, at 9:00 a.m., was the date and time set for hearing on Konrad Stimson, Case Number C-2025-000232, as set forth in the Complaint and notice of hearing.

Present to hear the testimony and for deliberation and decision are members of the Arizona State Board of Education Professional Practices Advisory Committee.

The time is actually 11:30 a.m.

Ms. DiGiovine, please call the roll.

MS. DIGIOVINE: Chair Dr. Williams.

CHAIRPERSON WILLIAMS: Present.

MS. DIGIOVINE: Vice Chair Helton.

VICE CHAIR HELTON: Present.

MS. DIGIOVINE: Member Alonzo.

MEMBER ALONZO: Present.

MS. DIGIOVINE: Member Ambos.

MEMBER AMBOS: Present.

MS. DIGIOVINE: Member Clynick.

MEMBER CLYNICK: Present.

MS. DIGIOVINE: Member Sawyer-Sinkbeil.

MEMBER SAWYER-SINKBEIL: Present.

MS. DIGIOVINE: And Member Scholl.

MEMBER SCHOLL: Present.

MS. DIGIOVINE: Hearing Officer Lee, we have a quorum.

HEARING OFFICER LEE: Thank you.

This hearing is held in accordance with Arizona Revised Statutes Section 15-203 and Arizona Administrative Code R7-2-701, et seq.

I'm the Hearing Officer designated by the State Board of Education Executive Director to conduct the hearing in this Complaint matter.

This hearing is being recorded by a court reporter and video recorded. We have one member appearing by Zoom. Therefore, only one person should speak at a time, and anyone speaking needs to speak up so the microphone will pick up what is said.

The Committee members have been given copies of the Complaint and exhibits.

Would all other persons present please identify yourself for the record?

MR. JERGENSON: Mitch Jergenson, State Board of Education Investigation Unit.

MS. DIGIOVINE: Stephanie DiGiovine, State

Board of Education, Enforcement Actions, project specialist support.

MS. STOLAROW: Dawn Stolarow, Enforcement Actions Specialist, State Board of Education.

MS. PORRITT: Sierra Porritt, Assistant Attorney General for the State.

MR. STIMSON: Konrad Stimson.

HEARING OFFICER LEE: Microphone.

MS. DIGIOVINE: Push the microphone on the bottom and let it turn green.

MR. STIMSON: Konrad Stimson.

HEARING OFFICER LEE: Thank you.

And we have our court reporter Mrs. Miller.

Are you representing yourself in this hearing, Mr. Stimson?

MR. STIMSON: Yes, I am.

HEARING OFFICER LEE: Do you waive your right to be represented by an attorney?

MR. STIMSON: I do.

HEARING OFFICER LEE: Thank you.

This hearing will consist of opening statements by the parties; these are optional with the party with a burden of proof presenting first.

In a Complaint hearing, the State has the burden of proof so will present first. You may ask questions of anyone

that the State presents as a witness, then when the State finishes its case, you may present your testimony, your case. The State has the right to ask questions of you.

Either party may raise legal objections to documents offered into evidence.

Are there any objections to proceeding this way?

MR. STIMSON: No. No, ma'am.

HEARING OFFICER LEE: Ms. Porritt?

MS. PORRITT: No. Thank you.

HEARING OFFICER LEE: All right, the Hearing Officer has the right to ask questions of the witnesses, as do Committee members.

At the conclusion of the presentation of evidence, closing argument will be heard.

At the conclusion of the hearing, the Committee will deliberate and decide whether to dismiss the case or take appropriate disciplinary action.

The State must prove its case by a preponderance of the evidence which means it is more likely than not that the facts occurred as asserted by the State.

In an administrative hearing such as this, hearsay is admissible and formal rules of evidence do not apply.

Are there preliminary matters from the parties?

I'll start with Ms. Porritt and continue with Mr. Stimson.

10

MS. PORRITT: Yes, thank you. The State moves to admit Exhibits 1 through 10.

(State's Exhibits 1 through 10 were offered in evidence.)

HEARING OFFICER LEE: Mr. Stimson, do you have these exhibits in front of you?

MR. STIMSON: I do not.

HEARING OFFICER LEE: Okay, have you seen them?

MS. DIGIOVINE: Did you bring the packet with you that we mailed out?

MR. STIMSON: I did not receive a packet. Basically the packet probably would have been sent to my sister's address in Richmond, Texas. She didn't receive anything. I live in Henderson, Nevada, and I didn't receive anything either.

HEARING OFFICER LEE: All right. Ms. Porritt, can you shed any light on that?

MS. PORRITT: I can provide the exhibits to Mr. Stimson now, our own copy, and then I believe Ms. Stolarow has some indication regarding the notice and mailing.

HEARING OFFICER LEE: Ms. Stolarow?

MS. STOLAROW: Hearing Officer Lee, back on

11

9/17 we sent the PPAC packet out to him certified mail and notice of meeting sent regular mail. On 9/22 it was out for delivery; delivery expected to be delivered by 9:00 p.m.

On 9/22 we sent it via secure e-mail to the e-mail address on record without bounceback. It was downloaded the same day at 1:55.

On 10/3 the certified mail tracking reflects they were unable to locate any delivery information.

On 10/3 an amended PPAC packet was sent via secure to the e-mail address on file. That was download on 10/8 at 1:12 p.m.

Regular mail has not been returned.

On 10/13 Stimson e-mailed with another exhibit and was told he had to bring four copies to the hearing. And we will get to that.

HEARING OFFICER LEE: And was the packet sent to either the Texas or the Henderson, Nevada, address?

MS. STOLAROW: Hearing Officer Lee, it was sent to the Texas address.

HEARING OFFICER LEE: All right. Mr. Stimson, do you remember getting these by e-mail?

MR. STIMSON: I did get things from e-mail. I looked through them, and if they're the same things, I'm not going to be objecting to it. I mean, I'm not disputing e-mails -- or I think that's what I saw was e-mails and some

12

other kind of like documents. But, yeah, I probably not going to disagree with it, whatever is provided.

HEARING OFFICER LEE: All right. And Ms. Porritt, you can provide Mr. Stimson a copy of the exhibits?

MS. PORRITT: Yes.

HEARING OFFICER LEE: Thank you for doing that.

MR. STIMSON: Wow. Okay. That's a lot.

HEARING OFFICER LEE: Well --

MR. STIMSON: Light reading, okay.

HEARING OFFICER LEE: -- I'm thinking you've seen them because you downloaded them.

MR. STIMSON: I downloaded and I kind of scanned through them. I'm not going to say that I, like, went through every -- some of the documents appeared very small and I really just have my phone. I don't have a laptop or anything, so I'm kind of looking at it with eyes that are already impaired. So did the best that I could with -- with that.

HEARING OFFICER LEE: Thank you.

MR. STIMSON: Yeah.

HEARING OFFICER LEE: All right, Ms. Porritt?

MS. PORRITT: Are my exhibits admitted?

HEARING OFFICER LEE: Which ones are they?

13

MS. PORRITT: I'll repeat. The State moves to admit Exhibits 1 through 10.

HEARING OFFICER LEE: Thank you. And I previously heard Mr. Stimson said he had no objection, so I'm admitting State's Exhibits 1 through 10 into evidence.

(State's Exhibits 1 through 10 were admitted in evidence.)

MS. PORRITT: State moves for identification and admission the notice of meeting and hearing and proof of service.

HEARING OFFICER LEE: The notice of meeting or hearing that brought you here today, Mr. Stimson, I -- the notice of meeting or hearing and proof of service that brought you to here today is marked as Exhibit 11.

Do you have any objection to that?

MR. STIMSON: I -- just want to make note. I'm not even sure if the e-mail had all of these documents in there. So I just want that on the record because some of them, I'm not sure about.

I'm not going to argue with them.

HEARING OFFICER LEE: All right, I've admitted them into evidence, and I'm going to admit Exhibit 11 into evidence.

MR. STIMSON: Okay.

14

(State's Exhibit 11 were offered and admitted in evidence, offered and admitted in evidence.)

HEARING OFFICER LEE: Ms. Porritt?

MS. PORRITT: The State moves for identification the Findings of Fact, Conclusions of Law and Recommendation as Document 1.

HEARING OFFICER LEE: Has Mr. Stimson been given a copy of those?

MS. PORRITT: Yes. It's included in the binder.

HEARING OFFICER LEE: Okay.

So this is not evidence -- it looks like this, Mr. Stimson. They are proposed Findings of Fact, Conclusions of Law and recommended decision. They are not evidence, but I'll identify them as Document 1.

All right Mr. Stimson, I believe you have exhibits that the Committee has seen and exhibits that the Committee has not seen.

I have Exhibits 1 through 9 that you submitted. Do you recall that?

MR. STIMSON: Yes, ma'am.

HEARING OFFICER LEE: All right, would you like those moved into evidence?

MR. STIMSON: Yes, I would.

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

15

HEARING OFFICER LEE: All right, is there any objection, Ms. Porritt?

MS. PORRITT: No. Thank you.

HEARING OFFICER LEE: So the Respondent's Exhibits 1 through 9 are admitted into evidence.

(Respondent's Exhibits 1 through 9 were offered and admitted in evidence.)

HEARING OFFICER LEE: And I believe you have something that you brought with you today?

MR. STIMSON: I did, ma'am. I received a document from -- should I bring it up to you?

HEARING OFFICER LEE: Ms. DiGiovine can do that for you.

MR. STIMSON: Okay.

MS. DIGIOVINE: Do you want me to bring all copies?

HEARING OFFICER LEE: Possibly. I mean, I'll let you know.

MS. DIGIOVINE: I'll hold on to them.

HEARING OFFICER LEE: All right, tell me about this document.

MR. STIMSON: So last Friday I was e-mailed a document from Civil Rights Department in California, basically the document is just identifying that 150 days has

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

16

passed of their investigation that I requested. Basically the document is identifying that I can pursue a right to sue.

I am -- to my understanding the CRD is -- has been for the last couple weeks, probably about four weeks I believe, doing mediation, which is on the second page of that document. It basically just identifies you're entitled to free mediation, and so that's basically what they've been doing.

I've given two documents, one before this and the one that I have provided also with that CRD report or 150-day notice.

HEARING OFFICER LEE: And CRD is Civil Rights Department?

MR. STIMSON: California Civil Rights Department, correct.

HEARING OFFICER LEE: Okay.

MR. STIMSON: They're in the exact same building as CTC.

HEARING OFFICER LEE: And you're bringing an action against your former school district; is that correct?

MR. STIMSON: I have been trying to do mediation with them.

HEARING OFFICER LEE: But you filed a --

MR. STIMSON: Correct. So I did file --

HEARING OFFICER LEE: -- claim --

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

17

MR. STIMSON: -- so I filed a complaint on the reprimand that is -- that's against me.

HEARING OFFICER LEE: All right. Ms. Porritt, have you seen these documents?

MS. PORRITT: I have not.

MS. DIGIOVINE: Oh. I'm sorry. I gave you all copies.

HEARING OFFICER LEE: I wasn't aware that she hasn't seen them.

MS. DIGIOVINE: I thought she had them.

HEARING OFFICER LEE: Take a look at them, and let me know if you have any objections.

While she's doing that, Mr. Stimson, there's a single page entitled October 13th. What is that?

MR. STIMSON: So that would be my response to CRD, the program specialist I guess you could say at CRD that I've been working with for the past few months, probably since about August.

HEARING OFFICER LEE: Thank you.

MS. PORRITT: I have no objection to the admission of these documents.

HEARING OFFICER LEE: All right, so the two-page letter to Mr. Stimson from the Civil Rights Department from the State of California is admitted into evidence. It's more than two pages, hold on.

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

18

MR. STIMSON: There should be three. Three total.

HEARING OFFICER LEE: The first document I'll mark as Respondent's Exhibit 10. I believe your other documents were 1 through 9; is that correct?

MR. STIMSON: Correct.

HEARING OFFICER LEE: And then the second document I will mark as Respondent's Exhibit 11.

And then I will distribute these to the Committee, and then I believe Ms. Stolarow, you're going to scan them?

MS. STOLAROW: Hearing Officer Lee, we've scanned them and uploading them right now to SIMBLI to the Committee and for our virtual member as well.

HEARING OFFICER LEE: So Ms. Sawyer-Sinkbeil, you'll be able to see what I've admitted in a few minutes.

MS. STOLAROW: Hearing Officer Lee, just to confirm, so we have the C- -- the CR- -- CRD, the Civil Rights Department is Exhibit 10, and then the mediation proposal is Exhibit 11?

HEARING OFFICER LEE: That's correct.

MS. STOLAROW: Thank you.

(Respondent's Exhibits 10 and 11 are marked for identification, offered, and admitted in evidence.)

HEARING OFFICER LEE: Any other preliminary

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

19

matters in terms of exhibits, Mr. Stimson?

MR. STIMSON: No, ma'am.

HEARING OFFICER LEE: I notice you also have a proposed Findings of Fact, and I'll mark that as Document 2, not to be confused with the State's proposed Findings of Fact which are Document 1.

Is that satisfactory?

MR. STIMSON: Yes, ma'am.

HEARING OFFICER LEE: All right.

All right, I think we're ready for opening statements, Ms. Porritt.

MS. PORRITT: Yes, Hearing Officer Lee.

Hearing Officer Lee, members of the committee, the facts surrounding the situation of this case are unique. Mr. Stimson, the Respondent, his case arose from his revocation in California of his teaching credentials. Mr. Stimson also has teaching certificates in Arizona which is why we're here today.

Despite the unique facts setting up this case, the question in front of you is simple. You must determine if the Arizona Board of Education should also revoke Mr. Stimson's Arizona teaching certificates based on his conduct reported and his subsequent revocation in California.

The evidence admitted will show that Mr. Stimson was disciplined in California for engaging in inappropriate

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

20

conduct with two adult special needs students. Specifically Mr. Stimson would take these students on 15-to-20 minute walks away from the supervision of other staff members. Mr. Stimson also touched these students an inappropriate amount and was also seen videotaping one of the students.

Mr. Stimson will claim that the walks, touching and videotaping were strategies to help address the students' behaviors. However, he did not document or include other paraprofessionals in these strategies. When California considered Mr. Stimson's conduct, it chose to revoke his teaching certificate.

Notably, Arizona Revised Statutes 15-534.04(A) requires for another state's final judgment of immoral or unprofessional conduct to also be treated as immoral or unprofessional conduct by Arizona in the Arizona Board.

As California revoked Mr. Stimson's teaching certificate for engaging in unprofessional and immoral conduct, the question for the Committee today is whether Arizona today should also revoke Mr. Stimson's Arizona teaching certificates.

For these reasons and after the conclusion of the presentation of evidence, the State will ask for the Committee to follow in California's steed [verbatim] and also revoke Mr. Stimson's teaching certificates in Arizona.

Thank you.

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

21

HEARING OFFICER LEE: Thank you.

Mr. Stimson, would you like to make an opening statement? This is not evidence but what you intend to prove to the Committee today.

MR. STIMSON: Yes, I would like to go over this.

For me I -- I -- there's -- I would just start with the reprimand that was against me.

HEARING OFFICER LEE: Remember, I want you to testify about this. This is just what you're going to show the Committee today.

MR. STIMSON: Correct. Correct.

HEARING OFFICER LEE: All right.

MR. STIMSON: I'm not going to go through every single word and read every page, I just want to highlight some of the what is taking place so there is a better understanding of this.

HEARING OFFICER LEE: Thank you.

MR. STIMSON: So basically what I was was a post-secondary education teacher. So when you do stuff looking through the reprimand, you will not see anything that has to do with autism. You will not see anything that has to do with the IEP. You will not see anything that has to do with one-on-one. Basically if it had anything to do with IEP, it was redacted or removed as if it didn't exist, but

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

22

that was my job. So they made every effort to censure me to the greatest extent of their ability.

If you read through the three-page reprimand, it's almost like they just decided to talk for me instead of taking my -- my comments into consideration.

It basically starts with looking at the very details and then looking at the evidence that I've -- I've provided. Every piece of evidence that I provide during my -- I don't even know if you want to call it an investigation because it was basically just redacting everything that I had to say -- there's -- in the exhibits you will see that when it comes to the walking, just going over that -- none of the walking initia- -- was initially my idea. A parent came to me and identified that their daughter when they were at the grocery store had run out of the store and into the parking lot.

So if you know anything about autism, it scares a lot of parents, there's a lot of videos on YouTube. So the parent came to the school, to her teacher, and asked if there was anything that we could do together to work together. We had an upcoming IEP, this student had a one-on-one in her IEP.

Basically FERPA was used heavily in the discussion of my investigation of why everything was removed. But you have a student who was entitled to a one-on-one. The

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

23

district did not from provide a one-on-one for the student. And we already had a student that if you're looking at the -- one of the pages that I provided, there -- the Student NAM (phonetic), in report there's only two students, there was three students that were actually involved.

I started walking the student not just because of the parent's concern -- and I ended up going to research to see what it is that I could look at and that is in the packet -- or the exhibits that are provided --

MS. PORRITT: Hearing -- sorry to interrupt, but I -- Hearing Officer Lee my sense is that this is veering into testimony, so I would ask for Mr. Stimson to be sworn in.

HEARING OFFICER LEE: I agree that it sounds like we're into testimony. Mr. Stimson, this probably falls under the category of testimony.

MR. STIMSON: I can just go over the allegations directly if that will, I don't know, do a summary of what it is that you're --

HEARING OFFICER LEE: I think -- I think the lines --

MR. STIMSON: I believe that's what the AG went over were some of the allegations, and I would like to as well look at those and make sure that that's on record because...

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

24

HEARING OFFICER LEE: Let me put you under oath because I think the lines are blurred between an opening and testimony.

Please raise your right hand.

(Whereupon, Konrad Stimson is placed under oath.)

MR. STIMSON: I do.

HEARING OFFICER LEE: Thank you. You may continue. Again, I would stick to an overall picture of what you intend to show today.

MR. STIMSON: Okay.

So in the reprimand document, there were three allegations.

So taking female students alone on walks without providing legitimate reasons for doing so. So in the exhibits I've provided -- and there's -- this is on autism so there is a mountain. You can probably -- there's probably billions of dollars invested into autism research. So there are -- there may be only one article that has three studies on the benefits of walking, but that is exactly what it is that is in the statement that I made at that time.

Basically it was -- and as I said before, I didn't really make a statement which basically the report on page 20 -- or on this exhibit, they identified that I was being defensive, contradictory and lacked credibility. But

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

25

everything I've said in this that actually came from me can be basically if you review the research, evidence-based practice, it's there. And, like I said, there's a mountain of it.

As for some of the words that were used in the reprimand, they used words like walking alone. The top foundational methods for teaching autism like applied behavioral analysis, discrete trial training, they're all one-on-one. So if I teach elementary, the ra- -- teacher-to-student ratio is usually 1-to-21; if I teach mod-severe it's 1-to-4. When I'm teaching autism the recommended -- and even there's an article in here that is provided -- is one-to-one. All of the research is going to be that the need for -- largely autism falls under into the mod-severe umbrella in California, and it falls into the same category as deaf and blind, so a heavy amount of support is usually there; smaller groups.

And the idea of I'm walking alone is basically I'm following the parent's concern, I'm following evidence-based practices, and I'm following the best teaching methods.

And the only thing that's left is the civil rights complaint that I filed. It's -- there's a heavy amount of sex discrimination of job duty where they're just identifying that if I wanted to do my job, I should go find another female staff to do it for me. Some of the quotes are

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

26

directly in the reprimand identifying if I -- if I simply wanted to do my job, I was the wrong gender. So that's where that's coming from.

If you actually look at the -- and I don't -- every single piece of this reprimand is easily, if you look at the evidence I've provided, like they use words like I isolated the student. In the training book I've provided there's direct -- they use the words "remove the audience." So I guess you could say I followed the training book, and that's -- and I trained it -- I followed evidence-based practices. I followed the best teaching methods for autism.

I -- I don't believe -- there may still not be an autism credential here in Arizona. I do have -- or did have the California autism credential, so I went to school specifically for education and training in autism. So I had an autism authorization.

The second allegation on here is excessive and unnecessary touching of a female student. Okay, this -- this document is only really two-and-a-half pages long. There is an entire paragraph of a witness that Stacy Lillard at a Great Mall where if you can picture going to the mall, there's the eatery areas where maybe all the restaurants are and they can go and sit down, and they kind of just huddle all the restaurants together. That's basically what it was.

So if you could picture that table here and that

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

27

table there where there's seven students, if over in the corner you see three staff, the complaint here is identifying that I was next to, my arm was resting on a bench, on across from, in a position closely. There's touching in that. There's no touching in that entire section of it.

But it doesn't have to do with video, and it doesn't have to do with the walking. So they're trying to identify that even when I'm not touching, I'm touching. By touching this bench, I'm touching the student.

There are words that I even highlighted because I wanted people to see this very easily. The body parts. I did everything to go: There it is.

So I highlighted all the body part words like arms, back, waist, lower back, shoulder. Hoping that ethical people would look at the training because there's two pictures with like I think 18 different pictures, and those body parts will match every single one of the words that they're saying that I was inappropriately touching.

I don't know how else you can touch an arm, but in the -- in the reprimand it's arm, in the training picture there's arm. There's -- there's the word I'm touching the back. In the training there's a back. Every single one is going to be able to be matched directly.

So between a -- pictures of training where they're doing this and a -- there are sections of the report where

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

135

28

there's no touching, in fact it gets worse with CDC's view --

HEARING OFFICER LEE: I think that we're heavy into the evidence now.

MR. STIMSON: Well, I'm -- I'm just going over the allegations themselves, like the video recording of a female student.

HEARING OFFICER LEE: And I will do that in your testimony.

MR. STIMSON: I have more than just that. There's a lot more to cover. There's a lot of things that just don't make -- there's -- for example, the -- some of the things that they wanted to identify was that the students didn't need help.

They're in mod-severe. They're going to school until 22 when they're at high school. They need help going to --

HEARING OFFICER LEE: When you're using the word "mod" you're meaning moderate?

MR. STIMSON: Right. Mod-severe.

HEARING OFFICER LEE: Well, I'm --

MR. STIMSON: So they're that saying mod-severe. They actually in the reprimand identify that are -- these particular mod-severe students were similar to gen ed students. No. Sorry. They're the same in every classroom. They're not -- it's kind of like saying that a

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

29

student who is blind in one class and a blind student in another, they see different. No, they don't.

HEARING OFFICER LEE: I still think we're into testimony, Mr. Stimson, so I'm going to stop you, and we're going to start the questioning by the State.

MS. PORRITT: Hearing Officer Lee, the State does not have a witness to present. The State rests it case and reserves the right to cross-examine Mr. Stimson.

MR. STIMSON: Objection. I had a ton of question for these witnesses. There -- is -- is there anything I'm going to be able to do to recover from that? Because I have literally ten pages of questions for these people. Like did you redact your report; do you remember the confidential document that you provided me saying that you were going to remove. How much FERPA allow you to remove? What did FERPA allow you to remove? There are like -- this is -- I have no doubt they don't want to be present.

HEARING OFFICER LEE: Mr. Stimson, the State is under no obligation to call witnesses. So the State has rested. The State will cross-examine you when you have finished your testimony.

So we're back to you, and you may continue. And you're in the testimony phase.

MR. STIMSON: Okay. Then I would like to just read through some of these questions that I would have had,

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

**30**

because some of it is just going to be yes-or-no questions because I didn't expect them to fully be honest with what was taking place anyways.

HEARING OFFICER LEE: But there are no witnesses to ask.

MR. STIMSON: No, but I can discuss what is being asked and what is being expected.

Like, we can actually -- let's -- most -- most -- like, my first questions: Can you see the word IEP in this document anywhere?

HEARING OFFICER LEE: We're not going --

MR. STIMSON: The reason --

HEARING OFFICER LEE: We're not going to --

MR. STIMSON: The reason --

HEARING OFFICER LEE: Mr. Stimson, we're not going to go through questions for witnesses who aren't here.

You can tell me or tell the Committee about actions by these people that you think were wrong.

MR. STIMSON: So can we review the evidence -- or the exhibits?

HEARING OFFICER LEE: You may.

MR. STIMSON: Is that allowed?

HEARING OFFICER LEE: This is your opportunity to tell the Committee what you want them to know.

MR. STIMSON: Okay.

**31**

DIRECT STATEMENT

BY MR. STIMSON: So if you're looking through Exhibit 1 and you're going through the --

HEARING OFFICER LEE: This is your exhibit?

MR. STIMSON: Correct.

HEARING OFFICER LEE: Thank you.

MR. STIMSON: If you're going through that they used words like in the top I highlighted probably a little bit more than what I did with the exhibits. I tried to draw attention to specifically what they were looking at. But they -- they identified unprofessional conduct, exercised poor judgment, inappropriate interaction.

I'm taking the inappropriate interaction from what they had told me had to do with I made them feel uncomfortable.

The walks alone I've already covered; it goes to the training. And I can say if you're looking at the exhibits, you will see a document about walking. Basically what was being argued is that the reason that I was taking these walks didn't have a good enough reason. But the studies that I were -- I was reading and the studies that are in this exhibit do identify that there is a calming the student, decreases the stress levels. It's not just healthy because it's exercise, but it's also basically what the body is releasing is endorphins and increasing a better mood. It

**32**

is the behaviors are likely to be increased. As I explained earlier, the parent came to me with that concern for safety.

The goal -- the idea at the time was to -- I basically exited the room, walked down the hall, walked down the outside sidewalk, and basically on campus. This was an elementary -- it used to be an elementary campus that HR and adult programs kind of took over, but the campus itself was very small. The reason I say that, all we were doing was basically doing a rectangle. The reason that we were kind of doing that is it took only 15, 20 minutes.

One of the things that's in the reprimand that kind of says that, like, what -- what were the staff doing in the room alone with the students? I mean, you -- you just leave them there.

But this is an adult autism program. So the best way I can explain that is that if you know about IEP transition program, like the IEP itself, the very first few pages talks about life after high school and it starts at age 16 where you're supposed to get them into what are you going to do after high school. And so the first part is like education and training, then it goes into employment, and then it goes into independent living.

Our program, our day lasted about six hours long, and I would say between three and four hours of that we were off campus, we went to Walgreens, we went to Walmart, every

**33**

single day we went somewhere different.

Perfect example is every Friday we went to the Great Mall, it was kind of like our -- I don't know if you want to call it a reward day. All of us went there to eat lunch together. So every Friday we went to the Great Mall, just because there was like ten different restaurants. Some people like Burger King; some people like kind of like a Panda Express-type thing. So there was a little bit of a choice in there what they wanted to eat for lunch.

But going back to that six-hour day and three to four hours of that was off campus. The only reason we even bothered to come back to campus is the free lunch. Because Friday was kind of like that reward day where we could get the parents to give a little bit of extra cash and go -- go eat, but that would have been expensive if we did it every single day. So we returned to the campus.

Which is part of what I don't understand from this in the first place, because they talk about in this that I was out of this -- when we took our walks, we were out of the sight of other staff. For three to four hours every single day of the week, we left campus. We walked down to the public bus and used that to go to Walmart, to go to the library. So the idea that we're walking on campus out of the sight of everybody -- which most campuses these days have cameras in the hall and outside for safety reasons. So I

34

don't get it. I don't understand that. But that's one of those things that just comes up that I'll never probably get.

As I said the -- a lot of this if you look at the exhibits that I've provided, the isolate -- the training book actually identifies remove the audience. The alone, just looking at the exhibit that I provided, almost every autism program basically does a one-to-one. It goes into the bottom of that on the computer labs which is the third allegation that was made in the reprimand, and it's basically she walks in, she sees me and I have my own stuff and I'm video recording. The only thing that I can think of is during that time -- and I tried to get this verified. I had both students tri-annuals that year. So I was trying to conduct assessments -- like, she followed me around one day and I was taking the student to the eye doc- -- or for an eye exam, because you basic -- our -- probably should be done every year, but where we were at, we were doing it every three years. So they had their hearing checked, they had their eyes checked for the IEP.

But for the assessment, I mean, I -- I took out a lot of exhibits but some of them talked about idea, 504, every -- what is it? -- ease, every student has a -- you know, access to education act. So basically all of the laws, basically state/federal laws, they support that for alternative assessments, accommodations, and access to the

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

35

curriculum you can use video recording, okay.

HEARING OFFICER LEE: Mr. Stimson, did you present this to the California agency who revoked your license --

MR. STIMSON: If you look at the reprimand I was cut out of that like I was even just -- total and complete censorship.

HEARING OFFICER LEE: Thank you.

MR. STIMSON: You will not -- if you read the reprimand, you won't -- you will see somebody speak for me, but I didn't have a chance to speak. That's part of the reason I filed the civil rights complaint because they literally treated me like I didn't exist. We're just going to write that for you.

Every single allegation, and I don't care what it is, it goes back to research, evidence-based practice, best teaching method, the training, the laws. They just didn't care.

HEARING OFFICER LEE: Did you actually appear before the California --

MR. STIMSON: I lost by the default -- I want to go into that because I understand -- I guess you can say I have a little bit of concern when some were voicing some support for California being kind of maybe ethical. Not in my -- in my practice, that is not my experience with it at

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

36

least.

There's Exhibit 9 --

HEARING OFFICER LEE: Mr. Stimson.

MR. STIMSON: -- show that it doesn't.

HEARING OFFICER LEE: Mr. Stimson, let me finish my question for you.

MR. STIMSON: Yes.

HEARING OFFICER LEE: Did you appear before the Commission on Teacher Credentialing in the State of California?

MR. STIMSON: No, I did not. But it's not because I didn't want to be there.

HEARING OFFICER LEE: So what --

MR. STIMSON: I absolutely truly believe that they did not want me there because there were issues that I wanted to bring up that they definitely did not want brought up.

HEARING OFFICER LEE: So what you're presenting to us today was never presented to the --

MR. STIMSON: That is correct.

HEARING OFFICER LEE: -- credentialing agency?

MR. STIMSON: I lost by default. In fact, the way they did it would be -- I turned in probably -- and I -- I don't know if the AG will identify just exactly how much evidence was taken out with the exhibits, but it was probably

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

37

about a 180 pages of exhibits for this case. I'm okay with that, but there's about 180 pages.

MS. PORRITT: Hearing Officer Lee, Mr. Stimson is talking about the pre-hearing conference we had earlier regarding the admission of his exhibits earlier and during which he consented to reducing his exhibits --

MR. STIMSON: I did.

MS. PORRITT: -- so I don't see how that's relevant here.

MR. STIMSON: What I'm saying is they did the same thing only to a greater extent. Although you did probably the ethical thing of setting up a pre-hearing, they decided to send me an e-mail staying stop sending me stuff.

HEARING OFFICER LEE: Mr. Stimson, there's been an objection in this hearing just now that you are discussing testimony that is not relevant, so I'm going to sustain that objection.

Ms. Porritt, could you state exactly what's before this Committee? I'm getting a little confused.

MS. PORRITT: Yes. The California Commission on Teacher Credentialing did revoke Mr. Stimson's certificates. That document is provided, and the findings are provided in the State's Exhibit 6. It was a decision, a default decision that was reported to the Arizona -- to the NASDTEC, which is the national database for discipline, and

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

38

by statute Arizona does adopt a reciprocal discipline.

So what's before the Committee is whether or not Mr. Stimson was disciplined or whether or not the conduct he was disciplined for was more, you know, the preponderance of the evidence more than likely did occur. And, if so, whether or not they should adopt the same discipline that California did.

HEARING OFFICER LEE: So this Committee can analyze the steps California took and decide whether Arizona would take the same steps --

MS. PORRITT: Yes.

HEARING OFFICER LEE: -- did I misunderstand?

MS. PORRITT: Oh. No, you did not misunderstand.

By statute, any finding of unprofessional conduct in another state shall be treated as unprofessional conduct by Arizona in a disciplinary decision. And Mr. Stimson did request a hearing which is why we are here today, so the responsibility to the Committee is to determine whether or not they should adopt the same discipline that California did.

HEARING OFFICER LEE: Okay. Thank you, Ms. Porritt.

MR. STIMSON: Will I be able to continue?

HEARING OFFICER LEE: You may continue. I

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

---

39

want you to address what California did. And I'm --

MR. STIMSON: So there was a large gap of time between the year that I worked at Milpitas and the CTC got involved. So I was given a kind of like, I guess you could say it was kind of like a preconference where I was given three minutes to explain myself.

HEARING OFFICER LEE: In front of the agency?

MR. STIMSON: Right.

HEARING OFFICER LEE: And did you do that?

MR. STIMSON: I -- I did it over the phone. And that's why I'm here today because I would never do that again. Because basically it felt like I wasn't even bothered being listened to. Three minutes to kind of go over everything that I have to cover is -- is not enough time.

And then there was just this -- I had sent -- and the only reason I brought it before. So I sent CTC over the summer about 200 pages worth of documents of what it is that I was -- I'm explaining to you now. I sent them the pictures from the training book, I -- I sent them evidence based on autism facts and everything else that I possibly could. And basically when they wrote their investigation report, you can see what I was basically contributing, which was basically they had a line and it was just my e-mail dates, and then down below it was the exhibit of CPI book and that's it. So everything I sent, two hundred-some pages, they might as well

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

---

40

shredded them because they didn't go anywhere.

Then a long period of time went by and basically I had no idea. Perfect example is this summer, July 5th, 2025, I filed for a new hearing. I'm told that I will have a new hearing in California. But say -- say, I sent a document from CRD -- and I did, just the other day to CTC -- what I'll get is like a very short e-mail it says: This is sent to the Commission, it will be added to your petition hearing request, and that's it. That's all I get.

Like if I ask direct questions of: So when's my hearing? You know, can you give me even a tentative date? Like Arizona gave me a tentative date like back in I think March. California didn't do that. They didn't give that to me. They didn't give me a lot of anything. Right now I have zero clue beyond the I'm told I have a hearing. That I will have one, that's it.

I did have a program manager that was on my case, that person was replaced by a legal analyst, and if I e-mail I would say that within one to two days, I'd get that kind of almost like a generic response: This was sent to the Commission. It will be added to the petition. That's all I get.

HEARING OFFICER LEE: I think -- I think it would be helpful if you went to the State's Exhibit 5.

MS. DIGIOVINE: What page number?

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

---

41

HEARING OFFICER LEE: Do you have Exhibit 5?

MR. STIMSON: Right.

HEARING OFFICER LEE: And page 35, the State of California's factual allegations. Page --

MR. STIMSON: And this confirms that three minutes. Because at the very bottom, that's basically what it says: Not exceeding three minutes each.

So that's all I ended up getting. Three minutes.

HEARING OFFICER LEE: Yeah, we've heard that.

MR. STIMSON: Yeah.

HEARING OFFICER LEE: So the factual allegations on page 35 of these exhibits, can you find that? And there's a title, Factual Allegations.

MR. STIMSON: Right.

HEARING OFFICER LEE: Can you --

MR. STIMSON: And I -- and I also entered these in right after -- for me it was Exhibit 2.

HEARING OFFICER LEE: Mr. Stimson, I want you to address these for the Committee.

MR. STIMSON: Okay.

HEARING OFFICER LEE: Because that is what's before us, what California did. So these are the allegations against you --

MR. STIMSON: Right.

HEARING OFFICER LEE: -- In the California --

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

42

MR. STIMSON: Correct.

HEARING OFFICER LEE: -- action.

MR. STIMSON: And I'm actually very, very happy to do so.

HEARING OFFICER LEE: Thank you.

MR. STIMSON: Because looking at Allegation Number 12, I'm not an attorney, but I'm going to send this in -- I was going to send in 12 and 16 to the State Bar to have it reviewed because I honestly think that 12 and 16 are felonies. Not against me. That date of June 2nd is a lie.

There's in my exhibits, Exhibit 1, there's -- the first three pages are the reprimand. Followed by that is -- so based on the CTC report when I read it, it says June 2nd, and it says: Respond [verbatim] was nonre-elected from blank as a teacher following an investigation into the allegation below. Okay.

Now in Exhibit 2, the date of the actual reprimand is May 20. I honestly think the reason that I say it's a felony is because it was like a complete dis- -- or falsified and intentional deception. Because the one that says Milpitas is -- is a nonre-election for one year of 2022 to 2023. It doesn't say that in there. The way I read this it's almost like I'm permanently nonre-elected. It's not what the official document says.

HEARING OFFICER LEE: And --

43

MR. STIMSON: It also identifies an ed code of 44929.21, and it also says in there probationary employee. But I've also highlighted that this document here it says: "The Milpitas Unified School District thanks you for the service you have extended to the students and the district."

HEARING OFFICER LEE: Let's go back to page 35, please.

MR. STIMSON: Right. I'm just trying to look at the allegation and explain with the evidence that I have.

HEARING OFFICER LEE: Well, you say --

MR. STIMSON: Number 12 is --

HEARING OFFICER LEE: You said the date was wrong. You want to correct the date?

MR. STIMSON: The date would be May 20th.

HEARING OFFICER LEE: That's when the reprimand was done.

MR. STIMSON: That is when the nonre-election is.

HEARING OFFICER LEE: Okay.

MR. STIMSON: But the -- to be correct, you are correct on that as well. The date of the reprimand is May 20, the date of the nonre-election is the exact same date. So they're both -- they were both done on the same date by the same person.

HEARING OFFICER LEE: Okay. Let 's move on to

44

Number 13.

MR. STIMSON: Well, if possible I'd like to -- because the three pages there support this one. The --

HEARING OFFICER LEE: Well, I'm --

MR. STIMSON: -- picture --

HEARING OFFICER LEE: -- asking you to take these paragraphs one by one --

MR. STIMSON: Right --

HEARING OFFICER LEE: -- and --

MR. STIMSON: -- that's what I'm trying to do.

HEARING OFFICER LEE: Okay.

MR. STIMSON: That's what I'm trying to do. These three pages I've attached here support what I'm claiming, that the date of May 20 is correct and that is not. This says that following an investigation. This says that when I was dismissed, it was for a probationary employee, basically wasn't there long enough. The reason that that matters to me is I wanted to file a lawsuit. I couldn't find an attorney that was going to be able to say, well, there's not -- they kept telling me there's not much grounds there for a probationary employee. I don't even know if we're going to win. They can -- they can have whatever reason they wanted and that's -- that's just the way it is.

Okay, the next -- the third page, it's called the resolution of nonre-election. So on this they -- the board

45

voted 5-to-0, and it's on there is the exact same, probationary employee ed code. It gives a date of when I can return. It basically is identifying next year. So nonre-elected next succeeding school year to such a position at any time prior to March 15.

So they're basically identifying when I would be able to return.

So again --

HEARING OFFICER LEE: Mr. Stimson, except for the date, you agree or disagree with paragraph 12?

MR. STIMSON: I disagree with the concept that June 2nd is not just a date that's wrong. It's the fact that it's not appro- -- it was not permanent. It was not based on at least the Milpitas's resolution and nonre-election purpose and the ed code page that they provided me, all of those identify it would have been for one school year.

HEARING OFFICER LEE: It just doesn't say. It doesn't say it's permanent, Number 12.

MR. STIMSON: No, I would say that if you take out information, that it's almost -- there's -- there's a direct intent there.

HEARING OFFICER LEE: The Committee will note that paragraph and make that interpretation.

Now let's go to Number 13.

MR. STIMSON: So Number 13 is -- and I'm going

46

to -- I have already highlighted to make it easier for me to read here. Another vision issue.

Okay. So this is the same page, I just highlighted some of the things to help point it out.

So Number 13 is basically that there were two staff and they identified that I -- I repeatedly took walks alone without informing them. The walks were 15 to 20 minutes long and that the route was out of sight.

So I basically already explained how the research, the training, the best teacher methods. The article that I've provided in as my exhibit which is Exhibit 3, it actually identifies the 15, 20 minutes. This is where I got from. Parent came to me, and I went to research so that I knew what were -- what were some options on the table that I could do to maybe help her.

But if you look at that, I put the great big "20" there because it's kind of smaller, but I wanted to draw the attention. Right in the article, it actually identifies that a person should probably exercise for about 30 minutes a day.

The -- I also identified at the very bottom, it says 30 minutes a day. So when it says I was repeatedly doing it, yes, I was repeatedly doing. I was repeatedly following this research article.

HEARING OFFICER LEE: Does the research tell you not to inform other employees?

47

MR. STIMSON: That's a whole different issue. That's a whole different issue on its own. We were in a very hostile classroom.

HEARING OFFICER LEE: Could you address that?

MR. STIMSON: Okay, so there's two events that happened that school year. In November of 2021 another teacher, David Sorenson, he's in an e-mail, one of the exhibits, the teacher basically set up a kind of like fun day. It was close to Thanksgiving -- and I don't know if it was before or just after, but I believe it was before. And so he invited my group and his group -- there's only two adult autism classrooms -- to go to the bowling alley.

His -- his group cleaned it, so they basically gave us kind of like a free roam day, so we went there. A student of mine showed up, the parent dropped him off. Basically he had a one-on-one, Miss Ruby, she would have been a witness, all of my questions would have been directed to her. But basically what happened at the bowling alley is he was very excited he was bouncing up and down like -- just like a rabbit, and it was kind of freaking me out because there were bowling balls, heavy objects.

HEARING OFFICER LEE: You know I've asked you to -- whether the research tells you not to inform other employees.

MR. STIMSON: Right, and I'm -- I'm -- what

48

I'm saying is that before those allegations, three months before my allegations took place, that student that I'm telling you was bouncing up and down basically ended up in surgery. The trust in that room dropped like a bomb. I -- I -- between that and there was just a heavy amount of -- and I've put it in here, Exhibit --

HEARING OFFICER LEE: So you're explaining your reason as lack of trust as why you didn't --

MR. STIMSON: Hostile classroom.

HEARING OFFICER LEE: Let me finish. The court reporter --

MR. STIMSON: Right.

HEARING OFFICER LEE: -- can't decipher between two people talking. Well, she probably can. But it makes it for a difficult record.

So you're telling me that you didn't inform other employees as contained in Number 13 because of lack of trust in the classroom?

MR. STIMSON: I'm saying that the relationships were extremely terrible. They -- I kept my distance from staff, and I'd say that there were two events that caused that. The bowling alley where the student was injured, what I was trying to explain was that this student, NAM, is what I referred to him as. NAM, which is on here because I -- so NAM ended up going to surgery and from my

49

understanding from Mom is that his hand was crushed like a pancake when I saw it and it looked -- we were worried he was going to lose his hand it was so bad.

HEARING OFFICER LEE: Is that a student's name that you used?

MR. STIMSON: NAM.

HEARING OFFICER LEE: All right.

MR. STIMSON: No. No. I did -- I did what they did, which was abbreviate.

HEARING OFFICER LEE: I think you covered Number 13. Let's move to 14.

MR. STIMSON: I just want to identify there was another part in this breakdown in trust and relationships and why I stayed away from some of these staff. And that would be under Exhibit 8, Culture of We.

HEARING OFFICER LEE: Culture of We is W-E?

MR. STIMSON: Right. Culture of We.

HEARING OFFICER LEE: Could you address yourself to 14, please.

MR. STIMSON: Did you not want me to go over Culture of We?

HEARING OFFICER LEE: I don't.

MR. STIMSON: You don't.

HEARING OFFICER LEE: Number 14.

We have it in the material and the Committee has

**50**

read the material. Correct?

MR. STIMSON: Okay.

So the Number 14 goes over the same thing that I did with the reprimand. In the reprimand I highlighted the body part words.

So what I get out of Number 14 what I would say stands out is it says often tried to isolate. There is an exhibit in the training following the pictures of the training images in there. There's kind of a -- looks like a kite.

So I highlighted the part where -- they're talking about isolate, and in this training it says "intervention" and it says "allow venting and if possible remove the audience."

And so when I did the walks and when I was doing the -- trying to reduce some of the aggression, especially student to student, I basically tried to put myself in between it so that if somebody was going to get hurt, it was me. I mean, it's easier to explain to a parent that I have a scratch on me because of that instead of it becoming a -- trying to explain why one student hurt another or why their child got hurt.

HEARING OFFICER LEE: Could you address the second sentence in Number 14?

MR. STIMSON: Let's see here. The second

**51**

sentence. "RD and FB observed Respondent regularly wrapped his arm around AN's waist and lower back, and touch and/or rub AN's back and shoulder."

So I basically for this I did a lot of highlighting and just so I could go directly to this training images.

Because, like I said, if you look at the training images they're doing more than I am.

HEARING OFFICER LEE: Just tell me --

MR. STIMSON: A lot more than I am.

HEARING OFFICER LEE: Just tell me if that second sentence is correct.

MR. STIMSON: That I used interventions?

HEARING OFFICER LEE: No. I don't believe it says that.

MR. STIMSON: No, but that's that I was doing.

So it says FB -- "RD and FB regularly observed Respondent wrap his arm around AN's waist and lower back."

So that's their description. I would -- I don't think I would put it that way because when I look at those training images, I'm basically following those training images.

And so basically the next part there is that I made them feel uncomfortable. Well I would say that Culture of We made me feel very uncomfortable on campus which is why I would have liked to explain it.

**52**

But this idea that -- you have the Great Mall as a perfect example of even when I'm touching or not touching. Right?

HEARING OFFICER LEE: Could you address the next sentence?

MR. STIMSON: So the next sentence starting with: "Additionally, both RD and FB observed Respondent rub AN's back when she would work or stand near."

Okay, so how do I put this? Behind the training images it or probably even -- there's a part that says prompts and it's talking about there's two different forms of prompts. Two of them -- one of them is physical and one is manipulated. Manipulated is hand over hand; physical is when you are -- and I guess the -- for me the easiest way to describe a prompt is kind of like when you are -- just kind of like physical therapy, you're basically assisting. When you have a blind student and maybe you open the door or you guide their hand over braille. So it is an assist.

So some of this, like I said, it is how it's said. Kind of like the word "alone." And there's one-on-one, there's isolate and then the training says that you're removing the audience. When they're saying these ways of putting it, I tried to explain that there was an extreme level of hostility on the campus.

HEARING OFFICER LEE: Could you address in

**53**

Number 15 that you were video -- you were allegedly video recording the student?

MR. STIMSON: Right. So for that I'd actually like to -- I mean, I could read through here, but I would also like to be able to explain --

HEARING OFFICER LEE: Go ahead.

MR. STIMSON: -- using the exhibits.

So if I read this: "FB stated that in or about March 2022, Respondent asked other MUSD" -- and I look at more of like the -- I -- I asked them to return to the classroom -- "and while the Respondent was still working with the student in the computer lab."

So to explain just that part, we -- were allowed one hour a week in the computer lab. We had either Wednesday or Thursday. The other classroom had one day, we had the other. I believe we had Thursday.

So we had one hour, it was in the afternoon, and what I was doing was her assessment. So, as I said, we had -- I had both -- well, I had more than just those two students' three-year assessment that year.

But I had the students' three-year assessment, and I was trying to use -- how to best put it? I don't know if it was COVID, but she had very limited use in her right arm. She would start walking kind of like normal but then she would start dragging her foot. So I don't know if it was

54

like some sort of like paralyses. But some of that touching, some of the what we were working on in the computer lab is she seemed to be able to do fine with a computer mouse. The holding a pen, that was not very good.

HEARING OFFICER LEE: Let's try to get to the video recording.

MR. STIMSON: What's that?

HEARING OFFICER LEE: Please address the video recording.

MR. STIMSON: So the video recording, I don't know what she's actually speaking of directly. There is zero evidence, zero pictures, zero seconds of video. I don't know if she came in and she saw me with my phone, I don't know. I can't -- I can't speak to questions that I would have asked if she was here.

What I can say is if you actually look at the -- and I wanted to ask Mr. Jonathon Brunson and some of the other witnesses, and I think they're -- I don't have to ask the person. Based on the allegation itself, if you read the allegation itself, only two things need to be true: Video recording and a female student. That's it.

So say the student is playing basketball and you video record, you're guilty. If they're doing art and they're a female and you video record, you're guilty.

Bottom line, if you actually read the allegation,

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

---

55

they don't give any concern for what is that person actually doing. It doesn't -- it doesn't actually -- the allegation is directly video recording a female is enough.

So what I -- I did was I found four pictures that were -- well, two pictures, but I did one color and then one in -- hoping it would be a little bit easier to see. But in these there is from Twitter or "X" the Milpitas school district and Jonathon Brunson. So in this I would say based on the evidence of the Allegation Number 3, Jonathon Brunson and Milpitas school district would technically be guilty and probably worse than the described allegation for two reasons.

One, based on this, they didn't just video record the four students, they -- because it says video recording or -- video reading. So reading and video recording while they were reading. So you basically have these four students and three of them appear to be female if you're just going be it's only wrong to do video recording of a female, I would say that there's three pictures up there.

So, again, it don't matter what they're doing. That is not what the allegation asks. Video recording, female student. And I would say this is worse for two reasons: They posted it on social media --

HEARING OFFICER LEE: Mr. Stimson --

MR. STIMSON: -- and the student are minors.

THE COURT: -- we're talking about your

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

---

56

actions, not others.

It's 12:46. We're going to break for lunch and we'll come back at 1:15.

(Recess taken from 12:46 p.m. to 1:16 p.m.)

HEARING OFFICER LEE: Thank you. We're back on the record at lunch break at 1:17 p.m.

Mr. Stimson, I believe you were presenting your testimony, and we were looking at the California allegations on page 35.

MS. PORRITT: Sorry, Hearing Officer Lee. Is --

HEARING OFFICER LEE: Mr. Stimson?

MS. PORRITT: Committee Member Sawyer-Sinkbeil...

HEARING OFFICER LEE: I'm sorry. Thank you.

MS. DIGIOVINE: There she is.

MEMBER SAWYER-SINKBEIL: I'm here.

HEARING OFFICER LEE: Thank you.

We're back on the record after a lunch break, and Mr. Stimson is presenting his direct testimony.

And Mr. Stimson, we were on Exhibit 5, page 35, and I was asking you to direct your testimony to what the California agency has done.

Would you like to say anything more?

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

---

57

MR. STIMSON: If possible can I continue from the Allegation Number 15?

HEARING OFFICER LEE: Sure.

MR. STIMSON: What we left off on was how those one pictures were not of mine, and so I wanted to address in Exhibit 5 what I -- so if I were to use video, it would have been directly from autism -- I used a site called AFIRM. There's like I want to say about 15 different autism intervention modules. Covers like -- some are 30, some are 60 pages long, but they are -- this particular one that I would say that I used for, like, say we were doing laundry or folding clothes or counting money, it might have to do with, like, getting the sequence order of something, you know, basically what would you do first, second, third and all that.

So that would probably be the closest that I would have ever used a strategy using video recording or video modeling.

HEARING OFFICER LEE: So you didn't use video as Number 14 [verbatim] suggests?

MR. STIMSON: I honestly don't know. Like, I really wish she had been here because I never had the opportunity to ask her what she was even -- my only -- the only thing that I know is that during that time period, I had three three-year assessments that I had to do.

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

**58**

So we had a six-hour day, so basically it was go off campus, come back, eat lunch, and then if there was time left over after lunch, we basically would do -- I tried to do applied behavioral analysis skills. Basically what I said -- what I would say I used as my kind of like my classroom program, was I actually -- since there wasn't really like a written program or curriculum for it, I kind of used the idea of the transition skills program from -- so if you look at the IEP, the first few page -- after age 16, I used that as kind of my classroom template of how to manage that ending part.

Like I said, we wouldn't even have ever been on campus if it wasn't for free lunch.

HEARING OFFICER LEE: I just want to know if you used a videocamera.

MR. STIMSON: No. Because I don't have one.

HEARING OFFICER LEE: Okay.

MR. STIMSON: Yeah. I mean, I have my phone. But that's it. I don't even know -- I don't even know if I know a person that owns a camera anymore.

HEARING OFFICER LEE: Is there anything else in those allegations you would like to address?

MR. STIMSON: No, because mine just went over the five exhibits. And then I mean that I was doing three-year assessments during that time, and then going into

**59**

Number 16.

HEARING OFFICER LEE: Do you want to address Number 16?

MR. STIMSON: I would love to. 16, 16 is perfect.

So I highlighted this one also in pink because, again, I'm not an attorney --

HEARING OFFICER LEE: Again Mr. Stimson, I can't see that.

MR. STIMSON: Okay. So this is exhibit page 36, but also it in my exhibit is 2.

So on here I wrote "on a bench." Because, again, I'm not an attorney, but I believe the person who wrote this may also have again committed another felony. This is -- this time instead of falsifying evidence, I would refer to it as altering a written witness statement.

The evidence is backed by the Milpitas -- so Exhibit 1, I believe page 2, it goes into where Stacy Lillard identified the Great Mall. So if you were to kind of cross-examine and look at the words directly, it's like they took a sentence, snipped it right in the middle, took out the middle piece and chucked it in the garbage and just said you just -- you just committed inappropriate touching.

All they had to do is when I said my arm was on a bench, all they did was they just removed "the bench."

**60**

Solved that problem right there. You went from touching the bench to touching the student.

HEARING OFFICER LEE: I don't think it says that, Mr. Stimson. I think it says you had your arm resting behind the student.

MR. STIMSON: But that's not what the reprimand -- that's not what the Stacy Lillard, the actual witness, identified.

HEARING OFFICER LEE: I'm just reading what the California agency says.

MR. STIMSON: So -- so, yes. And I'm -- I'm just saying that based on the actual witness statement it says: Lillard also reported that" -- let's here go to: "Lillard observes students sitting in the food court eating their lunches and you were seated directly next to Student A with your arm resting on the bench directly behind her."

If you look at the CTC report it says: "SL observed student sitting in the food court eating their lunches and Respondent was seated directly next to AN with his arm rested behind AN." So they just cut out half the sentence.

The part -- to my understanding when I read about this, I read about how even if you change one word in a witness statement, you could be potentially, as an attorney, committing a felony. Like if it says you broke into an

**61**

unlocked car versus a locked car, it changes the -- the crime. The -- and for this, I would say that what basically CTC did is it changed the nature, it altered the intent, misrepresented a physical act. It changed the scope and altered a witness statement.

So two out of the five were felonies for -- so my view -- what I was planning to do was initially send in all of the documents, wait for a decision and order from Arizona, put it with my documents, send it to the State Bar, because that's the only person -- when I looked it up, that's what I'm going by. When I looked it up online and I said, okay, so if you change and alter an allegation in order to go from not touching to touching or -- so who do you go to for that, and it says the State Bar.

So I was going to get my documents ready and send it to the California State Bar and say I think two of these are felonies. To my understanding it's a prison sentence and disbarment. So, hopefully it does. Because anybody that's willing to do that to another human being doesn't deserve to be practicing.

HEARING OFFICER LEE: Okay, we're kind of afield from the matter at hand. This Committee cannot determine felonies.

Is there anything else you want the Committee to know?

62

MR. STIMSON: I just want you to understand that if you -- just look at the evidence that I have provided. I worked an autism classroom, a parent came to me for help, I looked at research, I thought I found what would help which was the walking. The concern was she was running off in a parking lot and could have gotten hit. We were concerned about child safety -- student safety.

I practiced the foundational methods like I said, applied behavioral analysis and discrete trial training, they're both one-on-one. The HHS is also going to identify that it actually recommends one-on-one.

The touching, I honestly think that if you reflect on what Stacy, the witness, identified: Next to, close to across from, positioned with my hand on a bench, there's no touching. When there was touching, it was either intervention and usually -- so the other thing that needs to be taken into consideration is like when I wrap my arms around a waist, when did that happen?

I wrote -- well, one of the exhibits that I put was that a student almost got hit by a car. They -- we went to a crosswalk and they're walking across the street and the light was not green, so my concern was she was going to get hit by a car. So, yes, I used an intervention to do that.

There were multiple times where we didn't -- that's the biggest threat and risk working in autism, you just don't

63

know what's going to happen. Even the training -- well, the training identifies like self-hitting and self-harm. The biggest concern when I'm working on autism isn't that they're going to be aggressive even against another student. It's more like the situations that there's zero time to respond. Like they'll drop to the floor and just smack their head straight into the floor and they don't care if it's concrete, and I've had that.

So it's a -- it's a very nerve racking and -- in fact, I can honestly say when I went through my autism program at National University, there were only three other people in my class and none of them were teachers. One was like a school psychologist and another one was going to be a BCA. But I was the only person who was going to be a teacher in autism.

In fact, the only reason that I took the job at Milpitas was I was enrolled at National University, and I only had to get my student teacher completed for the mod-severe program. So I was able to use my mild-mod and my autism credential to -- to work and the State would allow it. But I was trying to get the mod-severe last piece done. I didn't really need it, but I felt if I could help more students in areas where there's a more critical shortage, that's the only reason I can work in autism. I have a math degree, science degree, elementary degree.

64

HEARING OFFICER LEE: So is there anything else that you would like the Committee to know about the allegations?

MR. STIMSON: So about the allegations. I mean, it comes down I followed evidence-based practices training, laws, 504, IDEA, state laws, even Arizona has its HB.

Bottom line I just followed -- I worked in an environment that was extremely hostile. There were just political ideologies taking place at the time, and it was during a time period of basically defund the police and a lot of other stuff taking place. And that kind of just trickled its way into our classroom and into creating a very aggressive situation.

And you have people like the comments that it's like I -- I didn't trust and I -- I didn't talk to and stuff like that. I -- I had -- the idea that you have to go into a work environment every single day and you know that your peers are looking at you for a reason that if you -- I'll just say Culture of We, they're looking at you in a way that is just it's not right.

I try to focus on my job. I focused on the research, focused on the training, focused on the students. I paid attention to the parents. But, yeah, I -- I kept my distance from people that I felt were going to say things, do

65

things. I mean, we live in a day and time when people even get shot for -- like Charlie Kirk here in Phoenix. I mean, honestly things happen.

HEARING OFFICER LEE: We're off topic.

MR. STIMSON: But that stuff happens and I can tell you right now.

HEARING OFFICER LEE: Were you threatened with shooting?

MR. STIMSON: Was I being threatened?

HEARING OFFICER LEE: With shooting?

MR. STIMSON: Not with being shot, no. Was I being threatened? Yes.

I just stayed away from them at that point. I didn't feel comfortable. They were talking about things that never should have existed in a K-12 school in the first place.

HEARING OFFICER LEE: Thank you, Mr. Stimson. Cross-examination?

MS. PORRITT: Yes. Yes, thank you.

CROSS-EXAMINATION

BY MS. PORRITT:

Q. Mr. Stimson, looking at the allegations on page 0035, I want to ask you a couple of questions about that with the exhibits.

Page 62 to 65 of 115

66

For paragraph 12, you took issue with the language effective June 22nd -- or June 2nd, '22, you were nonre-elected as a teacher; is that right?

A. So, yes, I objected to that. Yes.

Q. Okay. Can turn to State's Exhibit 0025?

In this Letter of Reprimand, is there any language which states that you were not re-elected?

A. I'm not disagreeing that they're saying it was nonre-elected.

Q. Well, when you were talking with Hearing Officer Lee, you stated that the letter of reprimand was sent on May 20th, 2022, and that you used that as an example as to why the June 22nd date wasn't correct; isn't that right?

A. First -- first of all, where are you exactly looking at?

Q. I'm looking at page 0025.

A. That one?

Q. Yes.

A. So right at the top it says May 20. So are you saying there's another date that you're referring to?

Q. Well I'm just saying, in this Letter of Reprimand, is there any statement about your nonre-election?

Yes or no?

A. I haven't memorized it, so. If you point something out, then I'll know.

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

67

Q. Okay, and then could you flip to page 0028?

A. Right.

Q. And here on this document states that on May 24, 2022, the School Board resolved to not re-elect you for the 2022 and 2023 school year; is that right?

A. Right, but they're not the same ed code either. Right.

Q. I don't know what you mean by ed code.

A. Well, it says Ed Code Section 44929, which refers to the probationary employee. So if you look at "whereas." So right under the title Resolution of Nonre-election, there's where as Education Code Section 44929.21(b) which refers to -- and even says it in here that that refers to the probationary employee.

And it -- it even gives a date on when I'm going to be returning, March 15th.

Q. So is the issue you have with paragraph 12 the fact that you were described as a teacher and not a probationary employee?

A. No.

Q. So --

A. No, I'm saying the -- I'm saying that the date is wrong. I'm saying that the reason that they're saying I was -- that the nonre-election existed -- because, like I said, I tried to go to attorneys so that I could sue, and

Miller Certified Reporting, LLC
www.MillerCertifiedReporting com

68

they looked at the probationary ed code, and they said that would be very hard to fight because you can basically just have -- it's like an at-will.

The way that it was described to me is like, you know, you're not going to be able to win that because it's just a coverall.

Q. Okay, so is your issue with the date then?

A. It's an issue with the date, the intent, and everything about it. So it's like not -- so when I read falsified date and evidence, it's basically not just the date is wrong, but that -- that can be a severe offense, but it's -- it's from -- from -- this is the reason I wanted to send it to the State Bar.

But when I'm reading it, it's you have -- the -- what I'm thinking they're basically trying to imply is that there is a different document. There is a different June 2nd document that no one has ever seen ever. And why would they do that? Because you have a message clearly on there saying thank you -- how do you fight that? Thank you for this -- Milpitas school district thanks you for your service to the students and the district. That is very hard to fight and say we revoked your license while thanking you for your service.

Because this -- this to me is all about I wanted to sue. A student was hurt and I wanted -- I basically told

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

69

Mr. Jonathon Brunson that that bowling alley accident was no accident. That was outright neglect. That student had a one-on-one, that means the only purpose that that staff had was to provide safety and support to that student.

Q. Okay, I'm going to move on and ask you to look at State exhibit on page 00 -- or 0114 at 114.

So this document is a notification of change in appointment status; is that right?

A. I guess from reading the title, yes.

Q. Okay, and it's regarding your change in employment status; is that right?

A. Correct.

Q. And the employment end date notated in this document is June 2nd, 2022; is that right?

A. That doesn't mean that it's correct.

Q. Okay.

A. Because I'm -- I'm going by the Milpitas document. I don't know where the June 2nd came from. It's like somebody just plucked it from somewhere. I don't know if they just didn't know the information --

MEMBER SAWYER-SINKBEIL: Microphone.

THE WITNESS: So I don't know if they just didn't know the correct information, but I'm actually believing more that it was direct an attempt to deceive. Because as I said, how are you going to fight a thank you for

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

**70**

your service to the students and the district.

They knew exactly what was taking place. I wanted to go to Parent Helping Parent which is an advocate group in California that focuses on autism students and special education and students who were getting kind of like screwed over. And I wanted to have them -- I told Mr. Brunson I want to go there. I want to get them to investigate this, and he told me that if I did, I was violating my contract.

BY MS. PORRITT:

Q.   Okay, just for one final question on page 114. You stated that you are relying on the Milpitas documents and not the Commission's documents; is that right?

A.   They're the ones that basically are -- I mean, yeah.

Q.   Okay.

A.   Because they're the originator.

Q.   For this document in the notification, who is the contact person?

A.   Who is the contact person for? This document?

Q.   Yes.

A.   I don't know because I've never seen it, so you'd have to point it out.

Q.   So it's at end of section one, contact person. Who is the contact person for this document?

Is the contact person listed as Mr. Jonathon

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

**71**

Brunson, Assistant Superintendent of HR?

A.   I see it, yeah.

Q.   Okay.

A.   That doesn't mean -- so again, that doesn't make it right --

HEARING OFFICER LEE: Mr. Stimson, you're arguing.

MR. STIMSON: Okay.

HEARING OFFICER LEE: You answered the question. Ms. Porritt moved on.

BY MS. PORRITT:

Q.   Okay, when discussing a factual allegation on page 0035, you agree you did take these two students out for 15- to 20-minute walks without supervision; is that correct?

A.   Let me get to the page before I -- so you're on -- I ran out of page numbers on this.

So 0 -- you said 035?

Q.   0035. It's the allegations section, factual allegations.

MS. STOLAROW: She's talking about the exhibits. There you go.

THE WITNESS: Okay. What was your question again?

BY MS. PORRITT:

Q.   So do you agree that you did take these two

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

**72**

students out for 15- to 20-minute walk with -- out of the supervision of the other employees; is that right?

A.   Yes, I did.

Q.   Okay.

A.   I took walks.

Q.   And you did --

A.   But I did -- but I just -- I don't want to argue it, but I did write it on the wall. We have -- as soon as you walk through the door to the right of you was a giant whiteboard. I actually think I still even have a picture. I wrote all the times down, wrote all of the places that we were going, lunches. They were kind of estimates of -- of times because we relied on public transportation, the bus, and so there wasn't exact.

Q.   But you took these students, just you and those students for walks, correct?

A.   Right.

Q.   As is it stated in the document?

A.   I did. I followed evidence-based practices, and I used basically for my Exhibit H, the one-on-one best practice teaching methods and followed a research article.

Q.   And the reason why you didn't communicate directly with the other employees was because of a student's another student's injury and a cultural disagreement?

A.   No, we -- I told them. I even wrote it on the

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

**73**

board.

Q.   My question was --

A.   So.

Q.   -- did -- okay, did you communicate with these --

A.   I did communicate.

Q.   -- directly?

A.   I would say that I communicated enough that moderate-severe autistic students knew exactly what was taking place. So I'm hoping that if moderate-severe autistic students do know, then paid staff could possibly figure out exactly what it is that they knew.

Q.   Did you verify with the paid staff that they did know that you were taking these students for unsupervised walks?

A.   Some of the times, they took the walks with me. So all we were doing is walking like a square. Because when we were going to go to the Great Mall, the idea was the IEP -- the pending IEP goal was going to be that when we went to the Great Mall -- and it's kind of like a circle -- and so the goal was going to be we would be able to make an entire rotation around that mall without staff needing to use intervention.

Q.   But this was only on occasion, right, walking with other staff members?

My question is: Did you on more than one occasion

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

**Page 74**

walk with these students alone?

A. Right.

Q. Okay.

And then you brought up walking in the Great Mall. Would -- when you visited the Great Mall, would that be with other school staff members and students?

A. Yes.

Q. Thank you.

A. However, just to add in there, when we went to the Great Mall we -- depending upon the students that we had, like if we had all seven students, one of the students that we had had a problem with running into the game room, and so there were times when he would sit down and a staff would sit with him.

So there were -- it -- circumstances adjusted to the needs of the student and students.

Q. As far paragraph 14, in your testimony you did state you did touch these students; is that correct?

A. I'm not going to put it that way because -- I -- one, if you look at the Great Mall, no touching was identified as touching, okay. Then you have training, and not everyone bothered to even go to the training.

I had like CPR qualified and I think I was the only one that did. There were trainings that they went to, like on the Culture of We that I did not go to.

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

**Page 75**

HEARING OFFICER LEE: Mr. Stimson, please answer the question. You're providing some nonrelevant comments.

THE WITNESS: Well, the question is

HEARING OFFICER LEE: Did you touch the students was the question.

THE WITNESS: Did I use interventions and prompts, yes. I'm going to use the words that are from training and what I actually did.

BY MS. PORRITT:

Q. And another issue you had with the factual allegations was the fact that the language in paragraph 16, so I'm going to ask you some questions about that.

So it's your opinion that the language with your arm resting behind the student means that you were touching the student?

A. Why else did they remove "the bench"? There was a direct intent to alter the physical act. It altered the witness statement, it altered the intent, and it basically misrepresented basically what was taking place.

Q. Do you agree with me, though, that the language here does not state Respondent was seated directly next to AN with his arm resting on AN?

A. So what I would say is that --

Q. I'm just --

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

**Page 76**

A. -- it went -- it went from --

Q. I'm just asking you a question.

A. I'm trying to answer your question.

So it went from an inappropriate interaction, right, because I supposedly made the staff feel uncomfortable, to inappropriate touching because of Number 16.

So I would say that if it went to inappropriate touching, which to my understanding again is a felony for an attorney to make up an allegation like that because you're basically committing an almost criminal act out of what did not happen, did not exist and is not there. You basically had to outright remove a word in order to get what you were wanting.

Like I said, this is going to the State Bar.

Q. I'm going to repeat my question again.

Does -- does paragraph 15 state that you had your arm resting on the student, yes or no?

A. So does it say in Number 16 that -- so does it lie and say that my arm was behind the student or rest -- my arm was resting behind AN? Yes. Is it a lie, yes.

MS. PORRITT: Hearing Officer Lee, that wasn't responsive to my question so I'm going to move to strike it from the record.

HEARING OFFICER LEE: Granted.

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

**Page 77**

BY MS. PORRITT:

Q. I'm going to move up to Allegation 15. On or about March 22, 2022, were you in the computer lab with the Student MT?

A. Yes, I was providing her three-year assessment.

Q. Okay, and were you recording the student?

A. No, I was not.

I do not own a camera or a computer.

Q. I'm going you to move to State's exhibit page 0112.

Sorry, pardon me. I'm going to ask you to page 1 -- 0111.

Was Ms. Francesca Berardi an employee with you at Milpitas Unified School District?

A. So was Francesca -- yes.

Q. Okay, and are you saying that Ms. Francesca Berardi was lying when she e-mailed that she saw you video recording Student M?

A. I am saying that she was lying. Or I think she saw something that she may have thought that was that. But, again, I don't have a camera, don't own one, and I don't own a computer because most school districts, if you're teaching special ed, provide one, so there's no point for me to provide my own.

Q. I want to go back to your testimony earlier.

So the reason why you did not communicate with the

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

78

other paraprofessionals in the classroom was because you did not trust them; is that right?

MR. STIMSON: I object to the question the way you framed it.

HEARING OFFICER LEE: What's your objection?

MR. STIMSON: The -- it sounds as if there's like no attempt to communicate. So there obviously was an attempt to communicate. Was there an attempt for me to also to stay away from people that were -- and I'm just going to go back to Culture of We because we don't want to discuss it evidently.

HEARING OFFICER LEE: All right, I'm going to overrule your objection because I think it's based on your prior testimony.

Repeat the question.

BY MS. PORRITT:

Q. Mr. Stimson, yes or no, did you trust the other paraprofessionals?

A. With certain things, probably. Yes. I mean, can you sit in a room with students and do nothing, yes.

Q. So did you communicate regarding your touch intervention with these paraprofessionals?

A. I showed them the training. I have a book. Like, if you -- I may even have brought it.

But, yeah, I have a -- in -- in the exhibit, and I

79

believe it is Exhibit 3 or 4 will.

So it's Exhibit 4, okay, this book is probably half a page long, but in there you see pictures of the training, okay. So there's multiple pictures that they can see. There's modules that identify like the remove the audience. There's charts that identify almost like if they're doing this, this is what you should do in order to preserve safety.

Like number three says risk behavior, they're hitting or self-injury. So in that instances you would go over to what does three say for the staff to do and that is a physical intervention, holding skill.

Q. All right, Mr. Stimson. And despite the fact that you presented these document pages to them, these paraprofessionals still reported you, correct?

A. It hadn't -- well, I would say it had nothing to do with what is taking place. Like I said, there's a tremendous -- it goes right back to Culture of We.

Q. And you maintain that writing on a whiteboard is sufficient when taking special needs students out for walks for 15 to 20 minutes; is that correct?

A. Are you -- are you asking if I write it up on the board and I tell the class what I'm doing and then I go and I do it and then I come out is -- is that sufficient? Is that what you're asking?

Q. You -- my question is, is it your understanding

80

that it is sufficient to notate that you were taking a student for a walk for 15 to 20 minutes without directly speaking to the other employees? Is that sufficient?

A. Like I said, I wrote it up on the board and I told students and staff exactly what we were doing and went and did so.

Q. Did you document these strategies anywhere within the class aside from -- like in the student files or with the other paraprofessionals?

A. So in reference to how did I take data, it depended on two things. Like, one, is it an IEP goal, because that's what we focus on our data tracking on; and two, I relied on teacher observation and trying to identify whether or not some of things that we were doing would actually be implemented into the creation or writing or presenting to the parent as a like viable goal that I thought would be reasonable and achievable.

Q. Did you memorialize these strategy, goal, or any improvement with your records or with the school district?

A. So, again, if it were an IEP goal I did. If it were not an IEP goal then, again, I relied on teacher observation and deciding if it was going to need modifications in order for it to be requested of the parent or presented at an IEP meeting. If -- if that would be something that they were -- is it going to -- like, was the

81

walking, was that going to -- was it helping in -- when the parent took their child to the store, was there any observations on their part?

So there were kind of like conversations more -- there were more conversations I would say between a teacher and a parent than the teacher and the staff. Now, I'm not saying that there wasn't, I'm saying that there was more. And that's because there's trying to view, does your goal work across the -- one, is it going to meet what the needs of the parent are.

Q. All right, so you wouldn't discuss IEP goals with school staff?

A. No, they would have the actual -- so not only did I discuss that, but there is IEP At a Glance that are like printouts of maybe it will just have the goals and the objectives and it will identify. And so they had that information so that they could actually -- so there were -- there was documentation as well as conversation in order to do that.

So, I mean, that's what IEPs are or IEPs At a Glance are, basically just a shortened version. We provide them to gen ed teachers. We provide them to one-on-one staff.

HEARING OFFICER LEE: Mr. Stimson, I think you answered.

82

BY MS. PORRITT:

Q. Earlier you stated you did not want to communicate with staff because of the cultural difference; is that correct?

A. No, it's more of I -- there were times I would say that I -- I felt like they were just coming off in a way that -- I mean, I'm -- I'm -- I'm trying to stay away from the -- the words that people are not wanting to hear.

There was a strong antiwhite sense and they -- yes, if they're -- if they're pushing that I kept my freaking distance because, one, it put me in a bad mood and that I would just walk away. I just did not want to listen. If you want to say -- I mean, there just isn't a place in the public school for it.

And I definitely didn't want it in my classroom, and I didn't want it in my ears and in my head and around me. It made me feel uncomfortable, and I did not want to participate in that. So if they started coming off in a way that was derogatory then, yeah, I kept my distance.

MS. PORRITT: Hearing Officer Lee, I have no further questions.

HEARING OFFICER LEE: Thank you.

Mr. Stimson, you may explain anything that you answered --

MR. STIMSON: I would like --

83

HEARING OFFICER LEE: -- that Ms. Porritt asked you about -- please don't interrupt me.

MR. STIMSON: Okay. Sorry.

HEARING OFFICER LEE: Did you hear me?

MR. STIMSON: I did, I'm sorry.

HEARING OFFICER LEE: I'll repeat it. You may explain anything that you said while Ms. Porritt was questioning you.

MR. STIMSON: Okay.

HEARING OFFICER LEE: It's not required, just if you want to.

MR. STIMSON: I do.

REDIRECT STATEMENT

BY MR. STIMSON: There was the point that you made about in the report to CTC that Jonathon Brunson had wrote -- wrote why I was nonre-elected. And so what I would say to that is -- I'd like to show an exhibit, Exhibit 5, "X" images.

So I just want to -- it will be the pages where it's basically the professional development.

So I just want to read that because it's not very long. It says: "Professional development is important for all employees" -- so he expected everybody to be at these -- "and we are so proud to start providing these same

84

experiences to our classified staff." That include Ruby, Ms. Fran, okay. "So the Culture of We is alive and well at Milpitas USD. So thank you for what you do for our students and each other."

The only reason that I read that is that I know for a fact that I stopped going to some of these professional developments, and I would say Mr. Brunson had a direct conflict of interest in probably making that investigation. I honestly think that the police or somebody else should have been called and brought in to do that investigation because Mr. Brunson was doing the training for the antiwhite C- -- basically CRT -- it's basically join our team, so I don't really know if it's more CRT. It's just basically just antiwhite views.

So if you're doing an investigation to somebody, that's probably a conflict of interest.

But, I mean, I thought my due process was just -- it was gone from the beginning because you basically have somebody who's not just attending these trainings, he's actually the one teaching it. And so you're just like, seriously? You can't call the police and have them -- I actually asked for that, by the way. Like we did the -- in the reprimand, it says something about an audio was done, right. I wanted to go to the police station in person, and I told them I wanted it video recorded. And because if you

85

Google search what is the, like, best practice for doing an investigation and -- and that kind of, like, putting it on record, that would have been probably the best place.

But I felt that he was absolutely not the right person to probably do that investigation.

But, you know, there's -- there -- it -- I would say this directly connects him to Culture of We. And so I don't -- I don't get it.

I'm sorry, but I'm one of those people that racism against anybody should not be allowed to exist. I don't care who it is. Sexism against anybody should not be allowed to exist. It is a freakin disease.

HEARING OFFICER LEE: Mr. Stimson, I think we're far afield. Is there anything else that you want to explain about your testimony under cross-examination?

MR. STIMSON: Honestly, there is -- there's a real strong part of me that feels going over the Culture of We is my due process but...

HEARING OFFICER LEE: It was part -- it was part of the exhibits, correct?

MR. STIMSON: Right.

HEARING OFFICER LEE: Okay.

MR. STIMSON: But I honestly think that if that -- it wasn't a small thing, it was a gigantic piece that was involved. Not only in my case, but in that school year.

86

It was just, you couldn't escape it. It was just there.

I -- I guess if I'm not going to go over that, is there any objection --

HEARING OFFICER LEE: The Committee has read it.

MR. STIMSON: -- is there any objection for me being able to go over Exhibit 9?

HEARING OFFICER LEE: Have we covered it already?

MR. STIMSON: So Exhibit 9 goes over how CTC was directly involved in an explosive lawsuit involving deceit, corruption, lies. I mention in the very beginning how FERPA was a huge part of removing the comments that I made. Like you will not see autism, you will not see IEP, you will not see one-on-one, you will not see three-year assessment, none of that will be in the IE -- in the reprimand and, therefore, it wasn't in the CTC report because -- and so that's actually one of the things that they got in trouble for with that lawsuit because -- and it directly identifies that numerous illegal acts and possibly thousands of improperly sanctioned teachers in the State of California.

Tampering with evidence, CTC attorneys improperly tampering with case outcomes and acting outside their legal jurisdiction and scope to go, you know, you know, after

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

87

teachers.

Well, I can tell you first hand that that's not something that stopped happening because of that lawsuit. It's -- it's now just as political and directed at -- I mean, it literally tells you thousands of improperly sanctioned teachers, and it has not stopped.

HEARING OFFICER LEE: Can I --

MR. STIMSON: These allegations are based on just research evidence and best practices easily explained. There's more evidence against Mr. Brunson and Milpitas on the video than there is me. Because there's no evidence. Because I don't own a camera; I don't own a computer.

HEARING OFFICER LEE: Mr. Stimson, Exhibit 9 is part of the exhibits and has been reviewed by the Committee. Move on.

MR. STIMSON: So I've explained that the relationships that were involved here, I mean it really does go to, like I said, right now I try - I provided the October 10th from Friday document from CRD.

At the time of all of this, there probably was a great deal of --

HEARING OFFICER LEE: I don't believe you were asked about the CRD by Ms. Porritt. This is the time for you to explain anything that Ms. Porritt asked you about.

MR. STIMSON: Well, I'm trying to explain that

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

88

that only exists because of this.

HEARING OFFICER LEE: We have the -- we have the exhibit. Is there anything else that Ms. Porritt asked you about for --

MR. STIMSON: There's nothing that I have more of what she's saying.

HEARING OFFICER LEE: Okay, thank you.

Does the Committee have any questions for Mr. Stimson?

Dr. Williams?

CHAIRPERSON WILLIAMS: Yes I have two.

EXAMINATION BY THE COMMITTEE

BY CHAIRPERSON WILLIAMS:

Q. Was Stacy Lillard your supervisor?

A. Kind of. Like I probably saw her maybe four to five times the entire time that I actually worked there. So she -- I had another, like, principal who was, like, straight down the hall. She's not mentioned in this. She was kind of like in charge of that building.

Q. Okay.

A. And so Miss Stacy actually worked, like, two buildings down and had other job duties, but. So the only time that I kind of engaged with Stacy was there was -- I requested due to the fact that one of the female students had

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

89

a one-on-one or was supposed to, there was several times that I would go see her. So it was mostly me initiating the contact with her. Because she hired me and she was responsible for hiring the one-on-one staff and, so.

Q. So then my next question is, so you have a supervisor you could go to and talk to in Miss Stacy or you also had a principal that you could go talk to as well and correct?

A. I didn't really feel like there was -- the -- I had more reason to go to David Sorenson --

Q. Okay.

A. -- than I did go to -- so that was the other teacher. And -- I mean, he's -- he's in the document I've provided.

Q. I remember his name.

A. Right.

Q. So my follow-up question to that is between these two in talking with either one of them, did you share with them that you were taking students out for walks?

A. Yes. I did. I -- I -- they knew that -- for one, they were supposed to attend the IEP, right. Because at the IEP, you have your -- so she would have been the main administrative person who would have attended and signed off and -- and been part of that IEP process.

CHAIRPERSON WILLIAMS: Thank you.

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

**90**

HEARING OFFICER LEE: Further questions for Mr. Stimson?

(No audible response.)

HEARING OFFICER LEE: Thank you.

I think we're ready for closing argument. Closing argument is not evidence but each party's opportunity to convince the Committee to decide in your favor.

Ms. Porritt?

MS. PORRITT: Thank you.

Hearing Officer Lee, members of the Committee, like I said earlier, this case is simple. The question for you to determine is whether or not the events which led to Mr. Stimson's revocation in California more than likely did occur and, if so, whether or not revocation which California adopted would also been appropriate in Arizona. And so the statute, Mr. Stimson's conduct which led to his revocation, shall be treated as immoral and unprofessional conduct for the purposes of the disciplinary hearing.

Now, throughout the hearing and throughout the exhibits, Mr. Stimson has distracted from his conduct at issue, taking issues with the way certain things were phrased and conveyed.

To -- I would like to start off to Chairperson Dr. Williams' statement -- or question regarding Mr. Stimson's communication earlier. Exhibit 8, page 0112

**91**

includes Ms. Stimson -- or sorry, Miss Stacy Lillard's e-mail to Mr. Jonathon Brunson summarizing her communications with the paraprofessionals highlighting their issues and noting that she also took issue with Mr. Stimson's resting his arm behind the student on the bench.

Here during the hearing, Mr. Stimson did say that he would take these two adult special needs students on walks unsupervised on occasion away from the supervision of other staff members. Multiple staff members also reported that they felt like Mr. Stimson's touches of the students were inappropriate and reported it to HR and other staff members. Although Mr. Stimson claims otherwise, another staff member relayed that he was videotaping her -- one of the students in the computer lab.

MR. STIMSON: Objection. Did you just say I admit I was video recording?

MS. PORRITT: I don't think objection -- I will answer that question. I will state that despite Mr. Stimson's statement that he was not video recording the student --

MR. STIMSON: Okay.

MS. PORRITT: -- Ms. --

HEARING OFFICER LEE: Overruled.

MS. PORRITT: -- the paraprofessional did report that he was -- did report that he was video recording

**92**

her and that e-mail is admitted in Exhibit 8 of the State's exhibits.

Exhibit 3 -- or, sorry, Exhibit 4 also includes the district's letter of reprimand regarding Mr. Stimson's conduct. I would urge you to look at page 0026 again, which notes that when the district had conversations with Mr. Stimson, he admitted he did not document his strategies regarding walking the students --

MR. STIMSON: Objection.

MS. PORRITT: -- or otherwise memorializing --

HEARING OFFICER LEE: What is your objection? What is your objection?

MR. STIMSON: My objection, I -- I did document. Like I --

HEARING OFFICER LEE: I'm sorry, she's referring to an exhibit. She's not referring to your testimony. The objection is overruled. She's referring to the reprimand on Exhibit 26.

MR. STIMSON: I -- I thought she was referring to the data -- data collection. IEP goals I did.

HEARING OFFICER LEE: Ms. Porritt, were you referring to page 26?

MS. PORRITT: Yes, I was referring to page 26. And in my closing argument, I stated that despite Mr. Stimson's claims otherwise during his testimony,

**93**

page 0026 notes that when -- that the district recorded that he did not otherwise memorialize it, so.

HEARING OFFICER LEE: Objection overruled. Continued.

MS. PORRITT: Those facts are in contention.

MR. STIMSON: No. Objection again.

HEARING OFFICER LEE: What's your objection?

MR. STIMSON: I documented IEP goals --

HEARING OFFICER LEE: You may --

MR. STIMSON: -- as I identified, the walking was going to lead to an IEP goal if --

MEMBER SAWYER-SINKBEIL: Microphone.

MR. STIMSON: So it would have led to an IEP goal if the parent and I had basically saw, like, progress and the same -- like it was working at home; it was working at school. We were look- -- we were comparing our notes; we were talking about our observations together about that. But the -- so data collection on IEP goals did happen.

HEARING OFFICER LEE: Mr. Stimson, I want Ms. Porritt to get through her closing argument. The points you are making can be covered in your closing. So make a note of them. You have something to write with?

MR. STIMSON: Yes.

HEARING OFFICER LEE: All right. I'm going to overrule the objection. You may not agree with what she's

**94**

saying, but you can cover it in your closing.

She is referring to the documents and she's giving us the page numbers. So she's not making this up; it's from the documents.

Continue.

MS. PORRITT: Thank you, Hearing Officer Lee.

To go back to the factual allegations made in California, the exhibits admitted support the findings made by California which show that Mr. Stimson took these students for walks unsupervised, he was reported for touching these students in an inappropriate manner and being too close to these students which was also reported to be inappropriate.

In his testimony earlier today, Mr. Stimson also conveyed that he felt uncomfortable with working with the other paraprofessionals, and due to that discomfort and somehow an injury of another student, communication was difficult. In that way Mr. Stimson put his own personal discomfort over the needs of the student -- or I should say rather the multiple students -- in failing to appropriately work with his staff members so to properly prevent and appropriately address all of the students' behaviors.

By taking issue with the issue in the factual allegations in the California report, by taking issues with FERPA protections which are designed to protect students' information, it's particularly identifying student

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

**95**

information and student safety, Mr. Stimson has chose to represent himself as a victim here when the only victims that are documented in the exhibits would be the students in which Mr. Stimson inappropriately interacted with as demonstrated in the exhibits.

As was also shown in Mr. Stimson's testimony today, Mr. Stimson has not learned from the experience. He has refused to acknowledge any wrongdoing or error on his part, particularly with communicating with staff members. And this issue is precisely why states like Arizona and California report discipline to each other. It's so to stop and address harmful behavior at the root instead of allowing educators to continue to engage in the same improper conduct in different states.

For these reasons the State requests for the Committee to adopt the same discipline that California had adopted and revoke Mr. Stimson's Arizona educator certificates.

Thank you.

HEARING OFFICER LEE: Thank you.

Mr. Stimson, you may make a closing argument.

MR. STIMSON: So -- I mean, it's pretty clear to me exactly what's taking place, so.

All of the allegations can be matched directly to research evidence-based practices. The walking with students

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

**96**

is directly from research. There isn't just one page, there are hundreds of studies between students with autism and these -- whether it improves behavior and reduces the aggression, and there is direct correlations that have been made in these studies. Clear improvements, improvements with attention, concentration, self control; the reducing of self-injury.

The only reason that I did these -- the walks was a parent had a safety concern with her child running through a parking lot and nearly getting hurt, and that is something she brought to her teacher's attention and tried to find a way to work together to provide a -- a way to try and still access the community and engage in activities like shopping, your daily living activities instead of just staying home.

And working with her, that is where the research came in. And the article I've provided, it actually identifies longer, like 30 -- 30 minutes a day for exercise and more specifically aerobic-type exercises of walking.

The idea that the aides were -- the TA were in the room and they were doing like math and science and whatever, none of that was happening. Our program, our day of six hours, three to four hours of it our classroom was the community, going to Walgreens and stocking shelves and learning job skills, going to Walmart and doing shopping so that we could do cooking at school.

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

**97**

There were the -- the HHS public access is just one of many, if not hundreds, of documents that will identify that one-on-one instruction is a critical component of evidence-based instruction to the students with autism, but it is not used as often as recommended.

You have all of the ideas of physical contact with students coming from CPI, and basically there are pictures that have identified to the AG and the Arizona Board to a point where there are actual pictures of the training that when they're saying it's excessive and unnecessary, and you look at the Stacy Lillard's explanation in the Great Mall, there are close to and next to and across from and arm on a bench. Words that identify that I wasn't even touching the student. And there are pictures in the training that directly identify that there were staff working with students and there were actual low-level, medium-level, and high-level holds for seating holds.

There were the -- it was identified that what contact, what interventions were used were often used when we were crossing the street, coming to a crosswalk, and there were moments when it was potentially serious or even grave danger to just stand back and watch it happen.

Considering in November of 2021 a student who is going to be a witness when I do reach out to CRD, and we'll look at the -- these allegations, there's the plan will be to

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

**98**

reach out to the teacher and these witness that could be at that CRD lawsuit hearing.

So this idea that the student at the Great Mall was injured by accident, it was not. Basically I saw early signs that the student was very excited and jumping up and down and there were heavy objects and I asked the one-on-one staff to bowl for the student and she said no. So I said: Just stay near her, you don't have to -- you don't have to bowl for her but you can -- you can stay next to, you can stay with the student, okay.

So I saw the situation before it happened, and I told the staff who was a one-on-one, which means he was her only job duty. All she had to do was stay with him and she could have prevented that accident from happening just by staying with him. She decided to go across the room, sit down, and play on her phone. And it was at a point when in January of that -- 2022 she ended up changing job duties. She went from being a one-on-one to being a classroom aide.

HEARING OFFICER LEE: Mr. Stimson, you're interjecting facts that have not been in evidence and going back to things that I don't think we've discussed yet. '21, '22. Am I incorrect?

MR. STIMSON: No, that -- that -- I tried to explain that. I tried to explain that.

HEARING OFFICER LEE: Please stick to the

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

**99**

facts that we've covered today.

MR. STIMSON: So this student was hurt and he -- we -- we -- I saw that coming, and I explained that to the staff that that was her -- her only job duty, just to stay with him.

As I said in the training book, there are literally the explanations for what it is that we're supposed to do and they may have used words like alone, but there was one-on-one. That is what the -- all of the applied behavioral analysis, just retrial training. That is what the CPI book uses.

They used the word isolate and isolate in our classroom in autism would refer to kind of like taking a student and putting them into a room by themselves, that would be isolate. The training for our CPI told us to remove the audience and to basically by taking the walks, that's what I was able to do was remove the audience.

The outcome was no students under my watch were ever in a physical injury other than at that bowling alley when I was basically ignored by the one-on-one staff. So it wasn't just an argument or bad communication, that staff was assigned a job duty of one-on-one, and her only problem was when she went to classroom staff, her pay was reduced. That was the only thing she cared about.

We had -- I've talked about the differences between

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

**100**

physical interventions and prompts. And so a prompt may be helping a student to hold a pen or how to hold a pencil correctly, a pincer grip. Helping it as identified, physical prompt or manipulated where it's hand over hand. So this -- this contact with the student was depending on the situation, helping them with doing work assignments when their physical strength or ability -- ability was an impairment.

I've tried to identify that with the video recording. I do not own a computer; I do not own a camera. I do know that during that time period, I had a three-year assessment and as I stated the -- we were in the computer lab because they had the computers in the room and this student because of her physical disability, could operate a mouse much better than she could do writing or any other. So part of our job in that kind of disability would be to focus on the -- on what strengths the student has in overcoming those limitations.

As I've stated, the Milpitas school district based on images the -- there are examples in evidence that they, in fact, not only because the allegation is video recording a female student, period, they not only violated that exact Number 3 allegation and CTC allegation, but they did more than that by posting it on social media. And by the fact that Arizona enforcement had me redact the faces, we know that I was informed to redact their facial images in order to

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

**101**

be admissible as evidence.

So I would say that posting it on social media and the use of minor children would probably be -- and the fact that there is zero evidence. Zero. Zero pictures, zero seconds. Because, again, I don't have a camera or a personal computer. So as I even said in this, the video modeling would have come directly from autism-focused intervention resources modules.

So AFIRM is basically what would have helped with what type of strategies and kind of lessons and things that we would have printed out and used to best support us.

There are -- going back to the relationships with students -- or the relationship with staff. There was communication from IEPs At a Glance. There was the whiteboard instruction identifying in writing, as well as verbal conversations that, again, the moderate-severe students knew what was taking place. They knew what we were doing, when we were going to do something next. And there was enough communication for a student between the ages of 18 and 22 with mod-severe autism to know what we were doing, when we were going to the bus, when we were -- where we were going, when we were going to get lunch, all of the different transitions were identified both in writing and verbally informed.

The communication I have identified, it wasn't no

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

102

communication with other staff. It was that I probably had a greater communication with the students themselves, I had -- like normal teachers.

As for this strong connection with the staff, there's even information out there that a -- a -- the job of a para or a TA, it isn't to take the focus of the teacher, it is the -- it's actually their -- their role to support and -- and in that it isn't to like I -- I need to go and have this lengthy conversation with a TA when my job is working with the students, not -- again, going back to how do you work with those students. The -- if I'm doing gen ed, the ratio would be 1-to-21, if I'm doing mod-severe, it's 1-to-4.

If it's working in autism, if you do the research, you will find that just like the exhibit document I've provided, it's one-on-one with autism. It is -- there -- there are hundreds, probably more than hundreds, even thousands of YouTube videos of basically one-on-one is interaction between the -- the trainer and the person who's from -- whether they're adults to children.

And, again, this is an adult program. So am I going to be -- most of our jobs, it's -- it's going to be working directly with that other person.

But, again, you -- you -- the break down in the relationships, there is a CRD, Civil Rights Department complaint, there -- there were complaints from the very

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

103

beginning. The -- the breakdown with the relationship with Mr. Brunson was, bottom line, it came down to what I felt was discrimination. You have these -- the CRD wrote this report. If the thought is I typed this up, that is not how this works.

The CRD -- the -- in fact, I clearly identified that Culture of We was probably a driving force. And CRD when it did its -- its investigation and asked its questions and did the intake, it was -- they were working in the same building as CTC, so they can see directly what it is. And so they had -- they knew exactly what was taking place.

And so the report here, it's focused largely on gender neutral, because in the report the -- this is something that Jonathon Brunson basically with his report -- CTC ended up rewriting it because the allegations clearly are identifying the focus is on gender. When we're at work it's, we are -- the Civil Rights Act does not identify that's a woman's job, that's a man's job, that's a job for a person's skin color. It does not say that. The Civil Rights Act is identifying that we are gender neutral.

So this idea that you have to be a particular or same-sex gender in order to work with a student is a lie. It's -- it's illegal.

The CRD is investigating these, and I actually hope that the State Bar takes a look at these as well because as

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

104

I've stated, it's not just word differences in these allegations with CTC. You have -- you don't just have a wrong date, you have the entire thing is wrong. You basically have, from what I've observed and what I've researched on this and what I'm going to ask of the State Bar is, does it even rise to the level of a felony?

So my -- my goal is to get -- after to get this decision in order --

HEARING OFFICER LEE: Mr. Stimson --

MR. STIMSON: -- so to ask you that --

HEARING OFFICER LEE: Mr. Stimson, I've cautioned you before that that is not in front of this Committee. Whether there's a felony, whether there's a charge against the attorney, that's not part of what we're doing today. I understand you're going to go forward with that in another matter, but please stick to what's in front of us today.

And are you about ready to wind up?

MR. STIMSON: Yes.

HEARING OFFICER LEE: Thank you.

MR. STIMSON: So as I stated, Number 12, Number 16, they are -- they are not simple word mistakes. Removing and changing something from not touching and turning it into touching is not ethical.

The other three goals are worded a little bit

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

105

different than the Milpitas allegations, but they're the idea of -- even the time of the walks, 15, 20 minutes. Going directly to and being able to identify exactly where that came from. That the walks for 20 to 30 minutes, the use of the training, resources, the interventions and the prompting and the --

HEARING OFFICER LEE: Mr. Stimson, we're getting repetitive. We have heard this about the link to the autism materials. So I'm going to ask you to move on.

MR. STIMSON: Okay.

So I will -- I'm at Culture of We and so I understand that has been entered into evidence, but evidently when -- I'm -- I'm hearing that the other side of the argument is there's simply breakdowns in communication. I would say that racism is not a breakdown in communication. Views of antiwhite, these are not even close to just being a breakdown in communication.

You're --

HEARING OFFICER LEE: This body won't rule on discrimination, that is the job of the California Civil Rights Department. Do you agree?

MR. STIMSON: I believe it's the moral obligation for every person to look at whether or not you want to live in a society where this type of stuff is allowed to exist. Because this is a K-12 school, you have third

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

**106**

grade teachers, kindergarten teachers, principals, health professionals, special ed people. If you look at their jobs and the age of these students, even the people that support this is being at a college level. This isn't a college level, these are little kids that have people that are identifying that.

HEARING OFFICER LEE: Move on, Mr. Stimson.

MR. STIMSON: Exactly.

I will say that whether it's sexism and identify that you have to be a certain gender to work with another certain gender or you have to work in an environment where you know that abuse simply because of appearance is tolerated. It never should be. It doesn't matter who it is or who it's against.

Just ending with the fact that while those want to review CTC as a just beacon of justice and light, the -- the fact is they've lost major lawsuits because of how they put numerous illegal acts in thousands of improperly sanctioned teachers. And this is one of those cases.

Their -- when politics is taking center over justice, actual justice, and that's what we're talking about really here, we're looking at whether or not a person's skin color and gender, and excusing it like it's just bad communication with staff.

HEARING OFFICER LEE: Mr. Stimson.

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

**107**

MR. STIMSON: That's not --

HEARING OFFICER LEE: You're beyond the scope of this hearing.

MR. STIMSON: -- accurate.

Okay.

HEARING OFFICER LEE: Rebuttal, Ms. Porritt?

MS. PORRITT: Yes, just briefly.

Mr. Stimson here can speak ad nauseam about the rules and proper etiquette and proper procedures regarding addressing autism and students, however the evidence provided demonstrates that all though his statements, Mr. Stimson did not adequately implement that with his staff members. And in particular, that resulted in multiple staff members reported him for acting inappropriately with students which then resulted in a Letter of Reprimand which then resulted in a report to the California CTC which then resulted in his revocation.

And for those reasons and for the fact that the exhibits admitted demonstrate that California's disciplinary action was based on these reports -- and you can look at the firsthand statements on Exhibit 8 from the staff members why they thought his conduct was inappropriate and his lack of knowledge regarding it -- the State asks for the Committee that the revocation of Mr. Stimson's Arizona certificates so to comply with California revocation of Mr. Stimson's

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

**108**

teaching credentials.

Thank you.

HEARING OFFICER LEE: Thank you.

Having heard the testimony and reviewed the evidence, the Committee will now discuss the case.

Mr. Stimson has presented proposed Findings of Fact, Conclusions of Law and Recommendation for you to consider. The State has done the same. So you may use either one or you may draw from both.

Is there any discussion before we move forward?

(No audible response.)

HEARING OFFICER LEE: Hearing none, is there a motion concerning either of the fact Findings of Fact -- let's start with the Findings of Fact.

CHAIRPERSON WILLIAMS: I move that we use the State's Findings of Fact 1 through 16 as presented.

HEARING OFFICER LEE: Is there a second?

MEMBER CLYNICK: Second.

HEARING OFFICER LEE: Let's take five minutes.

(Recess taken from 2:55 p.m. to 2:57 p.m.)

HEARING OFFICER LEE: Thank you, we're back on the record after a momentary pause. It's 2:58 p.m.

I believe Dr. Williams was making a motion. Could you repeat that for me?

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

**109**

CHAIRPERSON WILLIAMS: Sure. I propose that we use the State's Findings of Fact, Conclusions of Law and accept 1 through 16 as presented.

HEARING OFFICER LEE: Is there a second?

MEMBER CLYNICK: Second.

HEARING OFFICER LEE: Thank you.

It's been moved and seconded that the Committee use the State's proposed Findings of Fact 1 through 16.

Is there any discussion?

(No audible response.)

HEARING OFFICER LEE: Hearing none, all in favor?

(Chorus of ayes.)

HEARING OFFICER LEE: The State's findings -- in the State's Findings of Fact there are aggravating and mitigating factors for you to add to the Findings of Fact you've already adopted.

Are there aggravating factors the Committee would like to add to the Findings of Fact?

MEMBER CLYNICK: I move to add aggravating factors: (d), multiple offenses; (e), refusal to acknowledge wrongful nature of conduct; and (f), vulnerability of the victims.

MEMBER ALONZO: Second.

HEARING OFFICER LEE: It's been moved and

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

110

seconded that the Committee add aggravating factors: (d), multiple offenses; (e), refusal to acknowledge wrongful nature of conduct; and (f), vulnerability of the victims.

Is there discussion?

(No audible response.)

HEARING OFFICER LEE: All in favor?

(Chorus of ayes.)

HEARING OFFICER LEE: Opposed?

(No audible response.)

HEARING OFFICER LEE: The motion carries.

Are there any mitigating factors the Committee would like to add to the Findings of Fact?

(No audible response.)

HEARING OFFICER LEE: Hearing none, the State and the Respondent has submitted Conclusions of Law.

Is there a motion to consider either the Conclusions of Law of the Respondent or the State?

CHAIRPERSON WILLIAMS: I propose that we use the State's Conclusions of Law 19 through 27 as presented.

HEARING OFFICER LEE: Is there a second?

MEMBER CLYNICK: Second.

MEMBER SAWYER-SINKBEIL: Second.

HEARING OFFICER LEE: It's been moved and seconded that the Committee adopt the Conclusions of Law as presented by the State Numbers 19 through 27.

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

111

Any discussion?

(No audible response.)

HEARING OFFICER LEE: All in favor?

(Chorus of ayes.)

HEARING OFFICER LEE: Opposed?

(No audible response.)

HEARING OFFICER LEE: The motion carries.

The final issue for the discussion for the Committee is the Committee's recommended order to the Board of Education.

The Committee may consider any of the following actions alone or in combination pursuant to A.R.S. Section 15-203.

Ms. Porritt, do we only have one? Either -- when dealing with a California, we either revoke or not revoke? Or do we have other option?

MS. PORRITT: Let me pull up the statute to make sure.

My -- I'm going to just read the statute and have you interpret it.

HEARING OFFICER LEE: That's fine.

MS. PORRITT: Okay, so 15-534.04(D) -- or, sorry, (C) states that: "After conducting a hearing requested pursuant to this subsection, the State Board of Education shall determine whether to uphold or decline the

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

112

revocation or suspension."

HEARING OFFICER LEE: Okay. So I think there's two choices, uphold or decline.

So is there a motion on whether to uphold or decline the California's revocation?

CHAIRPERSON WILLIAMS: Based on the foregoing, it is recommended that the State Board of Education uphold the California revocation recommendation and that all states and territories be so notified of any disciplinary action taken.

HEARING OFFICER LEE: Is there a second?

MEMBER SAWYER-SINKBEIL: Second. Second.

HEARING OFFICER LEE: Thank you, Ms. Sawyer-Sinkbeil.

It's been moved and seconded that the based on the foregoing, it is recommended that the State Board of Education uphold the California revocation recommendation.

Is there any discussion?

(No audible response.)

HEARING OFFICER LEE: Hearing none, Ms. DiGiovine call the roll.

MS. DIGIOVINE: Chair Dr. Williams.

CHAIRPERSON WILLIAMS: I vote aye based on the aggravating and mitigating circumstances and the following in the practices of reciprocating revocations between states.

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

113

MS. DIGIOVINE: Vice Chair Helton.

MEMBER HELTON: I also vote aye. And while I understand that Mr. Stimson believes that he has evidence that negates the allegations that were brought forth in California, I believe that those need to be worked out through appeal maybe in California and until then, Arizona should uphold California's decision.

MS. DIGIOVINE: Member Alonzo.

MEMBER ALONZO: Aye.

MS. DIGIOVINE: Member Ambos.

MEMBER AMBOS: Aye.

MS. DIGIOVINE: Member Clynick.

MEMBER CLYNICK: Aye.

MS. DIGIOVINE: Member Sawyer-Sinkbeil.

MEMBER SAWYER-SINKBEIL: Aye.

MS. DIGIOVINE: And Member Scholl.

MEMBER SCHOLL: Aye.

MS. DIGIOVINE: Hearing Officer Lee, we have 7 ayes and 0 nays.

HEARING OFFICER LEE: By your vote of 7-to-0, based on the foregoing, it is recommended that the State Board of Education uphold the California revocation recommendation.

This concludes the formal hearing.

The Committee's decision will be reduced to a

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

**110**

seconded that the Committee add aggravating factors: (d), multiple offenses; (e), refusal to acknowledge wrongful nature of conduct; and (f), vulnerability of the victims.

Is there discussion?

(No audible response.)

HEARING OFFICER LEE: All in favor?

(Chorus of ayes.)

HEARING OFFICER LEE: Opposed?

(No audible response.)

HEARING OFFICER LEE: The motion carries.

Are there any mitigating factors the Committee would like to add to the Findings of Fact?

(No audible response.)

HEARING OFFICER LEE: Hearing none, the State and the Respondent has submitted Conclusions of Law.

Is there a motion to consider either the Conclusions of Law of the Respondent or the State?

CHAIRPERSON WILLIAMS: I propose that we use the State's Conclusions of Law 19 through 27 as presented.

HEARING OFFICER LEE: Is there a second?

MEMBER CLYNICK: Second.

MEMBER SAWYER-SINKBEIL: Second.

HEARING OFFICER LEE: It's been moved and seconded that the Committee adopt the Conclusions of Law as presented by the State Numbers 19 through 27.

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

**111**

Any discussion?

(No audible response.)

HEARING OFFICER LEE: All in favor?

(Chorus of ayes.)

HEARING OFFICER LEE: Opposed?

(No audible response.)

HEARING OFFICER LEE: The motion carries.

The final issue for the discussion for the Committee is the Committee's recommended order to the Board of Education.

The Committee may consider any of the following actions alone or in combination pursuant to A.R.S. Section 15-203.

Ms. Porritt, do we only have one? Either -- when dealing with a California, we either revoke or not revoke? Or do we have other option?

MS. PORRITT: Let me pull up the statute to make sure.

My -- I'm going to just read the statute and have you interpret it.

HEARING OFFICER LEE: That's fine.

MS. PORRITT: Okay, so 15-534.04(D) -- or, sorry, (C) states that: "After conducting a hearing requested pursuant to this subsection, the State Board of Education shall determine whether to uphold or decline the

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

**112**

revocation or suspension."

HEARING OFFICER LEE: Okay. So I think there's two choices, uphold or decline.

So is there a motion on whether to uphold or decline the California's revocation?

CHAIRPERSON WILLIAMS: Based on the foregoing, it is recommended that the State Board of Education uphold the California revocation recommendation and that all states and territories be so notified of any disciplinary action taken.

HEARING OFFICER LEE: Is there a second?

MEMBER SAWYER-SINKBEIL: Second. Second.

HEARING OFFICER LEE: Thank you, Ms. Sawyer-Sinkbeil.

It's been moved and seconded that the based on the foregoing, it is recommended that the State Board of Education uphold the California revocation recommendation.

Is there any discussion?

(No audible response.)

HEARING OFFICER LEE: Hearing none, Ms. DiGiovine call the roll.

MS. DIGIOVINE: Chair Dr. Williams.

CHAIRPERSON WILLIAMS: I vote aye based on the aggravating and mitigating circumstances and the following in the practices of reciprocating revocations between states.

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com

**113**

MS. DIGIOVINE: Vice Chair Helton.

MEMBER HELTON: I also vote aye. And while I understand that Mr. Stimson believes that he has evidence that negates the allegations that were brought forth in California, I believe that those need to be worked out through appeal maybe in California and until then, Arizona should uphold California's decision.

MS. DIGIOVINE: Member Alonzo.

MEMBER ALONZO: Aye.

MS. DIGIOVINE: Member Ambos.

MEMBER AMBOS: Aye.

MS. DIGIOVINE: Member Clynick.

MEMBER CLYNICK: Aye.

MS. DIGIOVINE: Member Sawyer-Sinkbeil.

MEMBER SAWYER-SINKBEIL: Aye.

MS. DIGIOVINE: And Member Scholl.

MEMBER SCHOLL: Aye.

MS. DIGIOVINE: Hearing Officer Lee, we have 7 ayes and 0 nays.

HEARING OFFICER LEE: By your vote of 7-to-0, based on the foregoing, it is recommended that the State Board of Education uphold the California revocation recommendation.

This concludes the formal hearing.

The Committee's decision will be reduced to a

Miller Certified Reporting, LLC
www.MillerCertifiedReporting.com



**Arizona State Board of Education**
1700 W. Washington Street
Executive Tower, Suite 300
Phoenix, Arizona 85007
Phone: (602) 542-5057
Website: azsbe.az.gov



December 8, 2025

**Sent via USPS Certified Mail No.**
9489 0090 0027 6599 3507 44

Konrad Stimson
3055 Saint Rose Pkwy
Box Number 777151
Henderson, NV 89052

Re:   **BOARD ORDER AND NOTICE OF ARIZONA STATE BOARD OF EDUCATION
      DISCIPLINARY ACTION**

      Case No.     C- 2025-000232
      Educator No.  7720079

The Arizona State Board of Education has taken disciplinary action against your Arizona educator certificate(s) or your right to work in an Arizona District or Charter School.   The Board consideration and discussion of this matter is available at https://azsbe.az.gov/public-meetings.

If your certificates have been suspended or revoked, during your disciplinary action, you may not seek to obtain or use an educator certificate in Arizona; you may not seek to provide professional services, or to work or volunteer in an Arizona public or charter k-12 setting in any capacity that requires you to possess a valid fingerprint clearance card as noted in A.R.S. §15-505.   Any violation of the terms of your disciplinary action may result in additional disciplinary action.

Your educator license or right to work in an Arizona K-12 district or charter school cannot be reinstated until you have completed your disciplinary action, have obtained an approval to reapply, have submitted an application for certification or reinstatement of your right to work, have had a reinstatement hearing before the PPAC, a recommendation is made for reinstatement and the Arizona State Board of Education reinstates your certificate(s) or right to work. *See Exception below*

You can request to apply for reinstatement at any time **after** the end date of your disciplinary action if you have completed all of the requirements of your disciplinary action.  You cannot be reinstated prior to the end of your disciplinary action.  To request to reapply, you must email your request to Enforcementactions@azsbe.az.gov Attn: Director of Enforcement.

At a review hearing, you will have the burden, consistent with the requirements of Board rules, to show your fitness for reinstatement as an educator in the state of Arizona.



**Arizona State Board of Education**
1700 W. Washington Street
Executive Tower, Suite 300
Phoenix, Arizona 85007
Phone: (602) 542-5057
Website: azsbe.az.gov



December 8, 2025

**Sent via USPS Certified Mail No.**
9489 0090 0027 6599 3507 44

Konrad Stimson
3055 Saint Rose Pkwy
Box Number 777151
Henderson, NV 89052

Re:     **BOARD ORDER AND NOTICE OF ARIZONA STATE BOARD OF EDUCATION DISCIPLINARY ACTION**

Case No.     C- 2025-000232
Educator No.   7720079

The Arizona State Board of Education has taken disciplinary action against your Arizona educator certificate(s) or your right to work in an Arizona District or Charter School.   The Board consideration and discussion of this matter is available at https://azsbe.az.gov/public-meetings.

If your certificates have been suspended or revoked, during your disciplinary action, you may not seek to obtain or use an educator certificate in Arizona; you may not seek to provide professional services, or to work or volunteer in an Arizona public or charter k-12 setting in any capacity that requires you to possess a valid fingerprint clearance card as noted in A.R.S. §15-505.  Any violation of the terms of your disciplinary action may result in additional disciplinary action.

Your educator license or right to work in an Arizona K-12 district or charter school cannot be reinstated until you have completed your disciplinary action, have obtained an approval to reapply, have submitted an application for certification or reinstatement of your right to work, have had a reinstatement hearing before the PPAC, a recommendation is made for reinstatement and the Arizona State Board of Education reinstates your certificate(s) or right to work. *See Exception below*

You can request to apply for reinstatement at any time **after** the end date of your disciplinary action if you have completed all of the requirements of your disciplinary action.  You cannot be reinstated prior to the end of your disciplinary action.  To request to reapply, you must email your request to Enforcementactions@azsbe.az.gov Attn: Director of Enforcement.

At a review hearing, you will have the burden, consistent with the requirements of Board rules, to show your fitness for reinstatement as an educator in the state of Arizona.

## Commission on Teacher Credentialing

651 Bannon Street, Suite 603, Sacramento, CA 95811     Fax (916) 898-0090     www.ctc.ca.gov

*Legal Office*

### SENT VIA EMAIL AND U.S. MAIL

January 13, 2026

Konrad Stimson
3055 SAINT ROSE PKWY, BOX NUMBER 777151
Henderson, NV 89052

Email: konrad.stimson@gmail.com

Dear Mr. Stimson:

Your appearance before the Commission on Teacher Credentialing regarding your Petition for Reinstatement is scheduled for *Friday February 13, 2026*, at the Commission's office located at 651 Bannon Street, Sacramento, CA 95811.

You should plan to arrive and check in with the receptionist no later than 8:30 am. After you've checked in with the receptionist, please wait in the reception area for a representative.

Should you have any questions, please do not hesitate to email me at thomas.amey@ctc.ca.gov.

Sincerely,

Thomas Amey Jr.
Legal Analyst

Enclosure

*Ensuring Educator Excellence*



# The State Bar
## of California

**OFFICE OF CHIEF TRIAL COUNSEL**

180 Howard Street, San Francisco, CA 94105

October 30, 2025

Konrad Alexander Stimson
3055 Saint Rose Pkway
Henderson NV  89052

RE:    Case Number:        25-NA-29299 Amy Reising

Dear Konrad Alexander Stimson:

We have received your complaint against one or more California attorney(s). We have assigned the number shown above to this matter; please reference this number in your communications with us.

Your complaint will first be reviewed by an attorney in the Intake Unit. If we need further information, we will contact you. We will also advise you of any determination in this matter. If you want to know the status of your complaint, you may contact us by calling the State Bar's toll-free complaint line at 800-843-9053.

Thank you for your patience.

Sincerely,


OFFICE OF CHIEF TRIAL COUNSEL/INTAKE

San Francisco Office
180 Howard Street
San Francisco, CA 94105

www.calbar.ca.gov

Los Angeles Office
845 S. Figueroa Street
Los Angeles, CA 90017



Stimson 0114

## Commission on Teacher Credentialing

1900 Capitol Avenue Sacramento. CA 95811   (916) 322-4974   Fax (916) 323-6735   www.ctc.ca gov

*Division of Professional Practices*

## NOTIFICATION OF CREDENTIAL HOLDER'S CHANGE IN EMPLOYMENT STATUS DUE TO ALLEGATIONS OF MISCONDUCT
### (CALIFORNIA CODE OF REGULATIONS, TITLE 5 SECTION 80303)

**SECTION 1:**

Name of Credential Holder: ____Konrad Stimson____

Date of Birth ____[REDACTED]____  Last Four of SSN: REDACTED  Incident Date(s): 03/05/22  *Saturday?*

Employment Start Date **10/18/21**   Employment End Date: **06/02/22**  Date of Final Action: **05/24/22**

Final Disciplinary Action: **Non-Reelection of Probationary Employee**  Board Approval Date: **05/24/22**

Current Address: ____REDACTED____

Position, Title, School Site: **Special Education Teacher, Post Secondary Special Day Program, 1331 E. Calaveras Blvd., Milpitas, CA 95035**

Employing School District: ____Milpitas Unified School District____ COF **Santa Clara**

Contact Person: ____Jonathan Brunson, Asst. Superintendent HR Contact Number: **408-635-2600 ext 6070**

**SECTION 2:**

*Please attach all of the following documents pursuant to Section 80303(b) - if applicable:*

- X Notification Form
- X Cover Letter (Summary of Case)
- ☐ Notice of Intent to Dismiss Suspend
- ☐ Statement of Charges Accusation
- ☐ Request for a CPC Hearing and Hearing Dates
- ☐ Final Decision (District CPC)
- ☐ Letter of Resignation or Retirement
- X Board's Acceptance
- ☐ Settlement/General Release Statement
- ☐ Copy of Signed Contract
- ☐ District Investigation Report(s)
- ☐ Law Enforcement Report(s) Police Court
- X Other **Non-reelection**

*NOTE: Parent permission is obtained prior to interviewing students*

- ☒ Written Statement(s) of:
  - Victim(s)
  - Witness(es)
  - Parent/Guardian(s)
- ☒ Contact Information*
  - Name, Address, Phone Number of:
  - Victim(s)
  - X Witness(es)
  - Parent Guardian(s)

**SECTION 3:**

*All Other Relevant Documents:*

- ☒ Copies of Emails Text Messages
- ☐ Computer Printouts (Hard Copy)
- X Correspondence with Employee
- ☐ Photographs
- ☒ Video Evidence
- ☐ Copies of Facebook, Instagram, etc
- ☐ Other

Mail To:      Commission on Teacher Credentialing
             Division of Professional Practices
             ATTN: Dominick Conde
             1900 Capitol Avenue
             Sacramento, CA 95811-4213

Fax To*:     (916) 323-6735                         Email To: DPPquestions@ctc.ca.gov

*If you have more than **20 pages**, please do not send a fax. You can mail documentation in excess of 20 pages to the address listed above. If you prefer, you may submit your documentation saved on a flash drive or CD. If you have any questions, Dominick Conde can be reached at the above email address or by calling (916) 324-5678.

*Ensuring Educator Excellence*

MUSD - KS000004

 Parent Advocates.org

---

**GOVERNMENT LIES, CORRUPTION AND MISMANAGEMENT**          Print This Article >>

---

# California State Whistleblower's Lawsuit Exposes Web Of Corruption And Deceit At The Commission On Teacher Credentialing (CTC)

*Kathleen Carroll, a former government lawyer turned whistleblower at the California Commission On Teacher Credentialing CTC has filed a [link=http://www.perdaily.com/2013/01/ca-state-whistleblowers-lawsuit-exposes.html#]potentially explosive suit against CTC officials and the state government[/link] that charges that the Commission attorneys and management of the commission were engaged in numerous illegal acts possibly resulting in thousands of improperly sanctioned teachers in the state of California. Some of the charges in Carroll's charged the commission with tampering with the selection and composition of the Committee of credential members, CTC attorneys improperly tampering with case outcomes, acting outside their legal jurisdictional scope to go after teachers, promoting the existence of a high level of nepotism, cronyism, favoritism and conflicts of interest throughout the CTC and improperly maintaining underground regulations In violation of the administrative procedures act. It also alleges that CTC employees were retaliated against if they questioned the practices of anyone within CTC management.*

---

LINK

Kathleen Carroll, a former government lawyer turned whistleblower at the California Commission On Teacher Credentialing CTC has filed a potentially explosive suit against CTC officials and the state government that charges that the Commission attorneys and management of the commission were engaged in numerous illegal acts possibly resulting in thousands of improperly sanctioned teachers in the state of California. Some of the charges in Carroll's charged the commission with tampering with the selection and composition of the Committee of credential members, CTC attorneys improperly tampering with case outcomes, acting outside their legal jurisdictional scope to go after teachers, promoting the existence of a high level of nepotism, cronyism, favoritism and conflicts of interest throughout the CTC and improperly maintaining underground regulations in violation of the administrative procedures act. It also alleges that CTC employees were retaliated against if they questioned the practices of anyone within CTC management.

This case which was filed on November 14, 2012 in the Superior Court in Sacramento County also has national implications as teachers continue to be demonized, bullied, retaliated against for reporting wrongdoing by school administrators and continually losing their jobs all under the guise of education reform.

Carroll v Commission on Teacher Credentialing et al., Sacramento Superior Court, Case No. 34-2012-00135527

The above suit implies that the critical Commission on Teacher Credentialing might have been used as a vehicle to illegally prevent credentialing of public school teachers so that they would be forced to go to work at non-union charters throughout California and top staff including it's lawyers were involved in violating the California Education Code and other state and federal laws protecting the rights of teachers and students in California. The complaint also cites potential violations of the privacy rights of student records, found in the federal Family Educational Rights and Privacy Act (FERPA).

The Commission is a critical education administrative body funded by the Credential holders themselves through application fees and exam fees. CTC is in charge of licensing California teachers, school administrators, and other school personnel. It is also involved in investigating misconduct complaints against credential holders and applicants, approving teacher preparation programs, including through charter chains and entering into contracts with private entities such as NCS Pearson in the development of education testing, teacher evaluations and curriculum development in California. The CTC also has a Committee on Accreditation which presumably accredits credential preparation programs.

It has played a key role in approving alternative routes to teacher certification, approval of teacher preparation programs within charter chains and for-profit colleges and has been intimately involved in teacher evaluations through its contract with the testing and publishing giant NCS Pearson. All of this government decision making while a number of its Commissioners were connected personally or financially with the industry they are supposed to regulate.

Carroll, who was a lawyer at the Commission on Teacher Credentialing for four years was fired after she blew the whistle and helped initiate an audit of the state commission which is directly under Governor Brown and

163

holder's fitness, competence, or ability to effectively perform the duties authorized by the credential.[4] These factors include, but are not limited to:

(1) The likelihood that the conduct may have adversely affected students, fellow teachers, or the educational community, and the degree of such adversity anticipated;

(2) The proximity or remoteness in time of the conduct;

(3) The type of credential held or applied for by the person involved;

(4) The extenuating or aggravating circumstances surrounding the conduct;

(5) The praiseworthiness or blameworthiness of the motives resulting in the conduct;

(6) The likelihood of the recurrence of the questioned conduct;

(7) The extent to which disciplinary action may inflict an adverse impact or chilling effect upon the constitutional rights of the person involved, or other certified persons;

(8) The publicity or notoriety given to the conduct.

## FACTUAL ALLEGATIONS

12.    At all times relevant herein, Respondent worked as a special education teacher in Milpitas Unified School District (MUSD), in MUSD's post-secondary education program. Effective June 2, 2022, Respondent was non-reelected from MUSD as a teacher following an investigation into the allegations below. *5 pages left out*

13.    Two of Respondent's colleagues, RD and FB, both Transitional Assistants (TA) assigned to Respondent's classroom, observed Respondent repeatedly taking two female students MT and AN, separately on walks alone, without informing other MUSD employees when or where Respondent was taking them. The walks would take about 15-20 minutes and would involve a route out of sight of other MUSD staff. *Counter Evidence?*

14.    Both RD and FB stated that Respondent often tried to isolate AN from other students and MUSD employees. RD and FB observed Respondent regularly wrap his arm around AN's *look at 14 and 16, go together*

[4] These factors must be applied in determining whether a teacher's conduct indicates unfitness to teach. (*Morrison v. State Board of Education* (1969) 1 Cal.3d 214, 229-230; *Board of Education v. Jack M.* (1977) 19 Cal.3d 691, 701, fn. 5.)

5

(KONRAD ALEXANDER STIMSON) ACCUSATION

*crisis prevention        bowling alley*

waist and lower back, and touch and/or rub AN's back and shoulder in a manner that made RD and FB feel uncomfortable. Additionally, both RD and FB observed Respondent rub AN's arm and back when she would work or stand near Respondent in the classroom. **#16**

15. FB stated that in or about March 2022, Respondent asked other MUSD employees to return to the classroom while Respondent worked with students in the computer lab. When FB entered the computer lab, she observed Respondent sitting in front of MT and video recording her. FB stated that once Respondent noticed her enter the room, he acted surprised and then immediately turned off the camera and disconnected the recording device. FB stated that Respondent was recording MT with his personal camera and computer, and was not using MUSD equipment. **FERPA   3 year assessment**

16. A third witness, SL, a Special Education and Student Services Coordinator at MUSD, stated that on or about March 25, 2022, Respondent's class took a trip to the Great Mall in Milpitas, California. SL observed students sitting in the food court eating their lunches, and Respondent was seated directly next to AN with his arm resting behind AN. SL stated that no other instructors were seated next to students. *on the bench*

**FIRST CAUSE FOR DISCIPLINE**

**(Unprofessional Conduct)** *CTC Felony?*

17. Respondent subjected his Credentials to disciplinary action under section 44421 of the Code in that he has committed an act or acts of unprofessional conduct as more particularly alleged in paragraphs 12 through 16, above, which are hereby incorporated by reference and realleged as if fully set forth herein.

**SECOND CAUSE FOR DISCIPLINE**

**(Immoral Conduct)**

18. Respondent has further subjected his Credentials to disciplinary action under section 44421 of the Code in that he has committed an act and/or acts of immoral conduct, as more particularly alleged in paragraphs 12 through 16, above, which are hereby incorporated by reference and realleged as if fully set forth herein.

///

6

 Parent Advocates

GOVERNMENT LIES, CORRUPTION AND MISMANAGEMENT                    Print This Article >>

## California State Whistleblower's Lawsuit Exposes Web Of Corruption And Deceit At The Commission On Teacher Credentialing (CTC)

*Kathleen Carroll, a former government lawyer turned whistleblower at the California Commission On Teacher Credentialing CTC has filed a [link=http://www.perdaily.com/2013/01/ca-state-whistleblowers-lawsuit-exposes.html#]potentially explosive suit against CTC officials and the state government[/link] that charges that the Commission attorneys and management of the commission were engaged in numerous illegal acts possibly resulting in thousands of improperly sanctioned teachers in the state of California. Some of the charges in Carroll's charged the commission with tampering with the selection and composition of the Committee of credential members, CTC attorneys improperly tampering with case outcomes, acting outside their legal jurisdictional scope to go after teachers, promoting the existence of a high level of nepotism, cronyism, favoritism and conflicts of interest throughout the CTC and improperly maintaining underground regulations in violation of the administrative procedures act. It also alleges that CTC employees were retaliated against if they questioned the practices of anyone within CTC management.*

LINK

Kathleen Carroll, a former government lawyer turned whistleblower at the California Commission On Teacher Credentialing CTC has filed a potentially explosive suit against CTC officials and the state government that charges that the Commission attorneys and management of the commission were engaged in numerous illegal acts possibly resulting in thousands of improperly sanctioned teachers in the state of California. Some of the charges in Carroll's charged the commission with tampering with the selection and composition of the Committee of credential members, CTC attorneys improperly tampering with case outcomes, acting outside their legal jurisdictional scope to go after teachers, promoting the existence of a high level of nepotism, cronyism, favoritism and conflicts of interest throughout the CTC and improperly maintaining underground regulations in violation of the administrative procedures act. It also alleges that CTC employees were retaliated against if they questioned the practices of anyone within CTC management.

This case which was filed on November 14, 2012 in the Superior Court in Sacramento County also has national implications as teachers continue to be demonized, bullied, retaliated against for reporting wrongdoing by school administrators and continually losing their jobs all under the guise of education reform.

Carroll v. Commission on Teacher Credentialing, et al., Sacramento Superior Court, Case No. 34-2012-00135527

**FERPA**

The above suit implies that the critical Commission on Teacher Credentialing might have been used as a vehicle to illegally prevent credentialing of public school teachers so that they would be forced to go to work at non-union charters throughout California and top staff including it's lawyers were involved in violating the California Education Code and other state and federal laws protecting the rights of teachers and students in California. The complaint also cites potential violations of the privacy rights of student records, found in the federal Family Educational Rights and Privacy Act (FERPA).

The Commission is a critical education administrative body funded by the Credential holders themselves through application fees and exam fees CTC is in charge of licensing California teachers, school administrators, and other school personnel. It is also involved in investigating misconduct complaints against credential holders and applicants, approving teacher preparation programs, including through charter chains and entering into contracts with private entities such as NCS Pearson in the development of education testing, teacher evaluations and curriculum development in California. The CTC also has a Committee on Accreditation which presumably accredits credential preparation programs.

It has played a key role in approving alternative routes to teacher certification, approval of teacher preparation programs within charter chains and for-profit colleges and has been intimately involved in teacher evaluations through its contract with the testing and publishing giant NCS Pearson. All of this government decision making while a number of its Commissioners were connected personally or financially with the industry they are supposed to regulate.

Carroll, who was a lawyer at the Commission on Teacher Credentialing for four years was fired after she blew the whistle and helped initiate an audit of the state commission which is directly under Governor Brown and

Stimson 0004 Respondent Exhibits



**MILPITAS**
UNIFIED SCHOOL DISTRICT

1331 E. Calaveras Blvd. | Milpitas, CA 95035 | 408-635-2600 | www.musd.org

reported that once you noticed that she entered the computer lab, you began to turn off the camera and disconnect the equipment.

A third witness, Stacy Lillard, Special Education and Student Services Coordinator, reported that on March 25, 2022, your class went to the Great Mall in Milpitas. Lillard observed students sitting in the food court eating their lunches and you were seated directly next to Student A with your arm resting on the bench directly behind her. Lillard also reported that none of the other District employees were sitting next to or across from students and none had their arms positioned closely or around students.  **CTC Felony ?**

Your responses to these allegations were defensive, contradictory, and lacked credibility. On May 10, 2022, the District interviewed you about these allegations. (A copy of the audio recording of this interview will be provided under separate cover). Regarding taking Student M on walks alone, you admitted to the conduct, and explained that the purpose of such conduct was to alleviate Student M's undesirable behaviors. However, you admitted that you did not document this strategy, discuss it with anyone else, or otherwise memorialize any improvement of Student M's behavior resulted from the walks. Additionally, when asked why you went on these walks alone with Student M, you explained that it was because you did not trust the paraprofessionals to take Student M on walks. However, you left the same paraprofessionals, whom you did not trust, to watch the other students while you went on walks alone with Student M and you permitted the paraprofessionals to take Student M to the bathroom alone. Regarding taking Student A on walks alone, you explained that the purpose of such conduct was because of Student A's aggressive behavior, distractedness, and physical limitations. However, you admitted that you did not document this strategy, discuss it with anyone else, or memorialize any improvement of Student A's behavior resulted from the walks. Additionally, you stated that Student A was a larger student and lunged at and/or grabbed at other people daily. However, despite these tendencies, you refused to invoke the assistance of paraprofessionals in handling Student A; admitted to taking her on walks alone; and chose rather to keep your arms around her waist, rub her back and/or shoulder, or put your arm around her when sitting next to her, explaining that such conduct was your effort to prevent her from lunging and/or grabbing people. Such preventative measures, however, were unnecessary since you stated that Student A's undesirable behavior could be prevented by having District staff walk along each side of her. However, you chose to rely on physical touching of Student A despite knowing that such touching would not be necessary if you invoked the assistance of the paraprofessionals. Your explanations for the foregoing conduct were patently inadequate.

The District's Director of Special Education reviewed your conduct and determined that your self-described handling of Student A was not required for special education or general education students. As discussed above, the Transitional Assistants, who are trained to support teachers working with special education students, also noted that your conduct was unnecessary.

167

## Defaults and Uncontested Cases

11520.   (a) If the respondent either fails to file a notice of defense or to appear at the hearing, the agency may take action based upon the respondent's express admissions or upon other evidence and affidavits may be used as evidence without any notice to respondent; and where the burden of proof is on the respondent to establish that the respondent is entitled to the agency action sought, the agency may act without taking evidence.

(b) Notwithstanding the default of the respondent, the agency or the administrative law judge, before a proposed decision is issued, has discretion to grant a hearing on reasonable notice to the parties. If the agency and administrative law judge make conflicting orders under this subdivision, the agency's order takes precedence. The administrative law judge may order the respondent, or the respondent's attorney or other authorized representative, or both, to pay reasonable expenses, including attorney's fees, incurred by another party as a result of the respondent's failure to appear at the hearing.

(c) Within seven days after service on the respondent of a decision based on the respondent's default, the respondent may serve a written motion requesting that the decision be vacated and stating the grounds relied on. The agency in its discretion may vacate the decision and grant a hearing on a showing of good cause. As used in this subdivision, good cause includes, but is not limited to, any of the following:

(1) Failure of the person to receive notice served pursuant to Section 11505.

(2) Mistake, inadvertence, surprise, or excusable neglect.



## Commission on Teacher Credentialing

651 Bannon Street, Suite 601, Sacramento, CA 95811    www.ctc.ca.gov

*Certification, Assignment, and Waivers Division*

*Yes correct!*

April 14, 2025

KONRAD ALEXANDER STIMSON
3055 SAINT ROSE PKWY
BOX NUMBER 777151
HENDERSON, NV 89052
Type: Clear Education Specialist Instruction Credential

RE: 2501160057

*Why? July, August, September. Evidence that CTC changes address back to Texas 3 times in 2025. Default?*

Dear KONRAD ALEXANDER STIMSON

Your application has been evaluated and it was determined that additional information is required before academic eligibility is established. Items sent separately from this letter will not be accepted and will be destroyed without review. If your materials are not returned within 60 days from the date of this letter, your application is denied. If you have any questions about the requested materials, contact the Commission's Certification Division at https://educatortools.ctc.ca.gov/ContactUs.

**1. You are not eligible for the reinstatement of your credential as one year has not passed since the revocation of your documents. Applicants can request for a reinstatement after one calendar year.**

**2. The application fee is considered earned upon receipt and is not refundable (California Administrative Code, Title 5 Section 80487(b). No further action will be taken.**

Per California Code of Regulations section 80487, application fees are earned upon receipt and are nonrefundable. The application fee associated with the application cannot be used towards another credential, permit, waiver, or certificate.

It is your responsibility to keep your postal and email address information up to date. You may verify your personal profile and contact information through the Educator Login button on the Commission's website at http://www.ctc.ca.gov/credentials/update-profile.html.

If you are an employing agency or program sponsor receiving a copy of this letter, please coordinate the submission of the requested information or materials with the educator to avoid delay of processing. Additional information on application status can be found at http://www.ctc.ca.gov/credentials/application-status.html.



## Commission on Teacher Credentialing

651 Bannon Street, Suite 601, Sacramento, CA 95811    www.ctc.ca.gov

*Certification, Assignment, and Waivers Division*

July 11, 2025

KONRAD ALEXANDER STIMSON
10811 JOWART COURT       **No**
RICHMOND, TX 77469

**INTAKE RETURN NOTIFICATION**                                    RE: 250710FEE23
Dear KONRAD ALEXANDER STIMSON

Your application has been received but contained errors which must be addressed before it can be evaluated for academic eligibility. Please review the item(s) listed below and submit the requested payment and/or materials along with this letter within 60 days from the date of this letter. Items sent separately from this letter will not be accepted and will be destroyed without review.

**1. Please submit the current application processing fee of $100. (no cash) Please staple your payment to this letter so it does not get separated from your information. Any payment received without this letter will be mailed back to the return address on the envelope it is sent in.**

Per California Code of Regulations section 80487, application fees are earned upon receipt and are nonrefundable. The application fee associated with the application cannot be used towards another credential, permit, waiver, or certificate.

It is your responsibility to keep your postal and email address information up to date. You may verify your personal profile and contact information through the Educator Login button on the Commission's website at http://www.ctc.ca.gov/credentials/update-profile.html.

If you are an employing agency or program sponsor receiving a copy of this letter, please coordinate the submission of the requested information or materials with the educator to avoid delay of processing. Additional information on application status can be found at http://www.ctc.ca.gov/credentials/application-status.html.

Prepared by: ST



## Commission on Teacher Credentialing

651 Bannon Street, Suite 601, Sacramento, CA 95811        www.ctc.ca.gov

*Certification, Assignment, and Waivers Division*

August 20, 2025

KONRAD ALFXANDER STIMSON
10811 JOWART CT
RICHMOND, TX  77469



**INTAKE RETURN NOTIFICATION**                                    RE: 250819FEE08
Dear KONRAD ALEXANDER STIMSON

Your application has been received but contained errors which must be addressed before it can be evaluated for academic eligibility. Please review the item(s) listed below and submit the requested payment and/or materials along with this letter within 60 days from the date of this letter. Items sent separately from this letter will not be accepted and will be destroyed without review.

**1. Please submit the current application processing fee of $100 for each application form. (no cash) (we have 3 apps) Please staple your payment to this letter so it does not get separated from your information. Any payment received without this letter will be mailed back to the return address on the envelope it is sent in.**

Per California Code of Regulations section 80487, application fees are earned upon receipt and are nonrefundable. The application fee associated with the application cannot be used towards another credential, permit, waiver, or certificate.

It is your responsibility to keep your postal and email address information up to date. You may verify your personal profile and contact information through the Educator Login button on the Commission's website at http://www.ctc.ca.gov/credentials/update-profile.html.

If you are an employing agency or program sponsor receiving a copy of this letter, please coordinate the submission of the requested information or materials with the educator to avoid delay of processing. Additional information on application status can be found at http://www.ctc.ca.gov/credentials/application-status.html.

Prepared by: ST



## Commission on Teacher Credentialing

651 Bannon Street, Suite 603 Sacramento, CA 95811   Fax (916) 898-0090   www.ctc.ca.gov

*Legal Office*

### SENT VIA EMAIL AND U.S. MAIL

November 24, 2025

Konrad Stimson
3055 SAINT ROSE PKWY, BOX NUMBER 777151
Henderson, NV 89052



Email: konrad.stimson@gmail.com

Dear Mr. Stimson:

Your Petition for Reinstatement (Petition) will be considered by the California Commission on Teacher Credentialing (Commission) at its **February 12-13, 2026,** meeting. At this meeting, the Commission will review all information that has been submitted by you in support of your Petition, as well as information in the agency's file.

You have the right to appear before the Commission. You have the option to appear in-person or by telephone. If you wish to appear before the Commission in-person or by telephone, please notify this office by email or mail, no later than **December 24, 2025.** For faster processing of requests, please submit by email. Please indicate if you would like an in-person appearance or telephone.

If you wish to appear by telephone, please provide the telephone number where you can be reached for your appearance. After the Commission receives your request, you will receive an appearance confirmation letter with instructions and procedures for the appearance.

Any additional materials in support of your Petition that you wish to submit for consideration must be in this office no later than **December 24, 2025.** Any materials submitted after the **December 24, 2025** deadline *will not* be considered as part of your Petition review.

Should you have additional questions concerning this matter, please contact Thomas Amey Jr. at thomas.amey@ctc.ca.gov.

Sincerely,

Thomas Amey Jr.
Legal Analyst

*Ensuring Educator Excellence*



.GOV **Teacher Credentialing**

Login      Search      Educator Profile

Back

Note: If you have any questions, please view the CTC Online – Written Instructions for Application and Paym

Note: If Fingerprint status is Incomplete contact the Fingerprint Unit at Contact Us.

| | |
|---|---|
| Last Name: | STIMSON |
| First Name: | KONRAD |
| Middle Name: | ALEXANDER |
| Last Known County of Employment: | |

Adver

Note: Information on Adverse and Commission Actions is available for this educator if a flag is displayed. If the Deceased flag is displayed, the licensee is deceased.

Document     Application     Adverse and Commission Actions

Click here for the CA Education Code

| Effective Date | Activity Type | Activity Description |
|---|---|---|
| 7/05/2024 | DECISION & ORDER | |
| 7/05/2024 | REVOKE 44421 | CTC revoked educators credentials because of misconduct. |



**Commission on Teacher Credentialing**

Login    Search    Educator Profile

Back

Note: If you have any questions, please view the CTC Online - Written Instructions for Application and Payment page.
Note: If Fingerprint status is incomplete contact the Fingerprint Unit at Contact Us.

Last Name: STIMSON
First Name: KONRAD
Middle Name: ALEXANDER

Last Known County of Employment:

Fingerprint Status  Complete No Action Required
Adverse and Commission Actions Indicator
Deceased Indicator

Note: Information on Adverse and Commission Actions is available for this educator if a flag is displayed. If the Deceased flag is displayed, the licensee is deceased

Document    Application    Adverse and Commission Actions

| Status | Status Date | Date Paid | Type |
|---|---|---|---|
| Pending Additional Evaluation | 09/23/2025 | 9/15/2025 | Education Specialist Instruction |
| Pending Additional Evaluation | 09/23/2025 | 9/15/2025 | Education Specialist Instruction |
| Returned for Additional Information | 08/21/2025 | | Fee Issue |
| Pending Additional Evaluation | 08/19/2025 | 7/30/2025 | Multiple Subject Teaching/Adding a Consent Area |



**Commission** on
**Teacher Credentialing**

Login    Search    Educator Profile

Back

Note: If you have any questions, please view the CTC Online – Written Instructions for Application and Payment page.
Note: If Fingerprint status is Incomplete contact the Fingerprint Unit at Contact Us.

Last Name: STIMSON
First Name: KONRAD
Middle Name: ALEXANDER
Last Known County of Employment:

Fingerprint Status:
Adverse and Commission Actions Indicator
Deceased Indicator

Note: Information on Adverse and Commission Actions is available for this educator if a flag is displayed. If the Deceased flag is displayed, the licensee is deceased.

Document    Application    Adverse and Commission Actions

| Status | Status Date | Date Paid | Type |
|---|---|---|---|
| Pending Additional Evaluation | 09/23/2025 | 9/15/2025 | CLAD/English Learner/Bilingual Authorization |
| Pending Additional Evaluation | 09/23/2025 | 9/15/2025 | Education Specialist Instruction |
| Pending Additional Evaluation | 09/23/2025 | 9/15/2025 | Education Specialist Instruction |
| Returned for Additional Information | 08/21/2025 | | Fee Issue |

## FINDINGS OF THE COMMITTEE OF CREDENTIALS

### 1. INTRODUCTION:

Konrad Alexander Stimson (Respondent) holds the following credential(s):

- Clear Multiple Subject Teaching Credential originally issued on November 4, 2013, and valid to August 1, 2023.
- Clear Education Specialist Instruction Credential originally issued on November 4, 2013, and valid to August 1, 2023.
- Certificate of Clearance issued on June 26, 2018, and valid to July 1, 2023.
- Clear Cross-cultural, Language, and Academic Development Certificate issued on October 27, 2017.
- Clear Educator Authorization issued on January 13, 2020.

Respondent held the following credentials:

- Intern Education Specialist Instruction Credential issued on July 29, 2021, and valid to September 1, 2021.
- Level I Education Specialist Instruction Credential originally issued on November 4, 2013, and valid to December 1, 2018.
- Preliminary Multiple Subject Teaching Credential issued on November 4, 2013, and valid to December 1, 2018.

A letter of inquiry was sent to Respondent on April 13, 2023.

These findings contain information that Respondent may be subject to discipline as a result of the following:

- Effective June 2, 2022, Respondent was non-reelected from Milpitas Unified School District (District) as a Special Education teacher following allegations that he frequently took two female students on walks alone to areas of the campus not visible to district staff. Additionally, Respondent was seen touching one of the female students inappropriately and recording one female student in the computer lab.

### 2. SUMMARY OF APPLICABLE LAW:

- The investigation commenced pursuant to Education Code section 44242.5(b)(3).
- The Committee of Credentials (Committee) has jurisdiction to hold a meeting pursuant to section 44244 based upon information sufficient to satisfy the requirements of section 44242.5(d)(3).
- The Commission on Teacher Credentialing has grounds for adverse action pursuant to Education Code sections 44421 and 44345.

176

1

- In finding probable cause to make a recommendation for adverse action against Respondent, the Committee concurs with the facts reported in the investigation and has determined that the acts described herein occurred. The Committee finds that there is a close relationship between the misconduct and Respondent's ability and/or fitness to perform the duties required for certificated services and thereby supports the disciplinary recommendation found in the letter to Respondent attached to this finding. (Education Code sections 44242.5(e)(1)(2), 44339, 44421, 44345, and 44346.

## 3. SUMMARY OF THE FACTS:

Effective June 2, 2022, Respondent was non-reelected from the District as a Special Education teacher following allegations that he frequently took two female students on walks alone to areas of the campus not visible to district staff. Additionally, Respondent was seen touching one of the female students inappropriately and recording one female student in the computer lab.

Based on the information above, the Commission requested additional information from the District. They notified the Commission that an investigation was conducted, but a formal report was not produced. The investigation findings were summarized in a Letter of Reprimand issued to Respondent.

### *Letter of Reprimand-dated May 20, 2022*

Respondent was issued a written reprimand for his unprofessional conduct as the District's probationary certificated employee. Based on credible witness statements and Respondent's responses to the evidence, the District determined that he engaged in inappropriate interactions with his students and exercised poor judgment in performing his duties.

Respondent was a teacher in the District's post-secondary education program, assigned to adult special education students. Two colleagues, RD and FB, both Transitional Assistants (TA)s' assigned to Respondent's classroom, observed Respondent repeatedly taking a female student MT, on walks alone with Respondent without informing other District employees when Respondent was going on these walks or where he was going on these walks. RD and FB also reported that Respondent would take female student AN on walks alone with Respondent without informing other District employees when he was going on these walks or where he was going. They further reported that these walks alone with these students took about 15-20 minutes and that sometimes Respondent ventured into areas that were not always visible to other District employees. Instead of providing instruction to other students in Respondent's care, Respondent took regular walks alone with two female students, which the TAs' could have done.

2

Further, they reported that Respondent often tried isolating AN from other students and District employees. Both RD and FB reported that during these walks with AN, Respondent regularly wrapped his arms around AN's waist and lower back and touched or rubbed AN's back and shoulder in a manner that made staff feel uncomfortable. They also reported that Respondent would rub AN's arm and back area when she would work or stand near Respondent. FB said Respondent would refuse to allow female classroom assistants to assist Respondent in handling AN.

FB reported that in March 2022, Respondent asked other District employees to return to the classroom while Respondent worked with students in the computer lab. When FB entered the computer lab, she observed Respondent sitting in front of MT and video recording her. FB reported that once Respondent noticed that she entered the computer lab, Respondent began to turn off the camera and disconnected the equipment.

A third witness, SL, Special Education, and Student Services Coordinator, reported that on March 25, 2022, Respondent's class went to the Great Mall in Milpitas. SL observed students sitting in the food court eating their lunches, and Respondent was seated directly next to AN with his arm resting on the bench directly behind her. SL also reported that no other District employees were sitting next to or across from students, and none had their arms positioned closely or around students.

Respondent's responses to these allegations were defensive, contradictory, and lacked credibility. On May 10, 2022, the District interviewed Respondent about these allegations. Regarding taking MT on walks alone, Respondent admitted to the conduct and explained that the purpose of such conduct was to alleviate MT's undesirable behaviors. However, Respondent admitted that he did not document this strategy, discuss it with anyone else, or otherwise memorialize any improvement of MT's behavior resulting from the walks.

When asked why Respondent went on these walks alone with MT, Respondent explained that he did not trust the paraprofessionals to take MT on walks. However, Respondent left the same paraprofessionals he did not trust to watch the other students. At the same time, he walked alone with MT and permitted the paraprofessionals to take MT to the bathroom alone.

Regarding taking student AN on walks alone, he explained that the purpose of such conduct was because of AN's aggressive behavior, distractedness, and physical limitations. However, Respondent admitted that he did not document this strategy, discuss it with anyone else, or memorialize any improvement of AN's behavior resulting from the walks. Additionally, Respondent stated that AN was a larger student and lunged at or grabbed at other people daily. However, despite these tendencies, Respondent refused to invoke the assistance of paraprofessionals in handling AN, admitted to taking her on walks alone, and chose rather to keep his arms around her waist, rub her back and shoulder, or put his arm around her when

3

178

sitting next to her, explaining that such conduct was his effort to prevent her from lunging and or grabbing people. However, such preventative measures were unnecessary since Respondent stated that AN's undesirable behavior could be prevented by having District staff along each side of her. However, Respondent chose to rely on the physical touching of AN despite knowing that such touching would not be necessary if Respondent invoked the assistance of the paraprofessionals. Respondent's explanations for the preceding conduct were patently inadequate.

The District's Director of Special Education reviewed Respondent's conduct and determined that his self-described handling of AN was not required for special education or general education students. As discussed above, the TA's were trained to support teachers working with special education students; it was also noted that Respondent's conduct was unnecessary.

The above-described conduct was inappropriate and unacceptable and violated the board's policies that govern employees to maintain the highest ethical standards, behave professionally, and exercise good judgment when interacting with students and members of the school community, to enhance the integrity of the District, calling on educators, to "make a reasonable effort to protect the student from conditions harmful to learning or the health and safety." Respondent's conduct flouted this policy, by taking female students alone on walks without providing a legitimate reason for doing so, excessive and unnecessary touching of a female student, and video recording of a female student is bereft of any good judgment and far below ethical standards.

All exhibits used in the findings are contained in the file for review. Respondent's audio interview with the District is contained in the file for review.

### Commission Investigation

Commission Investigator spoke with FB. FB stated that she was a TA in Respondent's classroom and worked with him for about two to three months. FB stated that they worked with older students who were 18 years or older. FB stated that Respondent tended to be very close to female students, lingering around them and isolating them from the rest of the class. FB stated she witnessed Respondent walking with students MT and AN. FB said that Respondent would take MT on long walks alone and would not inform the class where he was going. FB said that Respondent would put his hands around AN's waist, rub her back and shoulders, and put his arms around her waist. Respondent would isolate AN when they walked in groups. FB stated that Respondent would walk away with AN with his hands around her waist or lower back. FB said that AN had some undesirable behaviors, but there were other ways to de-escalate and redirect her behavior. She stated that if you told her not to often, she was responsive to that or diverted her attention.

FB stated that Respondent paid a lot of attention to AN and MT. He would walk with

4

MT alone for long periods alone. FB stated they were trained enough to be able to handle the students without unique contact, such as touching their waist, backs, shoulders, or lower back. FB stated most students were on the spectrum and did not like to be touched at all.

FB stated that she also witnessed Respondent video recording MT in the computer lab. FB said that Respondent was caught by surprise when FB walked in there. FB said that Respondent started shuffling and turned the recording equipment off immediately. FB said she did not know why he was recording her but stopped recording when FB entered the room. FB said that Respondent was using his own camera and computer to record MT. FB said that Respondent brought his own personal laptops and distributed them to students to use.

FB stated Respondent's inappropriate and questionable behavior was reported to the administration.

## 4. RECOMMENDATION

The Committee finds probable cause to recommend the revocation of Respondent's credential(s) and all other certification document(s).

180

5.

Stimson 0030



## Commission on Teacher Credentialing

1900 Capitol Avenue Sacramento, CA 95811        Phone (916) 322-4974        Fax (916) 898-5067
www.ctc.ca.gov
*Division of Professional Practices*

August 2, 2023

Konrad Alexander Stimson



Dear Mr. Stimson:

Your appearance before the Committee of Credentials (Committee) for the formal review of your case has been scheduled for Friday, August 18, 2023, beginning sometime between 11:00 AM - 1:00 PM. If you elected to appear in person, the meeting will be held at 1900 Capitol Avenue, Sacramento, CA 95811.

If you elected to telephonically appear before the Committee, we will call you and your attorney (if applicable) on the telephone number(s) that were provided. The telephone number that will appear on your phone when we call you, will not be the Commission's telephone number; rather, it will likely be an out-of-state number. Please answer your phone when called during this time window to ensure you do not miss the conference call. To ensure confidentiality at the beginning of the telephonic proceeding, you and your attorney (if applicable) will be required to agree, under oath, that you will not record or release any information obtained during your participation in this proceeding, and that you have ensured that the location from which you are participating is secure, confidential, and not visually or audibly accessible to third parties including your family members.

Please be advised that multiple appearances have been scheduled for this time slot. Consequently, it is possible that the time of your appearance may be later than the window of time provided above. Please ensure that your phone is charged and that you are available. If we are unable to reach you at the telephone number that was provided, your case will be heard as a nonappearance.

Should you choose not to appear or find yourself unable to appear because of illness or other serious emergency, please notify us as soon as possible by email at COCRequests@ctc.ca.gov, or by calling (916) 322-8173.

The Committee schedules multiple appearances each day and has a limited amount of time to conduct each formal review. Therefore, you should concisely present any relevant information and respond directly to questions. After you answer the Committee's questions, you and your attorney (if applicable) will have an opportunity, not exceeding three minutes each, to add any additional information that you would like the Committee to consider. Should you have any questions, please do not hesitate to email or call this office.

Sincerely,

*Arti Kumar*

Arti Kumar
Division of Professional Practices

*Ensuring Educator Excellence*

EXHIBIT
5
K. STIMSON 10-14-2025

Stimson 0031

ROB BONTA
Attorney General of California
JOSHUA A. ROOM
Supervising Deputy Attorney General
CHRISTOPHER M. YOUNG
Deputy Attorney General
State Bar No. 238532
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA 94102-7004

*Attorneys for Complainant*

**BEFORE THE
COMMISSION ON TEACHER CREDENTIALING
STATE OF CALIFORNIA**

| | |
|---|---|
| In the Matter of the Accusation Against:<br><br>KONRAD ALEXANDER STIMSON<br><br><br><br>Clear Multiple Subject Teaching Credential<br><br>Clear Education Specialist Instruction Credential<br><br>Certificate of Clearance<br><br>Intern Education Specialist Instruction Credential<br><br>Level 1 Education Specialist Instruction Credential<br><br>Preliminary Multiple Subject Teaching Credential<br><br>Clear Cross-cultural Language and Academic Development Certificate<br><br>Clear Educator Authorization<br><br><br><br><br><br>Respondent. | Case No.<br><br><br>**A C C U S A T I O N** |

1

(KONRAD ALEXANDER STIMSON) ACCUSATION

Stimson 0032

Complainant alleges:

## **PARTIES**

1. Mary Vixie Sandy, Ed.D (Complainant) brings this Accusation solely in her official capacity as the Executive Director of the California Commission on Teacher Credentialing (Commission).

2. Konrad Alexander Stimson (Respondent) holds the following certification documents (collectively, "Credentials"):

a. A Clear Multiple Subject Teaching Credential, originally issued on November 4, 2013. The Clear Multiple Subject Teaching Credential was in full force and effect at all times relevant to the charges brought herein and will expire on August 1, 2028, unless renewed.

b. A Clear Education Specialist Instruction Credential, originally issued on November 4, 2013. The Clear Education Specialist Instruction Credential was in full force and effect at all times relevant to the charges brought herein and will expire on August 1, 2028, unless renewed.

c. A Clear Cross-cultural Language and Academic Development Certificate, originally issued on October 27, 2017. The Certificate does not have an expiration date.

d. A Clear Educator Authorization, originally issued on January 13, 2020. The Authorization does not have an expiration date.

3. Respondent previously held the following certification documents (collectively, "Credentials"):

a. A Certificate of Clearance, originally issued on June 26, 2018. The Certificate expired on July 1, 2023, and has not been renewed.

b. An Intern Education Specialist Instruction Credential, originally issued on July 29, 2021. The Credential expired on September 1, 2021, and has not been renewed.

c. A Level I Education Specialist Instruction Credential, originally issued on November 4, 2013. The Credential expired on December 1, 2018, and has not been renewed.

d. A Preliminary Multiple Subject Teaching Credential, originally issued on November 4, 2013. The Credential expired on December 1, 2018, and has not been renewed.

2

(KONRAD ALEXANDER STIMSON) ACCUSATION

Stimson 0033

## JURISDICTION

4.   This Accusation is brought before the Commission under the authority of the following laws. All section references are to the Education Code (Code) unless otherwise indicated.

5.   Section 44000, et seq., of the Code and California Code of Regulations, title 5, section 80001, et seq., provide that the Commission is responsible for the credentialing of public school teachers, including issuing credentials[1] and taking adverse action[2] against applicants and credential holders.

6.   Section 44440, subdivision (b) of the Code states:

The suspension or expiration of any credential, its surrender without the written consent of the commission, or a revocation pursuant to Section 44423 does not deprive the commission of its authority to do any of the following:

(1) Institute or continue a disciplinary proceeding against the credential holder upon any ground provided by law.

(2) Enter an order suspending or revoking the credential.

(3) Issue a public reproval or private admonition to the credential holder.

7.   At its October 18-20, 2023 meeting, pursuant to its authority under section 44242.5 and 44244 of the Code, the Committee of Credentials (Committee) determined that probable cause existed, within the meaning of section 80300, subdivision (o) of title 5 of the California Code of Regulations, for an adverse action against Respondent. Respondent timely requested an administrative hearing. Pursuant to Code section 44242.5, subdivision (c)(3)(B), this Accusation is filed to initiate an adjudicatory hearing, as prescribed by Chapter 5 (commencing with Section 11500) of Division 3 of Title 2 of the Government Code.[3]

---

[1] Section 44002 defines "credential" as "a credential, certificate, life document, life diploma, permit, certificate of clearance, or waiver issued by the commission."

[2] Section 44000.5 defines "adverse action" as "the denial of an application for a credential, a private admonition, or public reproval of a credential holder, or the suspension or revocation of a credential."

[3] The administrative hearing is a *trial de novo*. (Cal. Code Regs., tit. 5, § 80317.)

3

(KONRAD ALEXANDER STIMSON) ACCUSATION

Stimson 0034

## STATUTORY AND REGULATORY PROVISIONS

8.    Section 44421 of the Code states:

The Commission on Teacher Credentialing shall privately admonish, publicly reprove, revoke, or suspend for immoral or unprofessional conduct, or for persistent defiance of, and refusal to obey, the laws regulating the duties of persons serving in the public school system, or for any cause that would have warranted the denial of an application for a credential or the renewal thereof, or for evident unfitness for service.

9. Section 44345 of the Code states:

The commission may deny any application for the issuance of a credential or for the renewal of a credential made by any applicant who falls under any of the following categories:

. . .

(e) Has committed any act involving moral turpitude.

. . .

Any denial pursuant to subdivisions (a) to (e), inclusive, shall be based upon reasons related to the applicant's fitness to teach or fitness to perform other duties for which that applicant is certificated, or competence to perform the duties which the credential would authorize the applicant to perform.

10.    California Code of Regulations, title 5, section 80300 states, in pertinent part:

. . .

(b) "Aggravating factor" is an event or circumstance which demonstrates that a greater degree of adverse action for an act of professional misconduct is needed to adequately protect the public, schoolchildren or the profession.  Aggravating factors may include, but are not limited to, the following:

. . .

(2) that the misconduct evidences multiple acts of wrongdoing or demonstrate a pattern of misconduct;

. . .

(4) that the misconduct significantly harmed a child entrusted to the care of a credential holder or applicant, significantly harmed the public or the educational system;

. . .

11.    California Code of Regulations, title 5, section 80302, subdivision (a) sets forth the factors used in determining the relationship between the alleged misconduct and the applicant's or

4

Stimson 0035

holder's fitness, competence, or ability to effectively perform the duties authorized by the credential.[4] These factors include, but are not limited to:

(1) The likelihood that the conduct may have adversely affected students, fellow teachers, or the educational community, and the degree of such adversity anticipated;

(2) The proximity or remoteness in time of the conduct;

(3) The type of credential held or applied for by the person involved;

(4) The extenuating or aggravating circumstances surrounding the conduct;

(5) The praiseworthiness or blameworthiness of the motives resulting in the conduct;

(6) The likelihood of the recurrence of the questioned conduct;

(7) The extent to which disciplinary action may inflict an adverse impact or chilling effect upon the constitutional rights of the person involved, or other certified persons;

(8) The publicity or notoriety given to the conduct.

## FACTUAL ALLEGATIONS

12. At all times relevant herein, Respondent worked as a special education teacher in ▓▓▓▓ School District (▓▓▓), in ▓▓▓'s post-secondary education program. Effective June 2, 2022, Respondent was non-reelected from ▓▓▓ as a teacher following an investigation into the allegations below.

13. Two of Respondent's colleagues, RD and FB, both Transitional Assistants (TA) assigned to Respondent's classroom, observed Respondent repeatedly taking two female students MT and AN, separately on walks alone, without informing other ▓▓▓ employees when or where Respondent was taking them. The walks would take about 15-20 minutes and would involve a route out of sight of other ▓▓▓ staff.

14. Both RD and FB stated that Respondent often tried to isolate AN from other students and ▓▓▓ employees. RD and FB observed Respondent regularly wrap his arm around AN's

_____

[4] These factors must be applied in determining whether a teacher's conduct indicates unfitness to teach. (*Morrison v. State Board of Education* (1969) 1 Cal.3d 214, 229-230; *Board of Education v. Jack M.* (1977) 19 Cal.3d 691, 701, fn. 5.)

5

(KONRAD ALEXANDER STIMSON) ACCUSATION

Stimson 0036

waist and lower back, and touch and/or rub AN's back and shoulder in a manner that made RD and FB feel uncomfortable. Additionally, both RD and FB observed Respondent rub AN's arm and back when she would work or stand near Respondent in the classroom.

15.   FB stated that in or about March 2022, Respondent asked other ▇▇▇ employees to return to the classroom while Respondent worked with students in the computer lab.  When FB entered the computer lab, she observed Respondent sitting in front of MT and video recording her.  FB stated that once Respondent noticed her enter the room, he acted surprised and then immediately turned off the camera and disconnected the recording device.  FB stated that Respondent was recording MT with his personal camera and computer, and was not using ▇▇▇ equipment.

16.   A third witness, SL, a Special Education and Student Services Coordinator at ▇▇▇, stated that on or about March 25, 2022, Respondent's class took a trip to the Great Mall in Milpitas, California.  SL observed students sitting in the food court eating their lunches, and Respondent was seated directly next to AN with his arm resting behind AN.  SL stated that no other instructors were seated next to students.

### FIRST CAUSE FOR DISCIPLINE

#### (Unprofessional Conduct)

17.   Respondent subjected his Credentials to disciplinary action under section 44421 of the Code in that he has committed an act or acts of unprofessional conduct as more particularly alleged in paragraphs 12 through 16, above, which are hereby incorporated by reference and realleged as if fully set forth herein.

### SECOND CAUSE FOR DISCIPLINE

#### (Immoral Conduct)

18.   Respondent has further subjected his Credentials to disciplinary action under section 44421 of the Code in that he has committed an act and/or acts of immoral conduct, as more particularly alleged in paragraphs 12 through 16, above, which are hereby incorporated by reference and realleged as if fully set forth herein.

///

6

(KONRAD ALEXANDER STIMSON) ACCUSATION

Stimson 0037

### THIRD CAUSE FOR DISCIPLINE

#### (Moral Turpitude)

19. Respondent has further subjected his Credentials to disciplinary action under section 44421, as defined by section 44345, subdivision (e), of the Code, in that he has committed an act and/or acts involving moral turpitude, as more particularly alleged in paragraphs 12 through 16, above, which are hereby incorporated by reference and realleged as if fully set forth herein.

### FOURTH CAUSE FOR DISCIPLINE

#### (Evident Unfitness for Service)

20. Respondent has further subjected his Credentials to disciplinary action under section 44421 of the Code in that he has demonstrated evident unfitness for service, as more particularly alleged in paragraphs 12 through 16, above, which are hereby incorporated by reference and realleged as if fully set forth herein.

### AGGRAVATING FACTORS

21. The following aggravating factors, individually and/or collectively, demonstrate that a greater degree of adverse action is needed to adequately protect the public, schoolchildren, or the profession:

    (a) Respondent's misconduct evidences multiple acts of wrongdoing or demonstrates a pattern of misconduct; and

    (b) Respondent's misconduct significantly harmed a child trusted to his care, significantly harmed the public or educational system.

///
///
///
///
///
///
///
///

7

(KONRAD ALEXANDER STIMSON) ACCUSATION

Stimson 0038

## PRAYER

WHEREFORE, Complainant requests that a hearing be held on the matters herein alleged, and that following the hearing, the Commission issue a decision revoking all credentials, certificates, and authorizations issued to Respondent Konrad Alexander Stimson, or taking other appropriate adverse action according to evidence.

DATED:

Amy Reising   Digitally signed by Amy Reising
Date: 2024 04 09 14.08:10
0700'

MARY VIXIE SANDY, ED.D
Executive Director
California Commission on Teacher
Credentialing
State of California
*Complainant*

8

(KONRAD ALEXANDER STIMSON) ACCUSATION

Stimson 0040



**BEFORE THE**
**COMMISSION ON TEACHER CREDENTIALING**
**STATE OF CALIFORNIA**

In the Matter of the Accusation Against:

KONRAD ALEXANDER STIMSON

Clear Multiple Subject Teaching Credential

Clear Education Specialist Instruction Credential

Certificate of Clearance

Intern Education Specialist Instruction Credential

Level 1 Education Specialist Instruction Credential

Preliminary Multiple Subject Teaching Credential

Clear Cross-cultural Language and Academic Development Certificate

Clear Educator Authorization

Respondent

Case No. ▮

**DEFAULT DECISION AND ORDER**

[Gov. Code, §11520]

(KONRAD ALEXANDER STIMSON) DEFAULT DECISION & ORDER Case No. ▮

EXHIBIT
6
K. STIMSON 10-14-2025

Stimson 0041

## FINDINGS OF FACT

1. On or about April 9, 2024, Complainant Mary Vixie Sandy, Ed.D, in her official capacity as the Executive Director of the California Commission on Teacher Credentialing, filed Accusation No. ▓▓▓▓▓▓ against Konrad Alexander Stimson before the Commission on Teacher Credentialing. (Accusation attached as Exhibit A.)

2. Konrad Alexander Stimson (Respondent) holds the following certification documents (collectively, "Credentials"):

   a. A Clear Multiple Subject Teaching Credential, issued on December 21, 2020. The Clear Multiple Subject Teaching Credential was in full force and effect at all times relevant to the charges brought herein and will expire on August 1, 2028, unless renewed.

   b. A Clear Education Specialist Instruction Credential, issued on July 9, 2018. The Clear Education Specialist Instruction Credential was in full force and effect at all times relevant to the charges brought herein and will expire on August 1, 2028, unless renewed.

   c. A Clear Cross-cultural Language and Academic Development Certificate, originally issued on October 27, 2017. The Certificate does not have an expiration date.

   d. A Clear Educator Authorization, originally issued on January 13, 2020. The Authorization does not have an expiration date.

3. Respondent previously held the following certification documents (collectively, "Credentials"):

   a. A Certificate of Clearance, originally issued on June 26, 2018. The Certificate expired on July 1, 2023, and has not been renewed.

   b. An Intern Education Specialist Instruction Credential, originally issued on July 29, 2021. The Credential expired on September 1, 2021, and has not been renewed.

   c. A Level 1 Education Specialist Instruction Credential, originally issued on November 4, 2013. The Credential expired on December 1, 2018, and has not been renewed.

   d. A Preliminary Multiple Subject Teaching Credential, originally issued on November 4, 2013. The Credential expired on December 1, 2018, and has not been renewed.

2

(KONRAD ALEXANDER STIMSON) DEFAULT DECISION & ORDER Case No. ▓▓▓▓▓

Stimson 0042

4.   On or about April 12, 2024, Respondent was served by Certified and First Class Mail copies of the Accusation No. ▮▮▮▮▮▮▮ Statement to Respondent, Notice of Defense, Request for Discovery, and Discovery Statutes (Government Code sections 11507.5, 11507.6, and 11507.7) at Respondent's address of record which, pursuant to California Code of Regulations, title 5, section 80412, is required to be reported and maintained with the Commission. Respondent's address of record was and is: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5.   Service of the Accusation was effective as a matter of law under the provisions of Government Code section 11505(c).

6.   Government Code section 11506(c) states, in pertinent part:

> (c)  The respondent shall be entitled to a hearing on the merits if the respondent files a notice of defense . . . and the notice shall be deemed a specific denial of all parts of the accusation . . . not expressly admitted.  Failure to file a notice of defense . . . shall constitute a waiver of respondent's right to a hearing, but the agency in its discretion may nevertheless grant a hearing.

7.   The Commission takes official notice of its records and the fact that Respondent failed to file a Notice of Defense within 15 days after service upon them of the Accusation, and therefore waived their right to a hearing on the merits of Accusation No. ▮▮▮▮▮▮▮

8.   California Government Code section 11520(a) states, in pertinent part:

> (a)  If the respondent either fails to file a notice of defense . . . or to appear at the hearing, the agency may take action based upon the respondent's express admissions or upon other evidence and affidavits may be used as evidence without any notice to respondent . . . .

9.   Pursuant to its authority under Government Code section 11520, the Commission finds Respondent is in default.  The Commission will take action without further hearing and, based on the relevant evidence contained in the Default Decision Investigatory Evidence Packet in this matter, finds that the charges and allegations in Accusation No. ▮▮▮▮▮▮▮, are separately and severally, found to be true and correct by clear and convincing evidence.

///

///

///

3

(KONRAD ALEXANDER STIMSON) DEFAULT DECISION & ORDER Case No. ▮▮▮▮▮▮

Stimson 0043

## DETERMINATION OF ISSUES

1. Based on the foregoing findings of fact, Respondent Konrad Alexander Stimson has subjected his Credentials, described above in paragraphs 2 and 3 of the Findings of Facts, to discipline.

2. The agency has jurisdiction to adjudicate this case by default.

3. The Commission on Teacher Credentialing is authorized to revoke Respondent's Credentials based upon the following violations alleged in the Accusation which are supported by the evidence contained in the Default Decision Investigatory Evidence Packet in this case:

a. Education Code, section 44421: Unprofessional conduct (inappropriate contact with two female students on multiple occasions resulting in non-reelection as teacher at ███ ███ School District);

b. Education Code, section 44421: Immoral conduct (inappropriate contact with two female students on multiple occasions resulting in non-reelection as teacher at ███ School District);

c. Education Code, sections 44421 and 44345· Moral turpitude (inappropriate contact with two female students on multiple occasions resulting in non-reelection as teacher at ███ ███ School District);

d. Education Code, section 44421: Evident unfitness for service (inappropriate contact with two female students on multiple occasions resulting in non-reelection as teacher at ███ ███ School District).

## ORDER

IT IS SO ORDERED that the Credentials issued to Respondent Konrad Alexander Stimson are revoked.

Pursuant to Government Code section 11520, subdivision (c), Respondent may serve a written motion requesting that the Decision be vacated and stating the grounds relied on within

4

(KONRAD ALEXANDER STIMSON) DEFAULT DECISION & ORDER Case No ███

Stimson 0044

seven (7) days after service of the Decision on Respondent. The agency in its discretion may vacate the Decision and grant a hearing on a showing of good cause, as defined in the statute.

This Decision shall become effective on July 5, 2024

It is so ORDERED June 28, 2024

FOR THE COMMISSION ON TEACHER
CREDENTIALING
MARQUITA GRENOT-SCHEYER
CHAIR, COMMISSION ON TEACHER
CREDENTIALING

Attachment:
Exhibit A: Accusation

194

5

(KONRAD ALEXANDER STIMSON) DEFAULT DECISION & ORDER Case No ██

## Danette C. Rugg

**From:** Steve Ngo
**Sent:** Wednesday, June 22, 2022 3:55 PM
**To:** Danette C. Rugg
**Cc:** Stephanie A. Arwick
**Subject:** FW: Copy of Interview

 **Lozano Smith**
ATTORNEYS AT LAW

**Steve Ngo | Attorney at Law**
2001 North Main Street, Suite 500, Walnut Creek, CA 94596
T: 925.953.1620 F: 925.953.1625

CONFIDENTIALITY NOTICE. This electronic mail transmission may contain privileged and/or confidential information only for use by the intended recipients. Unless you are the addressee (or authorized to receive messages for the addressee) you may not use, copy, disclose, or distribute this message (or any information contained in or attached to it) to anyone. You may be subject to civil action and/or criminal penalties for violation of this restriction. If you received this transmission in error, please notify the sender by reply e-mail or by telephone at (800) 445-9430 and delete the transmission.

**From:** Konrad Stimson <konrad.stimson@gmail.com>
**Sent:** Wednesday, May 11, 2022 9:56 AM
**To:** Jonathon Brunson <jbrunson@musd.org>; Steve Ngo <sngo@lozanosmith.com>
**Subject:** Copy of Interview

**CAUTION: External E-Mail:**

Hello,

I have a scheduled meeting with legal counsel for next week. I ask that you please provide the interview copy so we may discuss the matter.

I understand you wanted to remove court from the table. I want court with a jury.

I would love to have your argument against me with what you questioned, and my claim supported by real issues of surgery and police, covering it up, coming at an innocent person reporting it, and between my facts and preschool song lyrics or CPI and walking on campus before taking risks off campus - one thought, when Dave had police involved, do you think if he took the same strategy of trial test walking on campus his situation may not have required police? It's just a thought. I hope you have many people to report I took walks with students, because the more that I think about it - your questions will only reinforce my view on safety and the consequences of not being better prepared. You can bring up the bench and I will bring up 5 police 🚓 showing up on campus for Dave. 👍

I absolutely want court. I want parents helping parents. I want you to present all of your staff witness. Please 🙏

Thank you 😊 💜
Konrad Stimson

DPP REC'D 06/23/2022

## Danette C. Rugg

**From:** Konrad Stimson <konrad.stimson@gmail.com>
**Sent:** Friday, May 13, 2022 10:38 AM
**To:** Steve Ngo; Jonathon Brunson
**Subject:** Math is White Racist

**CAUTION: External E-Mail:**

Good afternoon,

I told you how one argument Ms Fran and I had about her being happy she did not need to pass a Math exam to become a special education teacher.

To explain further, YOUR interview seems to be a strategy of weaponize my requred job duties against me. CP . Working outside the classroom.

Math would be an easy and well-known, state changes, because some are seeing Math as white racist. My point in court would be - you crazy real racists - take things like Math, like CPI, like work required duties and weaponize against white male teachers.

You defend and promote- failure. Surgery, and not being good at one's job, poor judgement on why to investigate and what is truly abuse - surgery vs shoulders.

You purposefully weaponize logic and duty to be bad while real violence, crime, inflation- (that's the new good 👍)?

Respectfully
Konrad Stimson

DPP REC'D 06/23/2022

**Danette C. Rugg**

| | |
|---|---|
| **From:** | Steve Ngo |
| **Sent:** | Wednesday, May 18, 2022 3 54 PM |
| **To:** | Danette C. Rugg |
| **Subject:** | FW: Meeting with HR |

---

**From:** Konrad Stimson <konrad.stimson@gmail.com>
**Sent:** Wednesday, May 18, 2022 3:53:52 PM (UTC-08:00) Pacific Time (US & Canada)
**To:** Brunson, Jonathon <jbrunson@musd.org>
**Cc:** Steve Ngo <sngo@lozanosmith.com>
**Subject:** Re: Meeting with HR

**CAUTION: External E-Mail:**

Good afternoon,

No response is required.

I'm just thinking - Friday, I can save you time - by just coming and getting- what you are willing to give me without signing, you can explain what you want me to hear, I will need time to review before signing, but I don't plan to sign anything when we meet - unless you make the document very clear, "you are signing that you received a copy of your interview, period." If states how I can use it and I need to agree to the terms of use, I will want my legal counsel to review it before signing.

I understand we talked about no court at the interview, but that was your view, I acknowledge that I agree that you wanted me to understand your view. I never agreed that we would end our disagreement based on a one sided interview covering only the issues you felt were valid or relevant.

I have expressed my feeling discriminated against even before the investigation started. I was told we would discuss the issue and that never took place. The interview process was simply you interrogating me, no opportunity to ask my questions. If I had the opportunity to ask, "you mentioned taking walks alone on campus- why was Dave and his staff not placed on administrative leave if they each take student or students on and off campus alone for 3 hours OR when Dave was reported to police for what appeared to be excessive force, he was alone with a female student, why no investigation and no administrative leave?"
Or, easy question, "what is the only race mentioned on the entire culture of we website? Why is the entire site based on racism and negative rather than hope and positive, the NYC subway attacker had this type of belief on his computer, who do you feel anti white school supported websites help?" Do you think about the risk to the community if a violent 18 year old teen with mental health issues reads things like you allow posted on the district advertised website? The Buffalo teen that stated his ideas come from social media and websites that share your district website anti-white or anti-race ideas? Do you think a jury might care? A judge?

Thank you,
Konrad Stimson

On Wed, May 18, 2022, 10:34 AM Brunson, Jonathon <jbrunson@musd.org> wrote:

1

DPP REC'D 06/23/2022

**From:** Konrad Stimson
**To:** Kumar, Arti
**Subject:** Re: 2-407288960
**Date:** Saturday, May 20, 2023 12:51:47 PM
**Attachments:** images (1).png
download.png
images.png

Good morning,

I just received the information inquiry letter.

1. I would not say a phone call was an investigation. I asked for -and I was denied in person meeting (I asked for) even at the police station while being recorded. A phone call was my full opportunity to share my side. I wanted to go over words like inappropriate and what specific that meant. This was not an investigation.

I was informed that inappropriate meant elbows, shoulders... that is inappropriate.

This was Adult Autism and right now a strike in Santa Clara is taking place over short staffing and aggressive behaviors.

I touched a female student that had a 1:1 in her IEP but we were without that staffing and I touched shoulders and elbows, that specific area of touching was left out on purpose. It sounds bad when you say inappropriate and it sounds different when you're specific- and it's touching elbow.

I think when you hear inappropriate it sounds bad, but the instant elbow and shoulder and aggressive students and no injury is reported - than things look different.

Why does it say inappropriate touching and leaves out detail? Elbows.

2. I took walks in the hallway and at the track with and without the entire class nearly every morning it wasn't raining.

But - more important- My Job was adult work training. We left campus every day to a different work site by public bus and none of that time would be visible and it's not in the report and we were gone for 3 hours on average every day. Like most adult autism work programs. Why is that left out?

3. For example, based on this report - I was seen touching a student inappropriate and not visible and recording the student.

One important question comes up why even be secretive, why didn't I take the student off campus and forget acting secretive - taking students off campus was a large part of the job.

It would be like rob a bank but wait for a police officer to be present before doing it. Do I just arrest myself? It's just not intelligent.

I read the report, it sounds like I was trying to be secret- not visible- but I could have taken the student off campus instead of doing it on campus - making no sense.

means what I was seen and the staff - did nothing - just kept watching for more? Keenan training supports that process? No. So, why not call and write an Incident Report and have a meeting with the person? Elbows and Shoulders.

So, instead of police investigation, we have classroom staff investigating but not reporting - and the most they collected was no evidence, observed, by people who had serious problems with each other four months after a student ended up in surgery- and the teacher reporting (whistle-blower) ends up investigated? That doesn't look at all bad for those investigating only one sided statement leaving out enormous and consistent facts. Is it defamation and liable? I write IEPs and I know the risk of litigation. People are writing and signing reports without bothering to investigate full facts on both sides.

Intense hostile work environment caused by a student surgery, why was the student that ended up in surgery - not included in the investigation statement. Not one word.

Please, consider this - do you believe if a student fell and the bowling ball landed on a hand and crushed it - several hours of surgery involved- zero evidence of that event exists and long before this attack on me started? No medical report exists. No parent that could say, yes, it did happen.

Why were police not part of the investigation process? Very clear reasons will be shared. I promise that. Medical reports don't vanish. It's real. This was the direct cause of the attack on me. I blamed the staff that had one job duty to watch one student in his IEP. Proof of everything easy to find. But, not one word in the report. Nothing.

The people that investigated had a terrible relationship over a student injury and that played no part in the bias investigation prices that was done in a much disputed process when reviewing Keenan Mandatory Training.

I hope that the decision in this case either way provides me with a final conclusive decision that allows me to return after summer break and take the necessary steps one way or the other to work or take other action. I will be honest, I feel very confident in my ability to prove its only been a problem showing damage, pay loss, job loss, or job opportunities.

From,
Konrad Stimson

From:      Konrad Stimson
To:        Kumar, Arti
Subject:   Re: 2-407288960
Date:      Monday, May 22, 2023 11:50:41 AM

Good morning,

I do have witness from my time at Milpitas. The person that would be called to a hearing is David Sorenson.

David Sorenson
dsorense@.musd.org

David Sorenson is another teacher working with Adult Autism.

1. David can substantiate the November 2021 student and information regarding the accident at the bowling alley. It was a real and real medical records from the parent could be another witness.

2. David could also tell more about the classroom hostile work environment caused by the November event.

Specific - I would ask David for one of his students to be hired as a staff. David knew I didn't trust my staff after the bowling alley. David also knows about the female students behaviors and need for 1:1 staffing. And we didn't have the staff. I had to assume double duty responsibilities responsibilities. David can tell about how the female student would elope and grab people. He can also support information on the other female student.

3. David last can explain about a day in February of 2022 where he had to use physical prompts to get a female student across the street- someone called the police and several officers came to investigate- they understood the student with autism was being assisted to cross the street. But, someone did report the situation. This is the risk of accusations we deal with working with off campus adult autism.

4. The taking walks on campus was in part due to the situation with David. I felt working with difficult students and teaching cooperation would reduce problems. David would be able to explain work sites and leaving campus.

Again, when accusations suggest I took students to on campus walks, David can support our jobs involved taming students off campus that would not be visible to on campus staff. Target, Walmart, library.

5. David and I had one hour each week, he took students to the computer room on Wednesdays and I had one hour on Thursdays. We both used computers. This accusation about video - doesn't even include what was be done. A very large open comment. He videoed - period. More detail? They can't give more detail because they never did a thorough investigation.

But it's what and who we're left out of the investigation that I will show evidence.

## Danette C. Rugg

**From:** Konrad Stimson <konrad.stimson@gmail.com>
**Sent:** Monday, May 16, 2022 10:13 AM
**To:** Jonathon Brunson; Steve Ngo
**Subject:** Parents Helping Parents / Recorded Interview
**Attachments:** 20220513_193715.jpg

**CAUTION: External E-Mail:**

Good morning

I still need the recorded interview. I'm not sure how much you plan to edit and alter evidence. It will be key evidence in a court case with a jury hearing and later sharing the information with the community.

I also plan to start by sharing it with advocate groups, like Autism Speaks and Parents Helping Parents. I will ask them contact Carol Fu; ████ mother, and see about a class action lawsuit.

The court case I'm filing will be focused on employee rights discrimination by culture of we, people can simply look at the statements against white people. But, you took racism to a new level with "unfair and unequal investigation practices." To think that everyone with a parent as a witness talking about surgery for her son and no investigation BUT you targeted me for taking walks on campus? No investigation or administrative leave for Ruby or Dave (police involved) BUT you targeted and placed on administrative leave and I have a signed letter without a reason why I was placed on administrative leave? Emails for why I was investigated for inappropriate touching later changed to misconduct, but court would not be required and kept out of my file - because you lacked any real evidence to justify your investigation into me by staff that had covered up a real reason to investigate.

I wanted to return to work, but you would not allow a non-profit decision when I didn't care about money, I would have been happy with Stacey writing a formal letter of apology. Even at our interview, you could not help but try to ignore your questions were based on - my job duties - that my comments that Stacey was "required by the IEP to hire and provide a 1:1 for ████, my interaction was only due to her failure to provide a staff to perform the duty. And, large pictures can be put on posters to show the jury the training images they can find online by Google CPI training pictures. That you refused to accept. I don't care how many witness you have if my actions are not illegal or wrong. I can use the 2 surgery and police involved incidents to support my reason for why I took students for walks - safety and observations - my job as a teacher.

Even now, you have the ability to correct your decisions. But, like the interview instead of taking facts - yours and mine- and recognizing "Stacey and staff failed to be entirely forthcoming of how Dave and his paras do 1 staff with 1 or more students on and off campus for 3 hours, and used more force (police) or no response (surgery). Your case should be why did they report me when they had done so much damage already." ☹

If you watch the news with the NYC subway attack, that's what anti-white comments can lead to - violence against people for simple skin color. And, culture of we has anti-white comments throughout its website. Your pushing violence and hate and its visible to kids and adults.

Respectfully
Konrad Stimson

1

DPP REC'D 08/23/2022

# Danette C. Rugg

| | |
|---|---|
| **From:** | Konrad Stimson <konrad.stimson@gmail.com> |
| **Sent:** | Tuesday, May 10, 2022 3:01 PM |
| **To:** | Steve Ngo |
| **Cc:** | Jonathon Brunson |
| **Subject:** | Re: Walking Alone/Copy of Interview /Follow Up/Misconduct or M stake? |

**CAUTION:** External E-Mail:

But, if you only want one email. And, you don't want me upset

Why can't you say
1. I did not ask Dave or his paras IF they walk and work with student or students alone, that only applies to you - Mr Stimson. You need to justify your actions THEY do not. Zero investigation, zero questions. . surgery and shoulders are NOT the same thing. Mr. Stimson. And, you know it.

And, I would agree- this is crazy.

2. Or, with Dave - Mr. Stimson, he used force and restrained 3 students th.s year, involving police and injury YOU Mr. Stimson did far worse, you touched a shoulder. IEP documented aggressive history is NO excuse. No touch ng shoulders EVER! ??? You were at a bench Mr. Stimson, they are made ONLY for sitting. How could you descelate a student by your presence (like defund the police, right?) - how could more police OR my letting the student know I was there and no reason to grab a stranger because I'd be ready. Without Dave's maximum level force - who would know a single hand on a shoulder could be a crime? Excuse me? If I jump on top of a student and use force that's better? You guys DO confuse me.

Since we already discussed these issues - can you at least tell me what top'cs I'm m'ssing? That we talked about - unless you provide the recorded interview so I can with simple logic, common sense .. like the walking alone -really? What about Dave and his paras can BUT not a credentialed teacher?

If you send me an ema'l copy of the interview I will focus my time on reviewing it and pointing out the reality of the adult program and how the - two- c'assrooms actually work and with what support.

Like that came up -
School psychologist works 1 day on our campus, but primarily she attends IEP meetings and it's hard to reach her.
Like our program required a Speech, we have her 1 day only - again difficult to get her.
Our supervisor either sent emails - I will meet with you when I have time Or no response.

But your questions basically suggest paras in Dave's classroom need no help, just ME. Yet, police and restraining students suggest the opposite is true 😕

Respectfully
Konrad Stimson

On Tue, May 10, 2022, 2:31 PM Steve Ngo <sngo@lozanosmith.com> wrote:

Konrad, unless you receive a bounce back, please presume we have received your emails.

DPP REC'D 06/23/2022



**Steve Ngo | Attorney at Law**
2001 North Main Street, Suite 500, Walnut Creek, CA 94596
T: 925.953.1620 F: 925.953.1625

CONFIDENTIALITY NOTICE: This electronic mail transmission may contain privileged and/or confidential information only for use by the intended recipients. Unless you are the addressee (or authorized to receive messages for the addressee), you may not use, copy, disclose, or distribute this message (or any information contained in or attached to it) to anyone. You may be subject to civil action and/or criminal penalties for violation of this restriction. If you received this transmission in error, please notify the sender by reply e-mail or by telephone at (800) 445-9430 and delete the transmission.

**From:** Konrad Stimson <konrad.stimson@gmail.com>
**Sent:** Tuesday, May 10, 2022 2:29 PM
**To:** Jonathon Brunson <jbrunson@musd.org>; Steve Ngo <sngo@lozanosmith.com>
**Subject:** Re: Walking Alone/Copy of Interview /Follow Up/Misconduct or Mistake?

**CAUTION: External E-Mail:**

Please 🙏 just let me know you read my email, just- so I know your able to grasp what you asked me at the interview and why I may have been, seriously confused.

Because unless your report states, Stimson can NOT take walks alone with student 1 or students 1+ 😕 BUT paras in Dave's classroom do it regularly.

It was like 50-75% of your questions? The rest is what? Why a student with an IEP includes 1:1 support with a history of aggressive behavior 😕 I used proximity and low level least force measures?

And [redacted] were both restrained by Dave for up to 20 minutes with incident reports - this year? And, police? That's like saying - his paras can work alone with student or students, he can use forced restraints BUT I need to ask permission and seek help?

That's the claim? Okay 👍 see you in court? Discrimination?

Respectfully

2

DPP REC'D 06/23/2022

## Danette C. Rugg

**From:** Konrad Stimson <konrad.stimson@gmail.com>
**Sent:** Tuesday, May 10, 2022 3:25 PM
**To:** Jonathon Brunson; Steve Ngo
**Subject:** Next Interview Date?

**CAUTION: External E-Mail:**

Good afternoon,

I'm sorry, in light, of your interview questions, most of what you appear to have used as a complaint focused on - alone with a student.

AND if we go to court and Dave and his paras tell you, or his students tell you, that's regular routine for the program.

And, your entire understanding of my touching is low level (no student injuries) that even if you claim hip and shoulder touching, bench or not, while multiple incidents of much greater use of force leading to injuries is current this year time.

No investigation, no questions.... I dont care if you have 1, 10, or 1000 staff (based) on the complaint itself- you would need to say things, like Dave's paras can work alone with students (no questions asked, ever) but you touch shoulders and hips and they put students in the hospital- BIG difference.

If that's your full argument- please 🙏 either request a hearing with jury, gamble big time with a conduct report (ignoring huge counter facts) OR please 🙏 feel free to keep investigating until you realize - I was correct Day 1.

Respectfully
Konrad Stimson

DPP REC'D 06/23/2022

204

Committee Review Document for Re: 2-407288960

From: Konrad Stimson

Date: July 19, 2023

Request: Update

I continue to update this department because it's a case that part of me wishes it went to court.

It's based on 3 allegations, that the public should know about.

1.  Inappropriate touching- in court, I would play ☐ California Mandatory Child Abuse Reporting video and it would even identify the actual laws. With CPI Autism training to support that training.

    The district official- would need to claim that elbows and shoulders are inappropriate BUT at the same time I've identified (2 events) that by not responding (1 event) resulted in a student in surgery for 15 hours. The other (2nd event) was David Sorenson using physical contact that police responded and asked questions- but if David had not used physical contact the student could have been hit by a car. The school was in a busy traffic area.

    In court, I would make certain the real facts and events were stated for clarification.

    The point that would need to be made - use of physical interventions Vs. no intervention. BUT you have a student in surgery because of the point the district would be forced to defend, no intervention at the bowling alley put a student in the emergency room. Good luck defending that lack of response, I feel it's a real lawsuit.

It is failure to respond. Because it's view of elbows and shoulders is inappropriate. It becomes a larger issue of neglect and safety failures.

Allegation #2: Taking Walks on Campus - the allegation says it more sinister- but no matter how you put it, you would need to explain the job duties of that teacher

205

DPP RECVD 6/28/2023

- and it destroys the entire allegation. The job of the teacher is adult autism- which is performed mostly "off campus."

The allegation is walking secretly - on campus? But, the teacher works mostly off campus. How does that make common sense?

If the job duty of the adult autism teacher is take students off campus on public bus to community work and recreation sites. That's the teachers job duty. Why is preparing and training on campus - to avoid situations like David crossing the street - safety, life and death possible risks - video of individuals with autism walking directly into traffic is on video on YouTube. The risk is absolutely real. AND the district doesn't want its teachers practicing safe work practices. That's exactly what the district would need to defend. No response an no training- after a student ended up in the emergency room. How does the district defend that level of failure?

To be very clear - the allegation has no evidence of anything. It's based on very little, so it's not saying took walks and evidence shows - nothing.

So, far to clearly defend teacher actions with the first two allegations-
1.  The teacher states clearly training and the law authorizes safe and necessary physical contact. You have 2 provable events that can't be hidden. They happened. So, the district would need to defend why they find David should have allowed the student to be hit by a car. And the bowling alley was the appropriate no response, despite the student ending up in surgery for 15 hours.

I would love and pay for this to go into court. How can they defend the facts? Only by leaving the facts out.

Allegation #2 walks... why?

Let's just do word associate allegation - Amber Alert, Elope, IEP 1:1, Accidents, Neglect, Aggression, Common Sense Training.

The district official would be completely incapable of defending why zero response and zero training isn't the exact cause of the bowling alley and 15 hours of surgery.

But, it gets worse for the district to justify-

DPP RECVD 6/28/2023

In these two situations you even have more damaging evidence- from the IEP 1:1 failure to provide staff the teacher emailed over and over to provide. That would remove the idea of inappropriate touching by the teacher- because a staff 1:1 would be doing that job.

Third allegation, the video of students or student doing ? - the district would be required to at least suggest what they even think was being done. And hinting or inventing or thinking up new details- still I'd ask - for evidence.

All I can say for this is we had 1 hour per week if the custodian with the only key to the computer room unlocked that room. We had 1 hour. And in that one hour we had 10 people. It was only 1 hour they could use it. Not alone. Not free access. All of the students were allowed only one weekly opportunity- that only the custodian had the key.

As for what - we used it for - cooking, laundry, bus maps, music, recreation and Autsim learning purposes.

The real question here would come down to - what inappropriate evidence exists - against the teacher?

1. Inappropriate touching, what evidence?
2. Taking walks on campus, what wrong action?
3. Video and technology used, what wrong doing?

This would absolutely need to be clearly proven in court. We just feel like it might be wrong thinking... and may not stop a multi-million dollar lawsuit with zero evidence OR worse actual evidence destroys the district actions. I want court. I don't see how this situation can be explained. I just don't see it.

My legal case - all it requires to support it - is the two events of the bowling alley and David Sorenson crossing the street and police involved- with many Witness that were not included. Those two events support - necessary physical prompts, safety training walking on campus, and I'm not even sure what is the allegation with the video- it could be cooking or shopping- so defend what exactly, computers exist, technology is real? I'm not getting that one. So, two allegations that will do serious damage to the district for no response and no training. I want court.

DPP RECVD 8/28/2023

Committee Review Document for Re: 2-407288960

From: Konrad Stimson

Last school year 2021-2022, I was one of two Adult Autism teachers at Milpitas.

My job was adult autism life skills training, we used the public bus to visit work sites in the community, 9am to 11am we would be off campus, taking students to work sites (Walgreens, Walmart), recreation (library, mall, restaurants) and teaching independent life skills, cooking 1:1.

Part of why I described my job - the allegation was I was on campus taking walks. My job was taking students off campus every day. It's not in the report.

Based on the Allegations. It appears 3 things were reported.

I was seen touching inappropriately - I asked specific what that meant - I hope the committee asks the same questions - what does inappropriate mean?

I was seen touching elbows and shoulders.

If you look at the allegation it is - one sided. It is left very general and open, without clear detail. I believe that is to be malicious and deceitful and on purpose.

I believe it is easy to identify false statements from true ones, based on detail- it is difficult to show proof in favor of a lie and that's when little is shared, but if you tell the truth- you can be very detailed and evidence exists, like medical records.

A potential lawsuit was at risk after a bowling alley incident. I believe that's the cause of the allegations. A student ended up in surgery after a fall and ball landed on his hand. I also told the district, I believed it was preventable. This happened in 2021 four months before my allegations.

It is my understanding 3 people made comments about me, but I had witnesses that I wanted involved, you will not see that in the report. One sided report.

## Danette C. Rugg

**From:** Konrad Stimson <konrad.stimson@gmail com>
**Sent:** Friday, May 13, 2022 10:38 AM
**To:** Steve Ngo; Jonathon Brunson
**Subject:** Math is White Racist

**CAUTION:** External E-Mail:

Good afternoon,

I told you how one argument Ms Fran and I had about her being happy she did not need to pass a Math exam to become a special education teacher.

To explain further, YOUR interview seems to be a strategy of weaponize my required job duties against me. CPI. Working outside the classroom.

Math would be an easy and well-known, state changes, because some are seeing Math as white racist. My point in court would be - you crazy real racists - take things like Math, like CPI, like work required duties and weaponize against white male teachers.

You defend and promote- failure. Surgery, and not being good at one's job, poor judgement on why to investigate and what is truly abuse - surgery vs shoulders

You purposefully weaponize logic and duty to be bad while real violence, crime, inflation- (that's the new good 👍)?

Respectfully
Konrad St mson

DPP REC'D 06/23/2022

## Danette C. Rugg

| | |
|---|---|
| **From:** | Steve Ngo |
| **Sent:** | Wednesday, June 22, 2022 3:56 PM |
| **To:** | Danette C. Rugg |
| **Cc:** | Stephanie A. Arwick |
| **Subject:** | FW: Just Waiting Copy Interview |
| **Attachments:** | download.png |



**Steve Ngo | Attorney at Law**
2001 North Main Street, Suite 500, Walnut Creek, CA 94596
T: 925.953.1620 F: 925.953.1625

CONFIDENTIALITY NOTICE. This electronic mail transmission may contain privileged and/or confidential information only for use by the intended recipients. Unless you are the addressee (or authorized to receive messages for the addressee), you may not use, copy, disclose, or distribute this message (or any information contained in or attached to it) to anyone. You may be subject to civil action and/or criminal penalties for violation of this restriction. If you received this transmission in error, please notify the sender by reply e-mail or by telephone at (800) 445-9430 and delete the transmission

**From:** Konrad Stimson <konrad.stimson@gmail.com>
**Sent:** Wednesday, May 11, 2022 7:01 AM
**To:** Jonathon Brunson <jbrunson@musd.org>; Steve Ngo <sngo@lozanosmith.com>
**Subject:** Just Waiting Copy Interview

CAUTION: External E-Mail:

Good morning,

My misconduct, and your legal case against me - did you seriously base this on - a preschool song? 🎵 🎶 Head, shoulders, knees and toes? If I present pictures of CPI. As well as identify how many students were injured by me - zero.

And, between Dave and his paras working alone with students in the community, that Afirm Modules Autism website with exercise as a research based intervention strategy, and just common sense like when exactly did walking with a student become a crime? Never.

Please - ⚖ - tell me that's not your entire allegations and reason for attacking me? A preschool song 🎵 and walking 🧍 🧍 with students? Please provide the copy of our interview.

Thank you 💗 ⚖
Konrad Stimson

1

DPP REC'D 06/23/2022

understand our job), issues relating to discrimination and hostile work that took place between staff (not me) but supports I was just the "new" white target.

You have not informed me after new evidence was offered that you could check does Dave and his paras work alone with student or students. Unless you plan to ignore huge facts. What 50-75% of your Interview completely destroyed. 😵 If you edit the recording, you would need to remove most of it or leave your questions focused on - why do you, do your job duties? It's my job. I have the training and paras don't. I have a credential and staff don't. Dave - police and Ruby - Surgery. And, you ask why did I take walks with students alone? Safety.

Respectfully
Konrad Stimson

2

DPP REC'D 06/23/2022

**MILPITAS**
UNIFIED SCHOOL DISTRICT

1331 E. Calaveras Blvd. | Milpitas, CA 95035 | 408-635-2600 | www.musd.org

May 20, 2022

**By Personal Delivery & Email: konrad.stimson@gmail.com**

Konrad Stimson
510 E. El Camino Real
Sunnyvale, CA 94087

Re:    **NOTICE OF CONFIDENTIAL INFORMATION**
(May 10, 2022 Recorded Interview of Konrad Stimson)

Mr. Stimson:

You requested a copy of your recorded interview conducted on May 10, 2022, as part of the Milpitas Unified School District's investigation into allegations of misconduct against you ("May 10 Recording").

PLEASE TAKE NOTICE that several times in the May 10 Recording, the District's interviewer and you mentioned sensitive and/or confidential information about third-party minors. Specifically, you mentioned students' names, as well as references to their Individualized Education Programs at least five (5) times during the interview. Additionally, in the May 10 Recording you discussed information about students' conduct, behaviors, and disabilities. Such foregoing information is subject to protection under Education Code section 49076 and the State Constitution. (Cal. Const., art. I, § 1.)

PLEASE TAKE FURTHER NOTICE that given the statutory and constitutional protections which may apply to the information contained in the May 10 Recording, impermissible disclosure and/or sharing of which could constitute an unwarranted invasion of personal privacy.

YOU ARE HEREBY FURTHER NOTIFIED that nothing in this Notice is intended to deter, prohibit, or otherwise restrain you from sharing the May 10 Recording with your union representative or attorney, and or their agents, and for any other lawful reason.

**ACKNOWLEDGMENT OF RECEIPT OF**
**CONFIDENTIAL STUDENT INFORMATION**

I, _____Konrad Stimson_____ (insert name), certify that I have read the Milpitas Unified School District's Notice of Confidential Information, above, which explained the confidential, sensitive information regarding third-party minors in the May 10 Recording that I have requested and will receive upon my signing of this Acknowledgement of Receipt of

**Subject:**                          Letter of Reprimand, Response

---------- Forwarded message ---------
From: **Konrad Stimson** <konrad.stimson@gmail.com>
Date: Fri, May 20, 2022 at 9:52 AM
Subject: Letter of Reprimand, Response
To: Jonathon Brunson <jbrunson@musd.org>

May 20, 2022

Mr. Brunson falsified and failed to investigate the full facts. His report leaves out several witness district statements.

Dave Sorenson and staff take student or students on and off campus as part of their daily activities require. In order to work at multiple community job sites and recreation activities. Each staff may have one or more students for several hours.

No evidence of any recording in the computer lab was discovered by this investigation because no recordings took place by Mr. Stimson.

Mr. Stimson did not trust staff as a direct result of a student ending up in surgery due to her direct failure as a 1:1 staff. The district promoted the staff and she had a meeting with HR for higher pay. Bad relationships were a major factor in this investigation.

The only touching that took place was CPI training pictures were provided multiple times to Mr. Brunson as a direct result of falsifying his report. Mr. Stimson will seek legal counsel against his report and discrimination.


Respectfully
Konrad Stimson

Case 2:26-cv-00393-DJC-CKD   Document 1   Filed 02/12/26   Page 259 of 262

MILPITAS
UNIFIED SCHOOL DISTRICT

Brunson, Jonathon <jbrunson@musd.org>

## Investigation/Observation

1 message

**Lillard, Stacey** <slillard@musd.org>                                   Tue, Apr 19, 2022 at 10:36 AM
To: "Brunson, Jonathon" <jbrunson@musd.org>, Mary Jude Doerpinghaus <mdoerpinghaus@musd.org>

On Friday, March 25, I met with the classroom paraeducators to address concerns about Mr. Stimson's actions that involved two female students. The staff members, Ruby and Francesca, both shared concerns regarding Mr. Stimson's inappropriate physical contact with a student, ▓▓▓, who is non-verbal. Reportedly, Mr. Stimson prefers to work with ▓▓, rather than assigning one of the female staff members to work with her. During the investigation, staff shared that they always ensure that ▓▓ is accompanied to the restroom by one of the female staff, without Mr. Stimson. However, Mr. Stimson often makes efforts to isolate ▓▓ from the rest of the group/staff by taking her for walks around the building. These walks involve areas that are not visible by other staff at all times, and therefore, there is some concern around what may be taking place while Mr. Stimson and ▓▓ are not in a visible area. Reportedly, the length of the walks occur from 15-20 minutes. Mr. Stimson has been observed to hold his arm around ▓▓ waist area during walks around the building and in other areas in the community. Mr. Stimson also touches and rubs her back and shoulder area in a manner that makes staff feel uncomfortable. Mr. Stimson rubs her arm and back area while she is working or standing near him.

In addition, another very concerning event which involved another student, ▓▓▓▓, was also shared by Francesca. Reportedly, Mr. Stimson asked the staff to return to the classroom while he worked with the students in the computer lab. Francesca walked into the lab and observed Mt. Stimson with the video camera on, while recording ▓▓▓▓, a student. Once the teacher noticed Francesco entering the room, he started to turn the camera off and disconnected the equipment. ▓▓▓▓ is verbal, however her communication is not age/grade level appropriate and she is unable to maintain a lengthy conversation without digressing off topic or engaging in repetitive speech.

I also decided to join Mr. Stimson's class on the Friday outing on 3/25. I joined the class at the Great Mall in Milpitas where I noticed the students sitting in the food court while eating their lunch. Mr. Stimson was seated directly next to ▓▓▓, with his arm resting on the bench directly behind ▓▓▓. The other staff members were either sitting next to or across from students without their arms positioned closely or around students.

—
Stacey Lillard
Coordinator, Special Education and Student Services
408-625-2600 x 6049

"Your story is what you have, what you will always have. It is something to own"
Michelle Obama

214

DPP REC'D 06/23/2022

**MILPITAS**
UNIFIED SCHOOL DISTRICT

Brunson, Jonathon <jbrunson@musd.org>

## Fwd: Inappropriate behavior of Mr. Konrad

1 message

Lillard, Stacey <slillard@musd.org>
To: "Brunson, Jonathon" <jbrunson@musd.org>, Mary Jude Doerpinghaus <mdoerpinghaus@musd.org>

Tue, Apr 19, 2022 at 9:33 AM

Statement from Ruby.
———— Forwarded message ————
From: De Leon, Ruby <rdeleon@musd.org>
Date: Mon, Apr 4, 2022 at 1:13 PM
Subject: Re: Inappropriate behavior of Mr. Konrad
To: Lillard, Stacey <slillard@musd.org>

*Same date*

It was about late November when the teacher, Mr. Konrad started taking ▇▇▇▇ for a walk by themselves.without informing the class of his whereabouts. This became a routine for the teacher and the said female student. ( ▇▇▇▇ ) At first we didn't mind what he was doing until ▇▇▇▇▇▇▇▇, an old returning student finally decided to come to school face to face. This time, he turned his attention to ▇▇▇. I have observed that he was too close to her to the extent of putting his arms on the waist of ▇▇▇ and rubbing her shoulder like a baby.

The teacher made this a routine that whenever we went, he was always with ▇▇▇, even inside the bus. He also gives ▇▇▇ a walk by himself alone without letting the class know.

We all know that these behaviors shown by the teacher is not appropriate and therefore be given proper attention.

Thank you and God bless!

—
Stacey Lillard
Coordinator, Special Education and Student Services
408-625-2600 x 6049

"Your story is what you have, what you will always have. It is something to own"
Michelle Obama

Case 2:26-cv-00393-DJC-CKD    Document 1    Filed 02/12/26    Page 261 of 262

**MILPITAS** UNIFIED SCHOOL DISTRICT

Brunson, Jonathon <jbrunson@musd.org>

## Fwd: Mr. Stimson's inappropriate behavior
1 message

**Lillard, Stacey** <slillard@musd.org>

Tue, Apr 19, 2022 at 9:34 AM

To: "Brunson, Jonathon" <jbrunson@musd.org>, Mary Jude Doerpinghaus <mdoerpinghaus@musd.org>

Statement from Francesca

———— Forwarded message ————
From: **Berardi, Francesca** <fberardi@musd.org>
Date: Mon, Apr 4, 2022 at 12:52 PM
Subject: Mr. Stimson's inappropriate behavior
To: Stacey Lillard <slillard@musd.org>

*same date*

Dear Ms. Lillard,

I hope this email finds you well. I am writing to you concerning the inappropriate behavior of Mr. Stimson towards our students, in particular the female students.

I have noticed Mr. Stimson wrapping his hands around ▇▇▇ ▇▇ (non-verbal special ed student) waist and lower back at all times when walking around the Milpitas sport center field track and when out in the community. I have also noticed how Mr. Stimson has been refusing to allow us female TA's handle ▇▇▇▇.

I have also noticed how Mr. Stimson has invited on a daily basis another female student, ▇▇▇▇▇▇▇▇. He is usually taking 15 to 20 minutes walks only and exclusively with this student and nobody else of the school staff or other students from the special education program.

In addition to all this, a month ago on a Thursday afternoon at around 12:45 pm I found Mr. Stimson in the computer lab sitting in the row in front of ▇▇▇ ▇▇▇▇ and I found that he was video recording ▇▇▇▇▇▇.

Thank you for your attention!

Ms. Francesca Berardi

--
Stacey Lillard
Coordinator, Special Education and Student Services
408-635-2600 x 6049

"Your story is what you have, what you will always have. It is something to own"

DPP REC'D 06/23/2022

216

| From: | Konrad Stimson |
|---|---|
| To: | Kumar, Arti |
| Subject: | Konrad Stimson |
| Date: | Sunday, May 21, 2023 3:03:55 PM |

Good afternoon,

I wanted to share what I would present if a real investigation had taken place.

1. (The video concern) I attached AFIRM Autism Training Modules to this email, the list below the pink are Training titles. You will find video included in the Autism Training Modules.

2. As I stated before, inappropriate touching - should ethically- identify what that means, it should say elbow and shoulders. If review of the students IEP FAPE services page was investigated - you would see 1:1 support, that happens when a student has a proven need, such as Eloping and grabbing other people.

3. The taking walks on campus is just confusing- when my job was taking a student to Walmart, Target, Safeway, and off campus.

4. As I stated this was not an investigation, by reading the statement, I'm not disputing walking, using technology listed in AFIRM, nor do I dispute the Keenan approved legal protection and laws, as well as CPI training, that outright supports physical prompts.

I dispute wording and leaving out information.

5. The leaving out information- touching elbows, leaving out- job duty work sites off campus using the bus, leaving out- Autism Training Modules.... I definitely dispute the leaving out and wording. Reading the statement is very clearly one sided. That should be obvious. If the idea was full disclosure- why leave out several supporting facts and details on my side.

AFIRM explains video training.
Walking on campus - the job involved off campus work sites. Eloping and Missing Person.
Touching- Keenan. Mandatory Child Abuse Training reporting video and CPI training both support my decisions.

6. It is very important to not leave out the investigation process, and how that was outright violated multiple ways.

This investigation process went a lengthy period of time, rather than report one incident the first time concern came up - you identify in the report I was seen inappropriately touching. And the follow up was collecting he takes walks on campus and he used video (of what?), the report is left so lack of detail which is why no civil or criminal case was ever identified to my knowledge. And, based on the process - it would mean, event after event had no response, Keenan shows clear ways of procedures - that failed here. The student rights, my rights, conpletey violated.

I have reviewed Keenan and single event are to be reported to police within a specific number of hours to be done? Why wasn't it? If you consider touching inappropriate, so that